## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 22-cr-20191-KMW

**UNITED STATES OF AMERICA,**

**vs.**

**ANDREW ALTURO FAHIE,**

     **Defendant.**

_____/

## RESPONSE IN OPPOSITION TO
## MOTION TO REVOKE BOND

Andrew A. Fahie, through his undersigned counsel, hereby responds in opposition to the

Government's Motion to Revoke Bond. (D.E. 23). (the "**Motion**"). As grounds for his opposition,

Mr. Fahie responds as follows:

## PROCEDURAL BACKGROUND

1.       Mr. Fahie was arrested in Opa Locka, Florida in the Southern District of Florida on

April 28, 2022 and was charged by complaint with conspiracies to import a controlled substance

into the United States and launder money. (D.E. 1).

2.       Mr. Fahie had his Initial Appearance on April 29, 2022 at which time the

Government requested that he be detained pending trial.  The Magistrate Judge set the detention

hearing for May 4, 2022 and entered its Due Process Protections Act Order requiring the

Government to disclose all exculpatory evidence and the Government's duty to disclose "any

evidence that goes to negating the defendants guilty, the credulity of a witness, or that would

reduce a potential sentence.  The defendant is entitled to this information without a request.  Failure

to disclose exculpatory evidence in a timely manner may result in consequences, including but not

1

limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary actions or sanctions by the Court." (D.E. 5)

3.      The Government's request for pretrial detention was heard before the Court on May 4, 2022. After reviewing the record, including the Government's Motion for Pretrial Detention (D.E. 9), hearing the arguments of counsel and the evidence presented, the Court denied the Government's request for pretrial detention and set a bond more particularly described below. (D.E. 12). A Transcript of that proceeding has been provided to the Court and counsel, albeit not in compliance with the timeliness requirements of Local Magistrate Judge Rule 4(a)(2). A true and correct copy of the transcript is annexed hereto as "Exhibit A." (the "**Transcript**").

4.      The bond requires Mr. Fahie to post a $500,000.00 corporate surety bond with a *Nebbia* condition; Mr. Fahie is to be under house arrest and reside with his two adult daughters, both of whom are United States citizens, at their rented apartment in the Southern District of Florida; each daughter was required to surrender all travel documents;[1] Mr. Fahie's wife, Shelia Fahie, was permitted to travel for the purposes of her employment and is to advise the Court's pretrial services of such travel needs and to surrender her passport when not traveling for purposes of those needs; Mr. Fahie is to remain under 24 hour a day lock down at his daughters' residence, is to wear a GPS monitoring device, with exceptions only for medical needs, court appearance and consultation with counsel.[2] The Court rejected Mr. Fahie's request to be permitted to be relieved from lock down for purposes of attending religious services. Mr. Fahie does not appeal that rejection. Transcript at 43-47.

---

[1] The undersigned took possession of all such travel documents the evening of May 4, 2022. As such, even though the terms of the bond were stayed – and remain so – Mr. Fahie's daughters did not travel to the Virgin Islands on May 5, 2022 to attend their aunt (Mr. Fahie's sister) funeral.

[2] While not expressly stated in the bond, Mr. Fahie understands that such exceptions to the 24-hour lock down must be preceded by notice to the Court's Pretrial Services.

2

5.      The Court did **not** consider Mr. Fahie's previously noticed intent to seek **jurisdictional** immunity based on his then position as a high-ranking government official and/or head of Government of the Virgin Islands, an Overseas Territory of the Kingdom of Great Britain and Northern Ireland (the "**BVI**").

6.      The Government made an *ore tenus* motion to stay the bond pending their anticipated appeal, which request was granted without objection.  Transcript at 49-50.

7.      The Government timely filed its Notice of Appeal on May 5, 2022. (D.E. 15).  The Motion to Revoke Bond followed on May 11, 2022. (D.E. 23) (the "**Motion**").

8.      A three (3) count indictment was returned on May 10, 2022 charging Mr. Fahie and others with conspiracy to import in excess of five (5) kilograms of cocaine into the United States; conspiracy to launder the proceeds of a specified unlawful activity; and attempted importation of in excess of five (5) kilograms of cocaine into the United States.  (D.E. 21).  The cocaine related allegations, if proven, call for a mandatory minimum sentence of ten (10) years' incarceration.

9.      The matter has been set for hearing on May 19, 2022 at 9:00 a.m. before the Honorable Kathleen Williams, United States District Judge for the Southern District of Florida. (D.E. 24).

10.     Since at least May 3, 2022, undersigned counsel has requested copies of the recordings on which the Government basis its allegations.  To date, no copies have been provided. Despite a request, the Government cannot provide **any** approximation of the total number of hours of recordings in this matter.  No transcripts of the recordings in this matter, which began in October 2021, have been prepared.

11.     Mr. Fahie is currently housed at the FDC in Miami, Florida.  Mr. Fahie is currently housed in the general population having been released from the Special Housing Unit where he was, presumably, held pending completion of this Covid related quarantine.

12.     Covid related restrictions at FDC limit the availability of attorney client meetings to a single hour per day, Monday through Friday, from 7:00 a.m. through 2:00 p.m.[3]  There are limited attorney visitation rooms (6) equipped for review of the type of evidence in this case.  On Friday, May 13, 2022, the undersigned was informed by personnel at FDC that Covid cases at FDC were rising, and that family visitations had been suspended as a result.

13.     The FDC Miami website as of May 16, 2022, reflects that "All visiting at this facility has been suspended until further notice." Nothing in the website clarifies if such a suspension also applies to legal visits, but upon information and belief at this time legal visits are still permitted under the strictures (at least) set forth above.

## ARGUMENT

14.     The Government contends that it has established that Mr. Fahie is a risk of flight as well as a danger to the community.

15.     Not surprisingly, the Government touts as gospel its version of the events and what transpired during the referenced meeting.  In doing so, however, the Government's representations gild the lily based on the scantly available direct evidence.

16.     The Government claims that Mr. Fahie is charged with a crime "involving thousands of kilograms of cocaine and millions of dollars."  Motion at 1.  That statement is not accurate as it suggests that such cocaine or monies actually existed.  This arrest is a result of a ruse

_____

[3] In noting the restrictions in place at FDC, the undersigned does not take a position regarding the necessity of such restrictions in light of the on going, and currently spiking, Covid related cases in the Southern District of Florida.  Rather they are relevant here owing to the adverse impact they have on the reasonable and timely ability to prepare a defense.

and a sting operation.  To be sure, conspiracy to violate such laws can exist even where there is no cocaine or money.  Yet, as he stands before the Court he is presumed innocent, a presumption that cannot be understated nor disproven until the Government produces its evidence.

17.     The Government touts the statutory presumption of risk of flight because of the "quantity" of the amount of cocaine it set in its sting.  If the Government's argument on this score were taken to its logical conclusion, all the Government needs in **any** sting operation is to mention a quantity of more than five (5) kilograms of cocaine (or the triggering amount of any other substance) and it enjoys the statutory presumption.   In essence, the Government can thus manipulate the statutory presumption by simply structuring its ruse to an amount in excess of the triggering amount.  For that reason, alone the statutory presumption should be given less weight in the case of a sting than in a case of a substantive offense involving actual importation.

18.     The Government argues that Mr. Fahie has a "compelling reason" to flee.  Mr. Fahie has, in fact, a more compelling reason to fight these allegations wherever they are mounted. Simply by virtue of this arrest and the Government's allegations, he has been stripped of his position as the Premier of the BVI.

19.     The Government touts Mr. Fahie's travel record as evidence of his predisposition to flee.  This ignores, as the Government well knows, the fact that the overwhelming majority of such travel, primarily in the Caribbean, was related to official business undertaken by Mr. Fahie in his previous role as the Premier of the BVI.

20.     The Government argues that Mr. Fahie has a disregard for the law and connections and the ability to flee.  The "disregard" for the law assumes that the Government's case is proven. At this juncture, he enjoys the presumption of innocence and there has been no evidence outside of this case to support the Government's allegation of a habitual disregard for the law.  As to the

Government's allegations of "connections", we can only assume it means the alleged unnamed trafficker the Government refers to in its Motion.  Again, we are required to take the Government's word on several levels.  First, that Mr. Fahie made the statements the Government attributes to him.  Second, that this unidentified (but known to the Government) individual is, in fact, a trafficker and finally that whoever this person is in a position to, or even willing to assist flight – even were Mr. Fahie disposed to seek such assistance which he is not.  Motion at 4.

21.     These points would have less concern were it not for some of the discrepancies in the Government's Motion.  For example, the Motion discusses the origin of the sting operation as taking place after several meetings with Lebanese Hezbollah operatives in the BVI.  According to the Motion, "[m]embers of that group agreed to assist the CS by facilitating introductions to senior members of the BVI government who could offer protection for the CS's activities, **including Defendant Fahie**…" Motion at 2-3.  The Complaint, however, paints a different picture.  "The Lebanese Group agreed to assist the CS by facilitating introductions to senior members of the BVI government who could offer protection to the CS's activities, but would require payment for their assistance.  A member of the Lebanese group told the CS that he would approach the **head of security for Andrew Fahie** and try to set up a meeting."  Complaint at ¶5.  The alteration is slight, but significant.  Now the Government asserts in its attempt to revoke Mr. Fahie's bond that it was he, not the head of his security, who had some association with these alleged Lebanese Hezbollah members.  The Government offers no evidence, or explanation, as to this change in its narrative.

22.     The Government, without evidence, asserts that there are persons in Mr. Fahie's "orbit" who are willing to "procure his freedom from prosecution."  Motion at 15.  This is, at best, an outrageous claim for the Government to make based, exclusively, on a press report.  Motion at

9, fn 1. Several points need to be clarified for the record, and apparently for the Government's understanding.

23.     First, Mr. Fahie has never sought "immunity" from prosecution as represented by the Government.   Motion at 6. ("Early in the hearing, the Defendant noted his request for immunity, which had previously been filed with the Court.")  Rather, and as specifically noted in the record and as the Government well knows, Mr. Fahie asserts immunity in this Court based on personal jurisdiction.  Transcript at p. 5, lines 4-6.  The question raised in a personal jurisdiction challenge then is not whether the allegations of illegal activity are proven but rather the forum in which such allegations should be resolved.

24.     Second, the document referred to by the Government that claims "unauthorized immunity" for Mr. Fahie is a diplomatic note sent to the United States by an official of the Government of the BVI.  (D.E. 10, Exhibit A).  Whether submission of the diplomatic note was authorized as a statement of the Officer of the Premier (which Mr. Fahie was at the time) is a matter beyond the undersigned's knowledge, but one thing is certain – it is not material to the bond determination as specifically and repeatedly noted by the Magistrate Judge.

25.     Moreover, as the Government well knows, the diplomatic note frankly deals with matters that are either not contested (that Mr. Fahie was the Premier of the BVI including until the time of his arrest and until May 5, 2022 when he was summarily removed as a result of these allegations) **or,** respectfully, not legal relevant to the question of immunity as a high ranking official relative to personal jurisdiction.  For example, the note states that it is the position of the Premier's Office that Mr. Fahie held such immunity at all times relevant.  While the question of whether, and to what extent immunity from arrest and detention would apply in this case is complicated under U.S. law, it is clear that the relevant inquiry is not, respectfully, whether the

Office of the Premier asserted or waived immunity, because the Government of the United Kingdom, not the BVI, is the relevant competent authority to take a position. Transcript at 30.

26.     Finally, and perhaps most importantly, the Government says it does not "currently have evidence showing the Defendant's involvement in the creation of this letter, it is clear that someone is using the power of the Defendant's former office in an attempt to free him from prosecution in the United States." Motion at 15. First, while the Office is no longer Mr. Fahie's, he was the Premier at the time the diplomatic note was authored, as the Government well knows. Second, the Government actually possesses evidence tending to establish that Mr. Fahie did **not** have any role in the note owing to the fact that he had been held in the Special Housing Unit at FDC since his arrest until after the issuance of the note. Transcript at 4, 31. As such, and as the Government well knows, Mr. Fahie was held incommunicado from the outside world save for a brief visit from the undersigned and quite literally had no ability to engage in the supposed activity the Government infers. So the Government's attempts to interject this matter into its attempts to revoke the bond should be seen for what they are, more overreach to bolster its case.

27.     The Government's arguments as to danger to the community are strained and are based on allegations that he did not know but would ask a contact about firearms (hardly a rousing joinder) and that another alleged acquaintance was involved in some movement of firearms "apparently" with the knowledge and acquiescence" of Mr. Fahie. Motion at 11. In short, the Government has nothing but "apparent" knowledge and acquiescence and some supposed agreement to ask a question of a third party – with literally no context in which such statement, if made, was made. This is not clear and convincing evidence of anything, much less that Mr. Fahie is a danger to this, or any other, community. *See Colorado v. United States*, 467 U.S. 310, 316

(1984). (clear and convincing must place the factfinder with an "abiding conviction" that the factual contentions are "highly probable").

## THE BOND WILL ASSURE MR. FAHIE'S PRESENCE

28.     Mr. Fahie can be detained only if there are "no condition or combination of conditions (that) will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(c)(1)(B); *United States v. Price*, 773.F.2d 1526, 1527 (11th Cir. 1985) (*per curiam*).

29.     In a recent case involving production of child pornography and enticement, the same court found that although the alleged activities were heinous and the strength of the Government's evidence was strong, there were still conditions that could be imposed to assure the defendant's presence.  In *United States v. Pake*, 2021 WL 2603759 (June 24, 2021) (Reinhart, Magistrate Judge), the court considered allegations that carried the presumption of flight **and** danger to the community. The *Pake* Court noted fundamental principles that courts must consider when determining whether detention is appropriate, or in this instance reviewing whether the denial of detention is appropriate:

> Most notably, even if there is a risk of nonappearance and/or a risk of danger to the community, detention is only warranted if those risks cannot be sufficiently mitigated by conditions of release.  And those risks need not be mitigated completely.  A person cannot be detained if there are conditions that would *reasonably assure* their appearance and the safety of the community.  The "reasonably assure" standard reflects that Congress recognized that there would be circumstances where, despite conditions of release, a defendant would nevertheless fail to appear as required or would endanger the safety of another.  Given the choice, at the margin, of releasing a dangerous person or detaining a non-dangerous one, Congress chose the former.  The Bail Reform Act of 1984 requires this Court to accept that risk.  Put differently, the Court would not be complying with Congress' intent if it detained a defendant because release conditions could not *ensure* or definitively *assure* the defendant's appearance and the safety of the community.  A defendant is entitled to be released even if there is a residual (but not unreasonable) risk of non-appearance or danger to the community.

30.     Defendant Pako was released on less restrictive general conditions, but more restrictive as to internet access devices in consideration of the underlying allegations.  The *Pako* Court set a $100,000 personal surety bond to be cosigned by his parents and was placed on house arrest with electronic monitoring (not the more comprehensive GPS monitoring ordered as to Mr. Fahie).  The full range of conditions is outlined by the *Pako* Court at page *3 of its order.

31.     Here Mr. Fahie has the most restrictive bond possible, a **corporate** surety bond in the amount of $500,000. Mr. Fahie is to reside under "24-hour lock down" with a GPS monitoring device to monitor, literally, his every movement.  The Government attempts to diminish the tie that Mr. Fahie has to this district in saying that his daughters are merely attending on-line college and post graduate courses.  In truth, the fact that each will not be required to attended classes in Pennsylvania but rather are required by the conditions of their father's bond to stay in the United States underscores the ties to this community.  The Government ignores entirely that both children are citizens of the United States. The Government, oddly, makes short shrift of the ties that a parent has with his children.  As noted during the detention hearing there are fewer stronger bonds, if any. Also noted at the detention hearing was the fact that Mr. Fahie would have to flee to a destination other than the BVI (to avoid prosecution there), which would essentially deprive him of any family connections. Mr. Fahie may only leave the residence for medical, court and attorney reasons.  He may not even attend religious services.

32.     Mr. Fahie's bond, under the stringent conditions imposed, are more than sufficient to assure his appearance and, given the current state of Covid restrictions at FDC Miami, are critical to being able to prepare a defense to this case with all deliberate speed.  The Government's overreaching in its Motion are telling and hint at the realization that in this case, under these conditions, any risk of flight is, at best unreasonable.  Therefore, the policy underlying the Bail

Reform Action of 1984 and the presence of conditions, albeit strict, mandate that the Government's Motion be denied and the stay of the bond be lifted.

For the foregoing reasons, Mr. Fahie respectfully requests that the Motion be denied and respectfully requests this Court to order Mr. Fahie released on the conditions set by the Magistrate Judge or upon such additional conditions as the Court may deem proper.

Respectfully submitted,

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Theresa M.B. Van Vliet, Esq.
Fla. Bar No. 374040
Joyce A. Delgado, Esq.
Fla. Bar No. 1002228
*Counsel for Defendant Andrew A. Fahie*
200 East Broward Blvd., Suite 1110
Fort Lauderdale, FL  33301
Telephone: 954-453-8000
Telefax: 954-453-8010

By: /s/  Theresa M.B. Van Vliet
        Theresa M.B. Van Vliet, Esq.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion has been served upon all parties registered to receive electronic notice via CM/ECF Notification on this 16th day of May, 2022.

By: /s/  Theresa M.B. Van Vliet

# EXHIBIT "A"

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                        CASE NO. 22-MJ-2719-JG
 3
     UNITED STATES OF AMERICA,
 4                                      Miami, Florida
                   Plaintiff(s),
 5                                      May 4, 2022
               vs.
 6
     ANDREW ALTURO FAHIE,
 7
                   Defendant(s).      Pages 1 – 50
 8   ------------------------------------------------------------

 9                         DETENTION HEARING
               TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10            BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
                   UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     FOR THE PLAINTIFF(S):   FREDERIC SHADLEY, ESQ.
13                           UNITED STATES ATTORNEY'S OFFICE
                             11200 N.W. 20th Street
14                           Miami, FL 33172
                             (305) 715-7639
15                           frederic.shadley@usdoj.gov

16

17   FOR THE DEFENDANT(S):   THERESA VAN VLIET, ESQ.
                             GENOVESE JOBLOVE & BATTISTA, P.A.
18                           200 E. Broward Blvd.
                             Fort Lauderdale, FL 33301
19                           (305) 349-2300
                             tvanvliet@gjb-law.com
20

21

22   TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                             Court Reporter
23                           jemancari@gmail.com

24

25
```

1    Thereupon,

2    the following proceedings were held:

3            THE DEPUTY CLERK:  The United States of America v.

4    Andrew Alturo Fahie and Oleanvine Pickering Maynard, case No.

5    22 2719, Goodman.

6            MR. SHADLEY:  Good afternoon, I guess, your Honor.

7    Fritz Shadley for the United States.  With me at counsel table

8    is AUSA Shane Butland.

9            MS. VAN VLIET:  Good afternoon, your Honor.  Theresa

10   van Vliet on behalf of Mr. Andrew Fahie.  It is oddly spelt

11   F-A-H-I-E, pronounced Fahie, as in boy.

12           THE COURT:  OK.

13           MS. VAN VLIET:  Your Honor, I note that there is no

14   one present for Ms. Maynard.  I do have some historical

15   background on that vis-a-vis the events at the initial

16   appearance before Judge Goodman, if you'd like me to put them

17   on the record.

18           THE COURT:  OK.  We will address that.

19           Before we do that, I am informed that there are some

20   members of the press present in court.  Of course, you are

21   welcome, but I want to make sure that you are aware of our

22   local Rule 77.1, which reads as follows:  Other than required

23   by authorized personnel in the discharge of official duties,

24   all forms of equipment or means of photographing, audio or

25   video recording, broadcasting or televising within the

1    environments of any place of holding court in the district,

2    including courtrooms, chambers, adjacent rooms, hallways,

3    doorways, stairways, elevators, or offices of supporting

4    personnel, whether the court is in session or at recess, is

5    prohibited, with exceptions for naturalization and national

6    emergencies.

7         I want to ensure that the members of the press, who

8    are obviously welcome in the courtroom, are aware of this local

9    rule and will agree to abide by it.

10        All right.  Thank you very much.

11        (Matter as to defendant Maynard proceeds)

12        THE COURT:  All right.  So then we have Mr. Fahie.

13        MS. VAN VLIET:  Your Honor, may I just have a moment

14   to finish writing this phone number for Ms. Blair?

15        THE COURT:  Yes.  Yes.  Of course.

16        MR. SHADLEY:  Good afternoon again, your Honor.  Fritz

17   Shadley for the United States.

18        THE COURT:  OK.

19        (Pause)

20        THE COURT:  All right.  Ms. Van Vliet, so you're still

21   temporary, correct?

22        MS. VAN VLIET:  Yes, ma'am, I am.  I've talked to

23   Mr. Shadley and I am going to request that the court give us

24   three more weeks.  I know that the date is May 25th, having

25   been here today too, to have the inquiry re counsel determined.

1          Because of the situation, and I'll get into this

2     later, but Mr. Fahie is in that same observation period that

3     prior counsel in another matter discussed, and he is actually

4     in the SHU, the special housing unit, which makes it even more

5     impossible to get ahold of him or, more importantly for these

6     purposes, making financial arrangements for him to get ahold of

7     anyone else.

8          THE COURT:  Yes.

9          MS. VAN VLIET:  So if we could have that extra time, I

10    would greatly appreciate it so we could try to get it resolved.

11         THE COURT:  All right.  So as it stands right now the

12    preliminary hearing arraignment is set for May the 13th.

13         MS. VAN VLIET:  Yes, ma'am.

14         THE COURT:  You want to push that out, that and report

15    re counsel, to May 25th.

16         MS. VAN VLIET:  Yes, ma'am.

17         THE COURT:  Any objection?

18         MR. SHADLEY:  No, your Honor.

19         THE COURT:  All right.  So that's been pushed out to

20    May 25th.

21         So then the matter before us right now is the

22    government's request for detention hearing.

23         Now, I would like to ask regarding this notice of

24    immunity and government's response, notice of invocation of

25    immunity, government's response, is this something that is

1    being presented to me to address before proceeding on the

2    detention hearing or is this something that a motion to dismiss

3    will be filed eventually once an indictment is returned?

4           MS. VAN VLIET:  Both, your Honor, because it is a

5    personal jurisdiction basis.  So it has to be raised in the

6    first instance.

7           I fully admit that, and don't expect -- I mean, it is

8    a very complicated matter, issue, I believe.  I don't

9    necessarily think that the court, given the quick pace at which

10   things are going, would have necessarily the time to rule on it

11   today.  But certainly I have to raise it today or it may be

12   deemed waived.  Certainly it will also be the subject of

13   additional motion practice later and through down the road.

14          THE COURT:  So everything that we do would be subject

15   to your notice of invocation of immunity which then you can

16   keep pursuing whether by way of dismissal of the indictment or

17   requesting a hearing and so on, but we do need to get on with

18   the detention hearing, correct?

19          MS. VAN VLIET:  Yes, your Honor.

20          Some of the things I am going to address when we get

21   to the point of time of argument will relate to those things,

22   but I am also, candidly, to show my hand, am going to, while

23   reserving all rights under that notice and invocation that I've

24   made, I am going to, if you will, suggest an off-ramp for

25   purposes of the detention today and a condition, a series of

1    conditions of bond, actually, that are a little more onerous

2    than those suggested by Pretrial Services in this situation

3    because I recognize it is a unique situation.

4              THE COURT:  All right.  Have you had any discussions

5    with Mr. Shadley to see if there is some kind of agreement on

6    this proposed off-ramp?

7              MS. VAN VLIET:  I have had several conversations with

8    him, and to date the government is unwilling to agree.

9              THE COURT:  I see.  OK.  So we will go forward as a

10   regular detention hearing and you can raise all of the

11   arguments, including preservation of your notice of invocation

12   of immunity.

13             MS. VAN VLIET:  Thank you, ma'am.

14             THE COURT:  All right.  So then I did receive the

15   government's -- where is it?  Where did it go?  Here we go --

16   government's motion for pretrial detention.  I did get the

17   opportunity to review it.

18             We will start with the government's proffer to make a

19   record of, I suspect it will be along the lines of the motion,

20   but let's hear from you, Mr. Shadley, and then you will have an

21   agent?

22             MR. SHADLEY:  Yes, your Honor.  I have an agent

23   present.

24             THE COURT:  All right.

25             MR. SHADLEY:  Before delving into the detention issue,

1    just to briefly discuss, as outlined in our response to the

2    notice of invocation of immunity, this defendant is not

3    entitled to immunity.

4            THE COURT:  Right, but I'm not deciding that now.

5            MR. SHADLEY:  Understood, your Honor.

6            THE COURT:  Ms. Van Vliet said the issues are

7    complicated.

8            MR. SHADLEY:  I agree.

9            THE COURT:  So for that reason I said that whatever

10   decision is made is subject to Mr. Fahie preserving that

11   objection.

12           MR. SHADLEY:  Understood, your Honor.  I was

13   articulating that position in case relevant to future arguments

14   related to detention.  I will raise that at the time --

15           THE COURT:  Yes.

16           MR. SHADLEY:  -- if articulated by Ms. Van Vliet.

17           THE COURT:  Exactly.

18           MR. SHADLEY:  As noted in our motion and apparent from

19   the complaint, your Honor, the defendant faces two charges

20   here -- conspiracy to import controlled substances in the

21   United States, 5 kilograms or more of cocaine, and conspiracy

22   to launder money.

23           The guidelines range for those offenses, first of all,

24   the drug conspiracy carries a ten-year mandatory minimum

25   sentence.  The guidelines range, without enhancements for the

1  drug crime, is 235 to 293 months.  With a leadership

2  enhancement or an abuse of public trust, given this defendant's

3  role, the guidelines range would be 360 months to life.

4  I will note before proceeding to the factual proffer

5  that this is a presumption case due to the probable cause that

6  the defendant committed a violation of the Controlled

7  Substances Import and Export Act, and that offense carries a

8  sentence of greater than ten years.  The court is statutorily

9  required to presume, subject to rebuttal, that detention is

10  required here.

11  Getting into the factual basis, I will note for the

12  court that due to the nature of this offense it is a long

13  factual basis and I will be incorporating and relying on both

14  the complaint affidavit and the factual portion of the

15  government's motion for pretrial detention.

16  THE COURT:  Right.  As I said, I have reviewed it and

17  it is part of the record, but just to make sure that the

18  hearing record is complete, if you could just, in an

19  abbreviated fashion, state your grounds.  I believe you're

20  traveling under both risk and danger?

21  MR. SHADLEY:  That's correct, your Honor.

22  THE COURT:  So if you could state your grounds that

23  support those in terms of the factual proffer and then I'll

24  hear your argument.

25  MR. SHADLEY:  Of course, your Honor.  I will provide a

1   brief summary of the facts --

2             THE COURT:  Yes.  Thank you.

3             MR. SHADLEY:  -- instead of regurgitating everything

4   that's been filed.

5             So beginning in October of 2021, a DEA confidential

6   source began meeting with individuals on the Island of Tortola

7   who were engaged in drug trafficking and money laundering.  The

8   CS expressed a desire to use the island as a transshipment

9   point for cocaine that would be coming from Colombia through

10  the island into Puerto Rico and then here to Miami.

11            Those individuals expressed the ability and desire to

12  put the confidential source in touch with political leadership

13  on the Island of Tortola, including the director of ports,

14  Ms. Maynard, the codefendant here, and the Premier of the

15  island, Mr. Fahie, the defendant before us now.

16            Between the months of March and April of 2022, the CS

17  met and communicated with Mr. Fahie and Ms. Maynard and

18  Ms. Maynard's son, Kadeem Maynard, on multiple occasions.

19  Those occasions and telephone calls were audio or audio and

20  video recorded by the confidential source.

21            During those meetings and calls, the CS informed the

22  defendant that he was a member of the Sinaloa Cartel and he

23  wished to transport thousands of kilograms of cocaine from

24  Colombia through Tortola to Puerto Rico with the destination of

25  Miami and then New York.

The defendants, including Mr. Fahie, agreed to help import cocaine into Puerto Rico and then Miami by carrying out the following acts, among others:  First, by providing businesses the CS could use as cover for the drug transport; second, by providing the CS with licenses needed to assure safe passage for his cocaine through the BVI; third, by accepting bribes to assure that the CS's shipments would not be stopped by law enforcement in the BVI, including initial bribes of $10,000 to Ms. Maynard and $20,000 to Mr. Fahie; agreeing to accept future bribes to ensure the continued success of their drug trafficking venture; arranging bribes to another BVI government official, who I will refer to throughout this presentation as Government Official 1, so that that individual would not interfere with their drug trafficking activity; securing access for the CS through the BVI's ports and airports; arranging to receive payments from the CS through bank accounts, businesses, or cash deliveries via plane and boat; and eight, arranging for fake seizures of bad cocaine by the government of the BVI to ensure that the real cocaine shipments would not attract unwanted attention.

The defendants ultimately agreed that the first shipment of cocaine, 3,000 kilograms, would come through the BVI during early July 2022.  Then they agreed to coordinate two shipments of 3,000 kilograms of cocaine every month for a period of four months.

1    In sum, the conspiracy involving Mr. Fahie and

2  Ms. Maynard and Kadeem Maynard then would total 27,000

3  kilograms of cocaine.  Based on the Miami market price for

4  those kilos of cocaine, they would then agree to launder back

5  to the BVI tens of millions of dollars.

6    As an initial payment for their role in the

7  conspiracy, Mr. Fahie and Ms. Maynard planned to accept

8  $700,000 in cash during a trip to Miami on April 28, 2022.

9  That payment included $500,000 for Mr. Fahie and $200,000 for

10  Ms. Maynard.  They would later be paid approximately 10 percent

11  of the drug sales in Miami for each shipment, or roughly $7.8

12  million per load.  In addition, they would receive 2 percent on

13  and in order to pay for expenses on the island, including

14  additional bribes.  The defendants agreed to this payment

15  structure.

16    There were a series of meetings, as noted, throughout

17  the months of March and April of 2022 between Mr. Fahie,

18  Ms. Maynard, Kadeem Maynard and the confidential source, who

19  presented himself as a member of the Sinaloa Cartel.

20    I have a long written factual proffer that describes

21  each of those meetings, but I won't bore the court with that

22  now as that has previously been submitted into the record and I

23  incorporate that by reference now.

24    I will note, though, that throughout the defendant in

25  his own words in recorded conversations referred and discussed

1   connections with nefarious criminals or individuals throughout

2   the world.  This included a man in Senegal to whom the

3   defendant owed tens of thousands of dollars who had helped him

4   with political issues, including a drug trafficker from the

5   BVI, whose nickname the defendant provided, who moved guns and

6   cocaine, according to Mr. Fahie, and who Mr. Fahie found to be

7   very reliable.  This included a political fixture on the island

8   who Mr. Fahie claimed helped him with political issues that

9   were not exactly aboveboard.

10          All of these issues are set out, as I mentioned, in

11   the complaint and in the government's motion to dismiss, so I

12   won't go through each of them one by one now, but I will note

13   that the defendant explained to the confidential source during

14   their second-to-last meeting, after discussing the defendant's

15   sophisticated approach and cautious nature in carrying out the

16   crimes at hand, he was asked if it was his first rodeo, and he

17   responded, no, no, no, no, no, not my first rodeo, and then he

18   rose his voice and he said, not my first rodeo at all, and he

19   laughed.

20          Your Honor, I can get into now the specific arguments

21   for detention or, if you would prefer, I have DEA special agent

22   Brian Witek available.  We could present him first and then

23   proceed to argument.

24          THE COURT:  All right.  Would you like to question the

25   agent, Ms. Van Vliet?

1           MS. VAN VLIET:  Yes, ma'am.

2           THE COURT:  Let's have him come up.

3           THE DEPUTY CLERK:  Raise your right hand.

4           Do you solemnly swear to tell the truth, the whole

5  truth, and nothing but the truth, so help you God?

6           THE WITNESS:  I do.

7           THE DEPUTY CLERK:  You may be seated.

8           THE WITNESS:  Thank you.

9           THE DEPUTY CLERK:  You're welcome.

10          Please state your full name for the record and spell

11  your last name.

12          THE WITNESS:  Brian Witek, W-I-T-E-K.

13   BRIAN WITEK,

14      called as a witness,

15      having been duly sworn, testified as follows:

16  CROSS EXAMINATION

17  BY MS. VAN VLIET:

18  Q   Mr. Witek, are you employed by the Drug Enforcement

19  Administration?

20  A   Yes, I am.  I'm a special agent with the Miami field

21  division.

22  Q   How long have you been with DEA?

23  A   I've been with DEA since 2005.

24  Q   Prior to that, did you have any other law enforcement

25  experience?

1    A    No.

2    Q    OK.  Are you involved in this case involving Mr. Fahie

3    apart from your testimony here today?  Are you the case agent?

4    A    Yes.  I am one of two case agents assigned to this

5    investigation.

6    Q    OK.  Were you the affiant in the complaint?

7    A    No, I was not.

8    Q    Who was the affiant in the complaint?

9    A    The affiant was Shad Aschleman.

10   Q    OK.  Also a special agent with DEA, is that right?

11   A    Yes.

12   Q    OK.  Thank you.

13        Nonetheless, are you familiar with the facts and

14   circumstances set forth in the complaint as additionally set

15   forth in the government's motion for pretrial detention?

16   A    Yes, I am.

17   Q    Do you adopt those facts and circumstances as stated in

18   both documents as your own testimony today?

19   A    Yes, I do.

20   Q    OK.  Now, I noticed in the -- strike that.

21        How many affidavits have you written?

22   A    Over the course of my career, I've written several

23   affidavits.

24   Q    In the context of writing affidavits when you're dealing

25   with a confidential source, it is customary, is it not, to have

1    some discussion of the reliability of that source, is that

2    right?

3    A   Yes.

4    Q   OK.  The affidavit that your co-case agent, the affiant,

5    submitted in support of the arrest warrant in this case notably

6    doesn't discuss the reliability of the confidential source,

7    correct?

8    A   Yes.

9    Q   OK.  Now, to be sure, it discusses, and to be fair, it as

10   well as the motion discuss purported quotations from audio

11   and/or video recordings, correct?  Fair?

12   A   Yes.

13   Q   Are you aware of any -- strike that.

14           Is this the first time that confidential source has

15   ever been used?

16   A   No.  The confidential source is reliable, trustworthy.

17   Before and after the meetings, that were conducted here in

18   Miami and in Tortola, he was fully debriefed.  We would talk to

19   him, conduct interviews of this informant, and he has been used

20   in the past for several DEA international investigations.

21   Q   And has he been used by this affiant before?

22   A   Yes, he has.

23   Q   OK.  At any point in time are you familiar with any

24   incident where information sourced to that confidential

25   informant has been questioned as it has been portrayed in an

Witek – Redirect

1    affidavit?

2    A    No, I don't.

3    Q    This Senegalese fellow that Mr. Shadley mentioned and that

4    is discussed in the affidavits, as I understand it, Mr. Fahie

5    allegedly said that 83-some-odd-thousand dollars was owed to

6    this person, gentleman from Senegal, who did some work with him

7    on political matters of some nature, correct?

8    A    Correct.

9    Q    OK.

10            MS. VAN VLIET:  That's all I have.  Thank you.

11            THE WITNESS:  Thank you.

12            MR. SHADLEY:  Just one question, your Honor.

13            THE COURT:  Yes.

14   REDIRECT EXAMINATION

15   BY MR. SHADLEY:

16   Q    Regarding the gentleman from Senegal, was that a normal

17   business payment that would be paid via a wire or bank

18   transaction, or was he to be paid in cash?

19   A    He was supposed to be paid in cash and then during the

20   final stages of the meetings it was asked that 133,000 be

21   provided to him in the Island of St. Martin.

22   Q    Instead of 83?

23   A    Correct.

24            MR. SHADLEY:  Thank you, agent.

25            THE COURT:  All right.  No more questions?

```
 1            MR. SHADLEY:  None from the government.  Thank you,
 2   your Honor.
 3            THE COURT:  All right.  You're excused, sir.  Thank
 4   you very much.
 5            THE WITNESS:  Thank you, your Honor.
 6            (Witness excused)
 7            THE COURT:  All right.  So let me hear argument.
 8            Any more evidence, Ms. Van Vliet, before I hear
 9   argument?
10            MS. VAN VLIET:  I did send this morning copies of
11   three exhibits --
12            THE COURT:  Yes.
13            MS. VAN VLIET:  -- which I'm gathering from the
14   court's initial comments that you received.
15            THE COURT:  I did and I reviewed.
16            MS. VAN VLIET:  I would formally move those into
17   evidence now, Judge.
18            THE COURT:  They have been filed as part of the
19   record, but I am happy to mark whatever you would like as part
20   of the hearing exhibits.
21            So let's see.  It is docket entry 10.
22            MS. VAN VLIET:  Correct, and the attachments thereto,
23   if we could just --
24            THE COURT:  Yes.  That's the entirety of docket entry
25   10 --
```

```
 1              MS. VAN VLIET:  Yes, ma'am.

 2              THE COURT:  -- with all of the exhibits, and that is

 3     admitted into this hearing as Defendant's Exhibit A.

 4              MS. VAN VLIET:  Thank you, ma'am.

 5              THE COURT:  All right.

 6              MR. SHADLEY:  Your Honor, if I may, just briefly.  Our

 7     only objection to that would be as to the authenticity of

 8     those.  We haven't had anybody testify about where they came

 9     from or who wrote them or who signed them or how they were

10     provided.  So I have no reason to doubt Ms. Van Vliet's

11     veracity, but in terms of whether this is being admitted for

12     evidentiary purposes for an evidentiary type hearing, I don't

13     believe the foundation has been laid to authenticate those at

14     present.

15              THE COURT:  Well, if she relies on any of these for

16     her argument, then you can state your objections at that point

17     in time.

18              MR. SHADLEY:  Thank you, Judge.

19              THE COURT:  All right.

20              MS. VAN VLIET:  There is one other factual matter,

21     Judge, before we get to argument that I'd like to clear up.  I

22     have already talked to Mr. Shadley about it and I think we

23     agree.

24              In the Pretrial Services report there is a reference

25     to the government, and -- I apologize.  It is on the first
```

1    page --

2             THE COURT:  Yes.

3             MS. VAN VLIET:  -- second to the last line, where it

4    says:  Defendant -- sorry.  Third to the last line.

5             According to the government the defendant renounced

6    his U.S. citizenship.

7             The defendant has never been a U.S. citizen.  He was a

8    permanent resident, which, as it notes in the following phrase,

9    in the sentence, he did renounce.  He was a permanent resident

10   here when he attended F -- college.  I can't recall which one

11   right now.  I apologize.

12            So I believe that that's -- Mr. Shadley can confirm.

13   I just want to clarify because --

14            MR. SHADLEY:  That is my understanding as well, your

15   Honor.

16            THE COURT:  All right.  So we will officially correct

17   the Pretrial Services report to state that Mr. Fahie was never

18   a U.S. citizen, he was only a permanent resident, and that was

19   at the time that he attended Florida A&M University in

20   Tallahassee, Florida, where he graduated with a bachelor's

21   degree, bachelor of science degree in mathematics, and that

22   that permanent resident status was in fact relinquished.

23            MS. VAN VLIET:  Correct, your Honor.  I say that

24   because --

25            THE COURT:  Citizenship issue.

1          MS. VAN VLIET:  -- the other Pretrial Services

2     comments with regard to clarifying immigration status, which

3     hopefully has now been done.

4          So that's all I have from a factual perspective, your

5     Honor.

6          THE COURT:  All right.  Let me hear now from

7     Mr. Shadley regarding your arguments in support of detention

8     based on risk of flight -- we will take that one first -- and

9     then danger to the community, unless you want to mix and match,

10    then you are free to do that if it is more efficient.

11         MR. SHADLEY:  Thank you, your Honor.  I will address

12    the issues in the order you have suggested.  Before I get into

13    that, I will note once again for the record that this is a

14    presumption case based on the offense charge and the probable

15    cause outlined in the complaint against this defendant under

16    which detention is presumed.

17         So in terms of the defendant's risk of flight, again,

18    I'll note, as set out in our motion, that the risk of flight

19    must be shown by a preponderance of the evidence, and I believe

20    we have met and exceeded that standard here.

21         As an initial matter, this defendant has a very

22    serious and compelling reason to flee from prosecution here in

23    the Southern District of Florida.  As noted, he faces a

24    guidelines sentence, which is based on the staggering amount of

25    drugs and money at issue here, in the range of 360 months to

1   life imprisonment.  That provides a compelling reason for this

2   defendant not to remain here in the Southern District of

3   Florida and face the charges against him but to flee upon

4   release if this court were to consider or were to eventually

5   give this defendant a bond.

6        Secondly, and perhaps most staggeringly, is the

7   defendant's complete and utter disregard for the rule of law.

8   In this case, while the defendant was serving as the Premier of

9   the British Virgin Islands, he took bribes from someone who

10   presented themself as a member of the Sinaloa Cartel.  He

11   agreed to take future bribes here in Miami when he came to pick

12   up hundreds of thousands of dollars of cash in a private jet.

13   He did not uphold the duties or the roles required of him in

14   his office in the British Virgin Islands as a public servant.

15        He was presented with a lucrative criminal opportunity

16   by someone he thought belonged to the Sinaloa Cartel, and

17   instead of reporting that person Mr. Fahie joined.

18        He has shown throughout this case that he is corrupt

19   to the core, that he believes he is above the rule of law, and

20   that causes serious, serious doubts as to whether he could ever

21   comply or would willingly comply when faced with such a high

22   sentence with any terms of bond set by this court.  And that

23   wasn't just during law enforcement's investigation.  As I noted

24   earlier, Mr. Fahie himself explained his history of criminal

25   activity.  I know the court is commonly, and in this case too,

1    presented with a Pretrial Services report that sets forth

2    criminal history of the defendant.  We don't have here

3    convictions or arrests listed in the Pretrial Services report,

4    but we do have the defendant's own words during his meetings

5    with the confidential source when he discussed 15 to 20 years

6    of involvement in criminal activity, of helping deals get

7    through but being stiffed by his criminal partners, of working

8    with cocaine and arms traffickers in the BVI who he considered

9    to be old friends and reliable.  He said, as noted, this

10   endeavor with the Sinaloa Cartel was not his first rodeo.

11           I submit that that disregard for the requirements of

12   his office, the service he owed to the public places Mr. Fahie

13   in a heightened sense as someone who cannot be expected to

14   comply with any orders of this court.

15           I will note that we also often discuss in terms of

16   Pretrial Services reports and in hearings like this before your

17   Honor instances when individuals have been under probation or

18   ordered to appear and they fail to do so or they have been

19   under court orders and they fail to comply with those court

20   orders.  I will note for this court, although not the exact

21   same thing, a slightly analogous consideration is that while

22   these crimes were being committed by the defendant, he did all

23   of this while serving as the Premier of the BVI while the

24   government was under a commission of inquiry due to the rampant

25   corruption on the island.

1         There was legal inquiry ongoing into corruption.  It

2 was lawfully not allowed, his actions on the island or in the

3 United States, and he was a public servant sworn to uphold

4 those laws, but he broke them over and over again.

5         So we talked about the reason the defendant would flee

6 and we talked about his disregard for the rule of law.  Now I

7 want to focus on the defendant's connections and his ability to

8 flee.

9         We have mentioned briefly today, and it is set out in

10 detail in the papers before the court, the defendant mentioned

11 the following individuals as associates who were either

12 criminal or at the least involved in nefarious activity.  The

13 individual from Senegal who Mr. Fahie agreed to meet in St.

14 Martin to pay back a cash payment in $100 bills of $133,000,

15 because that individual helped him with something political;

16 the individual from the BVI for whom the defendant provided his

17 nickname who he considered to be a reliable, old friend, who

18 also just happened to be an arms dealer or trafficker and a

19 cocaine dealer or trafficker.  The defendant described a female

20 political fixer on the island who did things for him that were

21 political but not exactly aboveboard.  The defendant offered to

22 pay bribes to another government official, Government Official

23 1, on the island so that that individual would not interfere

24 with the drug trafficking plan alleged in the complaint.

25         The defendant explained to the confidential source how

1    he and his coconspirators controlled access to ports and

2    airports.  The parties discussed, including this defendant, the

3    use of boats and private jets for criminal activity.  And the

4    defendant has an extensive history of foreign travel.  Not just

5    the travel listed in the Pretrial Services report, but based on

6    law enforcement inquiries, I have also seen trips to London in

7    2021, '19 and '18, Jamaica in '18, '19 and '20, Barbados, the

8    Cayman Islands, Nicaragua, and China in 2014 and 2016.

9            I will note that China specifically does not have an

10   extradition treaty, is my understanding, with the United States

11   and any flight to those other islands would dramatically

12   complicate, slow down, and potentially make it possible any

13   prosecution of this defendant.

14           Finally, on this topic of the connections and ability

15   to flee, I will note that the defendant's ties to this district

16   are minimal.  The defendant's employed on the British Virgin

17   Islands, he was born there, his primary residence is there,

18   most of his family is not in south Florida, and he has lived

19   most of his life in the BVI.  It appears, based on submissions

20   to the court, Pretrial Services, that his sole connection here

21   is the fact that his daughters, one went to school here and

22   will graduate soon and the other is soon to enroll, and that

23   they have a college apartment in the area.  Based on law

24   enforcement investigation -- Ms. Van Vliet may be able to

25   confirm -- it appears that is a rented, not an owned residence.

1   It is not the defendant's primary residence, and by the very

2   nature of a college apartment, it is transitory, not permanent,

3   and falls far short of providing any type of certainty that

4   this defendant would have a stable place and assure his

5   appearance before this court.

6       Two final notes regarding risk of flight.  One thing

7   the court is required to consider in its analysis is the weight

8   of the evidence under 3142(g)(2).  Here, that weight is

9   overwhelming.  It is set out in the complaint.  There are

10  multiple, multiple, multiple recorded conversations with this

11  defendant and others which clearly set out a detailed agreement

12  to import cocaine to the United States and to launder money

13  thereafter.

14      The defendant was given multiple opportunities to

15  withdraw from that conspiracy.  He expressed his own previous

16  position to engage in that conspiracy.  He described his prior

17  involvement in criminal activity.  The evidence is overwhelming

18  and indisputable.

19      Finally, the defendant faces possible immigration

20  consequences in connection with the crimes he's committed here.

21  He traveled here on a visa waiver.  Committing drug trafficking

22  and money laundering offenses while under a visa waiver is in

23  violation of the terms of the visa waiver.  I'm working with

24  CBP to get further guidance on the exact ramifications for

25  immigration concerns for Mr. Fahie, but that is out there as a

1    potential negative repercussion that he might face.

2         Now, Ms. Van Vliet will propose a bond to the court,

3    and we have discussed that previously.  Specifically concerning

4    risk of flight, I'll explain to the court why that doesn't work

5    and why that does not resolve the concerns set out in the Bail

6    Reform Act at 3142, et seq.

7         This defendant has every reason to leave.  He has

8    demonstrated in the past that he will take and give bribes.  He

9    has demonstrated he does not have regard for the rule of law.

10   If released on bond, he is one cut ankle monitor and a

11   speedboat away from escaping into the islands never to be seen

12   again.

13        That is the concern that motivates the government's

14   motion.  That is the factual scenario that seems a near

15   certainty if he is released, and that is why the government

16   doesn't believe there is any condition or set of conditions

17   that this court can enter that would assure the defendant's

18   appearance at future proceedings in this matter for prosecution

19   for the crimes that he has committed.

20        I will briefly touch on danger as well, your Honor.

21   That covers the risk of flight arguments I wanted to set forth

22   for the court.

23        As to danger, I've noted it, but this is a staggering

24   amount of cocaine the defendant agreed to import here into our

25   community.  He is engaged in corruption at the highest levels,

1    not only allowing himself to be corrupted but offering to

2    corrupt others and knowing, observing, and acquiescing to the

3    criminal activities of still other individuals in the BVI.  He

4    protected those individuals, including discussing with the CS,

5    as I've mentioned, his reliable drug trafficking money

6    laundering friend in the BVI.  He expressed willingness when

7    asked by the source to inquire about acquiring firearms from a

8    Senegalese contact on behalf of the Sinaloa Cartel, and he has

9    self-professed to the government in recorded statements about

10   his lengthy involvement in criminal activity.  For those

11   reasons the defendant is a danger to the community should he be

12   released, not only because of the harm or the threats that he

13   himself poses but because of his ongoing acquiescence and

14   protection provided to other criminal individuals.

15           With that, your Honor, I have completed our argument

16   concerning both risk and danger.  I will note that risk is a

17   preponderance of the evidence.  I believe we have met and far

18   exceeded that standard here.  Danger is slightly higher, but I

19   believe we have also satisfied that.

20           I'm happy to address any questions the court has or,

21   of course, to respond to any concerns or arguments presented by

22   Ms. Van Vliet.

23           THE COURT:  All right.  Let me hear from Ms. Van

24   Vliet.

25           MS. VAN VLIET:  Thank you, your Honor.

 1            Obviously it goes without saying that Mr. Fahie stands
 2    here not guilty.  It will also be made clear when on May 25th,
 3    whenever it is we get to the point of an arraignment, that he
 4    is going to be pleading not guilty, and that the facts will
 5    show that the circumstances surrounding all of this are, number
 6    one, not quite as portrayed by the government but, number two,
 7    certainly not with the intent and with the manner or means that
 8    the government attempts to portray.
 9            One of the things -- and, yes, they have charged in
10    their -- they have made up in their sting, they threw out there
11    3,000 kilograms of cocaine.  They might just as well have said
12    10 or 12 or 30.  It doesn't really make any difference.  There
13    is no cocaine.  They can say whatever they want.  So they can
14    manufacture a staggering amount.  It does absolutely affect the
15    sentencing guidelines.
16            Mr. Shadley suggests that that fact alone gives
17    Mr. Fahie, who is without question, without controversy, and,
18    as acknowledged by the United States government in their
19    complaint, the Premier of the Virgin Islands.
20            THE COURT:  British.
21            MS. VAN VLIET:  Well, actually, it's literally called
22    the Virgin Islands.
23            THE COURT:  To make sure the record is clear.
24            MS. VAN VLIET:  Which is in overseas territory of
25    Great Britain and the United Kingdom, and that he is, and I'm

1    going to refer to it from here on out as the BVI, the British

2    Virgin Islands, even though the technical name is Virgin

3    Islands in overseas territory, blah blah.  He is the Premier as

4    he stands here today by reason of that country's, that

5    territory's constitution.  There is no question about that.

6          Now, the issue of whether down the road this court has

7    personal jurisdiction over him is one that I submit will be

8    argued and hopefully decided in my client's favor.  Again, for

9    the record, as you have noted before, we waive nothing in going

10   forward in this setting of those arguments.

11         One of the things -- and since Mr. Shadley referred to

12   it, I am going to address it.  I mean, obviously I don't speak

13   for the BVI.  I don't represent the BVI, in case there is any

14   lack of clarity on that.

15         Mr. Shadley suggested in a pleading, that he referred

16   to this morning before the court, that Mr. Fahie is seeking

17   immunity from his heinous and staggering crimes.  That is just

18   not true.  What he is doing is challenging this court's

19   personal jurisdiction.  This is not a request.  Frankly, I

20   don't think there is the basis to ask for a transactional

21   immunity situation.  This is what country deals with this

22   situation, the United States or the British Virgin Islands and

23   Great Britain and the United Kingdom.  We submit it should be

24   the latter.

25         Moreover, in that same pleading Mr. Shadley announced

1    that it was the position of the government that the British

2    Virgin Islands is not a sovereign state.  They're right, it's

3    not, and no one ever said it was.  It is, rather, an overseas

4    territory of the United kingdom and Great Britain, and thus it

5    is the United Kingdom and Great Britain whose sovereignty is at

6    issue here.

7            There is no question that this man is a high-ranking

8    official and a head of government of an overseas territory of

9    Great Britain and the United Kingdom.  There is also no

10   question, at least based on what I know when I came in here at

11   10:00, that no one in the United Kingdom has waived immunity,

12   and because the government's filings in this case don't address

13   the right sovereign, i.e., the United Kingdom and Great

14   Britain, there has been no express finding by the United

15   States, at least that's been announced before this court or in

16   any pleading, that the United States denies immunity of the

17   United Kingdom and Great Britain.

18           Now, there is no question that these concepts of

19   immunity, head of government -- by the way, not head of state.

20   Just so the record is clear.  Her Majesty Queen Elizabeth is

21   head of state of any overseas territory.  I mean, an overseas

22   territory for the United Kingdom and Great Britain is no

23   different than Puerto Rico is to the United States or Guam or,

24   dare I say, the U.S. Virgin Islands.  All are overseas

25   territory of some other larger -- well, maybe physically

1    larger, but another country.  In the case of the BVI, it is

2    Great Britain and the UK.  In the case of the other three I

3    just mentioned, it's us.  It's the United States.

4          The question then becomes whether the precepts

5    discussed in international law about jurisdictional issues

6    should apply here and are important in terms of serving as a

7    counterbalance and underscoring the need for conditions of bond

8    that will assure Mr. Fahie's appearance but do not hinder, as

9    the international judicial court, which is the civil court,

10   noted in its 2002 opinion.  Does it hinder his ability to

11   perform his duties?

12         Well, goodness knows, we have seen how the conditions

13   at FDC -- and I'm not complaining about them.  I note that they

14   are in place for good reason because of COVID and, quite

15   frankly, I have nothing but thanks and compliments to both the

16   United States Marshal Service and BOP.  They have treated

17   Mr. Fahie well.  They have, when possible, accommodated my

18   ability to contact him.  But I will tell you, being in SHU, it

19   is impossible to, other than if you are lucky, which I was this

20   week, to get a face-to-face meeting with the screen in between

21   you, there is no contact.

22         In the meantime, there are posers out on the internet

23   throwing around statements that purportedly come from this man

24   ginning up issues in a political nature down in the BVI, and

25   that is because, as Mr. Shadley referenced in his arguments,

1    the Commission of Inquiry, which Mr. Shadley referred to, which

2    was begun well before this case with a prior governor, who is,

3    of course, Her Majesty's representative in the BVI, that

4    500-some-odd page report was published within 48 hours of

5    Mr. Fahie's arrest.

6          There is absolutely, and I don't think the government

7    would disagree with me, there is no connection between these

8    allegations and that Commission report save this.  That

9    commission report recommends the suspension of the British

10   Virgin Islands Constitution for a period of two years.  As we

11   speak, the matter is subject of debate in the British Virgin

12   Islands between their representatives and the UK government.

13   What happens, I don't know.  I don't, obviously, have a dog in

14   that fight.  I have no ability to control it.

15         I do know one thing.  His detention makes it

16   impossible for him to fulfill his duties and even consult with

17   the members of his government.  We are not talking about

18   hinderance of his duty to attend a cruise conference or go on

19   any one of these other trips throughout the Caribbean and China

20   which, oh, by the way, were all official travel, as might be

21   expected by someone who is the head of government.  These are

22   fairly, I would say, the most serious of duties that he could

23   and should be performing.  Would he be able to perform them

24   perfectly under conditions of bond and not actually being

25   there?  No.  But at least he can do something.  He can consult.

1          THE COURT:  So let me ask you this.  Mr. Shadley, from

2    what I hear Ms. Van Vliet, she's asking that aside from the

3    usual calculus that is made on detention, which is risk of

4    flight and danger to the community, that this issue of

5    Mr. Fahie being able to fulfill his duties and consult with

6    members of his government play a role in the determination of

7    whether he should be afforded bond.

8          Do you have a response to that argument?

9          MR. SHADLEY:  I do, your Honor, and any consideration

10   of that fact would be wholly inappropriate under the statutory

11   framework provided by the Bail Reform Act.

12         For support Ms. Van Vliet cites to an opinion from

13   2002 from the International Court of Justice.  There is one

14   reason why in our immunity discussion I would tell the court

15   that these immunity-type discussions should come in the form of

16   motions and briefing concerning a motion to dismiss, as the

17   court noted, and that would include then further analysis of

18   any implications international law may have here.

19         I will note, though, that the United States since

20   Ronald Reagan in the '80s has been withdrawing from its

21   treatise with the International Court of Justice, which is the

22   pin cited by Ms. Van Vliet, slowly and first largely by Reagan

23   and then one at a time it picked up again under Trump.

24         So there are a smatter of responsibilities under that

25   court that the United States has treatise and require it to

1    have jurisdiction under the court.  There are a large number of

2    areas where that court has no jurisdiction or sway here in the

3    United States.  Because this opinion was just submitted, I

4    haven't, of course, done all the international legal research

5    required to make that exact determination, but for purposes of

6    today's hearing it would be wholly inappropriate to consider

7    something from an International Court of Justice opinion when

8    we have binding statutory framework and case law in our Circuit

9    and from the Supreme Court that explains what the court is

10   required -- "shall" is used in the statute -- to consider when

11   determining whether bond is appropriate.  Here, that is just

12   risk of flight and danger to the community.  It is not ability

13   to do your job.

14        THE COURT:  All right.  I appreciate your argument,

15   Ms. van Vliet, and I do note it and I do deem it to be reserved

16   with regard to the immunity arguments, but if the authority,

17   and I will let you respond to Mr. Shadley, but if the authority

18   that I am traveling under is limited to the Bail Reform Act and

19   the considerations that are to be taken, namely, risk of flight

20   and danger to the community, then I would hold those arguments

21   in abeyance.

22        MS. VAN VLIET:  Hold the immunity arguments in

23   abeyance.

24        THE COURT:  Right, and this detention-related argument

25   that you're making that is saying that in addition to the

1    statutory considerations, and I'm quoting because I wrote it as

2    you said it, impossible to fulfill his duties and consult with

3    members of his government as an additional factor to be

4    considered.  Mr. Shadley, upon my inquiry, said there is no

5    basis for adding that factor to the statutory framework.

6              Do you have any counter to that?

7              MS. VAN VLIET:  Well, I clearly don't have a case,

8    Judge, because this is pretty unique.

9              THE COURT:  Right.

10             MS. VAN VLIET:  I'm not asking you to consider it as

11   anything other than the kind of evidence that rebuts the

12   presumption that is present here.  I get that that is there, as

13   well as the counterbalance for assuming that we can carry the

14   day on the rebutting presumptions, the counterbalance that

15   indicates why detention is not the only and why there are, I

16   should say, conditions that can be set to bond that will assure

17   his appearance short of detention.

18             THE COURT:  OK.  Why don't you discuss those at this

19   time.  Why don't you let me know about those.

20             MS. VAN VLIET:  So what I kind of casually referred to

21   as my off-ramp --

22             THE COURT:  Right.

23             MS. VAN VLIET:  -- is a suggestion that, number one,

24   Mr. Fahie live with his two daughters, who -- I mean, any

25   parent knows, the closest ties you have are to your children,

1     both of whom are United States citizens.  So I think that the

2     suggestion that he does not have close ties here is not

3     recognizing that close tie between a father and daughter.

4          They do rent their house or apartment.  Actually,

5     pardon me.  They are both going to be continuing to live there

6     throughout the continued matriculation, one at Moravian College

7     in Philadelphia, which will be an online situation, and the

8     other at the University of Pennsylvania for a post BA, a

9     graduate degree.  Both online.  He would reside with them

10    there.

11         He would, of course, be submitting at his own cost to

12    any kind of monitoring, GPS, whatever it is that Pretrial

13    Services would recommend, acknowledging that they would have

14    the best call on that in terms of their expertise.  But I note

15    that he would be prepared to submit to the most onerous.

16         A corporate surety bond in the amount of $250,000, or

17    if the court thinks it is sufficient a 10 percent bond in that

18    same amount, and while there would be all other conditions of

19    bond, turning in travel documents, etc.  By the way, he does

20    have a U.S. Virgin Island -- beg your pardon.  A British Virgin

21    Islands passport that I am not sure that they have.  In any

22    event, we would make sure that all travel documents -- he has a

23    UK and a Virgin Islands passport.  We would make sure that all

24    travel documents were surrendered anyway.

25         In addition to only being able to attend religious

1    services, medical services, any court appearances, obviously,

2    and meetings with the defense and the defense team to prepare

3    for the case, I would propose something that I have done in

4    other situations with international clients, not of the same,

5    in this court with other magistrate judges who have approved

6    it, and that is that no travel between point A and point B,

7    between the house and my office, for example, be made alone

8    but, rather, that he be picked up and accompanied by a former

9    special agent of the DEA, formerly the head of the Mexican and

10   Central America branch, former special agent Michael McManus,

11   who is present in the courtroom today, in the very festive

12   colored mask, or another former federal agent, retired federal

13   agent or law enforcement officer would be responsible for

14   transporting the defendant from point A to point B and back

15   again with no stops in between.

16        That, quite frankly, is a situation that has been used

17   in a couple of cases, a case one of which was in front of Judge

18   Altonaga recently.  United States v. Jaseem, United States v.

19   Aores, and another case several years ago United States v.

20   Macchione.  There were no problems.  Everybody appeared.

21        I think the converse of what Mr. Shadley says.  I

22   think the charges here are his reason to stay or, if the court

23   finds that it has no jurisdiction, to fight them in the Virgin

24   Islands because that is the way that he clears his name.  If he

25   doesn't clear his name, his political career is gone, as is

1    everything else.

2         So that is what we have suggested and we are willing

3    to consider any other condition of bond.  But right now, your

4    Honor, from the sounds of it, there are hundreds of tapes.  I

5    can't get in to see him.  He can't call me.  I can't prepare

6    for this case without him.

7         While I know that the court is reserving on the

8    immunity, the personal jurisdiction issues, it is not a case

9    that can afford to linger.  There are some pretty serious

10   issues going on in that country right now.  For those reasons,

11   Judge, we think the off-ramp proposal that we have suggested is

12   sufficient to assure that he will be here.

13        As to the comments regarding danger to the community,

14   again, strenuously deny that the manner in which those things

15   are said are as portrayed, and let me clarify.  I am not

16   suggesting that Mr. Shadley is actively misleading the court or

17   anything.  I just know from 30 years as a federal prosecutor

18   and as the chief of narcotics at the Department of Justice that

19   listening to tapes is an arduous business and getting the

20   transcription right, particularly when you are dealing with

21   accents, is an arduous process, and sometimes it doesn't quite

22   work out correctly the first one, two, three, four, several

23   times.

24        Finally, Judge, I do note that Mr. Shadley had

25   indicated that Mr. Fahie had been given an opportunity to,

1    quote-unquote, withdraw.  Well, that is certainly not present

2    in any of the quotes in anything.  So I would ask, consistent

3    with the Brady order that was imposed by Judge Goodman, that

4    those portions of the transcript be provided to us immediately.

5            THE COURT:  All right.

6            MS. VAN VLIET:  Thank you, your Honor.  I appreciate

7    your time.

8            THE COURT:  Anything from Mr. Shadley?

9            MR. SHADLEY:  Yes, your Honor.  I can cite to that

10   portion, at least one of them right now.  It is in the

11   complaint where they were discussing Mr. Fahie's concerns, not

12   that the conduct was illegal but that the CS might be an

13   undercover.  As I flip through the complaint here, your Honor,

14   I'll read it to you.

15           THE COURT:  All right.  So the issue is it is in the

16   complaint.

17           MR. SHADLEY:  Correct, paragraph 9.

18           THE COURT:  So it's been disclosed, and I'm sure the

19   tapes will be produced.

20           MR. SHADLEY:  Discovery will be produced in due

21   course, your Honor.

22           THE COURT:  On Ms. Van Vliet's proposal, let me hear

23   from you.  You had said already that you did not think it was

24   sufficient.

25           MR. SHADLEY:  Wholly insufficient, your Honor, for a

1    number of reasons.

2            THE COURT:  OK.

3            MR. SHADLEY:  A few points I'll make.  First, just the

4    fact that this arrangement may have been used in other cases in

5    our district with other defendants about whom we know nothing

6    sitting here is not a compelling reason for this court to use

7    it, and I'll explain why in this specific instance it is

8    inappropriate.

9            This case involved criminal conduct coming through the

10   Caribbean into the United States, through the BVI.  It involved

11   travel to the U.S. Virgin Islands by codefendants,

12   conversations about individuals using boats and planes to

13   commit criminal activities between South Florida and throughout

14   the Caribbean.

15           Our district is littered with marinas, with private

16   airports through which this defendant could easily leave.  Just

17   having former federal agents with him when he travels places

18   doesn't protect our society or the risk of flight, from his

19   flight at any other time of the day.  This is not a stable but

20   a temporary residence that he would reside at and there would

21   be nothing essentially keeping him here but from the slip of

22   the scissors on an ankle monitor and a decision to get out of

23   town.

24           This is, I think we have seen through all the evidence

25   before the court, not someone who abides by rules or by laws or

1    by, I would submit, this court's orders.  I think he would be a

2    near certainty to flee the district.  This is not to impugn the

3    reputations of the DEA agent or Ms. Van Vliet, but purely

4    focused on this defendant and his acts as set out in the

5    criminal complaint and the government's motion would be almost

6    a near certainty to leave this district to avoid prosecution,

7    to avoid facing the responsibilities for the crimes that he

8    committed, and to avoid facing the lengthy sentence before him.

9    I think the conditions of bond proposed would be entirely

10   insufficient to maintain his presence here.

11           The money portion, a small amount would have to be put

12   up in relation to his finances and the property that he owns.

13   If he were to flee, the government would have no way to recover

14   that because his properties are and bank accounts are in the

15   British Virgin Islands.  That would be lost money.  That is not

16   a reason for him to stay here.

17           The ankle monitoring, it is something but it's not

18   much.  If you're determined to get out of here, it's very easy

19   to avoid, get out of town quickly.  The defendant has the

20   connections, the abilities, the money and the inclination or

21   reason to do exactly that, and this would be nothing, nothing

22   to keep him here.  That's our concern, your Honor.

23           So for those reasons I think the proposal by Ms. Van

24   Vliet is wholly inadequate, does not serve the purposes, and I

25   think the government has shown by that preponderance standard,

 1   which we're required under the statute -- again, that is just

 2   51 percent -- that he is a risk of flight and that no

 3   conditions here could assure his appearance in court.

 4          I do have comments on the immunity issue if your Honor

 5   would like to hear them as those were subsumed into comments

 6   about detention.

 7          THE COURT:  I put them to the side.  I made that clear

 8   to Ms. Van Vliet --

 9          MR. SHADLEY:  Thank you, your Honor.

10          THE COURT:  -- that that was put to the side for the

11   moment.

12          So the arguments that Ms. Van Vliet is saying is that

13   she's proposing a corporate surety bond or a 10 percent bond,

14   she is proposing that Mr. Fahie reside with the daughters, both

15   of whom seem to be college students studying from universities

16   online and living in a rental apartment, and she is proposing

17   Mr. Fahie being escorted at all times by a former agent.

18          MS. VAN VLIET:  May I clarify something on that,

19   Judge?

20          THE COURT:  Yes.

21          MS. VAN VLIET:  Mr. Shadley seems to be under the

22   impression that it is merely a chauffeur service.  The purpose

23   of having --

24          THE COURT:  No.

25          MS. VAN VLIET:  -- the former federal --

```
1                THE COURT:  That is why I said escorted.

2                MS. VAN VLIET:  I mean, they're armed.

3                THE COURT:  Yes.

4                MS. VAN VLIET:  It is like being escorted by a

5     marshal.

6                THE COURT:  Yes.

7                MS. VAN VLIET:  I just wanted to clarify it for the

8     record.

9                THE COURT:  I understand.  It was sort of like a

10    custody kind of concept.  I have seen that.

11               MR. SHADLEY:  I would note for the court, though, that

12    these individuals would be being paid by Mr. Fahie, and he has

13    previously shown a disregard for law enforcement.

14               THE COURT:  Right.  Right.  So this is the proposal

15    that Ms. Van Vliet is making.

16               The concerns that I have, to be perfectly honest, is a

17    little bit of what Mr. Shadley alluded to in the sense of the

18    nearness of the Caribbean islands and the facility that there

19    is to move back and forth to them.

20               Weighed against that, of course, is the presence of

21    the daughters here, which, as you said, children are a very

22    strong pull, and the fact that -- obviously, I don't know in

23    terms of Mr. Shadley's argument that the British Virgin Islands

24    would be a good destination.  It would probably have to be

25    another destination and that would basically deprive Mr. Fahie
```

```
1    of his family connections and so on.

2            I will fashion a bond, and of course, Mr. Shadley, you

3    may request a stay pending appeal, if that is what you would

4    like to do, but I will require a $500,000 corporate surety

5    bond.

6            MS. VAN VLIET:  Yes, ma'am.

7            THE COURT:  I will require that the daughters

8    surrender their passports and that -- where is the wife located

9    now?

10           MS. VAN VLIET:  Actually, they are all in the

11   courtroom right now, your Honor, and I can talk to them about

12   that.  One --

13           THE COURT:  That would be a requirement.  If they are

14   not willing to do it, the bond will not fly.

15           MS. VAN VLIET:  I understand.  Absolutely understand.

16   The wife is a permanent resident alien.  I just wanted to

17   advise the court of that.

18           THE COURT:  Where is the wife?  Does the wife need to

19   go back to the BVI or can she stay here?

20           MS. VAN VLIET:  They were all supposed to be going

21   back to the BVI tomorrow for a funeral.

22           THE COURT:  That is not happening.

23           MS. VAN VLIET:  I understand.

24           THE COURT:  Let me just get from you -- I know the

25   daughters live here and they need to stay here and they need to
```

1    surrender their passports.  My question is, does the wife need

2    to go back to take care of things or can she stay here?

3          MS. VAN VLIET:  If I might have a moment to go back

4    and ask her, I can clarify that right now, Judge.

5          THE COURT:  Go ahead.  Quickly.

6          (Pause)

7          MS. VAN VLIET:  We would ask that Mrs. Fahie be able

8    to go back for a short period of time to arrange for her

9    employment, which is at Banco Popular, down there as opposed to

10   just not showing and to deal with the funeral of Mr. Fahie's

11   sister.

12         THE COURT:  All right.  So Mrs. Fahie may travel as

13   needed with keeping the probation office apprised of those

14   travel needs, and when not traveling will surrender her

15   passport also.

16         MS. VAN VLIET:  I'm assuming the court would like

17   surrender of both the passports, correct, UK and --

18         THE COURT:  Whatever she --

19         MS. VAN VLIET:  -- all travel documents.

20         THE COURT:  -- uses to travel with.

21         MS. VAN VLIET:  OK.

22         THE COURT:  That applies to everybody.  If they have

23   ten passports, ten passports.

24         MS. VAN VLIET:  Yes, ma'am.

25         THE COURT:  Home confinement with monitoring of the

```
 1    highest level, Mr. Garcia, that is available.  All right.

 2              MR. GARCIA:  Yes, Judge.

 3              THE COURT:  I think this is a case that would require

 4    ankle monitoring with GPS.

 5              MR. GARCIA:  That is fine with us, Judge.  We would

 6    call that a 24-hour lockdown situation.

 7              THE COURT:  Yes.

 8              MR. GARCIA:  With the only allowance to be for

 9    emergency medical needs and for, of course, court appearances

10    and attorney visits only.

11              THE COURT:  Yes.

12              MR. GARCIA:  That would be our recommendation.

13              THE COURT:  Yes, sir.  That is adopted.

14              I honestly don't see the benefit of the escort.

15              MS. VAN VLIET:  OK.

16              THE COURT:  If you want to do that just for his own

17    peace of mind, I don't know.  I think with the GPS probation

18    would know where he is at all times.

19              MS. VAN VLIET:  That is fine.  Assuming Mr. Fahie has

20    a driver's license in Florida, that is fine with me.

21              THE COURT:  If he doesn't, he can take Uber.

22              MS. VAN VLIET:  Exactly.

23              THE COURT:  All right.  So he is under home

24    confinement.  He obviously cannot travel anywhere, may not

25    visit transportation establishments.
```

1          Anything else, Mr. Garcia, I might have missed?

2          MR. GARCIA:  Judge, that he report to our office.  We

3    do need to process him, at least initially, once he is

4    released.

5          THE COURT:  Yes.  I believe, Mr. Shadley, there is a

6    good chance he will appeal, and I will agree to stay the order

7    and I will give you until close of business tomorrow to file

8    the appeal; otherwise, the stay will cease.

9          MR. SHADLEY:  Thank you, your Honor.  You're correct.

10   I do request a stay and we will appeal the determination.

11         THE COURT:  I figured you would.

12         MR. SHADLEY:  Without in any way waiving our appeal or

13   changing our position, if the court is going to impose this

14   bond, I would suggest that any monetary amount put down include

15   a Nebbia condition.

16         THE COURT:  Yes.

17         MS. VAN VLIET:  I'm sorry?

18         MR. SHADLEY:  Nebbia condition.

19         THE COURT:  Corporate surety.

20         MS. VAN VLIET:  Oh, yes.

21         THE COURT:  It is 500,000 corporate surety with a

22   Nebbia.

23         MS. VAN VLIET:  Yes.

24         MR. SHADLEY:  Thank you, your Honor.  I would just for

25   the record note our request of stay and intent to appeal the

1    court's determination.

2           THE COURT:  That's right.  And all conditions must be

3    met --

4           MS. VAN VLIET:  Yes, ma'am.

5           THE COURT:  -- prior to release if the appeal is

6    denied.  Of course, if the government prevails, then that is

7    why I am giving them the opportunity.

8           MS. VAN VLIET:  Of course.

9           THE COURT:  I know that you have strong arguments,

10   Mr. Shadley, but I do believe that this defendant, the terms

11   that I am imposing would assure his appearance.

12          Anything else, Mr. Garcia?

13          MR. GARCIA:  Judge, just for clarification.  In the

14   event that he is released, absent the appeal, he will reside

15   with his daughters at the address reflected in the report in

16   Miami.

17          THE COURT:  Yes.  Yes.

18          MR. GARCIA:  OK.

19          THE COURT:  That address, the 1441 -- let me see.

20   Where is the address?  We will make it a part of the record.

21          MS. VAN VLIET:  It's 1440.

22          MR. GARCIA:  Your Honor, it's 1440 Southwest 104 Path,

23   apartment 203 in Miami.

24          THE COURT:  Yes.  That is the address.

25          MS. VAN VLIET:  I think that apartment number might be

1   wrong.

2           MR. GARCIA:  OK.

3           MS. VAN VLIET:  202.

4           THE COURT:  202.

5           MR. GARCIA:  OK.  Thank you.

6           MS. VAN VLIET:  Your Honor, just confirming that

7   travel documents that are already in the possession of the DEA

8   can stay with them.  We will surrender all others to Pretrial.

9           THE COURT:  You all work it out among the agencies.

10  As long as they don't have them.

11          MS. VAN VLIET:  They won't have them.

12          THE COURT:  That is the issue.

13          Now, on the matter of the immunity argument and so on,

14  however you want to raise it.  If you want to file some kind of

15  motion, because all you have done is a notice, it would be a

16  motion to dismiss the complaint at this stage because there

17  hasn't been an indictment turned in.  Of course, the judge on

18  that complaint is Judge Goodman.

19          MS. VAN VLIET:  Yes, ma'am.

20          THE COURT:  So it would need to be addressed to him.

21          MS. VAN VLIET:  Yes, ma'am.

22          THE COURT:  Anything else?

23          MR. SHADLEY:  Your Honor, one additional request.  I

24  believe I will need to get transcripts of this hearing before

25  proceeding with an appeal.  I don't know if I can get that and

1   digest it and write something before tomorrow close of

2   business.  Is it possible I could have some additional time to

3   complete the appeal?

4               THE COURT:  You need to file the notice of appeal.

5               MR. SHADLEY:  OK.  I can file the notice, of course,

6   but then I would have to file briefing as well.  Just to file

7   the notice by tomorrow?

8               THE COURT:  Yes, your notice of appeal.

9               MR. SHADLEY:  OK.

10              THE COURT:  Once you have the notice of appeal, then

11   that sort of guarantees the stay.

12              MR. SHADLEY:  Appreciate it.  Thank you, Judge.

13              THE COURT:  The reason I do that is in case you decide

14   not to appeal, we don't leave it hanging.

15              MR. SHADLEY:  Understood, your Honor.  Thank you.

16              THE COURT:  See what I mean?

17              MR. SHADLEY:  Yes.

18              THE COURT:  Anything else?

19              MS. VAN VLIET:  Not from Mr. Fahie, your Honor.  Thank

20   you.

21              THE COURT:  All right.  Thank you very much to

22   everyone.

23              MR. SHADLEY:  Thank you, Judge.

24              (Adjourned)

25

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


May 10, 2022              s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com