UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>22-20191-CR-WILLIAMS(s)</u>

**UNITED STATES OF AMERICA**

vs.

**ANDREW ALTURO FAHIE**
  a/k/a "Head Coach,"
  a/k/a "Coach,"

      **Defendant.**

_____/

<u>**MOTION IN LIMINE TO PRECLUDE DEFENDANT FAHIE
FROM RAISING ENTRAPMENT DEFENSE**</u>

**COMES NOW**, the United States of America, through its undersigned counsel, and hereby files this Motion in Limine to Preclude Defendant Andrew Alturo Fahie (the "Defendant") from Raising an Entrapment Defense. As a matter of fact and law, Defendant cannot demonstrate governmental inducement or misconduct. He should be barred from raising an entrapment defense at trial.

**I.**      <u>**STATEMENT OF RELEVANT FACTS**</u>

Between March 2022, and continuing through April 28, 2022, law enforcement, using a confidential source ("CS") and an undercover agent ("UC"), conducted a series of recorded phone calls, text messages, and meetings with the Defendant and co-conspirators Oleanvine Maynard ("Oleanvine") and Kadeem Maynard ("Kadeem"). These phone calls, text messages, and meetings related to a planned scheme to import thousands of kilograms of cocaine through the British Virgin Islands ("BVI") into the United States. The Defendant's role was to obtain licenses and bribe officials to allow passage of the cocaine through the BVI and, in exchange, he would take a cut of the drug proceeds. The Defendant was arrested on April 28 in Miami after

1

he boarded a private plane and verified what he believed to be $700,000 worth of bribe money to further the drug importation scheme.

*Undercover Meetings and Phone Calls*

**March 20, 2022 – the CS meets with Oleanvine and Kadeem**

On or about March 20, 2022, the CS met with Kadeem and Oleanvine in St. Thomas at a restaurant for the CS to present his drug importation scheme and see if Kadeem and Oleanvine would participate. This meeting was audio and video recorded. The CS told them that he was a member of the Sinaloa Cartel, and requested their help moving thousands of kilograms of cocaine from Colombia, through Tortola, to Puerto Rico, with a destination of Miami and possibly New York. The CS made it clear that he did not intend to bring drugs onto Tortola, but rather that he sought protection and safe passage for the contraband while in port for 24-48 hours before being moved to Puerto Rico. Oleanvine confirmed, "you want it to be done legally, so nobody will snoop around." The CS said that he would need the paperwork, and Oleanvine responded, "but that is where I will be able to assist." Oleanvine elaborated, "we can process your paperwork, you will be in the territory legally for the couple of days you want and move on. That part is easy."

The CS explained that his organizations had "kitchens" (cocaine laboratories) in Colombia, so they had a very cheap and sustainable product. He asked them the price of a kilogram on the island, and Kadeem responded "ten," referring to $10,000. The CS explained that he could get the product to Tortola for roughly $4,000, but it would sell for $26,000 to $28,000 a kilogram in Miami, or $32,000 to $38,000 in New York. The CS offered them a percentage of everything sold in the United States, and asked how he could get the money back to them in the BVI. Oleanvine responded that people used to set up shell companies. Later,

Kadeem told the CS that they had drawn up a plan that would involve Oleanvine—who at the time was the Director of the Ports in Tortola—speaking with the local Customs officials about a possible deal and they would set up a shipping business to further the scheme. Oleanvine told the CS that different licenses were involved and that the CS had to legitimize the scheme.

Oleanvine, Kadeem, and the CS also discussed the need to meet with another official in the BVI government, as well as the Defendant—who at the time was the elected Premier of the BVI. In describing her relationship with the Defendant, Oleanvine stated, "he and I get along very well," and that "he will do this" (referring to the scheme). Oleanvine said, "I know the type of person he (the Defendant) is, so I know he will take the opportunity." Oleanvine also revealed her personal opinion of the scheme, stating, "if you come to me and I don't want to do it, I'd say to you, 'Hi, I am not interested.' … or if I'm interested, I'd say 'I'm interested.'"

The CS then proposed a test run of 3,000 kilograms of cocaine on a big boat following the route described above. Oleanvine said she would need the name and size of the vessel, then she would get the necessary license, and handle customs and immigration. The CS brought up whether the Defendant would go along with the scheme and Oleanvine stated, "you see with my Premier he's a little crook sometimes. … He's not always straight."

At the end of the meeting, the CS provided Oleanvine with a bag containing $10,000 in United States currency, saying it was a gesture of good faith. Oleanvine responded that she would start her "homework" tomorrow. The CS stated, "give me your hand. Welcome to the Sinaloa Cartel."

Following the meeting, Kadeem became the point of contact between the CS and Oleanvine, and later the Defendant. On March 21, 2022, the day after the CS met Oleanvine and

Kadeem, Kadeem sent a WhatsApp message to the CS conveying that the meeting with the "head coach" (the Defendant) was scheduled the following day.

**March 22, 2022 – Oleanvine meets with the Defendant; later the CS speaks with Oleanvine and Kadeem**

On March 22, 2022, Oleanvine sent the Defendant a text message through WhatsApp, "Good morning. A gentle reminder concerning our meeting today please." Around noon, the Defenant responded to Oleanvine, writing, "Come now." Later that day, around 5:00 p.m. and after Oleanvine spoke with the Defendant, Kadeem sent the CS a message, "Meeting is completed & successful." "Head Coach want to play with the team…"

Around 6:00 p.m. the CS spoke with Kadeem and Oleanvine on a recorded phone call. Oleanvine told the CS that she had spoken with the Defendant for about two hours that day and that he was quite interested. Oleanvine stated that, "[the Defendant] going to need some money to, to get [other people] on his side." She told the CS, "he gave me some code words to use, and when I give him them code words, he will call me to meet with him privately. I tell him, this is something two of us die and go to the grave with. Not a next man should know. So, he has agreed to that, too. And he's very much interested, he's doing business with you." She continued, "he too want to know how serious you are. And I tell him, you're very much so serious. … So he was wondering … if it is you could have come up with $500,000 so he could start paying, he will give [it to people under him]." The parties then agreed to set up a meeting with the Defendant for April 7, 2022.

**March 30, 2022 – text messages between Oleanvine and the Defendant**

4

On March 30, 2022, the Defendant sent Oleanvine a text message via WhatsApp, "Please send [the CS's] name 911 for the meeting in April. I know you are busy and may have forgotten but I need the information today. Thanks." Later that day, Oleanvine sent a text message to the Defendant with the CS's name. Oleanvine asked to meet with the Defendant to "finalize details at [the Defendant's] convenience," and the Defendant told her, "[c]ome by my for 10:30am sharp." On March 31, 2022, at approximately 7:30 a.m., the Defendant sent a list of requested information to Oleanvine, for her to send to Kadeem and then to the CS. The requested information included the CS's full name, picture, biography, etc. The Defendant confirmed that the meeting would be April 7. Oleanvine sent this to Kadeem, who sent it to the CS.

### March 31, 2022 – the CS speaks with Oleanvine and Kadeem

On or about March 31, 2022, the CS had a phone call with Kadeem and Maynard. That call was audio recorded. Oleanvine said that the Defendant wanted some background information about the CS, but that, "He's very much interested" and that the meeting is "not off." Oleanvine suggested that the CS speak with the Defendant on the phone. The CS agreed and they confirmed a plan to arrange a phone call with the Defendant prior to their April 7, 2022, meeting.

### April 1, 2022 – the CS speaks with the Defendant, Oleanvine and Kadeem

On or about April 1, 2022, the CS had a phone call with the Defendant, Oleanvine, and Kadeem. That call was audio recorded. During the call, they discussed the information that the Defendant had previously requested of the CS. The Defendant explained that he had to be cautious to make sure the CS wasn't law enforcement. He told the CS, "it took me 20 years to get here, and I don't want to leave in 20 minutes." The CS said he was a "fixer" from Mexico,

5

and that he had some business propositions for the Defendant. They agreed that they would go forward with the planned meeting on April 7, 2022.

After the April 1, 2022, call, the CS and Kadeem exchanged a series of WhatsApp messages. The CS asked, "any comment from HC about myself and the call." Kadeem responded: "He say he feel much comfortable now and we going forward he going make sure your safe and whatever you want try to make sure you have what you need…just want to make sure the funds is for real."

### April 7, 2022 – the CS meets with the Defendant and Oleanvine

On April 7, 2022, the CS arrived in Tortola and met with Kadeem and Oleanvine. This meeting was audio recorded. They told the CS that they would be picked up and driven to a meeting with the Defendant. A vehicle arrived at their location to pick up Oleanvine and the CS, and the Defendant was already in the vehicle. They arrived at a large secluded house on Tortola. The Defendant, Oleanvine, and the CS entered the home and sat down to talk. This meeting was audio recorded.

During the meeting, the CS told the Defendant that his organization was looking for safe passage from Tortola. The CS stated, "[w]e are going to come sometimes from Colombia, sometimes from Trinidad and Tobago, and sometimes from Dominican Republic. So, what we bring over there is not testing positive. You understand, or no? The Defendant told the CS to explain. The CS explained, "It's, uh, cocaine. … It's not testing positive," and that "[he didn't] want to bring nothing in the island because I don't want any fight with any group." The CS continued,

> "That vessel is gonna carry, can carry a lot of tons. But we wanna start like a test run like for three thousand. So, three thousand pieces comes, stay. I need a

window 24 to 48 hours. When I have the window, that vessel goes from here to Puerto Rico and from Puerto Rico to Miami.

During the extraction process, the CS explained that, "the purity drops like 2% percent. So it still being, being a high quality product." The CS reassured the Defendant that nothing would test positive, "[i]f this test positive, you seize it because there's not the way that that we work," Further, the CS reassured the Defendant that nothing would be going onto the island, "[b]ut I have no intention to come here and do business inside your island. … Is because the price here in your island is not the price that that we are looking. … here on the island, your price for each kilo is 10 to 12 thousand dollars. Reaching Miami is 26-28." The Defendant replied, "[t]he market is too cheap."

The CS asked the Defendant what percentage of the proceeds the Defendant would need in exchange for his help passing through their ports. The CS explained that the minimum price was $26,000. The Defendant clarified, "per kilo." The Defendant took out a calculator and multiplied 26,000 times the 3,000 kilo shipment the CS wanted to start with and the Defendant said, "for 3,000. That's 78 mil?" The Defendant said, "I don't price people's work. You tell me, I say okay." The CS proposed 12%--comprised of 10% for the Defendant and 2% "to pay around." The Defendant replied, "Yeah, no problem."

Later, the Defendant recapped what he and Oleanvine would do to obtain the necessary licenses, "So that part there is clear. The first one will be the shipping. She told me she was putting in the license, so I need her to get through the one part. Then the other part to the license that I'm going- dealing with the location. I'm going to get that- … -going to get that sorted out." The CS asked, "And of course, how much money do we need, for, for that?" The Defendant said, "Yeah. First part is 500,000." The CS asked, "[s]o before we pass that, uh do we have an

7

agreement? Because you didn't say it." The Defendant stated, "I give you my word on that, the first one with working with you with that part."

After that, the CS gave the Defendant $20,000 in U.S. currency as a "good faith gift to seal that we have an agreement," to which the Defendant replied, "[n]o thank you, thank you. I didn't expect that at all. No, no, that first part, that's good."

During the meeting , the Defendant asked the CS if he was an undercover. In the CS's response, he explained to the Defendant, "well, first of all, you're not touching anything." The Defendant responded, "I will touch one thing, the money." The CS told the Defendant, "I have no problem with your question, and thank you that, that you understand. But it's, it's the same. You just trust. We can do it or we cannot. And we will be friends. Now, so we good on, on that matter?" The Defendant responded, "Yeah, I'm good."

Towards the end of the meeting, the CS, the Defendant, and Oleanvine agreed they would meet in Miami on April 27, 2022, and that the CS would leave the $700,000 cash in a private jet at Opa Locka airport, that would be retrieved by Oleanvine and an unknown individual on April 28, 2022, to be flown back to Tortola.

Following the meeting, Kadeem coordinated the arrival of the private jet with the $700,000 from Miami to the BVI. Kadeem had control of officials at the airport, and confirmed that they would allow the plane to land.

**April 27, 2022 – the CS and UC meet with Oleanvine and the Defendant at Embassy Suites**

On the evening of April 27, 2022, the CS and the UC met with the Defendant at the Embassy Suites hotel nearby the airport. This meeting was audio recorded. The Defendant, who was not staying at the hotel, arrived with R.S., who was going to accompany Oleanvine on the jet

with the $700,000 the following day. Oleanvine had rented a conference room for the evening meeting.

Once in the conference room, the Defendant asked the ladies to leave so that only the Defendant, the CS, and UC were present. The Defendant asked the CS if he was still selling the kilos for $26,000 apiece, like they had previously discussed. The CS affirmed that he was. The parties then began to discuss the money and its breakdown. The CS stated that the first shipment should arrive early July, and that the UC would be on the island as his contact to manage the movement of the money.

The parties discussed leaving Miami the following day, and the Defendant asked how the money would be packaged. The UC showed the Defendant a picture of the money and the CS explained that it would be in boxes. The Defendant asked, "… is there any way with the bags that they could fit them in to, or pack them in a suitcase where you have a suitcase like a, a dummy section?" The CS assured the Defendant the money would be concealed in the suitcases.

During the meeting, the CS asked the Defendant how he wanted his money delivered in the future. The Defendant stated that there is no crypto on the island, and that other accounts are traceable. The Defendant and the CS discussed cash delivery by sea. The Defendant told the CS that if it was by sea, he had a man named, "Tattoo" who, "moves anything that needs moving, whether it's cocaine, whether it's guns. He does everything." The Defendant said he helped "raise" Tattoo and that he was "like his father."

When the CS stressed the need for discretion, and not speaking over the phone, the Defendant stated, "I am so careful that even if someone goes to the bank and give me money in the wrappers, I take if off and burn it up. They can trace the wrapper." He elaborated that the banks stamp the wrappers on money and can trace the money back to the bank where it came

from. The CS, surprised by this asked, "[s]o this is not your first rodeo, right? I can tell, right? The Defendant replied, "[o]h, no, no, no, Not my first rodeo at all." The Defendant went on to say, "[b]ut over the last 15 to 20 years, with how much persons that rob me with money on the street that just gone dead, I'm up to about 7.5 million dollars. ... The deal went through. ... My part never comes through."

Before ending the meeting, the Defendant agreed to let the CS arrange a private flight for the Defendant and his daughter to Philadelphia the next morning so that they didn't have to take a commercial flight. The Defendant gave the CS his daughter's local address, which was where the Defendant was staying, so the CS could pick up the Defendant and his daughter in the morning.

### April 28, 2022 – Defendant's arrest at Opa Locka Airport

On April 28, 2022, the CS and UC arrived at the Defendant's daughter's residence in South Florida to pick them up and transport them to the airport so the Defendant could verify the cash was all set to be flown to Tortola and so he and his daughter could board their flight to Philadelphia. These interactions were audio and video recorded. Upon arrival at the airport, the CS showed the Defendant the plane destined for Tortola where the cash was stored. In the back of the plane, the CS showed the Defendant the boxes containing the $700,000 for the Defendant and Oleanvine. The Defendant asked as he held a box of cash, "[s]o, the full seven?" The CS replied, "Yes. Seven hundred." Shortly thereafter, the parties exited the plane, and Fahie was subsequently arrested.

II. **ARGUMENT**

At trial, the Government expects that the Defendant will try to assert an entrapment defense. Entrapment is an affirmative defense. Additionally, "entrapment is a relatively limited

defense. It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been 'overzealous law enforcement,' but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government." United States v. Russell, 411 U.S. 423, 435 (1973).

"The defense of entrapment rests on the theory that a defendant is not culpable where government officials instigated his conduct. There is no entrapment, however, if the accused is ready and willing to commit the crime whenever the opportunity might be afforded - even if by government agents or informers acting under their supervision." United States v. Mayweather, 991 F.3d 1163, 1175-76 (11th Cir. 2021) (quoting United States v. Groessel, 440 F.2d 602, 605 (5th Cir. 1971)).

Before entrapment can be properly raised, a defendant must first present evidence of governmental misconduct or improper inducement. A successful entrapment defense involves two elements: 1) governmental inducement of the crime; and 2) the defendant's lack of predisposition to commit the crime prior to inducement. See United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir. 2007). The burden first falls on the defendant to present evidence of governmental inducement or misconduct.

> This burden is light because a defendant is generally entitled to put a recognized defense to the jury where sufficient evidence exists for a reasonable jury to find in her favor. Nevertheless, evidence of the government's mere suggestion of a crime or initiation of contact is not enough. Instead, government inducement requires an element of persuasion or mild coercion. . . . [I]nducement consists of *opportunity plus something like excessive pressure or manipulation of a non-criminal motive.*

United States v. Sistrunk, 622 F.3d 1328, 1333 (11th Cir. 2010) (quoting United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995) (internal citations and quotations omitted) (emphasis added)).

"[T]the law clearly requires more than a scintilla of evidence that improper Government conduct created the risk that a person other than one ready to commit the offense was so involved." United States v. Davis, 902 F.2d 860, 866 (11th Cir. 1990). "The defendant will be considered to have met this burden if he produces evidence that the government's conduct included some form of persuasion or mild coercion." United States v. Grajales, 450 Fed. Appx. 893, 898 (11th Cir. Jan. 10, 2012) (unpub op.) (citing Brown, 43 F.3d at 623 (11th Cir. 1995)). "Evidence of 'persuasion or mild coercion' may be shown by evidence that the defendant 'had not favorably received the government plan, and the government had to 'push it' on him, or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate.'" Sistrunk, 622 F.3d at 1333 (quoting United States v. Alston, 895 F.2d 1362, 1368 (11th Cir. 1990)).

The Government's mere suggestion of a crime or initiation of contact is insufficient. Evidence that an agent simply sought out or initiated conduct with a defendant and proposed the illicit or "attractive" transaction does not entitle a defendant to an entrapment instruction. See Mayweather, 991 F.3d at 1177 (citing Sistrunk, 622 F.3d at 1334 and Brown, 43 F.3d at 623); see also United States v. Ventura, 936 F.2d 1228, 1233 (11th Cir. 1991); United States v. West, 898 F.2d 1493, 1502 (11th Cir. 1990). "In other words, an opportunity *plus* some added government behavior that aims to pressure, manipulate, or coerce the defendant into criminal activity is government inducement." Id. (emphasis in original); see also id. at 1179-80 (finding no inducement where confidential informant showed a defendant drugs, "explained how the job

12

worked," provided the defendant "the opportunity to back out and [t]he defendant declined to do so," or where confidential informant's contact with a defendant was initiated by the defendant, through another co-conspirator, and the confidential informant "confirmed with [the defendant] that [the defendant] was not being 'forced; to participate.").

Certainly, the Government may employ artifice and strategy in conducting the investigation. See Jacobson v. United States, 503 U.S. 540, 548 (1992); United States v. Hudacek, 24 F.3d 143, 146 (11th Cir. 1994). Further, "[a] defendant cannot avail himself of an entrapment defense unless the initiator of his criminal activity is acting as an agent of the [G]overnment." United States v. Isnadin, 742 F.3d 1278, 1308 (11th Cir. 2014) (quoting United States v. Mers, 701 F.2d 1321, 1340 (11th Cir. 1983)).

"If the defendant meets this initial burden, '[he] is entitled to have his defensive theory of the case put before the jury with appropriate instructions from the trial judge.'" Mayweather, 991 F.3d at 1176 (quoting United States v. Ryan, 289 F.3d 1339, 1344 (11th Cir. 2002)). Thereafter, the burden shifts to the Government to prove the defendant's predisposition to the jury beyond a reasonable doubt. See Ryan, 289 F.3d at 1343. "This element 'focuses upon whether the defendant was an 'unwary innocent' or, instead an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." Isnadin, 742 F.3d at 1298 (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)). "The 'predisposition inquiry is a purely subjective one which asks the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the [G]overnment's officers or agents.'" Id. (quoting Brown, 43 F.3d at 624).

The Eleventh Circuit "has rejected the notion that the predisposition analysis is one that occurs against a backdrop of fixed, enumerated factors; instead, it has held that it is necessarily a

13

fact-intensive, subjective inquiry into a defendant's state of mind." Isnadin, 742 F.3d at 1298. Nonetheless, there are several principles that aid courts in the analysis. The Government is not required to actually have evidence of predisposition prior to commencing its investigation. Evidence of predisposition can be developed or learned after the investigation commences. See United States v. Aibejeris, 28 F.3d 97, 99 (11th Cir. 1994). Predisposition may also be demonstrated by establishing: 1) the defendant's ready commission of the charged crime; 2) that the defendant was given chances to back out and failed to do so; 3) although not dispositive, the defendant's prior related offenses; 4) the defendant's post-crime admissions; and/or 5) the defendant's credibility and demeanor. Isnadin, 742 F.3d at 1298.

### A. Absent His Own Trial Testimony or Evidence, the Defendant Cannot Establish Governmental Misconduct or Inducement.

The Government's case-in-chief, which will include the Defendant's recorded conversations with the CS, Oleanvine's testimony, and WhatsApp messages between (1) Oleanvine and the Defendant, (2) Oleanvine and Kadeem, and (3) Kadeem and the CS, will overwhelmingly demonstrate the Defendant's knowing and willful participation in the scheme before the Defendant ever spoke with or had met the CS or the UC.

Specifically, on March 22, 2022, two days after the CS had met Oleanvine and laid out the scheme, Oleanvine, not the CS or UC, spoke with the Defendant about the scheme. When Oleanvine reported back to Kadeem and the CS, she explained that the Defendant was "very much interested" and that he had asked for $500,000 to get people on his side. Moreover, he gave her code words to use in reference to the CS and the scheme in order to avoid detection. At this point, having never spoken with the CS or the UC, the Defendant was already plotting with Oleanvine about what money he would need to carry out the scheme and how they would avoid

detection. As a matter of law, the Defendant cannot show the Government induced him to commit the crime.

Even after the Defendant met the CS, he cannot support an allegation that he was induced. The Defendant's first introduction to the CS was at Oleanvine's suggestion and this was done over the phone. During this phone call, the CS disclosed that he was a "fixer" from Mexico and said nothing that could be construed as coercive. The purpose of the phone call was for the Defendant to decide whether to meet with the CS, the Defendant was not asked to make any decision on the spot. Nonetheless, after this phone call, the Defendant agreed to move forward with a meeting with the CS, knowing that he was a "fixer" from Mexico.

At the April 7, 2022, meeting, the Defendant cannot present any evidence of government inducement or misconduct. The CS met with the Defendant and presented the scheme, or artifice, which is an entirely proper investigative method. The Defendant controlled every aspect of the meeting, which undermines any allegation that the CS induced him or engaged in government misconduct. The Defendant decided whether to have the meeting in the first instance. The Defendant chose the meeting location. The Defendant had his driver pick up the CS. The Defendant had his own security at the meeting. And the Defendant, who was the elected Head of Government of the BVI, had the CS travel from outside of the BVI to meet him in the BVI. During the meeting, the CS was clear that the scheme involved "cocaine" that "wouldn't test positive" and would be sold in the U.S. for at least "$26,000" per kilogram. After having said this, the CS gave the Defendant the opportunity to decline to participate in the scheme, stating, "We can do it or we cannot. And we will be friends. Now, so we good on, on that matter?" The Defendant responded, "Yeah, I'm good."

Even after the April 7, 2022, meeting the Defendant continued to engage Oleanvine and the CS with the plan. The Defendant agreed to meet the CS in Miami on April 27, 2022, where they discussed at length how the CS's vessels would pass through the BVI—including the licenses he was working on and the bribes he would pay.

In sum, the Defendant joined the conspiracy without having met the CS or UC, and even after meeting them he continued participating in the scheme despite several opportunities to back out. Thus, the Defendant cannot show government inducement and is not entitled to a raise an entrapment defense.

### III.   CONSULTATION

Counsel for the Defendant opposes the government's motion at this time.

### IV.   CONCLUSION

**WHEREFORE**, based on the foregoing, this Court should preclude the Defendant from raising an entrapment defense at trial.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   /s/Kevin D. Gerarde
Kevin D. Gerarde
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
Fla Bar No. 113844
11200 NW 20th Street, Suite 101
Miami, Florida 33172
Tel: (305) 715-7648
Email: Kevin.Gerarde@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 19, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF

                                                */s/Kevin D. Gerarde*
                                                Kevin D. Gerarde
                                                Assistant United States Attorney