```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                       CASE NO. 22-CR-20191-KMW
 3

 4    UNITED STATES OF AMERICA,
                                        Miami, Florida
 5                 Plaintiff(s),
                                        May 4, 2022
 6            vs.

 7    ANDREW ALTURO FAHIE,
      OLEANVINE PICKERING MAYNARD,
 8
                   Defendant(s).       Pages 1 -  61
 9    -----------------------------------------------------------

10                     STATUS/DETENTION HEARING
                TRANSCRIBED FROM DIGITAL AUDIO RECORDING
11          BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
                   UNITED STATES MAGISTRATE JUDGE
12
      APPEARANCES:
13
      FOR THE PLAINTIFF(S):  FREDERIC C. SHADLEY, ESQ.
14                           SHANE BUTLAND, ESQ.
                             UNITED STATES ATTORNEY'S OFFICE
15                           11200 N.W. 20th Street
                             Miami, FL 33172
16                           305-715-7649
                             frederic.shadley@usdoj.gov
17                           shane.butland@usdoj.gov

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES (CONT'D)

 2

 3    FOR THE DEFENDANT(S):    THERESA M.B. VAN VILET, ESQ.
      Fahie                    VENABLE, LLP
 4                             200 East Broward Boulevard
                               Fort Lauderdale, FL 33301
 5                             954-453-8012
                               tmvanvliet@venable.com
 6

 7

 8    FOR THE DEFENDANT(S):    ELIZABETH BLAIR, ESQ.
      Pickering Maynard        FEDERAL PUBLIC DEFENDER'S OFFICE
 9                             150 W Flagler Street
                               Miami, FL 33130-1556
10                             305-530-7000
                               elizabeth_blair@fd.org
11

12

13    TRANSCRIBED BY:          Joanne Mancari, RPR, CRR, CSR
                               Court Reporter
14                             jemancari@gmail.com

15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon,

2    the following proceedings were held:

3              THE DEPUTY CLERK:  The United States of America v.

4    Andrew Alturo Fahie and Oleanvine Pickering Maynard, case No.

5    22 2719, Goodman.

6              MR. SHADLEY:  Good afternoon, I guess, your Honor.

7    Fritz Shadley for the United States.  With me at counsel table

8    is AUSA Shane Butland.

9              MS. VAN VILET:  Good afternoon, your Honor.  Theresa

10   Van Vilet on behalf of Mr. Andrew Fahie.  It is oddly

11   pronounced -- spelled F-A-H-I-E, pronounced Foy, as in boy.

12             THE COURT:  OK.

13             MS. VAN VILET:  Your Honor, I note that there's no one

14   present for --

15             THE COURT:  For Ms. --

16             MS. VAN VILET:  -- Ms. Maynard.

17             I do have some historical background on that vis-a-vis

18   the events at the initial appearance before Judge Goodman, if

19   you'd like me to put them on the record.

20             THE COURT:  OK.  We will address that.

21             Before we do that, I am informed that there are some

22   members of the press present in court, and of course you are

23   welcome, but I want to make sure that you are aware of our

24   local Rule 77.1, which reads as follows:

25             Other than required by authorized personnel in the

1   discharge of official duties, all forms of equipment or means

2   of photographing, audio or video recording, broadcasting or

3   televising within the environs of any place of holding court in

4   the district, including courtrooms, chambers, adjacent rooms,

5   hallways, doorways, stairways, elevators or offices of

6   supporting personnel, whether the court is in session or at

7   recess, is prohibited, with exceptions for naturalization and

8   national emergencies.

9           I want to ensure that the members of the press, who

10  are obviously welcome in the courtroom, are aware of this local

11  rule and will agree to abide by it.

12          All right.  Thank you very much.

13          All right.  Ms. Van Vilet.  So if you want to go ahead

14  and give me the background.

15          MS. VAN VILET:  Yes, ma'am.

16          Both defendants made their initial appearance before

17  Judge Goodman on Friday --

18          THE COURT:  Right.

19          MS. VAN VILET:  -- at 1:00 by Zoom.

20          THE COURT:  Zoom.

21          MS. VAN VILET:  After I noticed my temporary

22  appearance for Mr. Fahie -- now I'm doing it -- for

23  Mr. Fahie --

24          THE COURT:  Fahie.

25          MS. VAN VILET:  -- the court was addressing

1    Ms. Maynard's situation, asked whether she had counsel.  She

2    responded that she did not and that she wanted appointed

3    counsel.

4          Judge Goodman was reviewing the Pretrial Services

5    report, indicated that while he would be happy to go through

6    the process with her, which would be under oath, that he just,

7    based on his cursory review, didn't believe that she would be

8    entitled to a finding of indigency.

9          THE COURT:  Indigency.

10          MS. VAN VILET:  He then asked me, and I was still on

11   the Zoom call, although muted and not present via video, if I

12   would reach out for members of Ms. Maynard's family, and the

13   court through the Pretrial Services officer within a chat on

14   Zoom provided me with the telephone number.

15          I did reach -- and tell them about the setting for

16   both today and for the preliminary or arraignment on the 13th.

17          I did so.  I gave the defendant's son Claudius the

18   name of a couple of attorneys.  Well, specifically one

19   attorney.  I gave the contact number for the attorney.  I gave

20   the attorney a call, you know, traded information.  I know they

21   called and spoke to each other because I've heard back from

22   that attorney.

23          Friday I heard from another attorney, Mr. Diruzzo,

24   D-I-R-U-Z-Z-O, in Fort Lauderdale, who indicated to me that he

25   was being retained for one of the Maynards.

1          That is the last I've ever heard.  I have no idea why
2     there is no one present today.
3          THE COURT:  All right.  So I guess, Ms. Maynard, let
4     me just ask you, are you in the process of obtaining
5     representation?
6          DEFENDANT O. MAYNARD:  Yes.
7          THE COURT:  You are.  How long do you think you will
8     need to do that?
9          DEFENDANT O. MAYNARD:  Your Honor, the problem is I'm
10    not getting any phone calls.
11         THE COURT:  Let's see.  Let's get the mic near you so
12    we can hear you.
13         DEFENDANT O. MAYNARD:  I am not get any phone calls to
14    the outside to be able to get in touch with the family to find
15    out what is happening.  I have requested it in writing.  I have
16    begged them for phone calls and to no avail.
17         THE COURT:  OK.  All right.  So you have not been able
18    to speak to either your family or anyone else?
19         DEFENDANT O. MAYNARD:  No, ma'am.  No, your Honor.
20         THE COURT:  All right.  OK.  And you do want to retain
21    your own counsel?
22         DEFENDANT O. MAYNARD:  I need some type of counsel.
23    (Inaudible) if I could have gotten one today, a public
24    defender.  Is that what you call them?
25         THE COURT:  Yes, that's what we call it.

1      DEFENDANT O. MAYNARD:  I would appreciate it to set
2 the bond ruling.  The problem is access to the outside.
3      THE COURT:  Yes.  I can see based on the Pretrial
4 Services report the concerns that Judge Goodman expressed in
5 terms of qualifying, but what I can do, and I don't know -- do
6 we still have the Public Defender here?
7      MS. BLAIR:  Yes, your Honor.
8      THE COURT:  What I could do, and obviously the Public
9 Defender would not be able to -- well, I don't know that they
10 would be prepared, but what I can do is I can make the inquiry
11 and make the appointment subject to your potential contribution
12 to the cost of the representation so that at least you have
13 someone on the outside speaking on your behalf and then maybe
14 getting things rolling.
15      Are you agreeable to that, Ms. Blair?
16      MS. BLAIR:  Yes, your Honor.
17      DEFENDANT O. MAYNARD:  Thank you, your Honor.
18      MS. BLAIR:  Yes, your Honor, and then if we could just
19 set a report very quickly so if she does have counsel, they can
20 enter a notice --
21      THE COURT:  Yes.
22      MS. BLAIR:  -- or if she doesn't, then we can start
23 working on it.
24      THE COURT:  Yes.  Yes.  OK.
25      MR. SHADLEY:  Your Honor.

```
 1              THE COURT:  Yes.
 2              MR. SHADLEY:  May I step out briefly to use the
 3    restroom while you do the colloquy?
 4              THE COURT:  Yes.
 5              MR. SHADLEY:  Mr. Butland will be at the table.
 6              THE COURT:  Yes.
 7              All right.  So let's just take up the matter of
 8    representation for Ms. Maynard.
 9              If Mr. Fahie could just step to the side for a moment.
10              All right.  If you can keep providing her with a
11    microphone.
12              All right, ma'am.  So I'm going to make an inquiry of
13    you at this point in time regarding the potential appointment
14    of counsel for you.
15              DEFENDANT O. MAYNARD:  Yes, your Honor.
16              THE COURT:  All right.  All right.  So to that end I'm
17    going to ask you some questions to determine if you are
18    eligible for the appointment of counsel.
19              Please listen carefully to my questions.  Answer only
20    the questions I ask you.  Any answer you give me must be
21    truthful, and false answers could subject you to prosecution
22    for perjury.  You have the right to refuse to answer questions,
23    but you do not have the right to answer them falsely.
24              THE DEPUTY CLERK:  Raise your right hand.
25              Do you solemnly swear to tell the truth, the whole
```

1    truth, and nothing but the truth so help you God?

2           DEFENDANT O. MAYNARD:  Yes.

3           THE COURT:  All right, ma'am.  So you have been trying

4    to hire an attorney but you have not been able to do so.

5           At this point in time here in the United States do you

6    have any resources that you can rely upon to hire an attorney?

7           DEFENDANT O. MAYNARD:  I have my bank cards, but

8    they're with the officers who detained me.  My purse is with

9    them still.

10          THE COURT:  OK.  So you don't have access to your

11   financial assets at this point in time?

12          DEFENDANT O. MAYNARD:  Not right now, unless I'm

13   outside to living, I wouldn't be able to have access to it.

14          THE COURT:  All right.  So based on those

15   circumstances I will not make any further inquiry at this point

16   in time regarding your potential assets since you don't have

17   access to them at this time.

18          So what I will do is I will appoint the Public

19   Defender subject to the requirement that they turn in a report

20   on your ability to contribute to your representation.

21          Ms. Blair then will be able to reach out on your

22   behalf to your family members if you give her some phone

23   numbers and help you expedite these matters.

24          DEFENDANT O. MAYNARD:  I will appreciate it, your

25   Honor.

```
 1              THE COURT:  All right.  So then I think Ms. Van Vilet
 2    has some numbers.
 3              MS. VAN VLIET:  I do, your Honor, and I'm gathering
 4    them for Ms. Blair right now.
 5              THE COURT:  OK.  So everything that Ms. Maynard would
 6    provide you already have?
 7              MS. VAN VLIET:  I don't know that I have everything,
 8    but I certainly have the number of her son that is local.
 9              THE COURT:  Is a local son, you have that number?
10              MS. VAN VLIET:  Yes, ma'am.
11              THE COURT:  Any other numbers you wish to provide to
12    Ms. Blair, Ms. Maynard?
13              MS. VAN VLIET:  I'm already providing her with the
14    numbers and the names of the two lawyers that I know we're in
15    contact with.
16              THE COURT:  Right.
17              MS. VAN VLIET:  But that is all I know.
18              THE COURT:  Any other family members, ma'am?
19              MS. VAN VLIET:  No, that's -- it's for you.
20              DEFENDANT O. MAYNARD:  I have a lot of family members
21    overseas.
22              THE COURT:  No, here.  I guess in Miami.
23              DEFENDANT O. MAYNARD:  No, ma'am.
24              THE COURT:  All right.  I guess the son would be the
25    prime contact, and Ms. Blair has that number.  So she will
```

 1   reach out.

 2          The report, Ms. Blair, when would you like to submit

 3   that on assets, or do you want to hold off on that and see if

 4   somebody shows up?

 5          MS. BLAIR:  If we could hold off on it and then if at

 6   the next court date we're fully appointed --

 7          THE COURT:  Yes.

 8          MS. BLAIR:  -- we can do that.  If we're not --

 9          THE COURT:  I'll give it 30 days.  That should be

10   enough.  30 days for the report.

11          So then when, then, do you want to set the detention

12   hearing then, so you can have time to see if somebody's willing

13   to appear?

14          MS. BLAIR:  If we can set for Friday report re counsel

15   and then report re detention hearing.

16          THE COURT:  Yes.

17          MS. BLAIR:  I know that FDC won't let me in in time.

18          THE COURT:  Yes.

19          MS. BLAIR:  But hopefully I can talk to counsel and

20   cocounsel and figure it out.

21          THE COURT:  OK.  All right.  So for Ms. Maynard we

22   will have report re counsel and detention hearing on Friday,

23   May 6th, at 10 a.m., and hopefully, Ms. Maynard, with the

24   assistance of Public Defender Ms. Blair we will get your

25   situation sorted out.

```
 1              DEFENDANT O. MAYNARD:  Thank you very much, ma'am.

 2         THE COURT:  All right, ma'am.  Thank you.

 3         MS. BLAIR:  Thank you, your Honor.

 4         THE COURT:  All right.

 5         So then we have Mr. Fahie.

 6         MS. VAN VLIET:  Your Honor, may I just have a moment

 7    to finish writing this phone number for Ms. Blair?

 8         THE COURT:  Yes.  Yes.  Of course.

 9         MS. VAN VLIET:  Thank you.

10         MR. SHADLEY:  Afternoon again, your Honor.  Fritz

11    Shadley for the United States as to Mr. Fahie.

12         THE COURT:  OK.

13         (Pause)

14         THE COURT:  All right.  Ms. Van Vilet, so you're still

15    temporary, correct?

16         MS. VAN VILET:  Yes, ma'am, I am.  I've talked to

17    Mr. Shadley and I am going to request that the court give us

18    three more weeks.  I know that the date is May 25th, having

19    been here today, to have the inquiry re counsel and determine.

20    Because of the situation, and I'll get into this later, but

21    Mr. Fahie is in that same observation period that prior counsel

22    in another matter discussed, and he's actually in the SHU, the

23    Special Housing Unit, which makes it even more impossible to

24    get ahold of him or, more importantly for these purposes,

25    making financial arrangements for him to get ahold of anyone
```

```
1    else.

2               THE COURT:  Yes.

3               MS. VAN VILET:  So if we could have that extra time, I

4    would greatly appreciate it so I could try to get it resolved.

5               THE COURT:  All right.  So as it stands right now the

6    preliminary hearing/arraignment is set for May the 13th.

7               MS. VAN VILET:  Yes, ma'am.

8               THE COURT:  You want to push that out, that and report

9    re counsel, to May 25th?

10              MS. VAN VILET:  Yes, ma'am.

11              THE COURT:  Any objection?

12              MR. SHADLEY:  No, your Honor.

13              THE COURT:  All right.  So that is being pushed out to

14   May 25th.

15              So then the matter before us right now is the

16   government's request for detention hearing.

17              Now, I would like to ask, regarding this notice of

18   immunity and government's response, notice of invocation of

19   immunity, government's response, is this something that is

20   being presented to me to address before proceeding on the

21   detention hearing or is this something that a motion to dismiss

22   will be filed eventually once an indictment is returned?

23              MS. VAN VILET:  Both, your Honor, because it is a

24   personal jurisdiction basis.  So it has to be raised in the

25   first instance.
```

```
 1              I fully admit and don't expect that -- it's a very
 2    complicated matter, issue, I believe, and I don't necessarily
 3    think that the court, given the quick pace at which things are
 4    going, would have necessarily the time to rule on it today.  I
 5    have to raise it today or it may be deemed waived.  Certainly
 6    it will also be the subject of additional motion practice later
 7    and through down the road.
 8              THE COURT:  So everything that we do would be subject
 9    to your notice of invocation of immunity which then you can
10    keep pursuing whether by way of dismissal of indictment or
11    requesting a hearing and so on, but we do need to get on with
12    the detention hearing, correct?
13              MS. VAN VILET:  Yes, your Honor.
14              Some of the things I'm going to address when we get to
15    the point of time of argument will relate to those things, but
16    I'm also, candidly, to show my hand, while reserving all rights
17    under that notice and invocation that I've made, I'm going to,
18    if you will, suggest an off-ramp for purposes of the detention
19    today and a condition, a series of conditions of bond,
20    actually, that are a little more onerous than those suggested
21    by Pretrial Services in this situation because I recognize it's
22    a unique situation.
23              THE COURT:  All right.  Have you had any discussions
24    with Mr. Shadley to see if there is some kind of agreement on
25    this proposed off-ramp?
```

1              MS. VAN VILET:  I have had several conversations with

2       him.  To date, the government is unwilling to agree.

3              THE COURT:  I see.  OK.  So we will go forward as a

4       regular detention hearing and you can raise all of the

5       arguments, including preservation of your notice of invocation

6       of immunity.

7              MS. VAN VILET:  Thank you, ma'am.

8              THE COURT:  All right.  So then I did receive the

9       government's -- where is it?  Where did it go?  Here we go --

10      government's motion for pretrial detention.  I did get the

11      opportunity to review it.

12             We will start with the government's proffer to make a

13      record of, I suspect it will be along the lines of the motion,

14      but let's hear from you, Mr. Shadley, and then you will have an

15      agent?

16             MR. SHADLEY:  Yes, your Honor.  I have an agent

17      present.

18             THE COURT:  All right.

19             MR. SHADLEY:  Before delving into the detention issue,

20      just to briefly discuss, as outlined in our response to the

21      notice of invocation of immunity, this defendant is not

22      entitled to immunity.

23             THE COURT:  Right, but I'm not deciding that now.

24             MR. SHADLEY:  Understood, your Honor.

25             THE COURT:  As Ms. Van Vilet said, the issues are

```
1   complicated.
2            MR. SHADLEY:  I agree.
3            THE COURT:  So for that reason I said that whatever
4   decision is made is subject to Mr. Fahie preserving that
5   objection.
6            MR. SHADLEY:  Understood, your Honor.  I was
7   articulating that position in case relevant to future arguments
8   related to detention.  I will raise that at the time --
9            THE COURT:  Yes.
10           MR. SHADLEY:  -- if articulated by Ms. Van Vilet.
11           THE COURT:  Exactly.
12           MR. SHADLEY:  As noted in our motion, and apparent
13  from the complaint, your Honor, the defendant faces two charges
14  here -- conspiracy to import controlled substances in the
15  United States, 5 kilograms or more of cocaine, and conspiracy
16  to launder money.
17           The guidelines range for those offenses -- first of
18  all, the drug conspiracy carries a ten-year mandatory minimum
19  sentence.  The guidelines range without enhancements for the
20  drug crime is 235 to 293 months.  With a leadership enhancement
21  or abuse of public trust given this defendant's role, the
22  guidelines range would be 360 months to life.
23           I will note before proceeding to the factual proffer
24  that this is a presumption case due to the probable cause that
25  the defendant committed a violation of the Controlled
```

1    Substances Import and Export Act, and that offense carries a

2    sentence of greater than ten years.  The court is statutorily

3    required to presume, subject to rebuttal, that detention is

4    required here.

5         Getting into the factual basis, I'll note for the

6    court that due to the nature of this offense it is a long

7    factual basis and I will be incorporating and relying on both

8    the complaint affidavit and the factual portion of the

9    government's motion for pretrial detention.

10        THE COURT:  Right, and as I said, I have reviewed it

11   and it is part of the record, but just to make sure that the

12   hearing record is complete, if you could just, in an

13   abbreviated fashion, state your grounds.

14        I believe you're traveling under both risk and danger?

15        MR. SHADLEY:  That's correct, your Honor.

16        THE COURT:  So if you could state your grounds that

17   support those in terms of the factual proffer and then I'll

18   hear your argument.

19        MR. SHADLEY:  Of course, your Honor.  I'll provide a

20   brief summary of the facts --

21        THE COURT:  Yes.  Thank you.

22        MR. SHADLEY:  -- instead of regurgitating everything

23   that's been filed.

24        So beginning in October of 2021, a DEA confidential

25   source began meeting with individuals on the island of Tortola

1    who were engaged in drug trafficking and money laundering.  The

2    CS expressed a desire to use the island as a transshipment

3    point for cocaine that would be coming from Colombia through

4    the island into Puerto Rico and then here to Miami.  Those

5    individuals expressed the ability and desire to put the

6    confidential source in touch with political leadership on the

7    island of Tortola, including the director of ports,

8    Ms. Maynard, codefendant here, and the Premier of the island

9    Mr. Fahie, the defendant before us now.

10        Between the months of March and April of 2022, the CS

11    met and communicated with Mr. Fahie and Ms. Maynard and

12    Ms. Maynard's son, Kadeem Maynard, on multiple occasions.

13    Those occasions and telephone calls were audio or audio and

14    video recorded by the confidential source.

15        During those meetings and calls the CS informed the

16    defendant that he was a member of the Sinaloa Cartel and he

17    wished to transport thousands of kilograms of cocaine from

18    Colombia through Tortola to Puerto Rico with the destination of

19    Miami and then New York.

20        The defendants, including Mr. Fahie, agreed to help

21    import cocaine into Puerto Rico and then Miami by carrying out

22    the following acts, among others:  First, by providing

23    businesses the CS could use as cover for the drug transport;

24    second, by providing the CS with licenses needed to assure safe

25    passage for his cocaine through the BVI; third, by accepting

1    bribes to assure that the CS's shipments would not be stopped

2    by law enforcement and the BVI, including initial bribes of

3    $10,000 to Ms. Maynard and $20,000 to Mr. Fahie; agreeing to

4    accept future bribes to ensure the continued success of their

5    drug trafficking venture; arranging bribes to another BVI

6    government official, who I will refer to throughout this

7    presentation as Government Official One, so that that

8    individual would not interfere with their drug trafficking

9    activity; securing access for the CS through the BVI's ports

10   and airports; arranging to receive payments from the CS through

11   bank accounts, businesses, or cash deliveries via plane and

12   boat; and eight, arranging for fake seizures of bad cocaine by

13   the government of the BVI to ensure that the real cocaine

14   shipments would not attract unwanted attention.

15          The defendants ultimately agreed that the first

16   shipment of cocaine, 3,000 kilograms, would come through the

17   BVI during early July 2022.  Then they agreed to coordinate two

18   shipments of 3,000 kilograms of cocaine every month for a

19   period of four months.

20          In sum, the conspiracy involving Mr. Fahie,

21   Ms. Maynard and Kadeem Maynard then would total 27,000

22   kilograms of cocaine.  Based on the Miami market price for

23   those kilos of cocaine, they would then agree to launder back

24   to the BVI tens of millions of dollars.

25          As an initial payment for their role in the

1    conspiracy, Mr. Fahie and Ms. Maynard planned to accept

2    $700,000 in cash during a trip to Miami on April 28, 2022.

3    That payment included $500,000 for Mr. Fahie and $200,000 for

4    Ms. Maynard.

5          They would later be paid approximately 10 percent of

6    the drug sales in Miami for each shipment or roughly $7.8

7    million per load.   In addition, they would receive 2 percent in

8    order to pay for expenses on the island, including additional

9    bribes.

10          The defendants agreed to this payment structure.

11          There were a series of meetings, as noted, throughout

12    the months of March and April of 2022 between Mr. Fahie,

13    Ms. Maynard, Kadeem Maynard, and the confidential source who

14    presented himself as a member of the Sinaloa Cartel.

15          I have a long written factual proffer that describes

16    each of those meetings, but I won't bore the court with that

17    now as that has previously been submitted into the record, and

18    I incorporate that by reference now.

19          I will note, though, that throughout the defendant in

20    his own words, in recorded conversations, referred and

21    discussed connections with nefarious criminals or individuals

22    throughout the world.   This included a man from Senegal, to

23    whom the defendant owed tens of thousands of dollars, who had

24    helped him with political issues; included a drug trafficker

25    from the BVI, whose nickname the defendant provided, who moved

1    guns and cocaine, according to Mr. Fahie, and who Mr. Fahie

2    found to be very reliable.  This included a political fixture

3    on the island who Mr. Fahie claimed helped him with political

4    issues that were not exactly aboveboard.

5        All of these issues are set out, as I mentioned, in

6    the complaint and in the government's motion to dismiss.  So I

7    won't go through each of them one by one now, but I will note

8    that the defendant explained to the confidential source during

9    their second-to-last meeting, after discussing the defendant's

10   sophisticated approach and cautious nature in carrying out the

11   crimes at hand, he was asked if it was his first rodeo, and he

12   responded:  No, no, no, no, no, not my first rodeo.  Then he

13   rose his first voice and said:  Not my first rodeo at all, and

14   he laughed.

15       So, your Honor, I can get into now the specific

16   arguments for detention or, if you would prefer, I have DEA

17   special agent Brian Witek available and we could present him

18   first and then proceed to argument.

19       THE COURT:  All right.

20       Would you like to question the agent, Ms. Van Vilet?

21       MS. VAN VILET:  Yes, ma'am.

22       THE COURT:  All right.  Let's have him come up.

23       THE DEPUTY CLERK:  Raise your right hand.

24       Do you solemnly swear to tell the truth, the whole

25   truth, and nothing but the truth so help you God?

Witek - Cross

1           THE WITNESS:  I do.

2           THE DEPUTY CLERK:  You may be seated.

3           THE WITNESS:  Thank you.

4           THE DEPUTY CLERK:  You're welcome.

5           Please state your full name for the record and spell

6    your last name.

7           THE WITNESS:  Brian Witek, W-I-T-E-K.

8     BRIAN WITEK,

9         called as a witness,

10        having been duly sworn, testified as follows:

11   CROSS-EXAMINATION

12   BY MS. VAN VILET:

13   Q   Mr. Witek, are you employed by the Drug Enforcement

14   Administration?

15   A   Yes, I am.  I'm a special agent with the Miami field

16   division.

17   Q   How long have you been with DEA?

18   A   I've been with DEA since 2005.

19   Q   Prior to that, did you have any other law enforcement

20   experience?

21   A   No.

22   Q   OK.  Are you involved in this case against, involving

23   Mr. Fahie apart from your testimony here today?  Are you the

24   case agent?

25   A   Yes, I am one of two case agents assigned to this

Witek - Cross

1    investigation.

2    Q   OK.  Were you the affiant in the complaint?

3    A   No, I was not.

4    Q   Who was the affiant in the complaint?

5    A   The affiant was Shad Aschleman.

6    Q   Also a special agent with DEA, is that right?

7    A   Yes.

8    Q   Thank you.

9         Nonetheless, are you familiar with the facts and

10   circumstances set forth in the complaint as additionally set

11   forth in the government's motion for pretrial detention?

12   A   Yes, I am.

13   Q   Do you adopt those facts and circumstances as stated in

14   both documents as your own testimony today?

15   A   Yes, I do.

16   Q   OK.  Now, I noticed in the -- strike that.

17        How many affidavits have you written?

18   A   Over the course of my career I've written several

19   affidavits.

20   Q   OK.  In the context of writing affidavits when you're

21   dealing with a confidential source, it is customary, is it not,

22   to have some discussion of the reliability of that source?  Is

23   that right?

24   A   Yes.

25   Q   OK.  The affidavit that your co-case agent, the affiant,

Witek - Cross

1    submitted in support of the arrest warrant in this case notably

2    doesn't discuss the reliability of the confidential source,

3    correct?

4    A   Yes.

5    Q   OK.  Now, to be sure, it discusses, and to be fair, it, as

6    well as the motion, discusses purported quotations from audio

7    and/or video recordings, correct?  Fair?

8    A   Yes.

9    Q   OK.  And are you aware of any -- strike that.

10           Is this the first time that confidential source has

11   ever been used?

12   A   No.  The confidential source is reliable, trustworthy.

13   Before and after the meetings, that were conducted here in

14   Miami and in Tortola, he was fully debriefed.  We would talk to

15   him, conduct interviews of this informant, and he has been used

16   in the past for several different DEA international

17   investigations.

18   Q   OK.  Has he been used by this affiant before?

19   A   Yes, he has.

20   Q   OK.  At any point in time are you familiar with any

21   incident where that confidential -- where information sourced

22   to that confidential informant has been questioned as it has

23   been portrayed in an affidavit?

24   A   No, I don't.

25   Q   The Senegalese fellow that Mr. Shadley mentioned and that's

Witek - Redirect

```
 1    discussed in the affidavits, as I understand it, Mr. Fahie
 2    allegedly said that 83-some-odd thousand dollars was owed to
 3    this person from, gentleman from Senegal who did some work with
 4    him on political matters of some nature, correct?
 5    A    Correct.
 6    Q    OK.
 7              MS. VAN VILET:  That's all I have.  Thank you.
 8              THE WITNESS:  Thank you.
 9              MR. SHADLEY:  Just one question, your Honor.
10              THE COURT:  Yes.
11    REDIRECT EXAMINATION
12    BY MR. SHADLEY:
13    Q    Regarding the gentleman from Senegal, was that a normal
14    business payment that would be made via a wire or bank
15    transaction or was he to be paid in cash?
16    A    He was supposed to be paid in cash, and then during the
17    final stages of the meetings it was asked that 133,000 be
18    provided to him in the island of St. Martin.
19    Q    Instead of 83?
20    A    Correct.
21    Q    OK.  Thank you, agent.
22              THE COURT:  All right.  No more questions?
23              MR. SHADLEY:  None from the government.  Thank you,
24    your Honor.
25              THE COURT:  All right.  You're excused, sir.  Thank
```

```
 1    you very much.

 2             THE WITNESS:  Thank you, your Honor.

 3             (Witness excused)

 4             THE COURT:  All right.  So let me hear argument.

 5             Anymore evidence, Ms. Van Vilet, before I hear

 6    argument?

 7             MS. VAN VILET:  I did send this morning copies of

 8    three exhibits --

 9             THE COURT:  Yes.

10             MS. VAN VILET:  -- which I'm gathering from the

11    court's initial comment that you received.

12             THE COURT:  I did, and I reviewed.

13             MS. VAN VILET:  But I would formally move those into

14    evidence now, Judge.

15             THE COURT:  They've been filed as part of the record,

16    but I'm happy to mark whatever you would like as part of this

17    hearing exhibits.

18             So let's see.  It is docket entry 10.

19             MS. VAN VILET:  Correct, and the attachments thereto,

20    if we could just --

21             THE COURT:  Yes.  That's the entirety of docket entry

22    10 --

23             MS. VAN VILET:  Yes, ma'am.

24             THE COURT:  -- with all of the exhibits, and that is

25    admitted into this hearing as Defendant's Exhibit A.
```

```
 1            MS. VAN VILET:  Thank you, ma'am.

 2            THE COURT:  All right.

 3            (Defendant's Exhibit A received in evidence)

 4            MR. SHADLEY:  Your Honor, if I may just briefly, our

 5    only objection to that would be as to the authenticity of

 6    those.  We haven't had anybody testify about where they came

 7    from or who wrote them or who signed them or how they were

 8    provided.

 9            I have no reason to doubt Ms. Van Vilet's veracity,

10    but in terms of whether this is being admitted for evidentiary

11    purposes for an evidentiary type hearing, I don't believe the

12    foundation's been laid to authentic those at present.

13            THE COURT:  All right.  Well, if she relies on any of

14    these for her argument, then you can state your objections at

15    that point in time.

16            MR. SHADLEY:  Thank you, Judge.

17            THE COURT:  All right.

18            MS. VAN VILET:  There's one other factual matter,

19    Judge, before we get to argument that I'd like to clear up, and

20    I've already talked to Mr. Shadley about it and I think we

21    agree.

22            In the Pretrial Services report there is a reference

23    to the government, and -- I apologize.  It is on the first

24    page --

25            THE COURT:  Yes.
```

```
 1              MS. VAN VILET:  -- second-to-the-last line, where it

 2    says:  Defendant -- according to the -- sorry.

 3    Third-to-the-last line.

 4              "According to the government, the defendant renounced

 5    his U.S. citizenship."

 6              The defendant has never been a U.S. citizen.  He was a

 7    permanent resident, which, as it notes in the following phrase

 8    in the sentence, he did renounce.  He was a permanent resident

 9    here when he attended college.  I can't recall which one right

10    now.  I apologize.

11              I believe that -- Mr. Shadley can confirm.  I just

12    want to clarify because --

13              MR. SHADLEY:  That is my understanding as well, your

14    Honor.

15              THE COURT:  All right.  So we will officially correct

16    the Pretrial Services report to state that Mr. Fahie was never

17    a U.S. citizen, he was only a permanent resident, and that was

18    at the time that he attended Florida A&M University in

19    Tallahassee, Florida, where he graduated with a bachelor's

20    degree, bachelor of science degree in mathematics, and that

21    that permanent resident status was in fact relinquished.

22              MS. VAN VILET:  Correct, your Honor, and I say that

23    because of the --

24              THE COURT:  Citizenship issue.

25              MS. VAN VILET:  -- other Pretrial Services comments
```

1    with regard to clarifying immigration status, which hopefully

2    has now been done.

3          So that's all I have from a factual perspective, your

4    Honor.

5          THE COURT:  All right.  OK.  Let me hear now from

6    Mr. Shadley regarding your arguments in support of detention

7    based on risk of flight -- we will take that one first -- and

8    then danger to the community, unless you want to mix and match,

9    and you're free to do that if it's more efficient.

10         MR. SHADLEY:  Thank you, your Honor.  I will address

11   the issues in the order you've suggested.

12         Before I get into that, I will note, once again for

13   the record, that this is a presumption case based on the

14   offense charged and the probable cause outlined in the

15   complaint against this defendant, under which detention is

16   presumed.

17         So in terms of the defendant's risk of flight, again,

18   I'll note, as set out in our motion, that the risk of flight

19   must be shown by a preponderance of the evidence, and I believe

20   we've met and exceeded that standard here.

21         As an initial matter, this defendant has a very

22   serious and compelling reason to flee from prosecution here in

23   the Southern District of Florida.  As noted, he faces a

24   guidelines sentence which is based on the staggering amount of

25   drugs and money at issue here and the range of 360 months to

1    life imprisonment.  That provides a compelling reason for this

2    defendant not to remain here in the Southern District of

3    Florida and face the charges against him but to flee upon

4    release if this court were to consider or were to eventually

5    give this defendant a bond.

6            Secondly, and perhaps most startlingly, is the

7    defendant's complete and utter disregard for the rule of law.

8            In this case while the defendant was serving as the

9    Premier of the British Virgin Islands, he took bribes from

10   someone who presented themself as a member of the Sinaloa

11   Cartel.  He agreed to take future bribes here in Miami when he

12   came to pick up hundreds of thousands of dollars of cash in a

13   private jet.  He did not uphold the duties or the roles

14   required of him and his office in the British Virgin Islands as

15   a public servant.

16           He was presented with a lucrative criminal opportunity

17   by someone he thought belonged to the Sinaloa Cartel, and

18   instead of reporting that person, Mr. Fahie joined.  He has

19   shown throughout this case that he is corrupt to the core, that

20   he believes he is above the rule of law, and that causes

21   serious, serious doubts as to whether he could ever comply or

22   would willingly comply when faced with such a high sentence

23   with any terms of bond set by this court, and that wasn't just

24   during law enforcement's investigation.

25           As I noted earlier, Mr. Fahie himself explained his

1    history of criminal activity.  I know the court is commonly,

2    and in this case too, presented with a Pretrial Services report

3    that sets forth a criminal history of the defendant.  We don't

4    have here convictions or arrests listed in the Pretrial

5    Services report, but we do have the defendant's own words

6    during his meetings with the confidential source when he

7    discussed 15 to 20 years of involvement in criminal activity,

8    of helping deals get through but being stiffed by his criminal

9    partners, of working with cocaine and arms traffickers in the

10   BVI who he considered to be old friends and reliable.  He said,

11   as noted, this endeavor with the Sinaloa Cartel was not his

12   first rodeo.

13        I submit that that disregard for the requirements of

14   his office, the service he owed to the public places Mr. Fahie

15   in a heightened sense as someone who cannot be expected to

16   comply with any orders of this court.

17        I will note that we often also discuss in terms of

18   Pretrial Services reports and in hearings like this before your

19   Honor instances when individuals have been under probation or

20   ordered to appear and they fail to do so or they have been

21   under court orders and they fail to comply with those court

22   orders.  I will note for this court, although not the exact

23   same thing, a slightly analogous consideration is that while

24   these crimes were being committed by the defendant he did all

25   of this while serving as the Premier of the BVI, while the

1    government was under a commission of inquiry due to the rampant

2    corruption on the island.

3         There was legal inquiry ongoing into corruption.  It

4    was lawfully not allowed, his actions on the island or in the

5    United States, and he was a public servant sworn to uphold

6    those laws but he broke them over and over again.

7         So we talked about the reason the defendant would flee

8    and we talked about his disregard for the rule of law.  Now I

9    want to focus on the defendant's connections and his ability to

10   flee.

11        We've mentioned briefly today, and it is set out in

12   details in the papers before the court, the defendant mentioned

13   the following individuals as associates who were either

14   criminal or at the least involved in nefarious activity.

15        The individual from Senegal, who Mr. Fahie agreed to

16   meet in St. Martin to pay back a cash payment in $100 bills of

17   $133,000 because that individual helped him with something

18   political.

19        The individual funded BVI, for whom the defendant

20   provided his nickname, who he considered to be a reliable old

21   friend, who also just happened to be an arms dealer or

22   trafficker and a cocaine dealer or trafficker.

23        The defendant described a female political fixer on

24   the island who did things for him that were political but not

25   exactly aboveboard.

1    The defendant offered to pay bribes to another

2    government official, Government Official One, on the island, so

3    that that individual would not interfere with the drug

4    trafficking plan alleged in the complaint.

5    The defendant explained to the confidential source how

6    he and his coconspirators controlled access to ports and

7    airports.  The parties discussed, including this defendant, the

8    use of boats and private jets for criminal activity, and the

9    defendant has an extensive history of foreign travel.  Not just

10   the travel listed in the Pretrial Services report, but based on

11   law enforcement inquiries I've also seen trips to London in

12   2021, '19 and '18, Jamaica in '18, '19 and '20, Barbados, the

13   Cayman Islands, Nicaragua, and China in 2014 and 2016.

14   I'll note that China specifically does not have an

15   extradition treaty, is my understanding, with the United

16   States, and any flight to those other islands would

17   dramatically complicate, slow down, and potentially make

18   impossible any prosecution of this defendant.

19   Finally, in this topic of the connections and ability

20   to flee, I'll note that the defendant's ties to this district

21   are minimal.  The defendant's employed on the British Virgin

22   Islands.  He was born there.  His primary residence is there.

23   Most of his family is not in South Florida, and he's lived most

24   of his life in the BVI.

25   It appears, based on submission to the court, Pretrial

1    Services, that his sole connection here is the fact that his

2    daughters, one went to school here and will graduate soon and

3    the other is soon to enroll, and that they have a college

4    apartment in the area.

5         Based on law enforcement's investigation -- Ms. Van

6    Vilet may be able to confirm -- it appears that is a rented,

7    not an owned, residence.  It is not the defendant's primary

8    residence.  And by the very nature of a college apartment it is

9    transitory, not permanent, and falls far short of providing any

10   type of certainty that this defendant would have a stable place

11   and assure his appearance before this court.

12        Two final notes regarding risk of flight.

13        One thing the court is required to consider in its

14   analysis is the weight of the evidence under 3142(g)(2).  Here

15   that weight is overwhelming.  It's set out in the complaint.

16   There are multiple, multiple, multiple recorded conversations

17   with this defendant and others which clearly set out a detailed

18   agreement to import cocaine to the United States and to launder

19   money thereafter.

20        The defendant was given multiple opportunities to

21   withdraw from that conspiracy.  He expressed his own previous

22   position to engage in that conspiracy.  He described his prior

23   involvement in criminal activity.  The evidence is overwhelming

24   and indisputable.

25        Finally, the defendant faces possible immigration

1    consequences in connection with the crimes he's committed here.

2    He traveled here on a visa waiver.  Committing drug trafficking

3    and money laundering offenses while under a visa waiver is in

4    violation of the terms of the visa waiver.  I'm working with

5    CBP to get further guidance on the exact ramifications for

6    immigration concerns for Mr. Fahie, but that is out there as a

7    potential negative repercussion that he might face.

8         Now, Ms. Van Vliet will propose a bond to the court,

9    and we've discussed that previously.  Specifically concerning

10   risk of flight, I'll explain to the court why that doesn't work

11   and why that does not resolve the concerns set out in the Bail

12   Reform Act at 3142, et seq.

13        This defendant has every reason to leave.  He has

14   demonstrated in the past that he will take and give bribes.  He

15   has demonstrated he does not have regard for the rule of law.

16   If released on bond, he's one cut ankle monitor and a speedboat

17   away from escaping into the islands never to be seen again.

18        That's the concern that motivates the government's

19   motion.  That is a factual scenario that seems a near certainty

20   if he is released, and that is why the government doesn't

21   believe there is any condition or set of conditions that this

22   court can enter that would assure the defendant's appearance at

23   future proceedings in this matter for prosecution for the

24   crimes that he has committed.

25        I'll briefly touch on danger as well, your Honor.

1    That covers the risk of flight arguments I wanted to set forth
2    for the court.

3         As to danger, I've noted it, but this is a staggering
4    amount of cocaine the defendant agreed to import here into our
5    community.  He is engaged in corruption at the highest levels,
6    not only allowing himself to be corrupted but offering to
7    corrupt others and knowing, observing, and acquiescing to the
8    criminal activities of still other individuals in the BVI.

9         He protected those individuals, including discussing
10   with the CS, as I've mentioned, his reliable drug trafficking,
11   money laundering friend in the BVI.  He expressed willingness
12   when asked by the source to inquire about acquiring firearms
13   from his Senegalese contact on behalf of the Sinaloa Cartel,
14   and he has self-professed to the government recorded statements
15   about his lengthy involvement in criminal activity.

16        For those reasons the defendant is a danger to the
17   community should he be released, not only because of the harm
18   or threat that he himself poses but because of his ongoing
19   acquiescence and protection provided to other criminal
20   individuals.

21        With that, your Honor, I've completed our argument
22   concerning both risk and danger.  I'll note that risk is a
23   preponderance of the evidence.  I believe we've met and far
24   exceeded that standard here.  Danger is slightly higher, but I
25   believe we've also satisfied that.

1            I'm happy to address any questions the court has or,

2    of course, to respond to any concerns or arguments presented by

3    Ms. Van Vilet.

4            THE COURT:  All right.  Let me hear from Ms. Van

5    Vilet.

6            MS. VAN VILET:  Thank you, your Honor.

7            Obviously, it goes without saying that Mr. Fahie

8    stands here not guilty.  It will also be made clear when on May

9    25th, whenever it is we get to the point of an arraignment,

10   that he's going to be pleading not guilty, and that the facts

11   will show that the circumstances surrounding all of this are,

12   number one, not quite as portrayed by the government but,

13   number two, certainly not with the intent and with the manner

14   or means that the government attempts to portray.

15           One of the things -- and, yes, there's absolutely --

16   they've charged in their -- they've made up in their sting,

17   they threw out there 3,000 kilograms of cocaine.  They might

18   just as well have said 10 or 12 or 30.  It doesn't really make

19   any difference.  There is no cocaine.  They can say whatever

20   they want.  So they can manufacture this staggering amount.

21           It does absolutely affect the sentencing guidelines.

22   Mr. Shadley suggests that that fact alone gives Mr. Fahie, who

23   is without question, without controversy, and as acknowledged

24   by the United States government in their complaint the Premier

25   of the Virgin Islands.

```
 1              THE COURT:  British.

 2              MS. VAN VILET:  Actually, it's literally called the

 3    Virgin Islands, but that's the --

 4              THE COURT:  To make sure the record is clear.

 5              MS. VAN VILET:  Which is an overseas territory of

 6    Great Britain and the United Kingdom, and that he is -- and I'm

 7    going to refer to it from here on out as the BVI, the British

 8    Virgin Islands, even though the technical name is Virgin

 9    Islands and overseas territory, blah, blah.  He is the Premier

10    as he stands here today by reason of that country's, that

11    territory's Constitution.  There is no question about that.

12              Now, the issue of whether down the road this court has

13    personal jurisdiction over him is one that, I submit, will be

14    argued and hopefully decided in my client's favor.  Again, for

15    the record, as you've noted before, we waive nothing in going

16    forward in this setting of those arguments.

17              One of the things -- and since Mr. Shadley referred to

18    it, I'm going to address it.  I mean, obviously I don't speak

19    for the BVI.  I don't represent the BVI, in case there is any

20    lack of clarity on that.

21              Mr. Shadley suggested in a pleading that he referred

22    to this morning before the court that Mr. Fahie is seeking

23    immunity from his heinous and staggering crimes.  That's just

24    not true.  What he is doing is challenging this court's

25    personal jurisdiction.
```

1          This is not a request or, frankly, I don't think there

2     is the basis to ask for a transactional immunity situation.

3     This is, what country deals with this situation -- the United

4     States or the British Virgin Islands and Great Britain and the

5     United Kingdom.  We submit it should be the latter.

6          Moreover, in that same pleading Mr. Shadley announced

7     that it was the position of the government that the British

8     Virgin Islands is not a sovereign state.  They're right, it's

9     not, and no one ever said it was.  It is, rather, an overseas

10    territory of the United Kingdom and Great Britain, and, thus,

11    it is the United Kingdom and Great Britain whose sovereignty is

12    at issue here.

13         There is no question that this man is a high-ranking

14    official and the head of government of an overseas territory of

15    Great Britain and the United Kingdom.  There is also no

16    question, at least based on what I know when I came in here at

17    10:00, that no one in the United Kingdom has waived immunity.

18    And because the government's filings in this case don't address

19    the right sovereign, i.e., the United Kingdom and Great

20    Britain, there has been no express finding by the United

21    States, at least that's been announced before this court or in

22    any pleading, that the United States denies immunity of the

23    United Kingdom and Great Britain.

24         Now, there is no question that these concepts of

25    immunity, head of government -- by the way, not head of state,

1    just also so the record is clear.  Her Majesty Queen Elizabeth

2    is head of state of any overseas territory.  I mean, an

3    overseas territory for the United Kingdom and Great Britain is

4    no different than Puerto Rico is to the United States or Guam

5    or, dare I say, the U.S. Virgin Islands.  All are overseas

6    territories of some other larger and -- well, maybe physically

7    larger, but another country.  In the case of the BVI it's Great

8    Britain and the UK.  In the case of the other three I just

9    mentioned, it's us.  It's the United States.

10        The question then becomes whether the precepts

11   discussed in international law about jurisdictional issues

12   should apply here and are important in terms of serving as a

13   counterbalance and underscoring the need for conditions of bond

14   that will assure Mr. Fahie's appearance but do not hinder, as

15   the International Judicial Court, which is the civil court,

16   noted in its 2002 opinion, does it hinder his ability to

17   perform his duties.

18        Well, goodness knows we've seen how the conditions at

19   FDC -- and I'm not complaining about them.  I note that they

20   are in place for good reason, because of COVID and, quite

21   frankly, I have nothing but thanks and compliments to both the

22   United States Marshal Service and BOP.  They have treated

23   Mr. Fahie well.  They have, when possible, accommodated my

24   ability to contact him.

25        I will tell you being in SHU, it is impossible to,

1   other than if you're lucky, which I was this week, to get a

2   face-to-face meeting with the screen in between you.  There's

3   no contact.  In the meantime, there are posers out on the

4   internet throwing around statements that purportedly come from

5   this man ginning up issues in a political nature down in the

6   BVI, and that is because, as Mr. Shadley referenced in his

7   arguments, the commission of inquiry, which Mr. Shadley

8   referred to, which was begun well before this case with a prior

9   governor, who is, of course, her Majesty's representative in

10  the BVI, that 500-some-odd page report was published within 48

11  hours of Mr. Fahie's arrest.

12          There is absolutely, and I don't think the government

13  would disagree with me, there is no connection between these

14  allegations and that commission report save this.  That

15  commission report recommends the suspension of the British

16  Virgin Islands Constitution for a period of two years.  As we

17  speak, the matter is subject of debate in the British Virgin

18  Islands between their representatives and the UK government.

19          What happens, I don't know.  I don't, obviously, have

20  a dog in that fight.  I have no ability to control it.  But I

21  do know one thing.  His detention makes it impossible for him

22  to fulfill his duties and even consult with the members of his

23  government.

24          We are not talking about hinderance of his duty to

25  attend a cruise conference or go on any one of these other

1    trips throughout the Caribbean and China, which, oh, by the

2    way, were all official travel, as might be expected by someone

3    who is the head of government.  These are fairly, I would say,

4    the most serious of duties that he could and should be

5    performing.

6            Would he be able to perform them perfectly under

7    conditions of bond and not actually being there, no, but at

8    least he can do something.  He can consult.

9            THE COURT:  So let me ask you this.  Mr. Shadley, from

10   what I hear Ms. Van Vliet, she's asking that aside from the

11   usual calculus that is made on detention, which is risk of

12   flight and danger to the community, that this issue of

13   Mr. Fahie being able to fulfill his duties and consult with

14   members of his government play a role in the determination of

15   whether he should be afforded bond.

16           Do you have a response to that argument?

17           MR. SHADLEY:  I do, your Honor, and any consideration

18   of that fact would be wholly inappropriate under the statutory

19   framework provided by the Bail Reform Act.

20           For her support Ms. Van Vliet cites to an opinion from

21   2002 from the International Court of Justice.  There is one

22   reason why -- in our immunity discussion, I would tell the

23   court that these immunity-type discussions should come in the

24   form of motions and briefing concerning a motion to dismiss, as

25   the court noted, and that would include then further analysis

1    of any implications international law may have here.

2           I will note, though, that the United States, since

3    Ronald Reagan in the '80s, has been withdrawing from its

4    treatises with the International Court of Justice, which is the

5    opinion cited by Ms. Van Vilet, slowly, and first largely by

6    Reagan, and then one at a time.  It picked up again under

7    Trump.

8           So there are a smattering of responsibilities under

9    that court that the United States has treatise and require it

10   to have jurisdiction under the court.  There are a large number

11   of areas where that court has no jurisdiction or sway here in

12   the United States.

13          Because this opinion was just submitted I haven't, of

14   course, done all of the international legal research required

15   to make that exact determination, but for purposes of today's

16   hearing, it would be wholly inappropriate to consider something

17   from an International Court of Justice opinion when we have

18   binding statutory framework and case law in our Circuit and

19   from the Supreme Court that explains what the court is

20   required -- "shall" is used in the statute -- to consider when

21   determining whether bond is appropriate.  Here, that is just

22   risk of flight and danger to the community.  It is not ability

23   to do your job.

24          THE COURT:  All right.  I appreciate your argument,

25   Ms. Van Vilet, and I do note it and I do deem it to be reserved

1    with regard to the immunity arguments, but if the authority --

2    and I'll let you respond to Mr. Shadley -- but if the authority

3    that I'm traveling under is limited to the Bail Reform Act and

4    the considerations that are to be taken, namely, risk of flight

5    and danger to the community, then I would hold those arguments

6    in abeyance.

7         MS. VAN VILET:  Hold the immunity arguments in

8    abeyance.

9         THE COURT:  Right, and this detention-related argument

10   that you're making that is saying that in addition to the

11   statutory considerations, and I'm quoting because I wrote it as

12   you said it, impossible to fulfill his duties and consult with

13   members of his government as an additional factor to be

14   considered.  Mr. Shadley, upon my inquiry, said there is no

15   basis for adding that factor to the statutory framework.

16        Do you have any counter to that?

17        MS. VAN VILET:  Well, I clearly don't have a case,

18   Judge, because this is pretty unique.

19        THE COURT:  Right.

20        MS. VAN VILET:  I'm not asking you to consider it as

21   anything other than the kind of evidence that rebuts the

22   presumption that is present here.

23        I get that that's there, as well as the counterbalance

24   for, assuming that we can carry the day on the rebutting

25   presumptions, the counterbalance that indicates why detention

1    is not the only and why there are, I should say, conditions

2    that can be set to bond that will assure his appearance short

3    of detention.

4            THE COURT:  OK.  Why don't you discuss those at this

5    time.

6            MS. VAN VILET:  OK.

7            THE COURT:  Why don't you let me know about those.

8            MS. VAN VILET:  So what I kind of casually referred to

9    as my off-ramp --

10           THE COURT:  Right.

11           MS. VAN VILET:  -- is a suggestion that, number one,

12   Mr. Fahie live with his two daughters, who -- I mean, any

13   parent knows that the closest ties you have are to your

14   children, both of whom are United States citizens.  I think

15   that the suggestion that he does not have close ties here is

16   not recognizing that close tie between a father and daughter.

17           They do rent their house or apartment, actually.

18   Pardon me.  They are both going to be continuing to live there

19   throughout the continued matriculation, one at Moravian College

20   in Philadelphia, which will be an online situation, and the

21   other at the University of Pennsylvania for a post BA, a

22   graduate degree, both online.  He would reside with them there.

23           He would, of course, be submitting at his own cost to

24   any kind of monitoring, GPS, whatever it is that Pretrial

25   Services would recommend, acknowledging that they would have

1    the best call on that in terms of their expertise.  But I note

2    that he would be prepared to submit to the most onerous.

3           A corporate surety bond in the amount of $250,000 or,

4    if the court thinks it's sufficient, a 10 percent bond in that

5    same amount, and while there would be -- all other conditions

6    of bond; turning in travel documents, etc.

7           By the way, he does have a U.S. Virgin Islands -- beg

8    your pardon -- a British Virgin Islands passport, that I'm not

9    sure that they have.  In any event, we would -- excuse me --

10   make sure that all travel documents -- he has a UK and a Virgin

11   Islands passport -- we would make sure that all travel

12   documents were surrendered anyway.

13          In addition to only being able to attend religious

14   services, medical services, any court appearances, obviously,

15   and meetings with the defense and the defense team to prepare

16   for the case.

17          I would propose something that I've done in other

18   situations with international clients, not of the same thing,

19   in this court with other magistrate judges who have approved

20   it, and that is no travel between point A and point B, between

21   the house and my office, for example, be made alone but,

22   rather, that he be picked up and accompanied by a former

23   special agent of the DEA, formerly the head of the Mexican and

24   Central America branch, former special agent Michael McManus,

25   who is present in the courtroom today, in the very festive

```
 1   colored mask, or another former federal agent, retired federal

 2   agent or law enforcement officer would be responsible for

 3   transporting the defendant from point A to point B and back

 4   again, with no stops in between.

 5        That, quite frankly, is a situation that has been used

 6   in a couple of cases, a case one of which was in front of Judge

 7   Altonaga recently, United States v. Jaseem, United States v.

 8   Aores, and another case several, several years ago United

 9   States v. Macchione.

10        There were no problems.  Everybody appeared.  I think

11   the converse of what Mr. Shadley says.

12        I think the charges here are his reason to stay, or if

13   the court finds that it has no jurisdiction to fight them in

14   the Virgin Islands because that is the way that he clears his

15   name.  If he doesn't clear his name, his political career is

16   gone, as is everything else.

17        So that is what we have suggested, and we are willing

18   to consider any other condition of bond.  But right now, your

19   Honor, from the sounds of it, there's hundreds of tapes.  I

20   can't get in to see him.  He can't call me.  I can't prepare

21   for this case without him.  While I know that the court is

22   reserving on the immunity, the personal jurisdiction issues,

23   it's not a case that can afford to linger.  There are some

24   pretty serious issues going on in that country right now.

25        For those reasons, Judge, we think the off-ramp
```

1    proposal that we have suggested is sufficient to assure that he

2    will be here.

3           As to the comments regarding danger to the community,

4    again, strenuously deny that the manner in which those things

5    are said are as portrayed, and let me clarify.  I'm not

6    suggesting that Mr. Shadley is actively misleading the court or

7    anything.  I just know from 30 years as a federal prosecutor

8    and as the chief of narcotics at the Department of Justice that

9    listening to tapes is an arduous business, and getting the

10   transcription right, particularly when you're dealing with

11   accents, is an arduous process and sometimes it doesn't quite

12   work out correctly the first one, two, three, four, several

13   times.

14          Finally, Judge, I do note that Mr. Shadley had

15   indicated that Mr. Fahie had been given an opportunity to,

16   quote-unquote, withdraw.  Well, that is certainly not present

17   in any of the quotes in anything.  So I would ask, consistent

18   with the Brady order that was imposed by Judge Goodman, that

19   those portions of the transcript be provided to us immediately.

20          THE COURT:  All right.

21          MS. VAN VILET:  Thank you, your Honor.  I appreciate

22   your time.

23          THE COURT:  Anything from Mr. Shadley?

24          MR. SHADLEY:  Yes, your Honor.  I can cite to that

25   portion, at least one of them, right now.  It is in the

1    complaint, where they were discussing Mr. Fahie's concerns, not

2    that the conduct was illegal but that the CS might be an

3    undercover.  As I flip through the complaint here, your Honor,

4    I'll read it to you.

5        THE COURT:  All right.  So the issue is it is in the

6    complaint.

7        MR. SHADLEY:  Correct, paragraph 9.

8        THE COURT:  So it's been disclosed and I'm sure the

9    tapes will be produced.

10       MR. SHADLEY:  Yes.  The discovery will be produced in

11   due course, your Honor.

12       THE COURT:  On Ms. Van Vilet's proposal, let me hear

13   from you.  You had said already that you did not think that it

14   was sufficient.

15       MR. SHADLEY:  Wholly insufficient, your Honor, for a

16   number of reasons.

17       THE COURT:  OK.

18       MR. SHADLEY:  A few points I'll make.  First, just the

19   fact that this arrangement may have been used in other cases in

20   our district with other defendants, about whom we know nothing

21   sitting here, is not a compelling reason for this court to use

22   it.  I'll explain why in this specific instance it is

23   inappropriate.

24       This case involved criminal conduct coming through the

25   Caribbean into the United States, through the BVI.  It involved

1    travel to the U.S. Virgin Islands by codefendants,

2    conversations about individuals using boats and planes to

3    commit criminals activities between South Florida and

4    throughout the Caribbean.

5            Our district is littered with marinas, with private

6    airports, through which this defendant could easily leave just.

7    Having former federal agents with him when he travels places

8    doesn't protect our society or the risk of flight from his

9    flight at any other time of the day.

10           This is not a stable but a temporary residence that he

11   would reside at, and there would be nothing essentially keeping

12   him from but from the slip of the scissors on an ankle monitor

13   and a decision to get out of town.

14           This is, I think we've seen through all the evidence

15   before the court, not someone who abides by rules or by laws or

16   by, I would submit, this court's orders.  I think he would be a

17   near certainty to flee the district, and this is not to impugn

18   the reputations of the DEA agent or Ms. Van Vilet, but purely

19   focused on this defendant and his acts as set out in the

20   criminal complaint and the government's motion would be almost

21   a near certainty to leave this district to avoid prosecution,

22   to avoid facing the responsibilities for the crimes that he

23   committed, and to avoid facing the lengthy sentence before him.

24           I think the conditions of bond proposed would be

25   entirely insufficient to maintain his presence here.

 1              The money portion, a small amount would have to be put

 2     up in relation to his finances and the property that he owns.

 3     If he were to flee, the government would have no way to recover

 4     that because his properties and bank accounts are in the

 5     British Virgin Islands.  That would be lost money.  That's not

 6     a reason for him to stay here.

 7              The ankle monitoring, it's something, but it is not

 8     much.  If you are determined to get out of here, it's very easy

 9     to avoid, get out of town quickly.  The defendant has the

10     connections, the abilities, the money, and the inclination or

11     reason to do exactly that, and this bond would be nothing,

12     nothing to keep him here.  That's our concern, your Honor.

13              So for those reasons I think the proposal by Ms. Van

14     Vilet is wholly inadequate, does not serve the purposes, and I

15     think the government has shown beyond that preponderance

16     standard, which we're required under the statute -- again, that

17     is just 51 percent -- that he is a risk of flight and that no

18     conditions here could assure his appearance in court.

19              I do have comments on the immunity issue, your Honor,

20     if you would like to hear them, as those were subsumed into

21     comments about detention.

22              THE COURT:  I put them to the side.  I made that clear

23     to Ms. Van Vilet --

24              MR. SHADLEY:  Thank you, your Honor.

25              THE COURT:  -- that that was put to the side for the

1    moment.

2          So the arguments that Ms. Van Vilet is saying is that

3    she's proposing a corporate surety bond or a 10 percent bond,

4    she's proposing that Mr. Fahie reside with the daughters, both

5    of whom seem to be college students studying from universities

6    online and living in a rental apartment, and she's proposing

7    Mr. Fahie being escorted at all times by a former agent.

8          MS. VAN VILET:  May I clarify something on that,

9    Judge?

10         THE COURT:  Yes.

11         MS. VAN VILET:  Mr. Shadley seems to be under the

12   impression that it is merely a chauffeur service.

13         THE COURT:  No.

14         MS. VAN VILET:  The purpose of having the former

15   federal --

16         THE COURT:  That is why I said escorted.

17         MS. VAN VILET:  I mean, they're armed.

18         THE COURT:  Yes.

19         MS. VAN VILET:  I mean, it's like being escorted by a

20   marshal.

21         THE COURT:  Yes.

22         MS. VAN VILET:  I just wanted to clarify for the

23   record, Judge.

24         THE COURT:  I understand that was it.  It was sort of

25   like a custody kind of concept.  I've seen that.

1          MR. SHADLEY:  I would note for the court, though, that

2     these individuals would be being paid by Mr. Fahie, and he has

3     previously shown a disregard for law enforcement.

4          THE COURT:  Right.  Right.

5          So this is the proposal that Ms. Van Vilet is making.

6          The concerns that I have, to be perfectly honest, is a

7     little bit of what Mr. Shadley alluded to in the sense of the

8     nearness of the Caribbean islands and the facility that there

9     is to move back and forth to them.

10         Weighed against that, of course, is the presence of

11    the daughters here, which, as you said, children are a very

12    strong pull, and the fact that -- obviously, I don't know in

13    terms of Mr. Shadley's argument that the British Virgin Islands

14    would be a good destination.  It would probably have to be

15    another destination, and that would basically deprive Mr. Fahie

16    of his family connections and so on.

17         I will fashion a bond, and, of course, Mr. Shadley,

18    you may request a stay pending appeal, if that is what you

19    would like to do, but I will require a $500,000 corporate

20    surety bond.

21         MS. VAN VILET:  Yes, ma'am.

22         THE COURT:  I will require that the daughters

23    surrender their passports and that the -- where is the wife

24    located now?

25         MS. VAN VILET:  Actually, they're all in the courtroom

```
 1   right now, your Honor.  I can talk to them about that.
 2             THE COURT:  That will be a requirement.
 3             MS. VAN VILET:  OK.
 4             THE COURT:  If they're not willing to do it, the bond
 5   will not fly.
 6             MS. VAN VILET:  I understand.  Absolutely understand.
 7             The wife is a permanent resident alien.  I just wanted
 8   to advise the court of that.
 9             THE COURT:  Where is the wife?  Does the wife need to
10   go back to the BVI or can she stay here?
11             MS. VAN VILET:  They were all supposed to be going
12   back to the BVI tomorrow for a funeral.
13             THE COURT:  That is not happening.
14             MS. VAN VILET:  I understand.
15             THE COURT:  Let me just get from you, I know the
16   daughters live here, and they need to stay here and they need
17   to surrender their passports.  My question is, does the wife
18   need to go back to take care of things or can she stay here?
19             MS. VAN VILET:  If I might have a moment to go back
20   and ask her --
21             THE COURT:  Go ahead.
22             MS. VAN VILET:  -- I can clarify that right now,
23   Judge.
24             THE COURT:  Quickly.
25             (Pause)
```

```
 1              MS. VAN VILET:  We would ask that Mrs. Fahie be able
 2    to go back for a short period of time to arrange for her
 3    employment, which is at Banco Popular down there, as opposed to
 4    just not showing, and to deal with the funeral of Mr. Fahie's
 5    sister.
 6              THE COURT:  All right.  So Mrs. Fahie may travel as
 7    needed with keeping the Probation Office apprised of those
 8    travel needs, and when not traveling will surrender her
 9    passport also.  Right.
10              MS. VAN VILET:  I am assuming the court would like
11    surrender of both the passports, correct, UK and --
12              THE COURT:  Whichever --
13              MS. VAN VILET:  -- all travel documents.
14              THE COURT:  Whatever she can use to travel with.
15              MS. VAN VILET:  OK.
16              THE COURT:  That applies to everybody.
17              MS. VAN VILET:  Yes, ma'am.
18              THE COURT:  If they have ten passports, ten passports.
19              MS. VAN VILET:  Yes, ma'am.
20              THE COURT:  All right.  Then home confinement with
21    monitoring of the highest level, Mr. Garcia, that is available.
22    All right.
23              MR. GARCIA:  Yes, Judge.
24              THE COURT:  Right.  I think this is a case that would
25    require ankle monitoring with GPS.
```

```
1              MR. GARCIA:  That is fine with us, Judge.  We would

2    call that a 24-hour-long down situation.

3              THE COURT:  Yes.  Yes.

4              MR. GARCIA:  With only allowance to be for emergency

5    medical needs and for, of course, court appearances and

6    attorney visits only.

7              THE COURT:  Yes.

8              MR. GARCIA:  That would be our recommendation.

9              THE COURT:  Yes, sir.

10             MR. GARCIA:  OK.

11             THE COURT:  That is adopted.

12             I honestly don't see the benefit of the escort.

13             MS. VAN VILET:  OK.

14             THE COURT:  If you want to do that just for his own

15   peace of mind, I don't know.  I think with the GPS Probation

16   would know where he is at all times.

17             MS. VAN VILET:  That is fine.  Assuming Mr. Fahie has

18   a driver's license in Florida, that's fine.

19             THE COURT:  If he doesn't, he can take Uber.

20             MS. VAN VILET:  Exactly.

21             THE COURT:  All right.  All right.  So he is under

22   home confinement.  He obviously cannot travel anywhere, may not

23   visit transportation establishments.

24             Anything else, Mr. Garcia, I might have missed?

25             MR. GARCIA:  Judge, that he report to our office.  We
```

1    do need to process him at least initially once he's released.

2            THE COURT:  Yes.  I believe Mr. Shadily, there is a

3    good chance he will appeal, and I will agree to stay the order

4    and I will give you until close of business tomorrow to file

5    the appeal; otherwise, the stay will cease.

6            MR. SHADLEY:  Thank you, your Honor.  You're correct,

7    I do request a stay.

8            THE COURT:  Yes.  I figured you would.

9            MR. SHADLEY:  We will appeal the determination.  And

10   without in any way waiving our appeal or changing our position,

11   if the court is going to impose this bond, I would suggest that

12   any monetary amount put down include a Nebbia condition.

13           THE COURT:  Yes.

14           MS. VAN VILET:  I'm sorry?

15           MR. SHADLEY:  Nebbia condition.

16           MS. VAN VILET:  Oh, yes.

17           THE COURT:  Corporate surety.  It's 500,000 corporate

18   surety with a Nebbia.

19           MR. SHADLEY:  Thank you, your Honor.

20           MS. VAN VILET:  Yes.

21           MR. SHADLEY:  I would just, for the record, note our

22   request of stay and our intent to appeal the court's

23   determination.

24           THE COURT:  That's right, and all conditions must be

25   met --

```
 1              MS. VAN VILET:  Yes, ma'am.

 2              THE COURT:   -- prior to release if the appeal is

 3    denied, and, of course, if the government prevails, then that

 4    is why I'm giving them the opportunity.

 5              MS. VAN VILET:  Of course.  Of course.

 6              THE COURT:  I know that you have strong arguments,

 7    Mr. Shadley, but I do believe that this defendant, the terms

 8    that I am imposing would ensure his appearance.

 9              Anything else, Mr. Garcia?

10              MR. GARCIA:  Judge, just for clarification.  In the

11    event that he is released, absent the appeal, he will reside

12    with his daughters?

13              THE COURT:  Yes.

14              MR. GARCIA:  At the address reflected in the report in

15    Miami?

16              THE COURT:  Yes.

17              MR. GARCIA:  OK.

18              THE COURT:  That address, the 1441 -- let me see.

19    Where is the address?  We'll make it a part of the record.

20              MS. VAN VILET:  I think it's 14 -- it's 1440.

21              MR. GARCIA:  Your Honor, it's 1440 Southwest 104 Path.

22              THE COURT:  Yes.

23              MR. GARCIA:  Apartment 203, in Miami.

24              THE COURT:  Yes.  That's the address.

25              MS. VAN VLIET:  I think that apartment number might be
```

```
 1    wrong.
 2             MR. GARCIA:  OK.
 3             MS. VAN VILET:  It is 202.
 4             THE COURT:  202.
 5             MR. GARCIA:  OK.  Thank you.
 6             THE COURT:  All right.
 7             MS. VAN VILET:  Your Honor, just confirming that
 8    travel documents that are already in the possession of the DEA
 9    can stay with them.  We'll surrender all others to Pretrial?
10             THE COURT:  You all work it out among the agencies.
11             MS. VAN VILET:  OK.
12             THE COURT:  As long as they don't have them.
13             MS. VAN VILET:  They won't have them.
14             THE COURT:  That is the issue.
15             Now on the matter of the immunity argument and so on,
16    however you want to raise it.  If you want to file some kind of
17    motion, because all you've done is a notice, it would be a
18    motion to dismiss the complaint at this stage --
19             MS. VAN VILET:  On personal jurisdiction.
20             THE COURT:  -- because there hasn't been an indictment
21    turned in.  Of course, the judge in that complaint is Judge
22    Goodman.
23             MS. VAN VILET:  Yes, ma'am.
24             THE COURT:  So it would need to be addressed to him.
25             MS. VAN VILET:  Yes, ma'am.
```

```
 1              THE COURT:  Anything else?

 2              MR. SHADLEY:  Your Honor, one additional request.  I

 3   believe I'll need to get transcripts of this hearing before

 4   proceeding with an appeal.  I don't know if I can get that and

 5   digest it and write something before tomorrow close of

 6   business.  Is it possible I could have some additional time to

 7   complete the appeal?

 8              THE COURT:  You need to file the notice of appeal.

 9              MR. SHADLEY:  I can file the notice, of course, but

10   then I would have to file briefing as well.  Just to file the

11   notice by tomorrow.

12              THE COURT:  That would be, yes, your notice of appeal.

13              MR. SHADLEY:  OK.

14              THE COURT:  Because once you have the notice of

15   appeal, then that sort of guarantees the stay.

16              MR. SHADLEY:  Appreciate it.  Thank you, Judge.

17              THE COURT:  The reason I do that is in case you decide

18   not to appeal we don't leave it hanging.

19              MR. SHADLEY:  Understood, your Honor.  Thank you.

20              THE COURT:  See what I mean?

21              MR. SHADLEY:  Yes.

22              THE COURT:  Anything else?

23              MS. VAN VILET:  Not from Mr. Fahie, your Honor.

24              THE COURT:  All right.

25              MS. VAN VILET:  Thank you.
```

1          THE COURT:  All right.  Thank you very much to

2     everyone.

3          MR. SHADLEY:  Thank you, Judge.

4          MS. VAN VILET:  Thank you, Judge.

5          (Adjourned)

6

7                   C E R T I F I C A T E

8

9       I hereby certify that the foregoing is an accurate

10    transcription to the best of my ability of the digital audio

11    recording in the above-entitled matter.

12

13    November 1, 2024          s/ Joanne Mancari
                                Joanne Mancari, RPR, CRR, CSR
14                              Court Reporter
                                jemancari@gmail.com
15

16

17

18

19

20

21

22

23

24

25