09:04

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 22-CR-2019-KMW

UNITED STATES OF AMERICA


        vs.

ANDREW ALTURO FAHIE


TRIAL HELD 2-1-2024
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE


**APPEARANCES:**

FOR THE UNITED STATES:        **Kevin Gerarde, A.U.S.A.**
                              **Sean McLaughlin, A.U.S.A.**


FOR THE DEFENDANT:            Theresa M. Van Vliet, ESQ.
                              **Joyce Delgado, ESQ.**


REPORTED BY:                  PATRICIA SANDERS, RPR
                              United States Court Reporter
                              400 North Miami Avenue, Suite 11-3
                              Miami, FL  33128
                              T: 305.523.5528
                              **Patricia_sanders@flsd.uscourts.gov**

09:19   1          THE COURT:  We have a full complement of jurors.  If

09:19   2   you would bring in the jury.

09:19   3          COURT SECURITY OFFICER:  All rise, please.

09:19   4          THE COURT:  Everyone may be seated.

09:21   5          And, Mr. McLaughlin, you may continue.

09:21   6          MR. McLAUGHLIN:  Thank you, Your Honor.

09:21   7   Q.   Detective Dominguez when we left off yesterday we were

09:21   8   playing a recording.  Where were you headed with the informant

09:21   9   Roberto and the defendant and his daughter?

09:21   10  A.   To the Opa Locka Airport.

09:21   11         MR. McLAUGHLIN:  I will publish for the record

09:21   12  Government's 13 A and the transcript book 13 B.  We are on page

09:21   13  44 and 45.

09:21   14         THE COURT:  Thank you.

09:22   15         VIDEOTAPE PLAYED FOR THE RECORD

09:23   16  Q.   Are you outside the vehicle at this point?

09:23   17  A.   Yes.

09:23   18  Q.   Where are you, Roberto, the defendant and his daughter at

09:23   19  this point?

09:23   20  A.   We are at the front entrance of the Opa Locka Airport, one

09:24   21  of the terminal areas.

09:24   22  Q.   Do you see where -- we are stopped at 31 and 34 seconds --

09:24   23  where is the defendant in the video?

09:24   24  A.   Wearing the black pants with the brown belt and blue shirt.

09:24   25  Q.   Who is he speaking with at this point?

09:24 1  A.  The CI.

09:24 2          VIDEOTAPE PLAYED FOR THE RECORD

09:25 3  Q.  We are at the top of 27.  Do you see the entry that says

09:25 4  pilot?

09:25 5  A.  Yes.

09:25 6  Q.  Who was the pilot?

09:25 7  A.  Law enforcement.

09:25 8  Q.  What was the purpose of the pilot's role at this point in

09:26 9  the investigation?

09:26 10  A.  He was playing the role of the operation.  He was going to

09:26 11  walk us to the airplane.

09:26 12          MR. McLAUGHLIN:  We will continue playing.

09:26 13          VIDEOTAPE PLAYED FOR THE RECORD

09:26 14  Q.  We are still on page 47.  Detective Dominguez, do you see

09:26 15  where Roberto states, do you have the other one just to show it

09:26 16  to him?

09:26 17  A.  Yes.

09:26 18  Q.  Based upon your participation this day, what is your

09:26 19  understanding of what Roberto is referring to when he says the

09:27 20  other one?

09:27 21  A.  He is referring to the second point that is going to be

09:27 22  holding the money.

09:27 23  Q.  When he uses the term show it to him, who is him?

09:27 24  A.  The defendant.

09:27 25  Q.  At this point where is the defendant's daughter?

09:27  1    A.   She is with us right there amongst us.

09:27  2              VIDEOTAPE PLAYED FOR THE RECORD

09:27  3    Q.   At this point did the defendant's daughter follow you out

09:28  4    to the tarmac?

09:28  5    A.   No.

09:28  6    Q.   Where did she stay?

09:28  7    A.   She stayed somewhere in the lobby.

09:28  8              MR. McLAUGHLIN:   We will continue playing at 48 a

09:28  9    minute 33 and 22 seconds.

09:28  10             VIDEOTAPE PLAYED FOR THE RECORD

09:29  11   Q.   At this point what is going on?

09:29  12   A.   We entered the plane and we are showing the boxes with the

09:29  13   money inside.

09:29  14   Q.   Going back to Government's Exhibit 35.   Showing you page

09:30  15   one, page two.   You see here on page four, what is the name

09:30  16   listed here?

09:30  17   A.   Louis Vuitton.

09:30  18   Q.   Are these the same bags you are showing him on April 28th

09:30  19   that you showed him photographs of the day before?

09:30  20   A.   Yes.

09:30  21   Q.   Where are you at in the plane at this point?

09:30  22   A.   Right beside them on the plane.

09:30  23             MR. McLAUGHLIN: Playing Government's 13 A at a

09:31  24   minute and 34 and 52 second.

09:31  25             VIDEOTAPE PLAYED FOR THE RECORD

09:31   1   Q.   Do you recognize yourself in the video?

09:31   2   A.   Yes.

09:31   3   Q.   Where are you?

09:31   4   A.   Standing up wearing a blue beige and green jacket.

09:31   5   Q.   Can you mark where you were?

09:31   6          (WITNESS INDICATES ON SCREEN)

09:32   7   Q.   Do you see the defendant in the video?

09:32   8   A.   Yes.

09:32   9   Q.   Can you mark on the screen where he is?

09:32   10          (WITNESS INDICATES ON SCREEN)

09:32   11   Q.   Is there anything contained on his lap at that point?

09:32   12   A.   Yes.

09:32   13   Q.   What is contained on his lap?

09:32   14   A.   One of the boxes containing the money.

09:32   15          MR. McLAUGHLIN:   We are still here on page 52 towards

09:32   16   the middle.   For the record we are at minute 35 and 21 seconds

09:32   17   of 13 A.

09:32   18          I'm going to continue publishing.

09:32   19          VIDEOTAPE PLAYED FOR THE RECORD

09:33   20   Q.   Now, detective, after the defendant departed the plane,

09:33   21   what happened next?

09:33   22   A.   He was detained.

09:33   23   Q.   Once the defendant -- was he taken into custody?

09:34   24   A.   Yes.

09:34   25   Q.   And what did you do next?

A.  I cleared the area after he was taken into custody and I just waited.

Q.  Did you have a meeting with anyone in law enforcement after the defendant was taken into custody?

A.  Yes.

Q.  Who did you meet with?

A.  The leads.

Q.  Who else was there?

A.  I met after for the second phase of the operation.

Q.  After the defendant was taken into custody who did you meet with?

A.  The CI.

Q.  Anyone else?

A.  Law enforcement along with the informant.

Q.  What was the purpose of meeting with those two agents with the informant?

A.  For the second phase of the operation.

Q.  What was the second phase of the operation?

A.  We were meeting with Ms. Maynard and Roxanne; taking them out and bringing them to the Opa Locka Airport.

Q.  After the defendant was taken into custody did you leave the Opa Locka Executive Airport?

A.  Yes.

Q.  Who was with you at that time?

A.  Myself, the CI, and I was followed by surveillance.

09:35  1   Q.   Where did you go?

09:35  2   A.   To the Embassy Suites.

09:35  3   Q.   What was the purpose of traveling there?

09:35  4   A.   To pick up Ms. Maynard and Roxanne.

09:35  5   Q.   After you arrived at the hotel what happened?

09:35  6   A.   We met them and we picked them up and drove back to Opa

09:35  7   Locka Airport.

09:35  8   Q.   What was the purpose of doing that?

09:35  9   A.   We took them to the plane to show them where the money was

09:35  10  at.  They were going to fly to Tortola with the money.

09:35  11  Q.   Did you show them the money?

09:35  12  A.   Yes.

09:35  13  Q.   What happened after you showed Roxanne and Ms. Maynard the

09:35  14  money?

09:35  15  A.   They were both taken into custody.

09:35  16  Q.   At any point during April 28, 2022, did any Blue on Blue

09:36  17  concerns arise?

09:36  18  A.   No.

09:36  19          MR. McLAUGHLIN:  No further questions.

09:36  20          THE COURT:  Thank you, Mr. McLaughlin.

09:36  21          Cross examination.  Ms. Van Vliet.

09:37  22  Q.   Good morning, Detective Dominguez, my name is Theresa Van

09:37  23  Vliet, and I represent Mr. Fahie.

09:37  24  A.   Good morning.

09:37  25  Q.   I will be asking you a few questions.

09:37  1   Do you still have your book with the binder with the

09:37  2   transcript?

09:37  3   A.   I do.

09:37  4   Q.   As I understand it, detective, you are employed by Miami

09:37  5   Beach PD?

09:37  6   A.   Yes.

09:37  7   Q.   But you are assigned to a DEA task force?

09:38  8   A.   Yes.

09:38  9   Q.   And on a number of occasions you have worked in another

09:38  10  undercover capacity; right?

09:38  11  A.   Yes.

09:38  12  Q.   You testified that you had some training in law enforcement

09:38  13  principles in general and also in specifically conducting

09:38  14  undercover work; is that right?

09:38  15  A.   Yes.

09:38  16  Q.   All right. And you learned the various techniques and the

09:38  17  various best practices to serve as an undercover officer; is

09:38  18  that right?

09:38  19  A.   Yes.

09:38  20  Q.   Am I correct that one of the things you learned, and that

09:38  21  is important for an undercover to do, is kind of play along

09:38  22  with the script that has been predetermined; it may have

09:38  23  hiccups here or there or need some "ad lib" as such?

09:39  24  A.   Yes.   They train us to improvise.

09:39  25  Q.   All right.

09:39 1    A.   Yes.

09:39 2    Q.   And I think you testified about -- a little bit about some

09:39 3    of the improvisation that went on when you were talking about

09:39 4    how the CI brought up Charlie who was supposed to be arranging

09:39 5    a pilot, and that was kind of a spur of the moment made up type

09:39 6    of situation; is that right?

09:39 7    A.   Yes.

09:39 8    Q.   How many hours would you say you have had in training over

09:39 9    the years -- not experience but just training doing undercover

09:39 10   work?

09:39 11   A.   I can't give you a rough estimate of hours.   I have done

09:39 12   several classes and some of these classes lasted for weeks.

09:40 13   Q.   So we are talking hundreds and hundreds of hours over the

09:40 14   years and -- in perfecting your skills as an undercover?

09:40 15   A.   A lot of hours; but the exact number I don't know.

09:40 16   Q.   A lot of time?

09:40 17   A.   Yes.

09:40 18   Q.   It is fair to say there is a certain art to being an

09:40 19   undercover agent in terms of being able to improvise as you

09:40 20   say?

09:40 21   A.   It is difficult sometimes but -- sometimes it becomes

09:40 22   difficult, yes.

09:40 23   Q.   Could you repeat that?

09:40 24   A.   It becomes difficult -- where you have to figure out how to

09:40 25   improvise and act in the moment.

09:40  1    Q.  It is not like on the TV shows where someone just walks

09:41  2    into a situation and you deliver some Oscar worthy performance,

09:41  3    it takes years of practice?

09:41  4    A.  Sometimes it just comes natural.

09:41  5    Q.  As I understand it -- by the way, you referred to Roberto

09:41  6    as the CI; correct?

09:41  7    A.  Correct.

09:41  8    Q.  Is it fair to say that a CI, a confidential informant, is

09:41  9    the same as a confidential source?

09:41  10   A.  Yes.

09:41  11   Q.  When it says CS, it's the same as CI?

09:41  12   A.  Yes.

09:41  13   Q.  You mentioned that he used the name Roberto Quintero during

09:41  14   the course of this undercover scenario; is that right?

09:41  15   A.  That is the name he said, yes.

09:41  16   Q.  So the record is clear, that is not the gentleman's real

09:42  17   name?

09:42  18   A.  I don't know the gentleman's real name.

09:42  19   Q.  The testimony you gave -- the first day of your testimony

09:42  20   -- did I understand it correctly that you first became involved

09:42  21   in this undercover scenario on the 27th or shortly before?

09:42  22   A.  My role in that became involved, yes.

09:42  23   Q.  I understand that your undercover role started on the 27th

09:42  24   that is the first time you were on one of the tapes?

09:42  25   A.  Yes.

Q.  When did you first become involved in the case in terms of your activity, not just on the tapes but when did you first become involved?

A.  Right around that time.  Exact date I would say a couple days before, but I can't give you the exact date.

Q.  Do I understand that from the point you became involved early in the week of the 27th through your testimony today you have not reviewed any of the other tapes or recordings in this case except for the 27th and 28th?

A.  Yes.

Q.  So you have no firsthand knowledge of what transpired or what the discussions were on the tapes with either the CS and Ms. Maynard or her son Mr. Maynard or the defendant Mr. Fahie?

A.  Yes.

Q.  The 28th when you and Roberto go to pick up Mr. Fahie you arrive at the apartment and use whatever the case code is to get in the gate, and you drive up and Mr. Fahie and his 18 year old daughter is there?

A.  Yes.

Q.  And you assist in loading the luggage into the vehicle?

A.  Yes.

Q.  At that point in time, as I understand it, Roberto sees some other female around there and says good morning and God bless you -- something of that nature?

A.  I saw her too.

09:44  1   Q.  At that point in time you all immediately leave -- after

09:45  2   you pack up the car -- you leave the apartment area and started

09:45  3   heading towards the Opa Locka Airport?

09:45  4   A.  Yes.

09:45  5   Q.  At some place along the road Roberto asks Mr. Fahie whether

09:45  6   his wife, meaning Mr. Fahie's wife, lives at the apartment?

09:45  7   A.  Yes.

09:45  8   Q.  As I recall your testimony you all decided to see if there

09:45  9   was a way to see if that was Mr. Fahie's wife?

09:45  10  A.  At that point it was small talk; the conversation just led

09:45  11  to that.

09:45  12  Q.  So there was no attempt to verify whether whoever this

09:46  13  woman was Mrs. Fahie?

09:46  14  A.  It was just small talk.

09:46  15  Q.  Now the first meeting that you were involved in on the 27th

09:46  16  -- we have heard the recording and in some instances seen it --

09:46  17  the transcript of the first meeting is Government's Exhibit 11

09:46  18  B?

09:46  19  A.  I remember the number 11.

09:46  20  Q.  Do you have the binder in front of you?

09:46  21  A.  I do right here.

09:46  22  Q.  If you turn to the first page under the tab 11.

09:47  23  A.  Yes.

09:47  24  Q.  Do you see the bottom right?  It says Government's

09:47  25  Exhibit 11 B?

A.   Yes.

Q.   This is the first time that you are involved in an undercover role in this case; right?

A.   Yes.

Q.   It is Roberto, the CI, yourself and Ms. Maynard; is that correct?

A.   Yes.

Q.   It is fair to say that many pages of the transcript and this discussion deals with what has been called the side deal?

A.   I want to say yes.  I would have to go back to see all the words they say but yes the side deal was discussed in that meeting.

Q.   Go ahead and flip through the transcript if you want; but it was discussed extensively the first part of the meeting, the 27th, where you attended?

A.   Yes.

Q.   The side deal -- and the Court has instructed the jury it is not something that -- Mr. Fahie did not know about it; correct?

A.   Yes.

Q.   He had no involvement in it; correct?

A.   Yes.

Q.   And that is a deal to bring kilograms of cocaine for sale directly into the Virgin Islands through the Maynard's; is that correct?

09:48  1    A.   Yes.

09:48  2    Q.   Now I believe that the side deal as well as the test -- the

09:49  3    other deal that Mr. Fahie is charged with -- do you have an

09:49  4    understanding that I am talking about the part of the plan that

09:49  5    Mr. Fahie is charged with?

09:49  6    A.   The 3000 kilograms?

09:49  7    Q.   Yes.

09:49  8    A.   Yes.

09:49  9    Q.   The side deal that he is not charged with involved bringing

09:49  10   60 kilos of cocaine at a time into the Virgin Islands for

09:49  11   Kadeem Maynard with the assistance of his mother Oleanvine

09:49  12   Maynard for approximately $11,000 a kilogram?

09:49  13   A.   Yes.

09:49  14   Q.   Now the side deal and the test deal, none of that is real,

09:50  15   there was never going to be 60 kilos going into the Virgin

09:50  16   Islands and going to Kadeem to sell?

09:50  17   A.   As I was made aware of, yes, there was no kilograms of

09:50  18   cocaine going into the island.

09:50  19   Q.   Certainly the DEA was not sending in real kilograms of

09:50  20   cocaine to be sold?

09:50  21   A.   Correct.

09:50  22   Q.   The point being the side deal with the Maynards and the one

09:50  23   with which Mr. Fahie was charged are all pure fiction in terms

09:50  24   of no cocaine is going anywhere, no real cocaine?

09:50  25   A.   Correct.

09:51  1   Q.   Lord knows on the way back the United States Government is

09:51  2   not sending $700,000 to go into the Virgin Islands to go on its

09:51  3   merry way; correct?

09:51  4   A.   Yes.

09:51  5   Q.   And the scenario that you and the CI are playing is that

09:51  6   you're operatives of a Mexican drug trafficking Cartel known as

09:51  7   the Sinaloa Cartel?

09:51  8   A.   Yes.

09:51  9   Q.   At any point in time during your participation on the 27th

09:51 10   and the 28th, were you made aware that the plan for the test

09:51 11   loads, the 3000 kilograms, is that it would be brought from

09:52 12   Colombia to some place in or outside of the British Virgin

09:52 13   Islands and that, that substance would not test positive for

09:52 14   cocaine?

09:52 15   A.   That it would not test positive.

09:52 16   Q.   Yes, that was the scenario, that it would not test

09:52 17   positive?

09:52 18   A.   It has to go through an inspection process.

09:52 19   Q.   So the answer is that, yes, you are aware that the scenario

09:52 20   presented that it would not test positive for cocaine; is that

09:52 21   right?

09:52 22   A.   He stated that it would have to go through an inspection

09:52 23   process.

09:52 24   Q.   And that was going to happen in Puerto Rico -- according to

09:52 25   the scenario?

09:52   1    A.   Where the actual inspection was going to happen.

09:52   2    Q.   Yes.  Was that the plan that was discussed?

09:53   3    A.   I am not aware exactly where it would happen.  He discussed

09:53   4    the process.  He said the fees to extract each kilo -- about 60

09:53   5    something -- that the extraction process to -- so it won't be

09:53   6    detected.

09:53   7    Q.   Based on the meeting back on the 27th and the 28th -- and I

09:53   8    realize that you were not aware of what happened leading up to

09:53   9    this -- but you were familiar with the story that it was going

09:53   10   to go to Colombia --

09:53   11   A.   Yes.

09:53   12   Q.   And when I say it, I am referring to the substance.

09:53   13   A.   Cocaine, yes.

09:53   14   Q.   Well, the 3000 kilograms --

09:53   15   A.   Right.

09:53   16   Q.   So it was going to go from Colombia to the Virgin Islands;

09:54   17   and in the discussions on the 27th and the 28th it is not

09:54   18   exactly clear how that test is going to come in, whether it is

09:54   19   going to come in to -- to which port and where?

09:54   20   A.   It was going to go from Colombia to the British Virgin

09:54   21   Islands -- the ports were all being discussed.

09:54   22   Q.   Meaning the ports that it was suppose to go into -- the

09:54   23   British Virgin Islands had not been nailed down yet by these

09:54   24   two meetings on the 27th and the 28th?

09:54   25   A.   Correct.

Q.  And then it was supposed to be given safe harbor in the British Virgin Islands for a period of 24, 48, 72 hours and then it was going to go from the British Virgin Islands to Puerto Rico; correct?

A.  Correct.

Q.  Obviously Puerto Rico is in the United States?

A.  Yes.

Q.  Then it was supposed to go from Puerto Rico to the mainland of the United States?

A.  Correct.

Q.  That is the scenario.

A.  Yes.

Q.  I realize it was never going to actually happen.  In return for both Ms. Maynard's participation in the test part of the deal -- as opposed to the side deal -- as well as Mr. Fahie's alleged participation in that, each was supposed to get a sum of money that obviously would equate to some percentage of the alleged overall profits that this cocaine was going to generate; correct?

A.  Correct.

Q.  There is a lot of discussion in the first meeting on the 27th where just Ms. Maynard is present about not letting Mr. Fahie know about the $200,000 that Ms. Maynard is supposed to receive; is that fair?

A.  Yes.

09:56  1   Q.   There is a lot of back and forth on that; is that right?

09:56  2   A.   They spoke about it.

09:56  3   Q.   When you say they spoke about it, you are referring to

09:56  4   Oleanvine Maynard and the CI Roberto?

09:57  5   A.   Yes.

09:57  6   Q.   And at some point during this meeting Ms. Maynard got her

09:57  7   son Kadeem or Stephan on the phone?

09:57  8   A.   Yes.

09:57  9   Q.   And Mr. Kadeem Maynard sometimes is known as Stephan in

09:57  10  these tapes?

09:57  11  A.   Yes.

09:57  12  Q.   And also he is referred to as Blacka?

09:57  13  A.   Yes.

09:57  14  Q.   During the meeting on the 27th -- the first meeting with

09:57  15  the Maynard's -- it becomes clear as to the side deal, as well

09:57  16  as the transfer of the $700,000, that is supposed to happen on

09:58  17  the 28th and that Kadeem, the son, has taken care of the flight

09:58  18  tower people?

09:58  19  A.   Yes.

09:58  20  Q.   And Ms. Maynard and her son have taken care of Customs and

09:58  21  Immigration?

09:58  22  A.   Yes.

09:58  23  Q.   All right.  And they are reporting back all the things that

09:58  24  they have done to earn their portion of the proceeds that they

09:58  25  are supposed to get in the first transfer on the 28th?

A.  Yes.

Q.  There is some discussion of a person by the name of Wade Smith.  Do you recall that discuss at the meeting with just the Maynard's?

A.  Yes.

Q.  And Mr. Smith -- during that conversation that you have with the Maynard's -- is supposed to be with Customs or the head of Customs in the BVI?

A.  He is with Customs; the exact title I don't know.

Q.  So someone within the Customs portion of the BVI Government on the law enforcement side of the house?

A.  Government official with the BVI.

Q.  Are you familiar at all with how the Government of the BVI is set up?

A.  No.

Q.  Do you know that the British Virgin Islands is an overseas territory of the United Kingdom?

A.  I am aware of that.

Q.  Are you aware that when you are speaking with Mr. Fahie on I think it is the 27th at some point the informant is asking Mr. Fahie can you get me a passport in the British Virgin Islands -- do you recall that discussion?

A.  Yes.

Q.  And Mr. Fahie says that would be very difficult and that it is run by the UK, the United Kingdom?

A.   That was out of his reach.   It was difficult for him to
get.

Q.   He is explaining to you and the CI that the United Kingdom
is in charge of certain things relative to the BVI; is that
right?

A.   Yes.

Q.   Are you familiar with the fact, based on your participation
in this investigation, that among some of the things that the
United Kingdom is in charge of -- obviously other than the
passports -- is security and foreign relations?

A.   Okay.

Q.   I am asking if you know that based on your work in the
case?

A.   Can you ask the question again, please?

Q.   I will try.   Are you aware, based on your work in your
undercover capacity, that the United Kingdom is in charge of
security and foreign relations for the BVI?

A.   I am aware that they oversee the BVI -- but the exact
specifics of what they do, no.

Q.   Let's talk about the money a little.   When I say the money
I mean the $700,000 that was supposed to be transported on the
plane to the British Virgin Islands on the 28th -- it is the
money that was in the picture with the Louis Vuitton bags and
the kind of upside down video that we just saw.

A.   Okay.

Q.   As I understand it from the testimony -- I am sorry from the recordings -- 500 of the sum was supposed to be for Mr. Fahie; is that correct?

A.   Yes.

Q.   And two hundred of that was supposed to be for Ms. Maynard?

A.   Yes.

Q.   I think you testified on direct, correct me if I am wrong, that the money was to be used to pay bribes for the safe passage of the 3000 kilograms into the British Virgin Islands?

     Do I recall your testimony on direct correctly?

A.   Yes.

Q.   The recordings actually talk about the fact that it was for a different purpose?

A.   Refresh my recollection.

Q.   The April 27th meeting that Ms. Maynard was present for -- at page 86, line fifteen -- this is the meeting where Mr. Fahie is not present; correct?

A.   Yes.

Q.   Roberto says, okay, mom let me tell you this because now I am angry.  I am paying this guy his own money, why he wants new money no, no, no...

     Do you see that?

A.   Yes.

Q.   At this portion of the conversation Roberto is referring to Mr. Fahie?

A.   Yes.

Q.   All right. And Ms. Maynard who is noted on the transcript is Oleanvine Maynard?

A.   Correct.

Q.   Whenever we see Oleanvine on the transcript it is Ms. Maynard?

A.   Yes.

Q.   Ms. Maynard responds; no, no, no; we had agreed on that first.  It was that they had some bills to pay for the party. He told me he wanted to clear up those bills from the old election and something else he wanted to do.

       Going to the next page, page 87, there is something there that is noted as unintelligible.

A.   Right.

Q.   He said we would have to split it in two, so now that he called you and said about this thing he don't know, he was probably thinking -- he didn't come out and say it -- but he kept asking me that he say we was going to put an extra 200; but that is for Stephan to start because that's what Stephan wants to do.  Did I read that correctly?

A.   Yes.

Q.   So Ms. Maynard and the CI were talking about the fact that the $500,000 was to pay off these old bills for the party.  And I realize that you have not listened to any of the earlier tapes; right?

10:06  1   A.  Yes.

10:06  2   Q.  Let's talk a little bit about Roxanne.  We have seen her

10:06  3   picture a lot.

10:06  4   A.  Do you want me to clarify what I understood from this?

10:06  5   Q.  No; I can read it.

10:06  6   A.  Yeah, but...

10:06  7          THE COURT:  If there is clarity needed, detective, Mr.

10:06  8   McLaughlin will have another opportunity to ask you those

10:06  9   questions he believes need some clarification.

10:06  10         So if you would just answer the questions that you are

10:06  11  being asked by defense counsel.

10:06  12         THE WITNESS:  Yes, Your Honor.

10:06  13  Q.  Now Roxanne was kind of a friend of both Mr. Fahie and Ms.

10:06  14  Maynard; is that right?

10:06  15  A.  Roxanne?  The lady I met that evening?  Yes, she was a

10:06  16  friend of -- seemed like she was a friend of Mr. Fahie -- I am

10:07  17  not sure how close she was to Maynard.

10:07  18  Q.  You do not recall Ms. Maynard saying that she was her best

10:07  19  friend, her good friend, during the meeting she attended?

10:07  20  A.  She may have said it -- there was a lot of discussion -- a

10:07  21  lot of hours.

10:07  22  Q.  Essentially Roxanne was also Mr. Fahie's friend?

10:07  23  A.  Yes.

10:07  24  Q.  Albeit a platonic relationship; correct?

10:07  25  A.  Correct.

10:07  1   Q.  And that Mr. Fahie -- I think during your meeting on the

10:07  2   28th with Mr. Fahie in the evening he said something to the

10:07  3   effect of I would trust her, meaning Roxanne, with his life.

10:07  4       Do you recall that?

10:07  5   A.  Yes.

10:07  6   Q.  Let's go to 12 B at page 45 -- pretty much in the middle --

10:08  7   the she you are talking about here is Roxanne?

10:08  8   A.  Yes.

10:08  9   Q.  In the middle of the page Mr. Fahie says at line 14, I

10:08  10  trust -- I trust her with my life -- you see that?

10:08  11  A.  Yes.

10:08  12  Q.  And the reason for that discussion with Roberto was that he

10:08  13  was questioning Roxanne -- the wisdom of involving Roxanne in

10:09  14  this transfer of $700,000 back from Miami to the BVI, fair?

10:09  15  A.  Yes.

10:09  16  Q.  I get that you don't know anything that happened before,

10:09  17  you never listened to any of the other recordings, but it is

10:09  18  clear from these meetings that you participated in that Roxanne

10:09  19  does not know how much money there is or what it is for or

10:09  20  really very much anything about this plan, the test plan, fair

10:09  21  to say?

10:09  22  A.  She does not know all of the details.  She is going to see

10:09  23  some cash, but she does not know all of the details.

10:09  24  Q.  Okay.

10:10  25  A.  She handles his stuff that is not up to board (sic).

1   Q.   When you say up to board you mean not above board?

2   A.   Yes.

3   Q.   And that is where Mr. Fahie talked about earlier in the

4   discussions that Roxanne handled political things for him that

5   were not above board; you recall that?

6   A.   Yes.

7   Q.   Were you there when they were all arrested together -- were

8   you actually in the lock up?

9   A.   Oh, no.

10  Q.   Just to clarify for the jury the lock up is what it sounds

11  like where individuals that have been detained --

12          MR. McLAUGHLIN:   Objection; counsel is testifying.

13          THE COURT:   I think that she's asking him.

14  Q.   A lock up is where people are detained; is that right?

15  A.   What you are referring to is like a police station or

16  interview room?

17  Q.   Are you familiar with the term lock up?

18  A.   If I understand what you mean it is like a police station.

19      No, it was not at a police station.

20  Q.   There was a lot of discussion on the tapes -- I say the

21  tapes but they are digital records; are they not?

22  A.   Yes.

23  Q.   And there were discussions during the recordings in both

24  meetings about Mr. Fahie's construction of his new family home;

25  correct?

10:12  1    A.   Yes.

10:12  2    Q.   And initially Ms. Maynard tells the CS in the early meeting

10:12  3    with just her that Mr. Fahie cannot afford to buy or pay for

10:12  4    any of this; do you recall that?

10:12  5    A.   No.

10:12  6    Q.   Going back to 11 A, page 87.   Ms. Maynard starts speaking

10:13  7    on line ten.   Do you see that?

10:13  8    A.   Yes.

10:13  9    Q.   It says he has already started construction.   Is it correct

10:13  10   you are referring to Mr. Fahie here?

10:13  11   A.   Yes.

10:13  12   Q.   And Roberto responds, yes, and you respond, yes.   And Ms.

10:13  13   Maynard says; have to pay the workers and to start the business

10:13  14   or what he wants so everything comes together because he

10:13  15   doesn't have the money himself.   You see that?

10:13  16   A.   Yes.

10:13  17   Q.   You recall Ms. Maynard saying Mr. Fahie did not have the

10:13  18   money himself to pay for the construction; is that right?

10:13  19   A.   Correct.

10:13  20   Q.   Did you in these two meeting become familiar with a lady

10:13  21   named Dorrie?

10:14  22   A.   No.

10:14  23   Q.   In addition to your undercover work, did you do any follow

10:14  24   up investigative work in this case after this case was done?

10:14  25   Did you subpoena records or anything after that?

10:14  1   A.   I went back to the hotel to get surveillance footages.

10:14  2   Q.   Have you ever served as a task force officer lead agent

10:14  3   before any of these cases?

10:14  4   A.   On other cases not involving this one?

10:14  5   Q.   Yes, sir.

10:14  6   A.   Yes.

10:14  7   Q.   You were not the lead agent on this one.  I believe you

10:14  8   testified Special Agent Witek and Special Agent Aschleman were

10:14  9   the lead agents?

10:15  10  A.   Yes.

10:15  11  Q.   I believe you testified that there was another sum of money

10:15  12  that Mr. Fahie was supposed to be paying to an individual that

10:15  13  was going to be met in Saint Martin.

10:15  14       Do you recall that testimony you gave on direct?

10:15  15  A.   Yes.

10:15  16  Q.   How much was that?

10:15  17  A.   I believe a total of -- adding up to 183,000.

10:15  18  Q.   And that money, according to the scenario, was going to be

10:15  19  funded by the CI; is that right?

10:15  20  A.   Correct.

10:16  21  Q.   It is going to be paid to this gentleman from Senegal; is

10:16  22  that correct?

10:16  23  A.   I don't recall exactly.

10:16  24  Q.   It is going to be paid to this gentleman when they meet in

10:16  25  Saint Martin?

| | | |
|---|---|---|
| 10:16 | 1 | A.   Yes. |

**A.   Yes.**

**Q.   If I recall your testimony on direct, that money was going to be used to pay bribes relative to letting the cocaine into the British Virgin Islands for safe passage; is that right?**

**A.   Yes.**

**Q.   Do you recall the discussion at the meeting on April 28th is the money was to pay the individual for past work that he had done in reference to elections?**

**A.   If you could refresh my recollection.**

**Q.   12 B.   The transcript of the meeting with Mr. Fahie on the 27th -- it is a few pages long -- but to put it in context, we will start with Roberto who is talking at line 16, page 35.**

**A.   Okay.**

**Q.   So I have the $133,000, that is the correct number, right?**

    Switching to another portion of the recording.

    Mr. Fahie responds, exactly correct.

    Roberto says; in hundreds.

    Mr. Fahie says, yeah, he's precise; he don't take a penny more or a penny less.

    Roberto; and you don't have anything else with him anymore.

    And Mr. Fahie responds, no; for him right now, no.

    Roberto says; you just give him the money and we good.

    Mr. Fahie says; he did a few things for me politically so he borrowed over a year now.

10:18  1      Roberto says, okay.

10:18  2      Mr. Fahie says; and he needs to pay them back so he is just

10:18  3  coming for that.

10:18  4      Roberto says, okay.  So this is not going to be repeatable

10:18  5  that every month we are -- have to go over there.

10:18  6      Mr. Fahie responds no, no, no.  I am like, he knows a lot

10:19  7  about elections so he comes around elections.

10:19  8      Roberto says, okay.

10:19  9      Mr. Fahie says; that is it.

10:19  10      Did I read that correctly?

10:19  11  A.  Yes.

10:19  12  Q.  So that $133,000 was to pay back this individual for things

10:19  13  that he had done for elections, at least to the discussion you

10:19  14  had with Mr. Fahie on the 28th?

10:19  15  A.  To pay the individual to fulfill the rest of the operation

10:19  16  to get it going.

10:19  17  Q.  Well, the transcript says what it says.

10:20  18      Now, in addition to the things that Mr. Fahie was discussing

10:20  19  about the gentleman who was going to be paid back the 133 on

10:20  20  Saint Martin, Mr. Fahie was asking a number of questions during

10:20  21  the course of the meeting on the 28th, correct?

10:20  22  A.  On the 28th?

10:20  23  Q.  I am so sorry, the 27th.

10:20  24  A.  Yes, he asked questions.

10:20  25  Q.  He was asking things about -- let's back that up.

10:20   1      Even before this meeting with Mr. Fahie -- that starts

10:21   2   about 7 o'clock at night on the 27th?

10:21   3   A.   Yes.

10:21   4   Q.   And the meeting with Ms. Maynard, do you recall discussions

10:21   5   with the CI, with Ms. Maynard, where the CI is talking about

10:21   6   Mr. Fahie is starting to get funny?

10:21   7   A.   I recall him saying that, yes.

10:21   8   Q.   And that the CI is asking Ms. Maynard if he maybe needs to

10:21   9   take precautions with Mr. Fahie -- you recall that?

10:21   10   A.   Yes.

10:21   11   Q.   Let's fast forward to the meeting the 27th.   Mr. Fahie

10:21   12   starts to ask a lot of questions.   He is asking how you guys,

10:22   13   yourself the CI in your undercover roles, are planning to get

10:22   14   money for the future loads of the 3000 kilograms into the BVI;

10:22   15   is that correct?

10:22   16   A.   He was asking about the details of the operation.

10:22   17   Q.   He is also just asking about how you guys do this

10:22   18   generally; was he not?

10:22   19   A.   He was curious.

10:22   20   Q.   He was asking how go fast vessels operate?

10:22   21   A.   Yes.

10:22   22   Q.   That was on page 68 of the transcript on 12 B.

10:23   23      He also asks about how you and the CI generally get money

10:23   24   into places?

10:23   25   A.   He was inquiring about his money, how to get it in.

10:23   1   Q.   He is not just inquiring specifically about money, he

10:23   2   specifically asks you how you get money in generally; is that

10:23   3   right?

10:23   4   A.   Yes, relating to the money we were going to give him for

10:23   5   the profit.

10:23   6   Q.   Let's go to what is actually on the tape, page 68, line

10:23   7   seven.   Mr. Fahie says, okay, is there any other way you can

10:24   8   get it in -- any other way that you use generally; correct?

10:24   9      And then Roberto says, oh, yeah.

10:24  10      And Mr. Fahie says; what other way?

10:24  11      Roberto says a boat.

10:24  12       And Mr. Fahie says, okay.

10:24  13      Roberto says the boat from Puerto Rico -- Miami -- send it

10:24  14   to Puerto Rico and from Puerto Rico in a boat.   Can you arrange

10:24  15   that also?

10:24  16      Mr. Fahie says say the boat reaches into -- the boat comes

10:24  17   from Puerto Rico straight to the BVI.

10:24  18      Roberto says, yes, that is how they get the fast boat; you

10:24  19   know that, right?

10:24  20      Mr. Fahie responds; right.   So they don't check it in?

10:24  21      Roberto says; no, no, no they don't check it in, no -- you

10:24  22   know that.

10:24  23      Mr. Fahie says; I am checking.   I am just making sure.

10:25  24      You say a little later down; nobody's saying nothing.

10:25  25   A.   Nobody's signing nothing.

Q.  To be sure; you guys are talking about money relative to loads of cocaine.  At some point you say -- or you ask Mr. Fahie if he has some other plan or suggestion to get the money into the island?

A.  Yes.

Q.  At some point you recall asking him that?

A.  I asked if he had any other way that he preferred to get the money there.

Q.  He says no; correct?

A.  I have to go back to that.

        THE COURT:  Why don't we take five plus minutes for coffee.  Do not talk amongst yourselves about the case and we will be back.

        COURT SECURITY OFFICER:  All rise, please.

                    RECESS TAKEN

        THE COURT:  Bring in the jury, please.

        COURT SECURITY OFFICER:  All rise for the jury.

        THE COURT:  Everyone may be seated.

        You may continue, Ms. Van Vliet.

Q.  We are on Government's 12 B the transcript from the evening of April 27th.  To kind of put some context back into where we were before the break, there was a time period you were asking Mr. Fahie whether he had suggestions or alternatives in terms of how money could be transported into the island; is that right?

10:43  1   A.  Yes.

10:43  2   Q.  On page 72 at line nine you ask Mr. Fahie; do you have

10:43  3   another way or another suggestion?

10:43  4       And Mr. Fahie responds, no, I just checking to see what

10:43  5   ways you have to get it in.

10:44  6       Did I read that correctly?

10:44  7   A.  Yes.

10:44  8   Q.  Is it your understanding when Mr. Fahie was talking to you

10:44  9   -- was a reference to the money?

10:44  10  A.  The money from the profit.

10:44  11  Q.  When you say the money from profit -- you are referring to

10:44  12  money from profit from the cocaine, the 3000 kilograms, that

10:44  13  was to be imported into the United States?

10:44  14  A.  Yes.

10:44  15  Q.  In addition to asking how you bring in the money and how it

10:44  16  is to be transported -- using go fast boats -- what is your

10:44  17  understanding of a go fast boat?

10:45  18  A.  A boat that goes fast -- it is used for drug smuggling.

10:45  19  Q.  It is used for other purposes?

10:45  20  A.  Yes.

10:45  21  Q.  It is used for a variety of other legal things?

10:45  22  A.  Yes.

10:45  23  Q.  In addition to asking some of these questions he also asked

10:45  24  where traffickers usually dock; is that right?

10:45  25  A.  Can you refresh my recollection?

10:45  1   Q.   12 B, 88 up to the top of 89.   Let me start with Roberto at

10:45  2   line fifteen.

10:46  3      Roberto says; that's it, yeah, so as soon as we are in your

10:46  4   waters they have nothing to do with us its just you.

10:46  5      Mr. Fahie, responds yeah.

10:46  6       Roberto says, perfect.

10:46  7        Mr. Fahie asks, with that now, with the boat so when they

10:46  8   come in the boat -- something unintelligible -- where would

10:46  9   they normally come and dock?

10:46  10      And then you say, well, you give the location.

10:46  11      Is that right?

10:46  12   A.   Correct.

10:46  13   Q.   Then there is a further discussion about Mr. Fahie would

10:46  14   give the location.

10:46  15   A.   Right.

10:46  16   Q.   There is also a lot of discussion about ways -- in terms of

10:47  17   Crypto currency -- and how that could be used among the three

10:47  18   of you.

10:47  19   A.   Yes.

10:47  20   Q.   The three of you is Roberto, the CI, Mr. Fahie and yourself

10:47  21   for the bulk of the meeting?

10:47  22   A.   Yes.

10:47  23   Q.   At times Ms. Maynard and Roxanne were in the room, then

10:47  24   they left and I believe at one point Ms. Maynard came back at

10:47  25   some period of time?

10:47  1   A.   Yes.

10:47  2   Q.   For the bulk of the meeting on April 27th it was just you,

10:47  3   Roberto, the CI, and Mr. Fahie; correct?

10:47  4   A.   CI, myself and Mr. Fahie, yes.

10:48  5   Q.   At some point the money in the Louie Vuitton boxes is shown

10:48  6   to Mr. Fahie literally on your phone; correct?

10:48  7   A.   Yes.

10:48  8   Q.   He asked a lot of questions about that as well; correct?

10:48  9   A.   About the money?

10:48  10  Q.   Yes, sir.

10:48  11  A.   He inquired, yes.

10:48  12  Q.   When he inquired he asked questions about how many boxes it

10:48  13  would be and how it would be packaged?

10:48  14  A.   Yes.

10:48  15  Q.   The CS announced during the meeting to Mr. Fahie that he

10:49  16  would be accompanying the money and Ms. Maynard and Roxanne

10:49  17  from Miami to Tortola?

10:49  18  A.   Yes; because she was a little nervous.

10:49  19  Q.   When you say she was a little nervous are you referring to

10:49  20  Ms. Maynard or Roxanne?

10:49  21  A.   Referring to Ms. Maynard.

10:49  22  Q.   And Roberto tells Mr. Fahie the night of the 27th that he

10:49  23  is going to go down to Tortola?

10:49  24  A.   Yes.

10:49  25

10:49  1   Q.  And the scenario was that the three of them, the CI, Ms.

10:49  2   Maynard, Roxanne were going to take the money, the $700,000,

10:50  3   via plane back to Tortola?

10:50  4   A.  Yes.

10:50  5   Q.  Mr. Fahie during the time period where you were discussing

10:50  6   the trip and the money -- I think that you have showed him the

10:50  7   picture -- asked a number of questions about how the money is

10:50  8   packaged; is that right?

10:50  9   A.  Yes.

10:50  10  Q.  Exhibit 12 B at about 104 Mr. Fahie is asking about how

10:51  11  many boxes -- how it would be packaged -- when I say it I am

10:51  12  referring to the money.

10:51  13      And then he asked where it would be in the plane and he

10:51  14  asked if it would be in a secret compartment.

10:51  15      Go to 106...

10:51  16  A.  I am there.

10:51  17  Q.  At the top Roberto says, okay, yeah it is going to be two

10:51  18  bags.  Is it your understanding the "it" that Roberto is

10:51  19  referring to is the $700,000 in currency?

10:51  20  A.  Yes.

10:51  21  Q.  One is bigger, the other one is smaller, the smaller one is

10:52  22  for her.  The smaller is a normal bag.

10:52  23      Is it your understanding the her that Roberto is referring

10:52  24  to in that statement is Ms. Maynard?

10:52  25  A.  Yes.

Q.  And the larger smaller he is talking about the relative

size of the suitcase?

A.  Yes.

Q.  Then Mr. Fahie says, right.

    And then Roberto says the other one, it is with little

wheels, it is yours.

    You say you will see it, you will see how it is broken down

and it has the marking right there.

    Did I read that correctly?

A.  Yes.

Q.  And as I recall it you were referring to the picture of the

phone where there are some markings on it?

A.  At that moment I am describing the suitcases were in the

plane -- when he sees the suitcases he will see the markings on

the suitcases indicating the money; but I'm not describing the

pictures and stuff like that.

Q.  It is your testimony there would be marks on the outside of

the suitcases?

A.  We spoke about putting on a bow.

Q.  Mr. Fahie told you that that was not necessary?

A.  I don't recall -- I would have to refresh my recollection

on that.

Q.  After you say you will see how it is broken down you will

see the marking there...

10:53  1       And Mr. Fahie responds, yeah, is there any way with the

10:54  2  bags they could fit them into or pack them in a suitcase where

10:54  3  you have a suitcase like a dummy section; correct?

10:54  4       And you respond, okay, with a false compartment; correct?

10:54  5  A.  Correct.

10:54  6  Q.  And then the CS says; you will see it, you will see it, you

10:54  7  will see how it is packed up.

10:54  8       And then there is further discussion that there will be

10:54  9  clothes in the suitcase as well?

10:54  10  A.  Yes.

10:54  11  Q.  So all of the details around the packing of the money, Mr.

10:54  12  Fahie is also asking for verification that there is going to be

10:55  13  some identifying mark on those bags; right?

10:55  14  A.  He was just inquiring how we were going to package it.

10:55  15  Q.  I understand that.  Did he also ask whether there would be

10:55  16  identifying marks on the bag?

10:55  17  A.  I believe so.

10:55  18  Q.  And he was also asking if the money would be hidden inside

10:55  19  the bag in a false compartment?

10:55  20  A.  Yes.

10:55  21  Q.  And the next day on the 28th when you get to the airport --

10:55  22  was the CS with you or just you and the pilot?

10:55  23  A.  It was myself, the CI and the defendant.

10:56  24  Q.  So the pilot who was also a law enforcement agent; correct?

10:56  25  A.  Yes.

Q.   He was not inside the plane with you?

A.   I do not remember seeing him inside the plane.

Q.   So, it was the three of you in the plane, and that is where we see the video -- I don't know if you are leaning over or down -- but you are somehow displaying the Louis Vuitton boxes where the money is packed to the defendant?

A.   Yes.

Q.   On the 28th were the suitcases that had the markings that you referred to on the 27th, the identifying markings, were those also shown to the defendant or was it just the actual money in the Louis Vuitton boxes?

A.   No.  I told the defendant that the crew, or whoever would be in charge of taking care of it, would be taking care of that part; but they were not there.

Q.   So, they were not shown to him on the 28th?

A.   Correct.

Q.   As I understand it, on the 28th -- Mr. Fahie also after you arrived at the airport asked specifically when it is the plane with the money is going to land in Tortola; do you recall that?

A.   Refresh my recollection.

Q.   Go to 13 B, which is the transcript of the 28th.

A.   Page number.

Q.   Let's start at 55.  You are speaking.  You say something unintelligible; everything good.

     Roberto says, yeah, time to go.

10:58  1      Mr. Fahie says; and this takes how long, how long to get

10:58  2  to Tortola?

10:58  3      Roberto says; 3:30.

10:58  4      Mr. Fahie says; it leaves at 3:30?

10:58  5      Roberto says, no, it leaves at 12:30.

10:58  6      Mr. Fahie says 12:30.

10:58  7      Roberto says; it is going to be at least 3:30.

10:58  8      Mr. Fahie responds; okay.

10:59  9      Roberto says three hours; correct?

10:59  10  A.   Correct.

10:59  11  Q.   So, he is confirming, as much as someone can with air

10:59  12  travel, when the plane is going to arrive at Tortola?

10:59  13  A.   Arrive and duration.

10:59  14  Q.   The flight being from Miami to Tortola?

10:59  15  A.   Yes.

10:59  16  Q.   There is a lot of talk about XO Jet both in the 27th

10:59  17  conversations with just Ms. Maynard and the later one with Mr.

10:59  18  Fahie.   There really is a business called XO Jet?

11:00  19  A.   I became aware of it later on.

11:00  20  Q.   So the answer is there is a real legitimate business called

11:00  21  XO Jet?

11:00  22  A.   Yes.

11:00  23  Q.   Did you become aware there is a website that people can

11:00  24  charter flights from here to there should they so desire?

11:00  25  A.   The exact details I don't know how it all works.

11:00  1   Q.  Do you recall discussions in the meetings about something

11:00  2   called a commission?

11:00  3   A.  Yes.

11:00  4   Q.  Do you recall Ms. Maynard and Mr. Fahie talking about the

11:01  5   commission and an inquiry from the UK into Mr. Fahie's

11:01  6   predecessor?

11:01  7   A.  Yes.

11:01  8   Q.  And as you testified at the time Mr. Fahie was the Premier

11:01  9   of the British Virgin Islands?

11:01  10  A.  Yes.

11:01  11  Q.  And when I say at the time that was prior to his arrest on

11:01  12  the 28th?

11:01  13  A.  Yes.

11:01  14  Q.  And he is no longer the Premier of the British Virgin

11:01  15  Islands?

11:01  16  A.  No.

11:01  17       MS. VAN VLIET:  May I have a moment, Your Honor.

11:02  18       THE COURT:  Yes of course.

11:02  19       MS. VAN VLIET:  I have nothing further.  Thank you,

11:02  20  detective.

11:02  21       THE WITNESS:  You're welcome.

11:02  22       THE COURT:  Redirect, Mr. McLaughlin.

11:02  23  Q.  Detective, during cross examination Ms. Van Vliet asked

11:03  24  questions if there were discussions about which specific ports

11:03  25  would be used for the thousand of kilograms importation scheme.

11:03  1   A.   Yes.

11:03  2   Q.   Showing you Government's Exhibit 11 B at page 80; line 7

11:04  3   through 12.   What port was going to be used to bring in the

11:04  4   drugs?

11:04  5   A.   Road Town.

11:04  6   Q.   You met with Ms. Maynard on April 27, 2022?

11:04  7   A.   Yes.

11:04  8   Q.   And did you meet with the defendant thereafter?

11:04  9   A.   Yes.

11:04  10  Q.   Taking you to page 93, Government's Exhibit 12 B.   Focusing

11:05  11  on lines 16 through 19.   When the defendant uses the term she

11:05  12  here, based upon your participation in the meeting, what is

11:05  13  your understanding of who he was referring to?

11:05  14  A.   Ms. Maynard.

11:05  15  Q.   And what is the word he uses here on line 19?

11:05  16  A.   Everything.

11:05  17  Q.   All right. Going to page twelve of Government's 12 B,

11:05  18  focusing on lines 11 through 14; who is the speaker here on

11:06  19  line 13?

11:06  20  A.   The defendant.

11:06  21  Q.   When he used the term everything here, based upon your

11:06  22  participation in the meeting what is your understanding of what

11:06  23  he was referring to?

11:06  24  A.   The importation of the kilograms of our strategic operation

11:06  25  we were planning with the defendant.

11:06  1    Q.   When you met with the defendant and Roberto on April 27 was

11:06  2    the defendant free to leave at any point?

11:06  3    A.   Yes.

11:06  4    Q.   Whose idea was it to pick him and his daughter up the next

11:07  5    morning?

11:07  6    A.   The defendant.

11:07  7    Q.   Did you or Roberto have to drag him into the jet to show

11:07  8    him the $700,000?

11:07  9    A.   No.

11:07  10   Q.   Did he at any point express to you, not on the video, that

11:07  11   he did not want to see the money?

11:07  12   A.   No.

11:07  13   Q.   And there were some questions by Ms. Van Vliet about the

11:07  14   purpose of the $500,000.

11:07  15       Do you recall those questions?

11:07  16   A.   Yes.

11:07  17   Q.   In the scenario where you were the Godson, what were you

11:07  18   and Roberto getting for that $500,000?

11:07  19   A.   Free passage.

11:07  20   Q.   What do you mean by that?

11:07  21   A.   Our load of cocaine -- the vessel containing that would go

11:08  22   past the BVI without inspection.

11:08  23   Q.   Taking you now to Government's 12 B and taking you to page

11:08  24   91.  I would like to focus your attention on lines twelve

11:08  25   through 18.

1    When the informant uses the term yours here, based upon

2  your participation in the meeting, what is your understanding

3  of who he is referring to?

4  A.  To the defendant.

5  Q.  There were questions by Ms. Van Vliet about Roxanne.

6  A.  Yes.

7  Q.  After the defendant was arrested, who did you pick up from

8  the hotel?

9  A.  We went to pick up Ms. Maynard and Roxanne.

10  Q.  Were they taken aboard a plane?

11  A.  Yes, the same one.

12  Q.  And what happened when they boarded the jet?

13  A.  They were presented with the money.

14  Q.  Taking you to page 43, Government's 12 B, focusing your

15  attention on lines 13 through 16.

16    Who is the speaker here?

17  A.  The defendant.

18  Q.  When the defendant uses the words; I told her she going to

19  see a little cash but fear not.

20    Based upon your participation in the meeting, what is your

21  understanding of who the defendant is referring to?

22  A.  He is referring to Roxanne.

23  Q.  Now there were questions about Ms. Maynard's home being

24  built?

25  A.  Yes.

11:11  1    Q.  Going to Government's Exhibit 11 B, page 87.  I would like

11:11  2    to take you to the top of 87 -- if we go to 86 starting at line

11:11  3    19, who is the speaker here?

11:12  4    A.  Ms. Maynard.

11:12  5    Q.  If we go to the top of 87, focusing your attention on lines

11:12  6    five through seven, what is the name of the person referred to

11:12  7    here?

11:12  8    A.  Stephan.

11:12  9    Q.  Who is Stephan?

11:12  10   A.  Ms. Maynard's son.

11:12  11   Q.  The gender pronoun used on line 11 is who?

11:12  12   A.  He.

11:13  13   Q.  If we go to page 88, line two, what is the name referenced

11:13  14   here?

11:13  15   A.  Stephan.

11:13  16   Q.  Ms. Van Vliet asked you some questions about your meeting

11:13  17   with the defendant on April 27th where he asked a series of

11:13  18   questions about how to get money back into the BVI.

11:13  19       Do you recall that?

11:13  20   A.  Yes.

11:13  21   Q.  Taking you now to Government's Exhibit 12 B.  Focusing your

11:14  22   attention on lines one and two, detective, who is the speaker

11:14  23   here?

11:14  24   A.  The defendant.

11:14  25

11:14  1    Q.   When the defendant was asking you all of these questions

11:14  2    about how to get money back in, did you find that strange as

11:14  3    the undercover?

11:14  4    A.   No.

11:14  5    Q.   Why not?

11:14  6    A.   He needs to get the money so he is trying to inquire how to

11:14  7    get it and what are all his options.

11:14  8    Q.   Were bank accounts discussed during this discussion?

11:14  9    A.   Yes.

11:14  10   Q.   Did the defendant want to use bank accounts?

11:14  11   A.   Yes.

11:14  12   Q.   He did?

11:14  13   A.   Yes.

11:14  14   Q.   Taking you to page 72, line 21, who is the speaker here?

11:14  15   A.   The defendant.

11:15  16   Q.   The next page 73.  Do you see here where he says the other

11:15  17   accounts are traceable?

11:15  18   A.   Yes.

11:15  19   Q.   What is he referring to there based upon your participation

11:15  20   in the investigation?

11:15  21   A.   Bank accounts.

11:15  22   Q.   Did the defendant want to use bank accounts?

11:15  23   A.   No.

11:15  24   Q.   Did he want to use Crypto currency?

11:15  25   A.   No.

11:15  1  Q.  Why not?

11:15  2  A.  At the time Crypto currency was not allowed in the BVI.

11:15  3  Q.  Now you were asked by counsel a series of questions about

11:15  4  bringing it in by boat; do you recall that?

11:15  5  A.  Yes.

11:15  6  Q.  Going to page 108 -- 108 of Government's Exhibit 12 B --

11:16  7  focusing your attention on lines 1 through 4. Who is the

11:16  8  speaker here?

11:16  9  A.  The defendant.

11:16  10  Q.  When he says here on page 108 lines, 9 through 10, I will

11:16  11  tell you exactly where, what is the defendant referring to

11:16  12  based upon your participation in the meeting?

11:16  13  A.  He is going to let us know the exact location for the money

11:16  14  in the BVI.

11:16  15  Q.  Going to lines 14 through 23.  You see the name referenced

11:17  16  here?

11:17  17  A.  Yes.

11:17  18  Q.  Had you or the informant brought up the name Tattoo in this

11:17  19  meeting prior to this moment?

11:17  20  A.  No.

11:17  21  Q.  And Ms. Van Vliet also asked you a series of questions

11:17  22  about when you showed the photograph of the money to the

11:17  23  defendant. Do you recall that?

11:17  24  A.  Yes.

11:17  25

Q.  She asked you a series of questions about how the money would be packaged?

A.  Yes.

Q.  Going to page 107.  Was the defendant going to be on the flight with the $700,000 going from Miami to the BVI on April 28th?

A.  No.

Q.  Who was?

A.  Ms. Maynard and Roxanne.

Q.  Focusing your attention on 107, when the defendant uses the term them on line 17, based upon your participation in the meeting, who is the defendant referring to?

A.  To Ms. Maynard and Roxanne.

Q.  Ms. Van Vliet also asked you questions about -- right before the defendant was arrested -- what time the plane was going to land?

A.  Yes.

Q.  Was that also discussed on April 27th as well?

A.  Yes.

Q.  So it was not the first time it was brought up?

A.  No.

          MR. McLAUGHLIN:  I have no further questions.

          THE COURT:  Thank you, agent, you may step down.

          THE WITNESS:  Thank you.

          THE COURT:  Government call your next witness.

11:19   1          MR. GERARDE:   Government calls Special Agent Brian

11:20   2   Witek.

11:20   3                    WITNESS SWORN

11:20   4          MR. GERARDE:   May I proceed, Your Honor?

11:20   5          THE COURT:   You may.

11:20   6          MR. GERARDE:   Thank you.

11:20   7   Q.   Special Agent Witek, where are you currently employed?

11:20   8   A.   I am currently employed as a special agent with the DEA in

11:21   9   the Miami Field Office.

11:21   10   Q.   How long have you been a DEA agent in the Miami Field

11:21   11   Office?

11:21   12   A.   I have been a special agent since 2005.

11:21   13   Q.   Since 2005; have you been in Miami the entire time?

11:21   14   A.   No, I have not.   I first served in the Saint Louis Division

11:21   15   and transferred down to Miami.

11:21   16   Q.   How long have you been a special agent in the Miami Field

11:21   17   Office?

11:21   18   A.   Since 2011.

11:21   19   Q.   And as a DEA agent in the Miami Field Office what are your

11:21   20   duties and responsibilities?

11:21   21   A.   So, our duties include conducting drug trafficking

11:21   22   investigations, money laundering investigations in Miami and

11:21   23   Florida; as well as abroad.

11:21   24   Q.   Were you the lead agent in the case that's before the Court

11:21   25   today?

11:21  1    A.  I was one of the co-case agents.

11:22  2    Q.  As a co-case agent what were your responsibilities?

11:22  3    A.  Some of the responsibilities include preserving evidence,

11:22  4    conducting investigations, doing the daily things that are

11:22  5    required for the case.

11:22  6    Q.  Focusing on the evidence, what evidence did you receive in

11:22  7    this case?

11:22  8    A.  During the course of this investigation we received audio

11:22  9    recordings, telephone recordings, video recordings.

11:22  10   Q.  Were any cell phones seized?

11:22  11   A.  Yes; cell phones were seized.

11:22  12   Q.  Were these recordings and cell phones preserved?

11:22  13   A.  They were.

11:22  14   Q.  Have you reviewed the recordings you received during the

11:22  15   case?

11:22  16   A.  Yes.

11:22  17   Q.  Through reviewing those recordings and through your

11:22  18   investigation did you become familiar with the voices of the

11:23  19   defendant Andrew Fahie, Oleanvine Maynard, Kadeem Maynard and

11:23  20   Roxanne Sylvester?

11:23  21   A.  Yes.

11:23  22   Q.  Prior to this investigation were you also familiar with the

11:23  23   voices of the confidential source used in this case?

11:23  24   A.  Yes.

11:23  25   Q.  And the Undercover Officer Dominguez?

11:23  1    A.   That is correct.

11:23  2    Q.   And as the co-case agent in the investigation were you

11:23  3    involved in preparing and fine tuning transcripts of the audio

11:23  4    recordings that you received in evidence?

11:23  5    A.   Yes, did.   We took part in the review process of the

11:23  6    recordings.

11:23  7         MR. GERARDE:   Without objection from the defense the

11:23  8    Government moves to admit the following exhibits:  1 A, 1 B, 2

11:23  9    A, 2 B, 3 A, 3 B, 4 A, 4 B, 5 A, 5 B, 6 A, 6 B, 7 A, 7 B, 8 A,

11:24  10   8 B, 9 A, 9 B, 10 A, 10 B and then going down to 15 A, 16 A, 17

11:24  11   A, 18 A, 19 A, 2O A, 21 A, 22 A and 29.

11:24  12        THE COURT:   Government's Exhibit 1 through 10 A and B

11:24  13   are admitted, Government's 15 through 22 A are admitted and

11:24  14   Government's Exhibit 29 is admitted without objection.

11:24  15        MR. GERARDE:   Your Honor, Judge 1 B through 10 B are

11:25  16   transcripts in separate binders.

11:25  17        THE COURT:   All right.

11:25  18        MR. GERARDE:   Can those be passed out to the jury.

11:25  19        THE COURT:   Mr. Santorufo and Officer Sanders, if you

11:25  20   could assist in getting the binders to the jury.

11:27  21   Q.   Let me start with Exhibits 1 A and B.   Looking at the

11:27  22   binder in front of you, if you could flip to the first tab.

11:27  23   Can you explain to the jury what Exhibit 1 B is?

11:27  24   A.   Exhibit 1 B is the recording transcript of a phone call

11:27  25   made on March 20, 2022, with the participants that included

1   Oleanvine Maynard and the confidential informant.

2   Q.   During the course of the investigation did you have an

3   opportunity to review this recording with Ms. Maynard and

4   Kadeem Maynard?

5   A.   Yes.

6   Q.   Did you have any concern that the recording was incomplete

7   or had been altered?

8   A.   No.

9   Q.   Have you reviewed the transcript Exhibit 1 B?

10  A.   Yes.

11  Q.   To the best of your knowledge is this a fair and accurate

12  depiction of the phone call recording in Exhibit 1 A?

13  A.   It is.

14  Q.   Let's turn to Exhibit 2 B.  Can you explain what 2 B is?

15  A.   Exhibit 2 B is the March 20, 2022, recording transcript

16  meeting between Oleanvine Maynard, Kadeem Maynard the

17  confidential informant and a few unidentified participants.

18  Q.   You said this was a meeting.  Where did this meeting take

19  place?

20  A.   The meeting took place in the U S Virgin Islands.

21  Q.   Have you reviewed the transcript?

22  A.   I have.

23  Q.   Have you reviewed the transcript with Ms. Maynard and

24  Kadeem Maynard?

25  A.   Yes.

Q.  Do you have any concern that the recordings in the corresponding transcripts have been altered or modified in any way?

A.  No.

Q.  Based on your review of Exhibit 2 B, is it a fair and accurate reflection of Exhibit 2 A?

A.  Yes, it is.

Q.  Let's turn now to Exhibit 3 B.  Can you explain to the jury what Exhibit 3 B is?

A.  Exhibit 3 B is a recording transcript of the phone call that occurred on March 20, 2022, which included Kadeem Maynard, Oleanvine Maynard and the confidential informant.

Q.  Have you reviewed this phone call with Oleanvine Maynard and Kadeem Maynard?

A.  Yes, I have.

Q.  Based on your review of the transcript, is this a fair and accurate reflection of the recording in Exhibit 3 A?

A.  Yes.

Q.  Let's flip to Exhibit 4 B.  Can you explain to the jury what Exhibit 4 B is?

A.  4 B is the recording transcript that occurred March 29th, 2022, between Kadeem Maynard, Oleanvine Maynard and the confidential informant.

Q.  Was this a phone call or a meeting?

A.  This was a phone call.

Q.  Have you reviewed this phone call with Ms. Maynard and Mr. Maynard?

A.  Yes, I have.

Q.  Based on your review of the transcript, is this transcript a fair and accurate reflection of the recording in Exhibit 4 A?

A.  Yes.

Q.  Let's turn to tab 5, Exhibit 5 B.  Can you explain to the jury what is contained in Government's Exhibit 5 B?

A.  5 B is the recording transcript of the phone call that occurred on March 31st, 2022, with the participants being Kadeem Maynard, Oleanvine Maynard and the confidential informant.

Q.  Have you reviewed the phone call with Ms. Maynard and Mr. Maynard?

A.  Yes.

Q.  Based on your review of this transcript, Exhibit 5 B, is it a fair and accurate reflection of the phone call that was recorded and admitted as Exhibit 5 A?

A.  Yes.

Q.  Let's flip to tab six, Government's Exhibit 6 B.  Can you explain to the jury what Government's Exhibit 6 is?

A.  The recording transcript that occurred on April 1st, 2022 of the phone call between Andrew Fahie, Kadeem and Oleanvine Maynard and the confidential informant.

Q.   Have you had the opportunity to review the recording of
this transcript with Oleanvine Maynard and Kadeem Maynard?

A.   Yes.

Q.   Based on your review of Exhibit 6 B, is it a fair and
accurate reflection of the recording that has been admitted as
Government's Exhibit 6 A?

A.   Yes.

Q.   Let's turn to tab number seven.   Can you explain to the
jury what Governments Exhibit 7 B is?

A.   The recording transcript of the meeting that occurred on
April 7, 2022, in the BVI between Andrew Fahie, Oleanvine
Maynard, Kadeem Maynard, the confidential informant.

Q.   Have you had an opportunity to review this transcript
yourself along with Ms. Maynard and Mr. Maynard?

A.   Yes.

Q.   Based on your review of the transcript, is it your opinion
that is a fair and accurate reflection of the recording that's
admitted as Government's Exhibit 7 A?

A.   Yes, it is.

Q.   Let's turn to tab eight; Government's Exhibit 8 B.   Can you
tell the jury what is contained in Government's Exhibit 8 B?

A.   And the recording transcript that occurred on April 19,
2022, which was a phone call between Kadeem Maynard and the
confidential informant.

Q.   Have you reviewed this phone call with Kadeem Maynard?

11:34  1    A.   Yes.

11:34  2    Q.   Based on your review of the transcript and the audio

11:34  3    recording admitted as Government's Exhibit 8 A, is this

11:34  4    transcript a fair and accurate reflection of that recording?

11:34  5    A.   Yes, it is.

11:34  6    Q.   Let's turn to Government's Exhibit 9 B in the binder.   Can

11:34  7    you explain to the jury what Government's Exhibit 9 B is?

11:34  8    A.   The recording transcript that occurred on April 19, 2022,

11:34  9    which was a phone between Andrew Fahie, Oleanvine Maynard,

11:34  10   Kadeem Maynard and the confidential informant.

11:34  11   Q.   Have you reviewed this phone call with Ms. Maynard and Mr.

11:34  12   Maynard?

11:34  13   A.   Yes.

11:34  14   Q.   Based on your review of the transcript and the audio

11:35  15   recording as Exhibit 9 A, is Government's Exhibit 9 B a fair

11:35  16   and accurate reflection of that recording?

11:35  17   A.   Yes it is.

11:35  18   Q.   Let's turn to Government's Exhibit 10 B.   Can you explain

11:35  19   to the jury what Government's Exhibit 10 B is?

11:35  20   A.   The recording transcript that occurred on April 27, 2022,

11:35  21   which was a phone call between Oleanvine Maynard and the

11:35  22   confidential informant.

11:35  23   Q.   Have you reviewed this call with Ms. Maynard?

11:35  24   A.   Yes.

11:35  25   Q.   Based on your review of the transcript as well as 10 A, is

11:35  1    the transcript of 10 B a fair and accurate reflection of that

11:35  2    recording?

11:35  3    A.   Yes it is.

11:35  4    Q.   We have two types of recording in this cases, recordings of

11:35  5    phone calls and recording of meetings; is that correct?

11:35  6    A.   That is correct.

11:36  7    Q.   Who made the recordings in this case?

11:36  8    A.   The recordings were made by the confidential source.

11:36  9    Q.   Have you also reviewed these recordings and transcripts

11:36  10   with the confidential source?

11:36  11   A.   Yes.

11:36  12   Q.   When we are talking about the phone calls, how does the

11:36  13   confidential source make a recording?

11:36  14   A.   The telephone calls are recorded by the confidential source

11:36  15   activating a speaker function on the cell phone and then using

11:36  16   a second device to record.

11:36  17   Q.   After a recording is made what happens with it?

11:36  18   A.   Once the recording is made it is provided to us and my

11:36  19   partner and it is downloaded and preserved as evidence.

11:36  20   Q.   Is that what happened in this case?

11:36  21   A.   Yes.

11:36  22   Q.   Were those phone calls made in the direct presence of

11:37  23   Oleanvine Maynard, Kadeem Maynard or the defendant?

11:37  24   A.   No.

11:37  25   Q.   Right.   Because they were phone calls?

A.   Yes.

Q.   Did law enforcement have any concern about the manner in which the recordings were being made?

A.   No.

Q.   *contract that with the meeting in this case, I believe you said there was a meeting on April 7th of 2022; is that right?

A.   Yes.

Q.   Who made the recordings during the April 7th meeting?

A.   The recordings were made by the confidential source.

Q.   Did the confidential source record the meeting in the same manner as he recorded the phone calls?

A.   Yes.

Q.   What type of device did he use?

A.   An recording device.

Q.   Was this something he just held out in the open to record the call?

A.   No.

Q.   How would you describe the device?

A.   An electronic device that is used to pick up the speech and sound in a meeting that he or she was in.

Q.   Was this device concealed on the informant in any way?

A.   It was placed on the body of the informant.

Q.   Was it readily apparent to someone speaking with the informant that he had a recording device?

A.   No.

11:38  1    Q.   The recording of the April 7th meeting happened in Tortola?

11:38  2    A.   Yes.

11:38  3    Q.   What did the informant do after the meeting?

11:38  4    A.   After the meeting on April 7th in Tortola the confidential

11:38  5    source flew back to Miami and was scheduled to meet with us.

11:38  6    Q.   Did you meet with him the same day he flew back?

11:38  7    A.   We did not.

11:38  8    Q.   Why not?

11:38  9    A.   He flew back after hours and it was very late in the day.

11:38  10   Q.   When did you meet with him?

11:38  11   A.   We scheduled to meet with him the following Monday after

11:39  12   the meetings occurred.

11:39  13   Q.   Was that essentially the next business day?

11:39  14   A.   For us it would have been the next business day because the

11:39  15   recordings and everything coincided with the weekend so Monday

11:39  16   was the next business day for us.

11:39  17   Q.   When you met with the informant after the April 7th meeting

11:39  18   what happens at that meeting?

11:39  19   A.   We conducted a thorough debrief of the meeting, myself and

11:39  20   my partner and obtained the recording device.  It was preserved

11:39  21   in my presence and later downloaded for preservation of

11:39  22   evidence.

11:39  23   Q.   When the recording device is not being used who maintains

11:39  24   custody of it?

11:39  25   A.   I maintain custody.  I keep it in a locked secured at my

11:39  1    work place.

11:40  2    Q.  Had this informant used this particular recording device

11:40  3    prior to this investigation?

11:40  4    A.  Yes.

11:40  5    Q.  Was that with you as the case agent?

11:40  6    A.  Yes.

11:40  7    Q.  How did the informant know how to work the recording

11:40  8    device?

11:40  9    A.  The informant was shown how to activate and deactivate the

11:40  10   device.

11:40  11   Q.  When you get the device back from the informant on April

11:40  12   7th, what did you do with it?

11:40  13   A.  I locked it up and kept it secured and then set everything

11:40  14   up to have it download once we were back in our workspace.

11:40  15   Q.  I think I said when you got the device back on April 7th

11:40  16   but, in fact, did you get the device back a few days later

11:40  17   after the meeting on April 7th?

11:40  18   A.  It was a few days later, yes.

11:41  19   Q.  Let's move to April 28th of 2022.  What happened on April

11:41  20   28th, 2022, in this case?

11:41  21   A.  On April 28th of 2022, there was an arrest conducted of Mr.

11:41  22   Fahie and Ms. Maynard.

11:41  23   Q.  Was Mr. Maynard also arrested?

11:41  24   A.  He was arrested in St. Thomas by DEA agents there.

11:41  25   Q.  Where were Oleanvine Maynard and the defendant arrested?

11:41 1  A.   They were arrested at the Opa Locka Executive Airport.

11:41 2  Q.   When the defendant was arrested, did he have any property

11:41 3  on him that law enforcement took and kept as evidence?

11:41 4  A.   Yes.   Once we returned to our DEA Weston office we

11:41 5  determined that he had electronic devices with him to include a

11:42 6  laptop and a cell phone.

11:42 7  Q.   Special Agent Witek, referring you to Government's

11:42 8  Exhibit 15 A.   If you could tell the jury what that is?

11:42 9  A.   A Samsung Note 10 cell phone with a blank outer box

11:42 10 protective case.

11:42 11 Q.   Whose cell phone is this?

11:43 12 A.   This is Mr. Fahie's cell phone.

11:43 13 Q.   Was that the cell phone law enforcement retrieved from him

11:43 14 when he was arrested?

11:43 15 A.   Yes.

11:43 16 Q.   What did law enforcement do with that cell phone after you

11:43 17 got it?

11:43 18 A.   The cell phone was deemed to be evidentiary value and was

11:43 19 later determined to go through a forensic process for

11:43 20 extraction.

11:43 21 Q.   Is that a process that you or your co-case agent undertook?

11:43 22 A.   No.

11:43 23 Q.   Who did?

11:43 24 A.   Other law enforcement agents that we worked with helped us

11:43 25 out in doing so.

11:43  1    Q.  Was that at your request?

11:43  2    A.  Yes.

11:43  3    Q.  From the time when you took the device from Mr. Fahie to

11:43  4    when it was examined by your law enforcement partners, did it

11:43  5    remain in law enforcement custody?

11:43  6    A.  Yes.

11:43  7    Q.  Let's look now at Government's Exhibit 16 A.  If you could

11:44  8    hold that up?

11:44  9    A.  Yes.

11:44  10   Q.  What is Government's Exhibit 16 A?

11:44  11   A.  16 A is a Microsoft Surface Pro laptop contained in its

11:44  12   leather protected case.

11:44  13   Q.  Where did law enforcement get Government's Exhibit 16 A?

11:44  14   A.  It was deemed to be of evidentiary in value and was

11:44  15   preserved upon the arrest of Mr. Fahie and preserved as

11:44  16   evidence with us.

11:44  17   Q.  Who maintained custody of the device throughout the

11:44  18   investigation?

11:44  19   A.  DEA maintained custody but it was later on extracted by our

11:44  20   law enforcement partners.

11:45  21   Q.  Were there any other devices or electronics retrieved from

11:45  22   the defendant when he was arrested?

11:45  23   A.  No.

11:45  24   Q.  Were you aware of any other devices on his person?

11:45  25   A.  No.

11:45  1    Q.   Showing you Government's Exhibit 17 A 18 A and 19 A.

11:45  2    Starting with Exhibit 17 A, if you could explain to the jury

11:45  3    what this device is?

11:45  4    A.   Exhibit 17 A is a cell phone that belongs to Ms. Maynard

11:45  5    that has this colorful case on it.

11:45  6    Q.   When did law enforcement retrieve this device?

11:45  7    A.   It was retrieved upon the arrest of Ms. Maynard.

11:46  8    Q.   Let's look at Government's Exhibit 18 A.   What is

11:46  9    Government's Exhibit 18 A?

11:46  10   A.   Exhibit 18 A is a second cell phone that was seized and

11:46  11   contained in this blue protective case.

11:46  12   Q.   Let's look at Government's Exhibit 19 A.   What is that?

11:46  13   A.   19 A is a Samsung Galaxy A 12 cell phone without a case;

11:46  14   gray in color.

11:46  15   Q.   Who had all three of these phones?

11:46  16   A.   These phones were seized by DEA and later provided to law

       17   enforcement for extraction.

       18   Q.   Were they on Ms. Maynard's person when she was arrested?

       19   A.   Yes.

       20   Q.   Did Ms. Maynard have any other phones or electronics on her

       21   at the time she was arrested?

11:46  22   A.   No.

11:46  23   Q.   Special Agent Witek, I have shown you what is in evidence

11:47  24   as Government's Exhibit 20 A, 21 A and 22 A.   Can you tell the

11:48  25   jury what Government's Exhibit 21 A is and show them?

11:48  1   A.  Do you want to begin with 20 A?

11:48  2   Q.  Yes.

11:48  3   A.  Government's Exhibit 20 A is a red iPhone belonging to

11:48  4   Kadeem Maynard.

11:48  5   Q.  Let's go to 21 A.

11:48  6   A.  21 A is a Samsung cell phone Galaxy S9 belonging to Kadeem

11:48  7   Maynard.

11:48  8   Q.  Government's Exhibit 22 A.

11:48  9   A.  22 A is a cell phone which is a flip phone.

11:48 10   Q.  Where were these phones taken from?

11:48 11   A.  They were seized from Mr. Kadeem Maynard when he was

11:48 12   arrested in Saint Thomas.

11:48 13   Q.  How did they get into the custody of the DEA in Miami?

11:49 14   A.  They were Fed Ex'd from the Saint Thomas DEA Office to the

11:49 15   office here in Miami.

11:49 16   Q.  Once they arrived here in Miami were they searched?

11:49 17   A.  Yes.  My partner applied for and received a search warrant

11:49 18   for this District and they were -- eventually all three phones

11:49 19   were searched.

11:49 20   Q.  Did the phones stay in law enforcement custody up until the

11:49 21   time they were searched?

11:49 22   A.  Yes.

11:49 23   Q.  Special Agent Witek, looking at the screen in front of you,

11:50 24   can you identify each of these three phones for the jury?

11:50 25   A.  Yes.

11:50  1   Q.   All right.

11:50  2   A.   Beginning with Government's Exhibit 22 A, the flip phone,

11:50  3   the middle phone, Government's Exhibit 21 A is the Samsung and

11:50  4   the red iPhone Government's Exhibit 20 A.

11:50  5   Q.   Whose phones were these?

11:50  6   A.   They were the phones seized upon the arrest of Kadeem

11:51  7   Maynard.

11:51  8   Q.   Directing your attention to the screen in front of you, if

11:51  9   you could identify for the jury what these three phones are?

11:51  10  A.   Beginning with Government's Exhibit 17 A is the cell phone

11:51  11  belonging to Ms. Maynard.

11:51  12       The second cell phone, Government's Exhibit 18 A, is the

11:51  13  cell phone belonging to Ms. Maynard.  And the third phone,

11:51  14  Government's Exhibit 19 A, is the cell phone belonging to Ms.

11:52  15  Maynard.

11:52  16  Q.   Can you identify for the jury what's on the screen in front

11:52  17  of you now?

11:52  18  A.   Yes.  Government's Exhibit 15 A is Mr. Fahie's Samsung Note

11:52  19  10 cell phone.  Government's Exhibit 16 A is the Microsoft

11:52  20  Surface Pro laptop belonging to Mr. Fahie.

11:52  21  Q.   As co-case agent in this case, were these all of the

11:52  22  electronic devices that were seized belonging to these three

11:53  23  individuals?

11:53  24  A.   Yes.

11:54  25

11:54  1    Q.  Showing you what is now in evidence as Government's Exhibit

11:55  2    29.  Do you recognize the person in this exhibit?

11:55  3    A.  Yes, I do.

11:55  4    Q.  Who is this?

11:55  5    A.  This is a photograph of Kadeem Maynard.

11:55  6    Q.  Who is Kadeem Maynard in this investigation?

11:55  7    A.  Mr. Maynard is the son of the BVI port director Oleanvine

11:55  8    Maynard.

11:55  9         MR. GERARDE:  I have no further questions.  Thank you

11:55  10   agent.

11:56  11        THE COURT: Cross examination.

11:56  12        MS. VAN VLIET: If I may have a moment.

11:56  13        THE COURT:  Yes.

11:56  14   Q.  Good morning, Special Agent Witek.

11:56  15   A.  Good morning.

11:56  16   Q.  I have placed before you Government's Exhibit 18 A.   Do

11:56  17   you see it there?

11:56  18   A.  Yes.

11:57  19   Q.  This is one of the phones that was seized from Ms. Maynard;

11:57  20   am I correct?

11:57  21   A.  Yes.

11:57  22   Q.  And there are post-it notes with information about

11:57  23   passwords or pass-codes. They were not there when you seized

11:57  24   it; am I right?

11:57  25

11:57   1   A.   They were not on there.

11:57   2   Q.   As I recall your testimony, the three phones that were

11:57   3   seized from Mr. Kadeem or Stephan Maynard or Blako -- however

11:58   4   we are going to refer to him -- they were accessed via a search

11:58   5   warrant?

11:58   6   A.   Yes.

11:58   7   Q.   How about Ms. Maynard's cell phones?

11:58   8   A.   The cell phones that were seized from Ms. Maynard they were

07:53   9   accessed by her consent.

11:58   10  Q.   And similarly with my client, Mr. Fahi gave consent to have

11:58   11  his cell phone searched?

11:58   12  A.   Yes.

11:58   13  Q.   As well as the computer?

11:58   14  A.   That is correct, he did.

11:58   15  Q.   You mentioned the data being extracted, phones being

11:58   16  extracted. What do you mean by that?

11:58   17  A.   By extraction I mean -- that is a way to refer to getting

11:59   18  the information from the phone in a useable format for

11:59   19  investigators or the Court or in evidence for trial.

11:59   20      It is something that the -- that is undertaken to get

11:59   21  information such as text messages, photos and things of that

11:59   22  nature.

11:59   23  Q.   Without it you would have to be punching in numbers and

11:59   24  accessing a phone -- in order to get access to things that need

11:59   25  to be preserved as evidence; is that right?

11:59  1    A.   Yes.

11:59  2    Q.   Do I understand that the extraction process was done by a

11:59  3    fellow law enforcement officer or agent on each of the devices

11:59  4    Mr. Gerarde just showed you?

11:59  5    A.   Yes

12:00  6    Q.   And your co-case agent is Special Agent Aschleman?

12:00  7    A.   Yes.

12:00  8    Q.   As I understand it, agent, when Mr. Fahie was arrested on

12:00  9    April 28th at Opa Locka Airport -- Ms. Maynard was arrested as

12:00  10   well on April 28th at Opa Locka Airport?

12:00  11   A.   Yes.

12:00  12   Q.   And we were talking about 2022?

12:00  13   A.   Yes.

12:00  14   Q.   Kadeem Maynard was arrested in Saint Thomas on April 28,

12:00  15   2022, yes?

12:00  16   A.   Yes.

12:00  17   Q.   And Saint Thomas is the U.S. Virgin Islands?

12:01  18   A.   Yes.

12:01  19   Q.   As opposed to the British Virgin Islands?

12:01  20   A.   Yes.

12:01  21   Q.   Were you there when Ms. Maynard and Mr. Fahie were arrested

12:01  22   on the 28th?

12:01  23   A.   Yes. I participated in the arrest with Mr. Fahie along with

12:01  24   my partner on the 28th.

12:01  25

12:01  1          We had a secondary arrest team that arrested Ms. Maynard

12:01  2   and Roxanne Sylvester who were then transported to the Weston

12:01  3   Office.

12:01  4   Q.  And when you say your partner you are referring to Special

12:01  5   Agent Aschleman?

12:01  6   A.  That is correct.

12:01  7   Q.  So you were not there physically to do the arrest of Ms.

12:01  8   Maynard and Roxanne Sylvester?

12:01  9   A.  I was not there.

12:02  10  Q.  And Ms. Sylvester was detained on the 28th?

12:02  11  A.  Yes.

12:02  12  Q.  And eventually she was -- she was not charged in this case;

12:02  13  is that correct?

12:02  14  A.  That is correct.

12:02  15  Q.  Did she have any communication devices with her?

12:02  16  A.  I don't recall if she had a cell phone on her. We were

12:02  17  processing and doing other things but --

08:25  18  Q.  Well, you certainly did not seize any phone or any other

12:02  19  electronic devices from Ms. Sylvester?

12:02  20  A.  Correct; we did not seize anything from her.

12:02  21  Q.  Ms. Sylvester was the individual that was to accompany

12:02  22  Oleanvine Maynard the CS -- in the scenario -- and the money

12:03  23  from Miami to Tortola?

12:03  24  A.  Yes.

12:03  25

Q.   The CS is referred to throughout the transcripts as Roberto
Quintero; is that correct?

A.   Correct.

Q.   And am I correct that is not his true name?

A.   That was the name that was used throughout this
investigation.

Q.   Let's go back in time. When did you and Special Agent
Aschleman -- you became involved in what eventually plays out
in the arrest of my client and others in late 20/21; is that
right?

A.   The investigation started a little after of 2021.  The
conversations about the case were towards -- after August of
2021.

Q.   And in addition to Special Agent Aschleman and Task Force
Officer Dominguez there were other law enforcement personnel
that you and Special Agent Aschleman consulted with in this
case, some folks with the National Crime Agency in the UK?

A.   Yes.

Q.   As I understand it your first contact with them -- I am not
getting into what contact you had -- but I am trying to pin
down some dates here.  So that would have been in or about end
of September 2021?

A.   No, the initial discussions about the case occurred right
after -- early August of 2021.

Q.   Would those initial discussions have been with folks from the National Crime Agency in the UK?

A.   Yes.

Q.   And you traveled to the UK in late September of 2021 for meetings with these UK law enforcement officers?

A.   Yes.

Q.   And Special Agent Aschleman was there and some other representative of the National Crime Agency; is that right?

A.   Yes.

Q.   And you had meetings or communications with the National Crime Agency folks in November of 2021 where there was like a phone interview or debriefing of the informant that was used on that date?

A.   I am not sure if there was one on that date but we would have had one.

Q.   I will hand you a report agent to see if that refreshes your recollection about that specific date.

A.   Okay.

Q.   I will direct you to the first paragraph to see if that refreshes your recollection.

A.   It does -- it is a report that my partner wrote.

Q.   So there was a telephonic conference, for lack of a better term, with the NCA, the UK law enforcement people, Special Agent Aschleman, yourself -- and I don't know if the CS was there or not.

12:07  1        But in any event there was a debriefing of the CS;

12:07  2   correct?

12:08  3   A.   Correct.

12:08  4   Q.   And then a little later, in February of 2022, the CS is

12:08  5   debriefed in Miami and the National Crime Agency people come

12:08  6   over here to attend the debriefing?

12:08  7   A.   Yes.

12:08  8   Q.   I think you testified you were in regular contact with the

12:08  9   NCA folks during the course of this investigation?

12:08  10  A.   We would communicate about what was happening and as to the

12:08  11  stages of the investigation -- as it would develop.

12:09  12  Q.   Now the British Virgin Islands is governed by the UK -- and

12:09  13  in certain respects it is an overseas territory of the United

12:09  14  Kingdom?

12:09  15  A.   It is.

12:09  16  Q.   There may be other things but is it your understanding that

12:09  17  the national security of the island and foreign policy the UK

12:09  18  is in charge of that for the island?

12:09  19  A.   Yes.

12:09  20  Q.   And Her Majesty, at the time representative of the island,

12:10  21  is the person that occupies the position of the Governor of the

12:10  22  island?

12:10  23  A.   Yes.

12:10  24  Q.   There is also a Premier of the island --

12:10  25  A.   Yes.

12:10   1   Q.   Formerly Mr. Fahie?

12:10   2   A.   Yes.

12:10   3   Q.   That does not run or have any control of the security or

12:10   4   foreign policy issue that may come up on the island?

12:10   5   A.   Yes.

12:10   6   Q.   And there is also the British Virgin Islands Police

12:10   7   Commissioner?

12:10   8   A.   Yes.

12:10   9   Q.   And the Commissioner's role in the British Virgin Islands

08:22  10   that would be in the chain of command on the UK side of the

12:11  11   equation under the Governor?

12:11  12   A.   I am not certain about that; I don't know.

12:11  13   Q.   Let's talk a little about the custody of the evidence in

12:11  14   this case.   You described the various phones and whatnot and

12:11  15   the recordings and how they came out of the digital device that

12:11  16   was used.

12:11  17       So in terms of the recordings that happened physically of

12:12  18   the meetings that happened in the Virgin Islands, whether the

12:12  19   British Virgin Islands or the U.S. Virgin Islands, were there

12:12  20   agents of U.S. law enforcement that were present to take

12:12  21   immediate control of the recording device that you described

12:12  22   right after the meeting of the CS?

12:12  23   A.   Which meeting are you asking about?

12:12  24   Q.   I will break it down.   There were some meetings that

12:12  25   happened in the British Virgin Islands; correct?

12:12   1   A.   Yes.

12:12   2   Q.   There was at least one that happened in the U.S. Virgin

12:12   3   Islands?

12:12   4   A.   Yes.

12:12   5   Q.   And that meeting was with Ms. Maynard and Mr. Maynard?

12:12   6   A.   Correct.

12:12   7   Q.   And I think that you have testified that the DEA has an

12:13   8   office in the U.S. Virgin Islands?

12:13   9   A.   Yes.   We have what is called a RAC Office in Saint Thomas.

12:13   10   Q.   And the RAC Office is staffed by DEA agents -- there are

08:30   11   obviously other individuals there as well--

12:13   12   A.   Yes.   And they assisted us a lot in this particular

12:13   13   investigation and helped us.

12:13   14   Q.   Now the meetings that were between, or among, the CS and

12:13   15   the Maynard's in March of 2022 that took place in Saint Thomas,

12:13   16   was the CS accompanied by an agent from the DEA?

12:14   17   A.   I believe the agents in Saint Thomas provided surveillance

12:14   18   and security for the safety of the informant.

12:14   19   Q.   So, they surveilled the meeting?

12:14   20   A.   Yes.

12:14   21   Q.   When you talk about surveilling the meeting, they visually

12:14   22   observed the meeting from another table at the restaurant or

12:14   23   something of that nature?

12:14   24   A.   That is correct.

12:14   25

1   Q.  When the meeting was over did they take custody of the

2   recording device from the confidential source?

3   A.  No, the confidential source remained in custody of the

4   device (sic) and then would be brought back to me and my

5   partner for download and put into evidence.

6   Q.  How about the meetings -- the physical meetings not phone

7   calls-- the meetings that happened with the CS and any of the

8   defendants on the British Virgin Islands side of things, was

9   there a DEA or U.S. law enforcement presence surveilling those

10  meetings?

11  A.  No, there was not.  Because corruption on the island is

12  pretty big; and if we were to advise and let local law

13  enforcement know what was happening the safety of the CS, as

14  well as U.S. law enforcement, would probably have been in

15  danger.

16  Q.  Well, when you were consulting with the UK law enforcement

17  people did you ask if they had someone that could assist you in

18  surveilling?  Certainly you trusted them.

19  A.  We work closely with NCA in different investigations and

20  they assisted us in this case but we did not travel to the BVI.

21  Q.  Well that is not what I asked, agent.  I asked whether you

22  asked whether they could surveil and assist you?

23  A.  I do not recall if we did.

24  Q.  Now there was a discussion about a meeting that took place

25  on April 7th and what took place in Tortola.

12:16  1      Do you recall those questions?

12:16  2  A.   Yes.

12:16  3  Q.   How did the CS get to Tortola for purposes of those

12:16  4  meetings?

12:16  5  A.   The CS was transported by our law enforcement partners to

12:16  6  the island.

12:16  7  Q.   He was brought over by the DEA Saint Thomas folks?

12:17  8  A.   Yes, in coordination with Homeland Security, Customs and

12:17  9  Border Protection.

12:17  10  Q.   And those are all U.S. law enforcement folks?

12:17  11  A.   Yes.

12:17  12  Q.   So the CS is accompanied over there and he then attends

12:17  13  this meeting, there is no law enforcement surveillance either

08:54  14  from the U.S Virgin Islands or from the BVI and we don't know

12:17  15  if the UK was even asked; is that right?

12:17  16  A.   I don't recall if they were asked.

12:17  17  Q.   So for that meeting when the U.S. agents left the CS in the

12:18  18  BVI on April 7th for this meeting he was equipped with a

12:18  19  recording device; correct?

12:18  20  A.   Yes.

12:18  21  Q.   Was he patted down beforehand?

12:18  22  A.   I don't know -- I was not there.

12:18  23  Q.   Okay.

12:18  24  A.   But fellow agents in Saint Thomas most likely did.

12:18  25

12:18  1          THE COURT:  If you would answer the question, agent,

12:18  2  do you know if he was patted down, you personally?

12:18  3          THE WITNESS:  I don't know if he was.

12:18  4  Q.  Do you know whether the CS was patted down after he left

12:18  5  the meeting?

12:18  6  A.  I don't know.

12:18  7  Q.  All right.  Is that process -- the process of patting down

12:18  8  a confidential source when they were going to enter a meeting

12:18  9  or after they are leaving a meeting -- is that a standard law

12:19 10  enforcement practice?

12:19 11  A.  It is a standard practice; and it is usually used for

12:19 12  street level narcotics investigations that we conduct.

12:19 13  Q.  Now you have dealt with this CS for a number of years?

12:19 14  A.  Yes.

12:19 15  Q.  How many investigations do you think you have conducted

12:19 16  with the CS?

12:19 17  A.  My partner and I have used this confidential source over

12:19 18  several cases here in Miami.

12:19 19  Q.  And those several cases involve often international drug

12:19 20  trafficking stings; is that right?

12:19 21  A.  No. They involve money laundering, street level crimes.

12:19 22  They involved different types of investigations.

12:20 23  Q.  Focusing now on whether they are international and domestic

09:01 24  matters.  When you have used this CS is it normally of an

09:01 25  international nature as opposed to walk or don't walk in Miami?

12:20  1    A.  We have conducted international cases, yes.

12:20  2    Q.  You have testified about search warrants that were obtained

12:20  3    in this case for the communication devices?

12:20  4    A.  Yes.

12:20  5    Q.  Did you do those affidavits?

12:20  6    A.  No.

12:20  7    Q.  Now over the course of your many years with the DEA have

12:20  8    you authored a few affidavits?

12:20  9    A.  I have.

12:20  10   Q.  And an affidavit is essentially a written recitation of

12:21  11   facts that are then sworn to by the person that is the affiant?

12:21  12   A.  Yes.

12:21  13   Q.  When I say sworn to you raise your right hand, much as you

12:21  14   did this morning, and swear that it is the truth the whole

12:21  15   truth and nothing but the truth; that kind of thing?

12:21  16   A.  Yes.

09:04  17              THE COURT:  Ms. Van Vliet is this a good time to

09:04  18   recess for lunch do you think?

09:04  19              MS. VAN VLIET: Yes, Your Honor; I believe now would be

09:04  20   a good time.

12:21  21              THE COURT:  Ladies and gentlemen, we are going to

12:21  22   break for lunch and come back at one.

12:21  23              Again, do not talk about the case with each other or

12:21  24   anyone else and I will see you back at 1 o'clock.

12:22  25                        LUNCH RECESS TAKEN

12:22   1    THE COURT:  All right.  We have all of our jurors back;

12:22   2    so if you would bring in the jury, please.

12:22   3    COURT SECURITY OFFICER:  All rise for the jury.

01:05   4    THE COURT:  Everyone may be seated.

01:06   5    You may continue, Ms. Van Vliet.

01:06   6    MS. VAN VLIET: Thank you, Your Honor.

01:06   7    Q.  Now, agent, before lunch I forgot to follow up on something

01:06   8    that you testified about on direct.  You testified that after

01:06   9    their arrest they were brought back to the DEA office -- which

01:06   10   I think was in Weston -- and then Ms. Maynard, Mr. Fahie and

01:06   11   Ms. Sylvester were put into lockup; correct?

01:06   12   A.  Yes.

01:06   13   Q.  And lockup is effectively like a holding cell in the DEA

01:06   14   office?

01:06   15   A.  Yes.

01:06   16   Q.  Am I correct that it is best practices at DEA to separate

01:06   17   people that have been arrested in the same case?

01:06   18   A.  Yes.

01:06   19   Q.  It is also best practices to separate a male prisoner from

01:07   20   a female prisoner even if it is the same case or not the same

01:07   21   case?

01:07   22   A.  Correct.

01:07   23   Q.  Were those best practices followed in this case?

01:07   24   A.  So, Mr. Fahie was put in one and Ms. Maynard was put in a

04:31   25   separate one.

04:31  1      Unfortunately our building in Weston is small so we do not

01:07  2  have separate facilities to separate individuals.

01:07  3  Q.   And where was Ms. Sylvester placed?

01:07  4  A.   Ms. Sylvester was placed in an interview room in the

01:07  5  building -- in the same lockup facility.

01:07  6  Q.   So separate from Mr. Fahie and Ms. Maynard?

01:07  7  A.   Yes.

01:07  8  Q.   Let me ask you to clarify something.

01:07  9  A.   Sure.

04:35  10  Q.   DEA did not arrest Mr. Fahie's 18-year old daughter; is

01:07  11  that correct?

01:07  12  A.   She was not under arrest and she was placed in an interview

01:08  13  room with a desk where she could come and go as needed.

01:08  14  Q.   Now before we took the lunch break we discussed the fact

01:08  15  that you had done a number of affidavits over the years?

01:08  16  A.   Yes.

01:08  17  Q.   And essentially an affidavit is written testimony?

01:08  18  A.   Yes.

01:08  19  Q.   There were affidavits done in this case for not only the

01:08  20  search warrants for Kadeem Maynard's phone but also in

01:08  21  connection with the arrest of the various defendants in this

01:08  22  case?

01:08  23  A.   Yes.

01:08  24  Q.   As I understand it you were not the affiant, the person

01:08  25  that signed the affidavit, in the case of the affidavit

01:08  1   particularly discussing the arrest of the defendant?

01:08  2   A.  No, I was not.  Special Agent Aschleman was the affiant for

01:09  3   that.

01:09  4   Q.  Now there was obviously a confidential source used in this

01:09  5   case?

01:09  6   A.  Yes.

01:09  7   Q.  We have talked a little about DEA best practices.  Is it a

01:09  8   best practice when dealing with a confidential source -- in any

01:09  9   affidavit you are going to present to a Judge -- to describe

01:09  10  the confidential source's reliability and credibility?

01:09  11  A.  Yes.

01:09  12  Q.  That was not done in this case was it -- in Special Agent

01:09  13  Aschleman's affidavit?

01:09  14  A.  I do not recall the affidavit.  I would have to refresh my

01:09  15  recollection.

01:09  16  Q.  Well, do you recall testifying in this matter on May 4,

01:10  17  2022?

01:10  18  A.  Yes.

01:10  19  Q.  And that was at a hearing where you had certainly very

01:10  20  recently reviewed the affidavit; is that correct?

01:10  21  A.  Yes.

01:10  22  Q.  I will show you what I have marked for identification only

01:10  23  as Defendant's 3.  For the record I have provided Government

01:10  24  counsel with a copy.

01:10  25          THE COURT:  All right.

01:10  1    Q.  Now, special agent, if you would turn to page fifteen of

01:11  2    the transcripts I would ask you to take a look at lines 3

01:11  3    through 8.

01:11  4        If you would just read it silently and tell me if that

01:11  5    refreshes your recollection as to whether anything about the

01:11  6    confidential source's reliability and credibility was mentioned

01:11  7    in this case?

01:11  8    A.  Yes, there is the question posed about the confidential

01:11  9    source and there was --

01:11  10   Q.  Without reading from a document that is not in evidence;

01:11  11   can you tell me whether that refreshes your recollection as to

01:11  12   whether the confidential source's reliability and credibility

01:11  13   was discussed in this affidavit?

01:11  14   A.  I did not participate in the draft of the affidavit so I am

01:11  15   not --

01:11  16       THE COURT:  No, no, no agent.  If you would listen to

04:45  17   the question.  The question is; was there any mention in the

04:45  18   affidavit of the confidential source's credibility?

01:12  19       THE WITNESS:  I do not recall.

01:12  20       THE COURT:  You may proceed.

01:12  21   Q.  Were you asked the following question on May 4th, 2022, by

01:12  22   myself?

01:12  23       Okay.  The affidavit that your co-case agent, the affiant,

01:12  24   submitted in support of the arrest warrant in this case notably

01:12  25   doesn't discuss the reliability of the confidential source

01:12  1    correct?

01:12  2        Answer by you, yes.

01:12  3        You did so testify in front of a Federal Magistrate Judge

01:12  4    in this District on May 4th, 2022, correct?

01:12  5    A.   Yes, I did.

01:12  6    Q.   Prior to your testimony in this case on May 4, 2022, some

01:12  7    four years earlier in November of 2018 -- three and a half

01:12  8    years actually -- did you become aware of allegations that a

01:13  9    Foreign Judge had found the confidential source to lack

04:50  10   credibility and believability?

01:13  11   A.   This was a case that the confidential source was involved

01:13  12   in, in Mexico and had mentioned it to us.  We were not part of

01:13  13   that and it had nothing to do with here in the United States.

01:13  14   Q.   So is the answer to my question, yes, you learned in

01:13  15   approximately November of 2019 that the confidential source was

01:13  16   found to have lacked credibility by a Foreign Judge?

01:13  17   A.   We did not know the details about that because that was in

01:13  18   Mexico.

01:13  19   Q.   I am not asking whether you knew the details, agent.  Did

01:13  20   you know the general proposition that a Foreign Judge found

01:13  21   your CS to have lacked credibility?

01:14  22   A.   I do not recall.  It was a long time ago.

01:14  23   Q.   Well, might that be something that would stick in an

01:14  24   agent's mind if his confidential source had been found by a

01:14  25   Judge to have lacked credibility?

01:14   1          That is not something that would stick out to you and that

01:14   2    you would remember?

01:14   3    A.   In my own experience, in working with the CS, we never had

01:14   4    any issues with him.   We had worked cases here without any

01:14   5    problems.

01:14   6    Q.   So basically you disagreed with the other Judge's finding;

01:14   7    is that right?

01:14   8    A.   Again, I don't work in Mexico, nor did I have any sort of

01:14   9    participation in what happened in Mexico so I can't speak about

01:14   10   Mexico.

01:14   11   Q.   I'm not asking you to speak about Mexico.   Prior to the

01:14   12   defendant's arrest in 2022, did you know that the confidential

01:15   13   source in this case had been found by a Foreign Judge to lack

01:15   14   credibility, yes or no?

01:15   15   A.   In preparation for this case we were asked to look and to

01:15   16   search -- to find out details about this.   After we did this

01:15   17   research we found out this was due to corruption --

01:15   18          THE COURT:   No, no, no, no.

01:15   19          Ladies and gentlemen, step outside a moment.

01:15   20          COURT SECURITY OFFICER:   All rise, please.

01:16   21                       JURY EXCUSED

01:16   22          THE COURT:   Everyone may be seated.

01:16   23          So, agent, this is not coming as a galloping shock to

01:16   24   you that you were going to be asked this question.

01:16   25

04:57  1    So, you must answer the question that you are asked;

04:57  2  not what you would like to talk about or what you think the

04:57  3  question might be but the actual question.

01:16  4    The question Ms. Van Vliet has been asking is did you

01:16  5  know in 2018 that another Judge had found the CI to lack

01:16  6  credibility; yes or no?

01:16  7    Mr. Gerarde is a very accomplished lawyer and so if he

05:07  8  thinks you need to expand on something he will do that on cross

05:08  9  examination.

05:08  10    So if you would listen to the question and if it is a

05:08  11  yes or no question then answer yes or no.  If there is an

05:08  12  explanation that is needed Mr. Gerarde will have an opportunity

05:08  13  to handle that on redirect.

05:08  14    Are you clear, agent?

05:08  15    THE WITNESS:  Yes, Your Honor.

05:08  16    My apologies.

05:08  17    THE COURT:  Bring in the jury, please.

05:08  18    COURT SECURITY OFFICER:  All rise for the jury.

05:08  19    THE COURT:  Everyone may be seated.

01:18  20    You may continue, Ms. Van Vliet.

01:18  21  Q.  Special Agent Witek, did you find out prior to May of 2022

01:18  22  that there had been a finding by a Foreign Judge that the CI in

01:18  23  this case lacked credibility?

01:18  24  A.  No.

01:18  25  Q.  When did you find that out?



01:19  1    A.  In the process of getting this case together we were asked

05:11  2    to conduct a Google search through media about this

01:19  3    information.

01:19  4    Q.  When was that in terms of a date?

01:19  5    A.  I don't recall when we searched.

01:19  6          THE COURT:  This year, last year; give us a timeframe,

01:19  7    agent.

01:19  8          THE WITNESS:  Just before getting ready for this

01:19  9    trial.

01:19  10         THE COURT:  So, the last six months?

01:19  11         THE WITNESS:  Yes, Your Honor.

01:19  12   Q.  Never before that -- never in relation to a case -- let me

01:19  13   back up.  Were you one of the case agents in United States

01:19  14   versus Lampeck (phonetic)?

01:19  15   A.  I was a co-case agent in that case.

01:19  16   Q.  Was Special Agent Aschleman your co-case agent?

01:20  17   A.  Yes.

01:20  18   Q.  You did not find out about that allegation in connection

05:13  19   with that case particularly at the sentencing --

01:20  20   A.  I was not a part of the sentencing.

01:20  21         THE COURT:  No, no, agent; the question is you did not

01:20  22   find out about this, not whether you were a part of the

01:20  23   sentencing.

01:20  24         THE WITNESS:  Could you repeat the question?

01:20  25         THE COURT:  The same thing we have been talking about

01:20  1    the past few minutes, agent, as to the finding of the Foreign

01:20  2    Judge; did you find out about it back in 2018 during that case

01:20  3    around the time of sentencing?

01:20  4         THE WITNESS:  I believe my partner took part in that

01:20  5    and there was general information about the situation in

01:20  6    Mexico.

01:20  7         THE COURT:  Did you know this general information; yes

01:20  8    or no?

01:20  9         THE WITNESS:  Yes.

01:20  10        THE COURT:  There you go.

01:20  11   Q.  And in your testimony before the Magistrate Judge in May of

01:21  12   2022, did you deny knowing that -- in any affidavit that had

01:21  13   been written regarding the confidential source used in this

01:21  14   case -- that there had been questions raised about information

01:21  15   sourced to that confidential source?

01:21  16   A.  During the time period I was thinking of my own experiences

01:21  17   and working cases with the CS, and that is why I said no at the

01:21  18   time as to my own cases.

01:21  19   Q.  So the answer to the question is, yes, you denied knowing

01:21  20   that information sourced to the confidential source used in

01:21  21   this case had ever been questioned in the past?

01:22  22   A.  Could you repeat that question?

01:22  23   Q.  Why don't you look at page fifteen of defendants Exhibit 3

01:22  24   at the bottom, line 23; and then go through to the top of the

01:22  25   following page, the second line.

A.   Yes -- again, my experience in working cases with the CS is the reason I said no at the moment this question was posed.

Q.   So the question that was posed while you were under oath is whether you were aware in 2022 of any question being raised about information provided by this confidential source and you answered no; is that correct?

A.   I answered no, correct.

MS. VAN VLIET:  May I have a moment, Judge.

THE COURT:  Yes.

MS. VAN VLIET:  I have nothing further for Special Agent Witek.

THE COURT:  Redirect.

Q.   Special Agent Witek, let's pick up where Ms. Van Vliet left off.  Did you become aware of the finding that the informant you used in this case had lacked credibility in a prior case where he was used?

A.   Yes.

Q.   What was the approximate timeframe when you learned of the prior case where the CS was found to have lacked credibility?

A.   Approximately 2018.

Q.   So 2018 not six months ago?

A.   Yes.

Q.   When did this prior case where the CS was found to lack credibility, when did that happen?

A.   I don't know the exact case but it was many years ago in

01:24   1   Mexico.

01:24   2   Q.  That was my next question.  So, was it in the United States

01:24   3   or in Mexico?

01:24   4   A.  It was in Mexico.

01:24   5   Q.  Are you aware of whether subsequent to the testimony the CS

01:24   6   was found to have actually committed any misconduct?

01:24   7   A.  No -- we learned in a later Court ruling he was found to be

01:25   8   exonerated.

01:25   9   Q.  All right. Why did you use an audio or video recording

01:25   10  device for every interaction the CS had with the defendant in

01:25   11  the other targets?

01:25   12  A.  We use the multiple recording devices to use as backup in

01:25   13  case one of the devices fail.

01:25   14  Q.  What is the benefit of the DEA having the recording of a

01:25   15  conversation versus the recollection of a conversation?

01:25   16  A.  The recording captures what happens in -- and later on

01:25   17  these recordings are used as transcripts as the ones we have

01:25   18  today.

01:25   19  Q.  Ms. Van Vliet asked you about the role of the NCA in your

01:25   20  investigation.  Who was leading the investigation, the DEA or

01:25   21  the NCA?

01:25   22  A.  The DEA was the lead investigative agency of the case.  The

01:25   23  NCA played more or a partnership role in bridging gaps between

01:25   24  FBI HSI and IRS.

01:26   25  Q.  Who made the investigative decisions in the case?

01:26  1   A.   The DEA did.

01:26  2   Q.   Did the DEA retain veto authority over the NCA?

01:26  3   A.   Yes.   We played the main role in the case, the DEA did.

01:26  4   Q.   Ms. Van Vliet asked you about patting down the confidential

01:26  5   source before and after certain meetings and if that was a best

01:26  6   practice.   Do you recall that?

01:26  7   A.   Yes.

01:26  8   Q.   Why is it important for the DEA to conduct a pat down of an

01:26  9   informant before or after?

01:26  10  A.   It is important to make sure they have our sole recording

01:26  11  device and to make sure that there are no other contraband or

01:27  12  drugs or weapons on the confidential source.

01:27  13  Q.   In this investigation was the confidential source given

01:27  14  money to use in the investigation?

01:27  15  A.   Yes, he was provided money.

01:27  16  Q.   Can you be more specific.   When was the informant provided

01:27  17  money for specific meetings?

01:27  18  A.   The confidential source was provided with funds on a -- a

01:27  19  meeting where he met with Oleanvine Maynard and Kadeem Maynard.

01:27  20  Q.   When was that meeting?

01:27  21  A.   I don't recall the date.

01:27  22  Q.   Was that early on in the investigation or later on in the

01:27  23  investigation?

01:27  24  A.   It was early on and the second time that the confidential

01:27  25  source was provided money was for the meeting that he had on

01:27  1   April 7th.

01:27  2   Q.  Going back to the first meeting, how much money was the

01:27  3   confidential source given?

01:27  4   A.  $10,000.

01:27  5   Q.  What was the purpose of giving him $10,000?

01:27  6   A.  It was a bribe; a payment to begin his business that he was

01:28  7   trying to construct.

01:28  8   Q.  Who was that payment made to?

01:28  9   A.  It was given to port director Oleanvine Maynard.

01:28  10  Q.  How do you know after that meeting if the payment was made

01:28  11  or whether the informant kept the $10,000?

01:28  12  A.  We made sure with the agents in Saint Thomas that the money

01:28  13  was expended; and the CS was thoroughly debriefed and made sure

01:28  14  the money was given to Oleanvine Maynard.

01:28  15  Q.  What would have happened if the confidential source gave

01:28  16  $5,000 to Ms. Maynard and kept 5,000 for himself and didn't

01:28  17  tell the DEA?

01:28  18          MS. VAN VLIET:  Objection.

01:28  19          THE COURT:  Sustained.

01:28  20  Q.  So when was the second time that the confidential source

01:28  21  was given money?

01:28  22  A.  The second time the confidential source was given $20,000

01:28  23  which he gave to the BVI Premier Mr. Fahie on April 7th.

01:29  24          MS. VAN VLIET:  I would object.  It is beyond this

01:29  25  gentlemen's personal knowledge; he was not there.

01:31   1          THE COURT:  Sustained.  Let's move on.

01:31   2          MR. McLAUGHLIN: I have no further questions.

01:31   3          THE COURT:  You may step down, agent.

01:31   4          Government, call your next witness.

01:31   5          MR. McLAUGHLIN:  At this time the Government would

01:31   6   call William Cortes Negron.

01:31   7                    WITNESS SWORN

01:39   8   Q.  Good afternoon, Mr. Cortes, who do you work for?

01:39   9   A.  Customs and Border Protection Labs and Scientific Services.

01:39   10  Q.  What is your current position?

01:39   11  A.  Digital Forensic Analyst.

01:39   12  Q.  Where are you currently stationed?

01:39   13  A.  Homestead, Florida.

01:39   14  Q.  How long have you been a digital forensic analyst with

01:39   15  Customs and Border Protection?

01:39   16  A.  Three years.

01:39   17  Q.  When did you start?

01:39   18  A.  November 2020.

01:39   19  Q.  Prior to joining Customs and Border Protection, or the

01:39   20  Department of Homeland Security, what did you for a living?

01:40   21  A.  I served in the U.S. Army.

01:40   22  Q.  What did you do in the U.S. Army?

01:40   23  A.  I was a chemical, biological radiological non commissioned

01:40   24  officer.

01:40   25  Q.  You are currently a digital forensic analyst?

01:40 1 A.   Yes.

01:40 2 Q.   Did you do similar work in the Army?

01:40 3 A.   The last five years I was a team leader for a digital

01:40 4 forensic team.

01:40 5 Q.   If you could explain what are your duties as a digital

01:40 6 forensic analyst?

01:40 7 A.   My duties -- daily duties include forensic examination of

01:40 8 digital evidence.   I conduct digital forensic analysis of media

01:40 9 devices such as mobile phones, computers, laptops, and GPS

01:41 10 devices.

01:41 11 Q.   Are you familiar with the term digital forensic extraction?

01:41 12 A.   Yes.

01:41 13 Q.   Are you familiar with the term digital forensic parsing?

01:41 14 A.   Yes.

01:41 15 Q.   What is the difference between extraction and parsing?

01:41 16 A.   The extraction is the process of extracting the raw data

01:41 17 out of a device in a forensically done manner.

01:41 18 Q.   What is parsing?

01:41 19 A.   Pretty much breaking down the data that was extracted into

01:41 20 data that a human being would be able to read.

01:41 21 Q.   Such as what?

01:41 22 A.   Contacts, text messages, calls, pictures, audio, files,

01:42 23 etcetera.

01:42 24 Q.   Do you have any specialized training or certifications in

01:42 25 digital extraction or parsing?

01:42  1   A.   Yes.

01:42  2   Q.   What do you have?

01:42  3   A.   I am a Cellebrite certified mobile expert examiner.

01:42  4   Q.   What does that mean?

01:42  5   A.   Cellebrite is a certification that is required for us to do

01:42  6   our job and conduct our daily operations.   There are three

01:42  7   prerequisites to become a CCME.   One is the Cellebrite

01:42  8   certified operator.   The other is Cellebrite certified digital

01:43  9   analyst.

01:43  10  Q.   What is Cellebrite?

01:43  11  A.   One of the many vendors within the digital forensic

01:43  12  industry.

01:43  13  Q.   What do you need to become certified in Cellebrite?

01:43  14  A.   You become certified so you are familiar with the software

01:43  15  or the hardware you are using from that specific vendor.

01:43  16  Q.   And does Cellebrite provide digital tools that can conduct

01:43  17  extractions?

01:43  18  A.   Yes.

01:43  19  Q.   And also digital tools to conduct parsings?

01:43  20  A.   Yes.

01:43  21  Q.   And what tools do you have regarding Cellebrite extractions

01:43  22  and Cellebrite parsings?

01:43  23  A.   For Cellebrite extraction the main one would be the

01:43  24  Cellebrite certified operator.   That one consists more of

01:43  25  hands-on on the actual devices themselves.

01:44  1     And for the analysis the tool would be the Cellebrite

01:44  2   certified physical analyst (sic).

01:44  3   Q.   When did you become certified in Cellebrite?

01:44  4   A.   2020.

01:44  5   Q.   And how did you become certified?

01:44  6   A.   To become certified you have to -- there is a process you

01:44  7   need to have the three prerequisites, the CCPO, CCPA the CMFF.

01:44  8     In order for you to become certified they will issue you

01:44  9   two extractions, one from an IOS device and one from an Android

01:44  10  device.

01:44  11    In order to go through with the certification process you

01:44  12  conduct the analysis of the IOS device, you get the questions

01:44  13  and -- once you pass you move on to the Android device

01:44  14  extractions, you answer the questions correctly, and you pass

01:45  15  on to the final stage which consists of about fifty questions

01:45  16  and you have three hours to complete it.

01:45  17  Q.   Who provides the training?

01:45  18  A.   Cellebrite.

01:45  19  Q.   Where is it located?

01:45  20  A.   I did mine here in Miami.

01:45  21  Q.   When did you become certified in extraction and parsing

01:45  22  using Cellebrite?

01:45  23  A.   2021.

01:45  24  Q.   How long does that certification last?

01:45  25  A.   The certifications are good for two years.  I took those in

01:45  1   2021.  When I became a CCME, a Cellebrite mobile examiner, it

01:45  2   renews the other two certifications.

01:46  3   Q.  Do you undergo any sort of continuing education to maintain

01:46  4   the certification?

01:46  5   A.  To certify now for the CCME I have to have a minimum of 20

01:46  6   continuing hours.

01:46  7   Q.  How do you go about receiving your continuing education

01:46  8   with Cellebrite?

01:46  9   A.  Either through webinars that the different vendors in the

01:46  10  digital forensic industry provide and some from Cellebrite

01:46  11  themselves.

01:46  12  Q.  Are you familiar with a digital forensic tool called Magnet

01:46  13  Axiom?

01:46  14  A.  Yes.

01:46  15  Q.  Are you certified in Magnet Axiom?

01:46  16  A.  Yes.

01:46  17  Q.  What is Magnet Axiom?

01:46  18  A.  It is another of the many vendors in the digital forensic

01:46  19  industry.

01:46  20  Q.  Are you certified in Magnet Axiom?

01:47  21  A.  Yes.

01:47  22  Q.  When did you become certified?

01:47  23  A.  In June 2023.

01:47  24  Q.  How did you become certified?

01:47  25  A.  I became certified by obtaining different courses from

01:47  1   Magnet.

01:47  2   Q.   What do those courses include?

01:47  3   A.   The first one is the Magnet Axiom Forensic Fundamentals

01:47  4   Course.   The second would be Magnet Axiom ...

01:47  5        (ANSWER PARTIALLY INAUDIBLE)

01:47  6     .. the third one would be Magnet Axiom Incident Response

01:47  7   Examinations and the other one would be Magnet Axiom Advance

01:47  8   Mobile Forensics.

01:48  9        THE COURT: Speak right into the microphone; you are

01:48  10  very soft spoken.

01:48  11       THE WITNESS:   Yes, Your Honor.

01:48  12  Q.   Upon taking these courses do you have to take a test to

01:48  13  become certified?

01:48  14  A.   After I completed the course it is the same thing, they

01:48  15  provide you with an extraction.   Magnet only does an IOS

01:48  16  device.   They change it from time to time.

01:48  17     They provide the extraction.   In order to move on I have to

01:48  18  parse that extraction and answer questions from the extraction

01:48  19  after my analysis.

01:48  20  Q.   All right. You had testified earlier about IOS devices and

01:48  21  Android devices.

01:48  22  A.   Yes.

01:48  23  Q.   What is an IOS device?

01:48  24  A.   IOS stands for iPhone operating system and Android is an

01:48  25  open source operating system for mobile devices.

01:49  1   Q.   Going back to Magnet Axiom; when did you become certified?

01:49  2   A.   In June of 2023.

01:49  3   Q.   How long does that certification last?

01:49  4   A.   Two years.

01:49  5   Q.   Do you have to do something to maintain the certification?

01:49  6   A.   The same thing as the Cellebrite.  I have to obtain some

01:49  7   continuing education, plus I have to interact with this one --

01:49  8   a minimum of ten devices a year -- which I will do way more

01:49  9   than that.

01:49  10  Q.   All right. Cellebrite, is it an extraction tool only or is

01:49  11  it extraction and parsing?

01:49  12  A.   It does both.

01:49  13  Q.   Does Magnet Axiom do both?

01:49  14  A.   Yes.

01:49  15  Q.   Are you familiar with MSABXOY?

01:49  16  A.   Yes.

01:49  17  Q.   What is that?

01:49  18  A.   MSABXOY is another vendor from -- extraction and parsing

01:50  19  tools in the digital forensic industry.

01:50  20  Q.   Do you have a certification in MSABXOY?

01:50  21  A.   Yes, I do.

01:50  22  Q.   When did you obtain that?

01:50  23  A.   MSABXOY was in February 2021.

01:50  24  Q.   What did you do to get that certification?

01:50  25  A.   To get that one the same thing; take a three or four day

01:50 1   course.  Same concept as Cellebrite and Axiom.  Take practicals

01:50 2   with the IOS devices and Android, do the extractions and answer

01:50 3   questions based on the extractions to include digital forensic

01:50 4   questions in general.

01:50 5   Q.  Do you have any kind of continuing education requirements

01:50 6   for MSABXOY?

01:50 7   A.  Yes, the same thing, continuing education either through

01:50 8   webinars or school.

01:51 9   Q.  Are you familiar with the tool Graykey?

01:51 10  A.  Yes.

01:51 11  Q.  What is Graykey?

01:51 12  A.  Graykey is an extraction tool.

01:51 13  Q.  Are you trained in that?

01:51 14  A.  Yes.

01:51 15  Q.  What training do you have in Graykey?

01:51 16  A.  So, when I joined CBP I had to obtain extraction of

01:51 17  competency in digital forensic realm in Chicago, Illinois, and

01:51 18  I was trained to use the tool then.

01:51 19  Q.  Are you certified in Graykey?

01:51 20  A.  They do not provide courses for Graykey in specific

01:51 21  anymore.

01:51 22  Q.  You have testified about your certifications in Magnet

01:52 23  Axiom, Cellebrite, MSABXOY; why do you need to be certified in

01:52 24  all of these different forensic tools, why not just use one?

01:52 25  A.  Some tools work better with some devices and some work

01:52  1   better with others so that is why we train on so many tools and

01:52  2   have so many tools.

01:52  3   Q.   Do you routinely use Magnet Axiom, Cellebrite, MSABXOY,

01:52  4   Graykey in your daily work?

01:52  5   A.   On a daily, yes.

01:52  6   Q.   What do you use them for?

01:52  7   A.   I use them for extracting and parsing.

01:52  8   Q.   What kind of devices?

01:52  9   A.   Androids and IOS.

01:53  10  Q.   To date how many extractions have you done utilizing those

01:53  11  digital forensic tools?

01:53  12  A.   Thousands.

01:53  13  Q.   How many parsings have you done utilizing those same

01:53  14  things?

01:53  15  A.   Thousands, same thing.

01:53  16  Q.   What kind of devices have you used those tools on?

01:53  17  A.   Apple devices, IOS and Androids.

01:53  18  Q.   Focusing now on the extracting process, what is the first

01:53  19  step that you take?

01:53  20  A.   In the extraction process I make sure the phone is isolated

01:53  21  from the network.   I research the phone to determine which tool

01:53  22  that I will use to conduct the extraction.

01:54  23  Q.   You said that you isolate the phone from the network.   Why

01:54  24  is that important?

01:54  25  A.   We isolate the phone from the network because they can be

01:54  1   remotely wiped.

01:54  2   Q.  When you say the network what do you mean?

01:54  3   A.  Isolate the phone from communicating to the cellphone

01:54  4   tower.

01:54  5   Q.  How do you go about isolating a phone?

01:54  6   A.  There are different methods to do it; you can use a Faraday

01:54  7   system, which is a bag that is created to isolate the device

01:54  8   from the network, or removing the SIM card which is an old

01:54  9   school way, now they have electronic SIM cards or we have a box

01:54  10  which places the device in there in airplane mode and then

01:55  11  disabling wifi or bluetooth.

01:55  12  Q.  Once you have isolated the phone from the network, what is

01:55  13  the next step in the extraction process?

01:55  14  A.  I decide the extraction tool I will use and power on the

01:55  15  system and with the extraction we have software and we have

01:55  16  hardware, so I power on the computer which the hardware will be

01:55  17  connected to, so the hardware that the device is going to be

01:55  18  connected to is going to be connected to the computer and I

01:55  19  follow the instructions on the software.

01:55  20  Q.  What influence your decision in selecting the extraction

01:55  21  tool?

01:55  22  A.  Some vendors are better for certain devices.  Cellebrite is

01:56  23  great with the Android devices and the Graykey is great with

01:56  24  IOS devices.

01:56  25

01:56  1   Q.  If you could explain to the ladies and gentlemen what you

01:56  2   mean by that?

01:56  3   A.  They are easier -- not easier -- they provide more support.

01:56  4   For example, the Graykey can support more IOS devices than

01:56  5   Cellebrite will in a certain way, depending on the operating

01:56  6   system.

01:56  7   Q.  In your experience depending on how old the phone is and

01:56  8   the operating system of the phone, does that influence what

01:56  9   tool you use?

01:56  10  A.  Yes.

01:56  11  Q.  How is that?

01:56  12  A.  Not every phone is supported for you to conduct an

01:56  13  extraction.  If IOS 718 comes out today I will not be able to

01:57  14  conduct an extraction on it.

01:57  15  Q.  What about an old phone, a 10 year old phone?

01:57  16  A.  For older phones it all depends, and you will hear this a

01:57  17  lot within the digital forensics, but the tools don't support

01:57  18  every single phone out there in the whole world.

01:57  19  Q.  If a tool does not support a phone does it mean you cannot

01:57  20  do an extraction?

01:57  21  A.  Specifically no.  You can do it the old way by scrolling

01:57  22  through the phone and looking at the screen and taking pictures

01:57  23  and so on.

01:57  24  Q.  Once you have decided what tools to use what is the next

01:57  25  step in the extraction process?

01:57  1    A.  I power down the system that I will conduct the extraction

01:57  2    on; the hardware, if there is hardware, required for the

01:57  3    extraction and then I will follow the steps on software.

01:58  4    Q.  Are there types of extraction in digital forensics?

01:58  5    A.  Yes.

01:58  6    Q.  Are you familiar with the full file system extraction?

01:58  7    A.  Yes.

01:58  8    Q.  What is a full file system extraction?

01:58  9    A.  The full file system would be pretty much everything on the

01:58  10   physical device which would include calls, messages, files,

01:58  11   audio, pictures, hidden data.

01:58  12   Q.  Is that considered the most thorough extraction you can do?

01:58  13   A.  Yes.

01:58  14   Q.  Why is it considered the most thorough?

01:58  15   A.  Because you gain access of everything on the device.

01:58  16   Q.  When you say everything what do you mean?

01:58  17   A.  All of the data that is stored on that device.

01:58  18   Q.  Is it always possible to conduct a full file extraction?

01:59  19   A.  No.

01:59  20   Q.  Why not?

01:59  21   A.  It depends on whether the tools support a full process

01:59  22   extraction for that specific device and the state on which the

01:59  23   device is; if the password is normal or if it is not normal and

01:59  24   so on and so forth.

01:59  25   Q.  What is the next level of extraction you can do for a full

01:59  1   file system extraction?

01:59  2   A.   The only thing that change on a file system would be the

01:59  3   deleted data.

01:59  4   Q.   What do you mean by that?

01:59  5   A.   With the file system extraction you can gain access to

01:59  6   calls, call logs, contacts, messages, SMS, audio, pictures,

01:59  7   files, hidden files but not deleted data.

01:59  8   Q.   Are you familiar with what is called a logical extraction?

02:00  9   A.   Yes.

02:00  10  Q.   What is a logical extraction?

02:00  11  A.   Another type of extraction for mobile devices.  In this one

02:00  12  you are only able to get calls, messages, SMS, audio files

02:00  13  pretty much if you are scrolling through the phone and you can

02:00  14  see it physically.  You will not get hidden data or deleted

02:00  15  data.

02:00  16  Q.   Are you familiar with the term advance logical extraction?

02:00  17  A.   Yes.

02:00  18  Q.   What's the difference between a logical and advance

02:00  19  logical?

02:00  20  A.   The different with the advance logical is with the advance

02:00  21  logical you will be able to get in hidden data.

02:00  22  Q.   Once you do the extraction on a device what is the next

02:00  23  step?

02:00  24  A.   To parse the data from that extraction.

02:00  25  Q.   How do you do that?

02:00  1    A.   Graykey does not give you an option to parse so we use a

02:01  2    different tool.   Everything depends on what the submitting

02:01  3    officer or whoever brought you the digital evidence, they

02:01  4    prefer that they like to work with to conduct the analysis of

02:01  5    the data.

02:01  6    Q.   What goes into the parsing tool you select?

02:01  7    A.   At the customer request.   For example, I get a lot of

02:01  8    requests for Cellebrite reader extractions because they are

02:01  9    more familiar with that vendor.

02:01  10   Q.   Once you have done the extraction how do you parse the

02:01  11   data?

02:01  12   A.   I parse the data by ingesting the extraction that was

02:02  13   conducted with the extraction tool, I would just ingest it into

02:02  14   the parsing tool.

02:02  15   Q.   Once you do that what happens?

02:02  16   A.   Once the data is parsed and once the parsing is completed

02:02  17   you will be able to see everything broken down in the software

02:02  18   from calls, messages, towers that the phone were connected to,

02:02  19   wifi connections and so on and so forth.

02:02  20   Q.   Does it create some sort of digital report?

02:02  21   A.   If you choose to, yes.

02:02  22   Q.   Once you create your digital report what do you do with it?

02:02  23   A.   Once I create -- I do a report for the requestors; that way

02:02  24   they are able to see the data without requiring them to have a

02:02  25   license.

02:02  1    For these tools you are required to have licenses and we

02:02  2    renew our license each year.  So, I create a report which is

02:03  3    either an examine viewer report from MSNB -- Cellebrite is

02:03  4    called Cellebrite viewer -- and once the viewer is complete it

02:03  5    is stored in a storage media and given back to the submitter.

02:03  6    Q.  During the extraction and parsing process what steps do you

02:03  7    take to ensure that the data can't be tampered with or lost?

02:03  8    A.  So when we conduct the extraction, once the extraction is

02:03  9    complete the data on that extraction is verified by a hash; a

02:03  10   hash is a digital fingerprint.

02:03  11       So that digital fingerprint is given to you in a form of a

02:03  12   report.  I print out the logs every time I do the ingested data

02:04  13   into the parsing tool and the parsing is complete.

02:04  14       Once the parsing is complete it gives you the option to

02:04  15   verify the extraction.  I have mine set to where when the

02:04  16   parsing is done it verifies right before it finishes the

02:04  17   parsing.

02:04  18       And that digital fingerprint from the extraction should

02:04  19   match the digital fingerprint that the parsing tool is going to

02:04  20   give you; and that's how you verify that the data is correct.

02:04  21            MR. McLAUGHLIN:  At this time I would designate this

02:04  22   witness as an expert in digital and forensic extraction and

02:04  23   parsing and offer his testimony now under Rule 702 and 703.

02:04  24            MS. VAN VLIET:  No objection.

02:04  25            THE COURT:  You may proceed, Mr. McLaughlin.

02:04  1  Q.  Mr. Cortes, I would like to point you to Government's

02:05  2  Exhibit 16 A.  Do you recognize that exhibit?

02:05  3  A.  Yes.

02:05  4  Q.  What is that exhibit?

02:05  5  A.  It is a Microsoft surface tablet.

02:06  6  Q.  How do you recognize it?

02:06  7  A.  I conducted the extraction.  The case has some very easy

02:06  8  identifying features on it.

02:06  9  Q.  What extraction tool did you use in conducting your

02:06  10  extraction of Government's 16 A?

02:06  11  A.  For 16 A I used Cellebrite digital collector.

02:06  12  Q.  Did you conduct a parsing of the device?

02:06  13  A.  Yes.

02:06  14  Q.  And what tool did you use?

02:06  15  A.  Magnet Axiom.

02:06  16  Q.  At the time did you use the newest version of both

02:06  17  Cellebrite and Axiom?

02:06  18  A.  Yes.

02:06  19  Q.  And why is that?

02:06  20  A.  You use the latest version because sometimes there are new

02:06  21  apps that come out.  So, say a new app comes out and I am using

02:06  22  an old version and the new app comes out and the vendor ask

02:06  23  support for that specific app, if I do not use the most current

02:07  24  version of the software I will not get the data from the new

02:07  25  app that they just added to the new version.

02:07  1    Q.   Now Mr. Cortes, I am showing you an item that is marked

02:07  2    Government's Exhibit 15 D for identification.  Do you see that

02:07  3    on the screen in front of you?

02:07  4    A.   Yes.

02:04  5              MS. VAN VLIET:   We have no objection to this exhibit,

02:09  6    Your Honor.

02:09  7              MR. McLAUGHLIN:   At this time the Government moves in

02:10  8    15 B.

02:10  9              THE COURT:   It is admitted without objection.

02:10  10   Q.   Referring you to 16 A; do you see the file marked 15 B for

02:10  11   identification?

02:10  12   A.   Yes.

02:10  13   Q.   Are you familiar with the folder and the files in there?

02:10  14   A.   Yes.

02:10  15   Q.   What is in it?

02:10  16   A.   It contains the applications to launch the VM ware for that

02:10  17   particular software.

02:10  18   Q.   Software for what?

02:10  19   A.   For Axiom.

02:10  20   Q.   Is this the extraction you did on 16 A, the laptop?

02:10  21   A.   Yes.

02:10  22   Q.   Under what authority did you conduct that extraction?

02:10  23   A.   Under consent to search.

02:10  24   Q.   Showing you Government's Exhibit 15 D which has now been

02:11  25   admitted; I believe you said you recognize that?

02:11 1    A.   Yes.

02:11 2         MR. McLAUGHLIN:   And if we can publish that, Your

02:11 3    Honor, since it is now in evidence.

02:11 4         THE COURT:   You may.

02:11 5    Q.   What are we looking at here?

02:11 6    A.   The consent to search from the Department of Justice DEA.

02:11 7    Q.   Now in conducting your extraction on Government's 16 A, how

02:12 8    much data was on the laptop?

02:12 9    A.   Not much data was extracted.

02:12 10   Q.   What was the capacity of the laptop itself?

02:12 11   A.   About two hundred plus gigabytes.

02:12 12   Q.   How much data did you extract?

02:12 13   A.   I would say about 20 odd gigs, not much.

02:12 14   Q.   Did you have an opportunity to review the data on the

02:12 15   laptop?

02:12 16   A.   I reviewed some of the artifacts.

02:13 17   Q.   Based on your review or what's your opinion of what type of

02:13 18   computer 16 A was?

02:13 19   A.   To me it seemed to be a work computer or a Government

02:13 20   computer.

02:13 21   Q.   Why is that?

02:13 22   A.   Based on the artifacts that he had on there it did not seem

02:13 23   to be a personal laptop.

02:13 24   Q.   Do you recognize Government's Exhibit 15 A?

02:13 25   A.   This is a Samsung Note 10.

02:13  1   Q.   How do you recognize it?

02:13  2   A.   I recognize it because I spent a lot of hours on that.

02:13  3   Q.   Did you conduct an extraction of that phone?

02:13  4   A.   Yes, I did.

02:13  5   Q.   What tool did you use?

02:13  6   A.   For this one I used a Graykey.

02:13  7   Q.   Why did you use a Graykey?

02:13  8   A.   The reason I used Graykey -- this phone kept on crashing

02:14  9   all of the other software and tools.  The only tool that worked

02:14  10  for the extraction was the Graykey.

02:14  11  Q.   When you say crashing what do you mean?

02:14  12  A.   It depends on how much power the computer has.  If you are

02:14  13  using a lot of memory and you do not have a lot of memory

02:14  14  stored in your computer it just causes the system to crash it.

02:14  15     I was able to do it because one of my work stations has a

02:14  16  lot of memory, 256 gigs, but it still took a very long time.

02:14  17  Q.   The extraction software you used was Graykey?

02:14  18  A.   The extraction tool was Graykey.

02:14  19  Q.   Do you recognize Government's Exhibit 15 A here on the

02:15  20  screen in front of you?

02:15  21  A.   Yes.

02:15  22  Q.   Where is that?

02:15  23  A.   (WITNESS INDICATES ON SCREEN)

02:15  24  Q.   This was also done pursuant to the defendant's consent?

02:15  25  A.   Yes.

02:15  1   Q.   Do you parse the data within Government's Exhibit 15 A?

02:15  2   A.   Yes.

02:15  3   Q.   Did you use Graykey to parse as well?

02:15  4   A.   No.

02:15  5   Q.   What tool did you use?

02:15  6   A.   Same thing with this with the parsing; I attempted to use

02:15  7   the Cellebrite at first, but it did not work, and so at the

02:15  8   submitter's request I attempted to use Axiom as well and it

02:16  9   kept crashing.   The only tool that was able to parse the data

02:16  10  from the phone was MSABXOY.

02:16  11  Q.   Showing you Government's Exhibit 15 B for identification

02:16  12  purposes; do you recognize the files here on Government's

02:16  13  Exhibit 15 B?

02:16  14  A.   Yes.

02:16  15  Q.   What are these?

02:16  16  A.   Part of the extraction and the parsing of the Note 10.

02:17  17  Q.   Do you recognize Government's Exhibit 20 A in front of you?

02:17  18  A.   Yes.

02:17  19  Q.   What color is the phone?

02:17  20  A.   Red.

02:17  21  Q.   How do you recognize it?

02:17  22  A.   I did the task code recovery and parsing and extraction for

02:17  23  this phone.

02:17  24  Q.   What extraction software tool did you use for Government's

02:17  25  Exhibit 20 A?

02:17  1   A.   For this one I used Cellebrite.

02:18  2   Q.   Under what authority was that phone searched and extracted?

02:18  3   A.   This phone was under a warrant.

02:18  4   Q.   Are you familiar with the term brute forcing a phone?

02:18  5   A.   Yes.

02:18  6   Q.   What is it to brute force a phone?

02:18  7   A.   With this device in specific brute force pretty much the

02:18  8   code for the phone was numeric so brute force goes through

02:18  9   every combination of numbers until it finds a password.

02:18  10  Q.   So, you try to crack the pass code to then search the

02:18  11  phone?

02:18  12  A.   Yes.

02:18  13  Q.   How long can that process last?

02:18  14  A.   Years.   It will depend on the sequence and the complexity

02:18  15  of the password.

02:18  16  Q.   How do you as a forensic digital analyst go about trying to

02:19  17  crack the password on any given phone; how does that work?

02:19  18  A.   For one it has to be supported within the tools we use; not

02:19  19  every device supports brute force, it is not possible.

02:19  20  Q.   Once you select the extraction tool you then try to brute

02:19  21  force or crack the code with the same tool?

02:19  22  A.   The same tool, yes.

02:19  23  Q.   How long did it take with this phone for the process to

02:19  24  take?

02:19  25  A.   With this phone the pass code started June 10, 2022, and

02:19  1    the password was recovered around October 13, 2022.

02:19  2    Q.   Approximately four months?

02:20  3    A.   Four months.

02:20  4    Q.   Did you use a parsing software tool on that same phone?

02:20  5    A.   Yes.

02:20  6    Q.   What parsing tool did you use?

02:20  7    A.   Cellebrite physical analyzer.

02:20  8    Q.   Showing you what has been marked for identification as 20 C

02:20  9    1 through 20 C 6.   Do you see those folders?

02:20  10   A.   Yes.

02:20  11   Q.   Are you familiar with the content of those folders?

02:20  12   A.   Yes.

02:20  13   Q.   For purposes of this trial did you assist in the creation

02:21  14   of certain extraction reports regarding your extraction of

02:21  15   Government's Exhibit 20 A?

02:21  16   A.   Yes.

02:21  17   Q.   Is Government's Exhibit 20 C 1 through 20 C 6 reports from

02:21  18   your extraction of the phone?

02:21  19   A.   Yes.

02:21  20   Q.   Did those reports 20 C 1 and 20 C 6 contain the same or

02:21  21   substantially the same information as your overall large

02:21  22   extraction of the phone?

02:21  23   A.   Yes.

02:21  24           MR. McLAUGHLIN: At this time Your Honor, we would

02:21  25   move to admit Government's 20 C 1 through 20 C 6.

02:21   1         THE COURT:  Any objection?

02:21   2         MS. VAN VLIET:  No objection.

02:21   3         THE COURT:  Government's Exhibit 20 C 1, 2, 3, 4, five

02:21   4    and six are admitted.

02:21   5         MR. McLAUGHLIN:  Permission to publish.

02:21   6         THE COURT:  You may publish.

02:22   7    Q.  I will start with 20 C 5.  What are we looking at here?

02:22   8    A.  This is an extraction report.

02:22   9    Q.  For the red phone in front of you?

02:22   10   A.  Yes.

02:22   11   Q.  You see the Apple OIS full file system?

02:22   12   A.  Yes.

02:22   13   Q.  What is reflected there?

02:22   14   A.  That was the extraction that was done on the cell phone in

02:23   15   front of you.

02:23   16   Q.  On the iPhone 11?

02:23   17   A.  Yes.

02:23   18   Q.  Let me start at the tethering last hot spot activity.

02:23   19   A.  Yes.

02:23   20   Q.  What is the date associated there?

02:23   21   A.  October 13, 2022, which is the date the phone was cracked.

02:23   22   Q.  The phone or the pass code?

02:23   23   A.  The pass code, I am sorry.

02:23   24   Q.  Taking you to IMEI; what is reflected there?

02:23   25   A.  IMEI is what identifies the device to the network.

02:23  1    Q.   For the record we are on page one of Government's 20 C 5.

02:24  2    Do you see where it says here MSISDN?

02:24  3    A.   Yes; that is pretty much the phone number.

02:24  4    Q.   What is the phone number for Government's 20 A?

02:24  5    A.   284-543-8396.

02:24  6    Q.   Over the course of your career as a digital forensic

02:24  7    analyst have you become familiar with various area codes for

02:24  8    certain countries?

02:24  9    A.   Yes.

02:24  10   Q.   And are you familiar with the 284 area code?

02:24  11   A.   Yes.

02:24  12   Q.   And that is what country?

02:25  13   A.   British Virgin Islands.

02:25  14   Q.   I will publish Government's Exhibit C 6.   Approximately how

02:25  15   many pages is this exhibit?

02:25  16   A.   124.

02:25  17   Q.   What is reflected here on Government's 20 C 6?

02:25  18   A.   The call log.

02:25  19   Q.   What is a call log?

02:25  20   A.   Calls made from that device from either the third party

02:25  21   application or the application on the device.

02:25  22   Q.   Does the call log reflect only outgoing calls?

02:25  23   A.   No.

02:25  24   Q.   What other calls does it reflect?

02:25  25   A.   Incoming calls, missed calls, outgoing, etcetera.

02:25   1   Q.  This exhibit 20 C 6, is this the call log on this

02:26   2   particular device from March 6, 2022, on page one through

02:26   3   April 28, 2022?

02:26   4   A.  Yes.

02:26   5           THE COURT:  Mr. McLaughlin, would this be a good place

02:26   6   to break do you suppose?

02:26   7           MR. McLAUGHLIN:  I think this would be a good time.

02:26   8           THE COURT:  Thank you, Mr. McLaughlin.

02:26   9           All right.  We are going to end for the day and for

02:26   10  the week, ladies and gentlemen.  At the beginning of trial, Mr.

02:26   11  Santorufo gave you our trial schedule, and so we will not be in

02:26   12  session tomorrow because of other scheduling conflicts that I

02:26   13  have; so we will start Monday at nine.

02:27   14          So, you will be away from me for three days; and

02:27   15  during that time you will not only be talking to the people you

02:27   16  live with at home, you might be going to some parties and other

02:27   17  events as well.

02:27   18          You will be asked how you are and what you have been

02:27   19  doing, and to this new group of people you will advise; I am a

02:28   20  Federal juror on a criminal case.

02:28   21          Really; that is interesting, what is the case about?

02:28   22  And you will have to, again, say to this "new" group of people

02:28   23  that you are not permitted to talk about the case and that you

02:28   24  have taken an oath.

02:28   25

02:29  1          Again, don't talk about the case with anyone, don't do

02:29  2     any research on the case, don't even think about the case.

02:29  3          Have a great weekend, do fun things, and I will see

02:29  4     you back here Monday morning fresh and rested and ready to

02:29  5     resume your duties.

02:29  6          You are excused.

02:29  7          COURT SECURITY OFFICER:  All rise, please.

02:30  8                        JURY EXCUSED

02:30  9          THE COURT:  All right. Mr. Cortes, you are excused

02:30  10    until Monday morning at nine.  I would ask you to step into one

02:30  11    of the attorney rooms off to the side and wait until the jury

02:30  12    gets off the floor before you leave.

02:30  13          THE WITNESS:  Have a nice weekend.

02:30  14          THE COURT:  You as well.

02:30  15                      WITNESS EXCUSED

02:31  16          THE COURT: I would ask the parties to be prepared to

02:32  17    begin a charge conference Monday afternoon.  Not that I am

02:32  18    prejudging whether we will need jury instructions -- because I

02:32  19    assume there will be motions made -- but it is prudent to be

02:33  20    prepared just in the eventuality we get to that point.

02:33  21          MS. VAN VLIET:  Understood, Judge.

02:33  22          MR. McLAUGHLIN: Yes, Your Honor.

02:33  23          MS. VAN VLIET:  We will have an additional theory of

02:33  24    defense instruction to submit as well.

02:33  25          THE COURT:  All right.

02:33  1          MS. VAN VLIET:  We will submit that, Your Honor, and

02:33  2     we will have some suggested tweaks to the Foreign Law portion.

02:33  3     Mr. McLaughlin and I have not had a moment to talk, but there

02:34  4     are some little minor things -- more like tracking the language

02:34  5     of the foreign law -- so I don't think there would be a lot of

02:34  6     controversy on those.

02:34  7          THE COURT:  All right. If you could before Monday

02:34  8     afternoon give us a draft of the "tweaking" so we can go over

02:34  9     that with the packet the Government has submitted.

02:34  10         MR. McLAUGHLIN:  And if we have an agreement would you

02:35  11    like us to refile so that we are not working off of different

02:35  12    versions?

02:35  13         THE COURT:  I would appreciate that.  And you do not

02:35  14    have to file it to the docket you can just send it to the

02:35  15    chambers' e-mail box; that way we are all working off of the

02:35  16    same document.  And then the final instructions will be

02:35  17    docketed.

02:35  18         MR. McLAUGHLIN: Sounds good.

02:35  19         THE COURT:  I have two in person hearings tomorrow.

02:35  20    If you wish to keep your boxes off to the side that is fine; I

02:36  21    will not let anyone go near them.  The courtroom will be locked

02:36  22    after those hearings; so it is entirely up to you.

02:36  23         MR. GERARDE:  We will take our boxes and put them

02:36  24    there in the corner.

02:36  25         MS. VAN VLIET:  We will keep ours in the room.  We

| | | |
|---|---|---|
| 02:36 | 1 | have some stuff in there already. |
| 02:36 | 2 | THE COURT:  Is there anything further I can take up on |
| 02:36 | 3 | behalf of the United States or Mr. Fahie? |
| 02:36 | 4 | MR. GERARDE:  Not on behalf of the United States |
| 02:36 | 5 | FIRST SPEAKER:  No, Your Honor, thank you. |
| 02:36 | 6 | THE COURT:  All right.  I will see you all Monday |
| 02:36 | 7 | morning at nine. |
| | 8 | COURT IN RECESS |

```
1                          -   -   -

2                   C E R T I F I C A T E

3          I hereby certify that the foregoing is an accurate

4    transcription of proceedings in the above-entitled matter.

5

6                                    /S/PATRICIA SANDERS

7    _____                _____

8    DATE FILED                 PATRICIA SANDERS, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$10,000** [3] - 91:4, 91:5, 91:11
**$11,000** [1] - 14:12
**$133,000** [2] - 28:14, 29:12
**$20,000** [1] - 91:22
**$200,000** [1] - 17:23
**$5,000** [1] - 91:16
**$500,000** [3] - 22:23, 43:14, 43:18
**$700,000** [8] - 15:2, 18:16, 20:21, 24:14, 36:2, 36:19, 43:8, 48:5

## /

**/S/PATRICIA** [1] - 120:6

## 1

**1** [16] - 47:7, 51:8, 51:12, 51:15, 51:21, 51:23, 51:24, 52:9, 52:12, 78:24, 113:9, 113:17, 113:20, 113:25, 114:3
**10** [15] - 47:10, 51:10, 51:12, 51:15, 56:18, 56:19, 56:25, 57:1, 61:9, 65:19, 102:15, 109:25, 111:16, 112:25
**104** [1] - 36:10
**106..** [1] - 36:15
**107** [2] - 48:4, 48:10
**108** [3] - 47:6, 47:10
**11** [10] - 12:17, 12:19, 12:22, 12:25, 26:6, 42:2, 42:18, 45:1, 45:11, 114:16
**11-3** [1] - 1:17
**12** [14] - 24:6, 28:10, 30:22, 32:20, 34:1, 36:10, 42:3, 42:10, 42:17, 43:23, 44:14, 45:21, 47:6, 63:13
**124** [1] - 115:16
**12:30** [2] - 40:5, 40:6
**13** [9] - 2:12, 4:23, 5:17, 39:21, 42:19, 44:15, 113:1, 114:21
**133** [1] - 29:19
**14** [3] - 24:9, 42:18, 47:15
**15** [13] - 51:10, 51:13, 61:8, 65:18, 108:2,

108:8, 108:10, 108:24, 109:24, 110:19, 111:1, 111:11, 111:13
**16** [16] - 28:12, 42:11, 44:15, 51:10, 62:7, 62:10, 62:11, 62:13, 65:19, 107:2, 107:10, 107:11, 108:10, 108:20, 109:7, 109:18
**17** [6] - 48:11, 51:10, 63:1, 63:2, 63:4, 65:10
**18** [9] - 11:17, 43:25, 51:11, 63:1, 63:8, 63:9, 63:10, 65:12, 66:16
**18-year** [1] - 80:10
**183,000** [1] - 27:17
**19** [10] - 42:11, 42:15, 45:3, 51:11, 55:22, 56:8, 63:1, 63:12, 63:13, 65:14
**1st** [1] - 54:22

## 2

**2** [8] - 51:8, 51:9, 52:14, 52:15, 53:5, 53:6, 114:3
**2-1-2024** [1] - 1:9
**20** [26] - 51:25, 52:15, 53:11, 63:24, 64:1, 64:3, 65:4, 96:5, 109:13, 111:17, 111:25, 113:8, 113:9, 113:15, 113:17, 113:20, 113:25, 114:3, 114:7, 115:1, 115:4, 115:17, 116:1
**20/21** [1] - 70:9
**200** [1] - 22:18
**2005** [2] - 49:12, 49:13
**2011** [1] - 49:18
**2018** [5] - 83:7, 85:5, 87:2, 88:20, 88:21
**2019** [1] - 83:15
**2020** [2] - 92:18, 95:4
**2021** [9] - 70:11, 70:13, 70:22, 70:24, 71:4, 71:11, 95:23, 96:1, 98:23
**2022** [33] - 7:16, 42:6, 51:25, 52:15, 53:11, 53:22, 54:10, 54:22, 55:11, 55:23, 56:8, 56:20, 58:6, 60:19, 60:20, 60:21, 68:12,

68:15, 72:4, 74:15, 81:17, 82:21, 83:4, 83:6, 84:12, 85:21, 87:12, 88:4, 112:25, 113:1, 114:21, 116:2, 116:3
**2023** [2] - 96:23, 98:2
**21** [8] - 5:16, 46:14, 51:11, 63:24, 63:25, 64:5, 64:6, 65:3
**22** [7] - 4:9, 51:11, 51:13, 63:24, 64:8, 64:9, 65:2
**22-CR-2019-KMW** [1] - 1:3
**23** [2] - 47:15, 87:24
**24** [1] - 17:2
**256** [1] - 110:16
**27** [4] - 3:3, 42:6, 43:1, 56:20
**27th** [25] - 10:21, 10:23, 11:7, 11:9, 12:15, 13:15, 15:9, 16:7, 16:17, 16:24, 17:22, 18:14, 19:20, 21:15, 28:11, 29:23, 30:2, 30:11, 32:21, 35:2, 35:22, 39:9, 40:16, 45:17, 48:18
**28** [3] - 7:16, 68:14, 116:3
**284** [1] - 115:10
**284-543-8396** [1] - 115:5
**28th** [30] - 4:18, 11:9, 11:15, 15:10, 16:7, 16:17, 16:24, 18:17, 18:25, 20:22, 24:2, 28:6, 29:14, 29:21, 29:22, 38:21, 39:8, 39:15, 39:17, 39:21, 41:12, 48:6, 60:19, 60:20, 60:21, 68:9, 68:10, 68:22, 68:24, 69:10
**29** [3] - 51:11, 51:14, 66:2
**29th** [1] - 53:21
**2O** [1] - 51:11

## 3

**3** [10] - 51:9, 53:8, 53:9, 53:10, 53:17, 81:23, 82:2, 87:23, 114:3
**3000** [6] - 14:6, 15:11, 16:14, 21:9, 30:14, 33:12
**305.523.5528** [1] -

1:18
**31** [1] - 2:22
**31st** [1] - 54:10
**33** [1] - 4:9
**33128** [1] - 1:18
**34** [2] - 2:22, 4:24
**35** [3] - 4:14, 5:16, 28:12
**3:30** [3] - 40:3, 40:4, 40:7

## 4

**4** [10] - 47:7, 51:9, 53:19, 53:20, 53:21, 54:5, 81:16, 83:6, 114:3
**400** [1] - 1:17
**43** [1] - 44:14
**44** [1] - 2:13
**45** [2] - 2:13, 24:6
**47** [1] - 3:14
**48** [2] - 4:8, 17:2
**4th** [2] - 82:21, 83:4

## 5

**5** [10] - 51:9, 54:7, 54:8, 54:9, 54:16, 54:18, 114:7, 115:1
**5,000** [1] - 91:16
**500** [1] - 21:2
**52** [2] - 4:24, 5:15
**55** [1] - 39:23

## 6

**6** [14] - 51:9, 54:20, 54:21, 55:4, 55:6, 113:9, 113:17, 113:20, 113:25, 115:14, 115:17, 116:1, 116:2
**60** [3] - 14:10, 14:15, 16:4
**68** [2] - 30:22, 31:6

## 7

**7** [7] - 30:2, 42:2, 51:9, 55:9, 55:11, 55:18
**702** [1] - 106:23
**703** [1] - 106:23
**718** [1] - 102:13
**72** [3] - 17:2, 33:2, 46:14
**73** [1] - 46:16
**7th** [12] - 58:6, 58:8, 59:1, 59:4, 59:17, 60:12, 60:15, 60:17,

75:25, 76:18, 91:1, 91:23

## 8

**8** [6] - 51:9, 51:10, 55:20, 55:21, 56:3, 82:3
**80** [1] - 42:2
**86** [2] - 21:16, 45:2
**87** [5] - 22:12, 26:6, 45:1, 45:2, 45:5
**88** [2] - 34:1, 45:13
**89** [1] - 34:1

## 9

**9** [7] - 47:10, 51:10, 56:6, 56:7, 56:15
**91** [1] - 43:24
**93** [1] - 42:10

## A

**A.U.S.A** [2] - 1:12, 1:13
**able** [9] - 9:19, 93:20, 102:13, 104:12, 104:21, 105:17, 105:24, 110:15, 111:9
**aboard** [1] - 44:10
**above-entitled** [1] - 120:4
**abroad** [1] - 49:23
**access** [3] - 67:24, 103:15, 104:5
**accessed** [2] - 67:4, 67:9
**accessing** [1] - 67:24
**accompanied** [1] - 74:16, 76:12
**accompany** [1] - 69:21
**accompanying** [1] - 35:16
**accomplished** [1] - 85:7
**according** [2] - 15:24, 27:18
**accounts** [5] - 46:8, 46:10, 46:17, 46:21, 46:22
**accurate** [11] - 52:11, 53:6, 53:17, 54:5, 54:17, 55:5, 55:17, 56:4, 56:16, 57:1, 120:3
**act** [1] - 9:25
**activate** [1] - 60:9

**activating** [1] - 57:15
**activity** [2] - 11:2, 114:18
**actual** [4] - 16:1, 39:10, 85:3, 94:25
**ad** [1] - 8:23
**added** [1] - 107:25
**adding** [1] - 27:17
**addition** [5] - 26:23, 29:18, 33:15, 33:23, 70:14
**additional** [1] - 117:23
**admit** [2] - 51:8, 113:25
**admitted** [10] - 51:13, 51:14, 54:18, 55:5, 55:18, 56:3, 108:9, 108:25, 114:4
**advance** [4] - 104:16, 104:18, 104:20
**Advance** [1] - 97:7
**advise** [2] - 75:12, 116:19
**affiant** [4] - 78:11, 80:24, 81:2, 82:23
**affidavit** [13] - 78:10, 80:17, 80:25, 81:9, 81:13, 81:14, 81:20, 82:13, 82:14, 82:18, 82:23, 87:12
**affidavits** [4] - 78:5, 78:8, 80:15, 80:19
**afford** [1] - 26:3
**afternoon** [3] - 92:8, 117:17, 118:8
**Agency** [5] - 70:17, 71:2, 71:8, 71:11, 72:5
**agency** [1] - 89:22
**Agent** [21] - 27:8, 49:1, 49:7, 61:7, 63:23, 64:23, 66:14, 68:6, 69:5, 70:7, 70:14, 70:16, 71:7, 71:24, 81:2, 81:12, 85:21, 86:16, 88:11, 88:13
**agent** [37] - 9:19, 27:2, 27:7, 38:24, 48:23, 49:8, 49:10, 49:12, 49:16, 49:19, 49:24, 50:2, 51:2, 60:5, 61:21, 65:21, 66:10, 68:3, 68:6, 68:8, 71:16, 74:16, 75:21, 77:1, 79:7, 82:1, 82:16, 82:23, 83:19, 84:23, 85:14, 86:7, 86:15, 86:16, 86:21, 87:1, 92:3

**agent's** [1] - 83:24
**agents** [12] - 6:15, 27:9, 50:1, 60:24, 61:24, 73:20, 74:10, 74:17, 76:17, 76:24, 86:13, 91:12
**ago** [3] - 83:22, 88:21, 88:25
**agreed** [1] - 22:8
**agreement** [1] - 118:10
**ahead** [1] - 13:13
**air** [1] - 40:11
**airplane** [2] - 3:11, 101:10
**Airport** [9] - 2:10, 2:20, 6:20, 6:22, 7:7, 12:3, 61:1, 68:9, 68:10
**airport** [2] - 38:21, 39:18
**albeit** [1] - 23:24
**allegation** [1] - 86:18
**allegations** [1] - 83:8
**alleged** [2] - 17:16, 17:18
**allowed** [1] - 47:2
**altered** [2] - 52:7, 53:2
**alternatives** [1] - 32:23
**ALTURO** [1] - 1:6
**AMERICA** [1] - 1:4
**analysis** [5] - 93:8, 95:1, 95:12, 97:19, 105:4
**Analyst** [1] - 92:11
**analyst** [7] - 92:14, 92:25, 93:6, 94:9, 95:2, 112:16, 115:7
**analyzer** [1] - 113:7
**ANDREW** [1] - 1:6
**Andrew** [4] - 50:19, 54:23, 55:11, 56:9
**Android** [6] - 95:9, 95:13, 97:21, 97:24, 99:2, 101:23
**Androids** [2] - 100:9, 100:17
**angry** [1] - 21:20
**announced** [1] - 35:15
**answer** [12] - 15:19, 23:10, 40:20, 77:1, 83:2, 83:14, 85:1, 85:11, 87:19, 95:14, 97:18, 99:2
**ANSWER** [1] - 97:5
**answered** [2] - 88:6, 88:7
**apartment** [3] - 11:16, 12:2, 12:6

**apologies** [1] - 85:16
**app** [4] - 107:21, 107:22, 107:23, 107:25
**apparent** [1] - 58:23
**aPPEARANCES** [1] - 1:11
**Apple** [2] - 100:17, 114:11
**application** [2] - 115:21
**applications** [1] - 108:16
**applied** [1] - 64:17
**appreciate** [1] - 118:13
**approximate** [1] - 88:18
**apps** [1] - 107:21
**April** [35] - 4:18, 7:16, 21:15, 28:6, 32:21, 35:2, 42:6, 43:1, 45:17, 48:5, 48:18, 54:22, 55:11, 55:22, 56:8, 56:20, 58:6, 58:8, 59:1, 59:4, 59:17, 60:11, 60:15, 60:17, 60:19, 60:21, 68:9, 68:10, 68:14, 75:25, 76:18, 91:1, 91:23, 116:3
**area** [4] - 6:1, 12:2, 115:7, 115:10
**areas** [1] - 2:21
**arise** [1] - 7:17
**Army** [3] - 92:21, 92:22, 93:2
**arrange** [1] - 31:14
**arranging** [1] - 9:4
**arrest** [16] - 41:11, 60:21, 62:15, 63:7, 65:6, 68:23, 69:1, 69:7, 70:9, 79:9, 80:10, 80:12, 80:21, 81:1, 82:24, 84:12
**arrested** [19] - 25:7, 44:7, 48:15, 60:23, 60:24, 60:25, 61:1, 61:2, 61:14, 62:22, 63:18, 63:21, 64:12, 68:8, 68:9, 68:14, 68:21, 69:1, 79:17
**arrive** [3] - 11:16, 40:12, 40:13
**arrived** [3] - 7:5, 39:18, 64:16
**art** [1] - 9:18
**artifacts** [2] - 109:16, 109:22
**Aschleman** [10] -

27:8, 68:6, 69:5, 70:8, 70:14, 70:16, 71:7, 71:24, 81:2, 86:16
**Aschleman's** [1] - 81:13
**assigned** [1] - 8:7
**assist** [5] - 11:20, 51:20, 51:17, 75:22, 113:13
**assistance** [1] - 14:11
**assisted** [2] - 74:12, 75:20
**associated** [1] - 114:20
**assume** [1] - 117:19
**attempt** [1] - 12:12
**attempted** [2] - 111:6, 111:8
**attend** [1] - 72:6
**attended** [2] - 13:15, 23:19
**attends** [1] - 76:12
**attention** [7] - 43:24, 44:15, 45:5, 45:22, 47:7, 48:10, 65:8
**attorney** [1] - 117:11
**audio** [9] - 50:8, 51:3, 56:2, 56:14, 89:9, 93:22, 103:11, 104:6, 104:12
**August** [2] - 70:12, 70:24
**authored** [1] - 78:8
**authority** [3] - 90:2, 108:22, 112:2
**Avenue** [1] - 1:17
**aware** [16] - 14:17, 15:10, 15:19, 16:3, 16:8, 19:18, 19:19, 20:15, 20:18, 40:19, 40:23, 62:24, 83:8, 88:4, 88:14, 89:5
**Axiom** [17] - 96:13, 96:15, 96:17, 96:20, 97:3, 97:4, 97:6, 97:7, 98:1, 98:13, 99:1, 99:23, 100:3, 107:15, 107:17, 108:19, 111:8

## B

**backup** [1] - 89:12
**bag** [4] - 36:22, 38:16, 38:19, 101:7
**bags** [5] - 4:18, 20:23, 36:18, 38:2, 38:13
**bank** [4] - 46:8, 46:10, 46:21, 46:22

**based** [22] - 3:18, 16:7, 20:7, 20:12, 20:15, 42:12, 42:21, 44:1, 44:20, 46:19, 47:12, 48:11, 53:5, 53:16, 54:4, 55:4, 56:2, 56:14, 56:25, 99:3, 109:17, 109:22
**Based** [2] - 54:16, 55:16
**Beach** [1] - 8:5
**became** [7] - 10:20, 10:22, 11:6, 40:19, 70:8, 96:1, 96:25
**become** [20] - 11:1, 11:3, 26:20, 40:23, 50:18, 83:8, 88:14, 94:7, 94:13, 94:14, 95:3, 95:5, 95:6, 95:8, 95:21, 96:22, 96:24, 97:13, 98:1, 115:7
**becomes** [3] - 9:21, 9:24, 18:15
**beforehand** [1] - 76:21
**begin** [3] - 64:1, 91:6, 117:17
**beginning** [3] - 65:2, 65:10, 116:10
**behalf** [2] - 119:3, 119:4
**beige** [1] - 5:4
**believability** [1] - 83:10
**believes** [1] - 23:9
**belonging** [7] - 64:3, 64:6, 65:11, 65:13, 65:14, 65:20, 65:22
**belongs** [1] - 63:4
**belt** [1] - 2:24
**benefit** [1] - 89:14
**beside** [1] - 4:22
**best** [9] - 8:17, 23:18, 52:11, 79:16, 79:19, 79:23, 81:7, 81:8, 90:5
**better** [4] - 71:22, 99:25, 100:1, 101:22
**between** [11] - 52:16, 53:22, 54:23, 55:11, 55:23, 56:9, 56:21, 74:14, 89:23, 93:15, 104:18
**beyond** [1] - 91:24
**big** [1] - 75:12
**bigger** [1] - 36:21
**bills** [3] - 22:9, 22:10, 22:23
**binder** [4] - 8:1, 12:20,

51:22, 56:6
**binders** [2] - 51:16, 51:20
**biological** [1] - 92:23
**bit** [2] - 9:2, 23:2
**black** [1] - 2:24
**Blacka** [1] - 18:12
**Blako** [1] - 67:3
**blank** [1] - 61:9
**bless** [1] - 11:24
**Blue** [2] - 7:16
**blue** [3] - 2:24, 5:4, 63:11
**bluetooth** [1] - 101:11
**board** [4] - 24:25, 25:1, 25:5
**boarded** [1] - 44:12
**boat** [11] - 31:11, 31:13, 31:14, 31:16, 31:18, 33:17, 33:18, 34:7, 34:8, 47:4
**boats** [1] - 33:16
**body** [1] - 58:22
**book** [2] - 2:12, 8:1
**Border** [4] - 76:9, 92:9, 92:15, 92:19
**borrowed** [1] - 28:25
**bottom** [2] - 12:24, 87:24
**bow** [1] - 37:19
**box** [3] - 61:9, 101:9, 118:15
**boxes** [9] - 4:12, 5:14, 35:5, 35:12, 36:11, 39:5, 39:11, 118:20, 118:23
**break** [5] - 32:22, 73:24, 78:22, 80:14, 116:6
**breaking** [1] - 93:19
**Brian** [1] - 49:1
**bribe** [1] - 91:6
**bribes** [2] - 21:8, 28:3
**bridging** [1] - 89:23
**bring** [7] - 2:2, 13:23, 32:16, 33:15, 42:3, 79:2, 85:17
**bringing** [5] - 6:20, 14:9, 47:4
**British** [20] - 15:12, 16:20, 16:23, 17:2, 17:3, 19:16, 19:21, 20:22, 21:9, 28:4, 41:9, 41:14, 68:19, 72:12, 73:6, 73:9, 73:19, 73:25, 75:8, 115:13
**broken** [3] - 37:7, 37:23, 105:17
**brought** [8] - 9:4,

15:11, 47:18, 48:20, 75:4, 76:7, 79:9, 105:3
**brown** [1] - 2:24
**brute** [6] - 112:4, 112:6, 112:7, 112:8, 112:19, 112:20
**building** [2] - 80:1, 80:5
**built** [1] - 44:24
**bulk** [2] - 34:21, 35:2
**business** [7] - 26:13, 40:18, 40:20, 59:13, 59:14, 59:16, 91:6
**but..** [1] - 23:6
**buy** [1] - 26:3
**BVI** [21] - 19:8, 19:10, 19:12, 19:13, 20:4, 20:17, 20:18, 24:14, 30:14, 31:17, 43:22, 45:18, 47:2, 47:14, 48:5, 55:11, 66:7, 75:20, 76:14, 76:18, 91:23
**BY** [1] - 1:16

# C

**cannot** [2] - 26:3, 102:19
**capacity** [3] - 8:10, 20:16, 109:10
**captures** [1] - 89:16
**car** [1] - 12:2
**card** [1] - 101:8
**cards** [1] - 101:9
**care** [4] - 18:17, 18:20, 39:13
**career** [1] - 115:6
**Cartel** [2] - 15:6, 15:7
**case** [82] - 1:3, 11:1, 11:9, 11:16, 13:3, 20:13, 26:24, 32:12, 49:24, 50:1, 50:2, 50:5, 50:7, 50:15, 50:23, 51:2, 57:7, 57:20, 58:5, 60:5, 60:20, 61:10, 61:21, 62:12, 63:5, 63:11, 63:13, 65:21, 68:6, 69:12, 70:12, 70:17, 70:23, 73:14, 75:20, 78:3, 78:23, 79:17, 79:20, 79:21, 79:23, 80:19, 80:22, 80:25, 81:5, 81:12, 82:7, 82:23, 82:24, 83:6, 83:11, 84:13, 84:15, 85:23, 86:1, 86:12, 86:13, 86:15, 86:16,

86:19, 87:2, 87:14, 87:21, 88:15, 88:19, 88:23, 88:25, 89:13, 89:22, 89:25, 90:3, 107:7, 116:20, 116:21, 116:23, 117:1, 117:2
**cases** [10] - 27:3, 27:4, 57:4, 77:18, 77:19, 78:1, 84:4, 87:17, 87:18, 88:1
**cash** [2] - 24:23, 44:19
**causes** [1] - 110:14
**CBP** [1] - 99:16
**CCME** [3] - 94:7, 96:1, 96:5
**CCPA** [1] - 95:7
**CCPO** [1] - 95:7
**cell** [27] - 50:10, 50:11, 50:12, 57:15, 61:6, 61:9, 61:11, 61:12, 61:13, 61:16, 61:18, 63:4, 63:10, 63:13, 64:6, 64:9, 65:10, 65:12, 65:13, 65:14, 65:19, 67:7, 67:8, 67:11, 69:16, 79:13, 114:14
**Cellebrite** [33] - 94:3, 94:5, 94:7, 94:8, 94:10, 94:13, 94:16, 94:21, 94:22, 94:23, 94:24, 95:1, 95:3, 95:18, 95:22, 96:1, 96:8, 96:10, 98:6, 98:10, 99:1, 99:23, 100:3, 101:22, 102:5, 105:8, 106:3, 106:4, 107:11, 107:17, 111:7, 112:1, 113:7
**cellphone** [1] - 101:3
**certain** [9] - 9:18, 20:4, 72:13, 73:12, 90:5, 101:22, 102:5, 113:14, 115:8
**certainly** [4] - 14:19, 69:18, 75:18, 81:19
**certification** [8] - 94:5, 95:11, 95:24, 96:4, 98:3, 98:5, 98:20, 98:24
**certifications** [4] - 93:24, 95:25, 96:2, 99:22
**certified** [21] - 94:3, 94:8, 94:13, 94:14, 94:24, 95:2, 95:3, 95:5, 95:6, 95:8, 95:21, 96:15, 96:20,

96:22, 96:24, 96:25, 97:13, 98:1, 99:19, 99:23
**certify** [2] - 96:5, 120:3
**chain** [1] - 73:10
**chambers'** [1] - 118:15
**change** [2] - 97:16, 104:2
**charge** [6] - 20:4, 20:9, 20:16, 39:13, 72:18, 117:17
**charged** [5] - 14:3, 14:5, 14:9, 14:23, 69:12
**Charlie** [1] - 9:4
**charter** [1] - 40:24
**check** [2] - 31:20, 31:21
**checking** [2] - 31:23, 33:4
**chemical** [1] - 92:23
**Chicago** [1] - 99:17
**choose** [1] - 105:21
**CI** [25] - 3:1, 6:12, 6:25, 9:4, 10:6, 10:8, 10:11, 13:5, 15:5, 18:4, 20:3, 22:22, 27:19, 30:5, 30:8, 30:13, 30:23, 34:20, 35:3, 35:4, 36:1, 38:23, 85:5, 85:22
**clarification** [1] - 23:9
**clarify** [3] - 23:4, 25:10, 80:8
**clarity** [1] - 23:7
**classes** [2] - 9:12
**clear** [6] - 10:16, 16:18, 18:15, 22:10, 24:18, 85:14
**cleared** [1] - 6:1
**client** [2] - 67:10, 70:9
**close** [1] - 23:17
**closely** [1] - 75:19
**clothes** [1] - 38:9
**CMFF** [1] - 95:7
**co** [9] - 50:1, 50:2, 51:2, 61:21, 65:21, 68:6, 82:23, 86:15, 86:16
**co-case** [9] - 50:1, 50:2, 51:2, 61:21, 65:21, 68:6, 82:23, 86:15, 86:16
**cocaine** [14] - 13:23, 14:10, 14:18, 14:20, 14:24, 15:14, 15:20, 16:13, 17:18, 28:3, 32:2, 33:12, 43:21

**code** [9] - 11:16, 111:22, 112:8, 112:10, 112:21, 112:25, 114:22, 114:23, 115:10
**codes** [2] - 66:23, 115:7
**coffee** [1] - 32:12
**coincided** [1] - 59:15
**collector** [1] - 107:11
**Colombia** [4] - 15:12, 16:10, 16:16, 16:20
**color** [2] - 63:14, 111:19
**colorful** [1] - 63:5
**combination** [1] - 112:9
**coming** [2] - 29:3, 84:23
**command** [1] - 73:10
**commission** [2] - 41:2, 41:5
**commissioned** [1] - 92:23
**Commissioner** [1] - 73:7
**Commissioner's** [1] - 73:9
**committed** [1] - 89:6
**communicate** [1] - 72:10
**communicating** [1] - 101:3
**communication** [2] - 69:15, 78:3
**communications** [1] - 71:10
**compartment** [3] - 36:14, 38:4, 38:19
**competency** [1] - 99:17
**complement** [1] - 2:1
**complete** [2] - 95:16, 106:4, 106:9, 106:13, 106:14
**completed** [2] - 97:14, 105:16
**complexity** [1] - 112:14
**computer** [8] - 67:13, 101:16, 101:18, 109:18, 109:19, 109:20, 110:12, 110:14
**computers** [1] - 93:9
**concealed** [1] - 58:21
**concept** [1] - 99:1
**concern** [2] - 52:6, 53:1, 58:2
**concerns** [1] - 7:17

**conduct** [18] - 77:12, 86:2, 90:8, 93:8, 94:6, 94:16, 94:19, 95:12, 100:22, 102:12, 102:14, 103:1, 103:18, 105:4, 106:8, 107:12, 108:22, 110:3
**conducted** [6] - 59:19, 60:21, 77:15, 78:1, 105:13, 107:7
**conducting** [5] - 8:13, 49:21, 50:4, 107:9, 109:7
**conference** [2] - 71:22, 117:17
**confidential** [50] - 10:8, 10:9, 50:23, 52:1, 52:17, 53:12, 53:23, 54:11, 54:24, 55:12, 55:24, 56:10, 56:22, 57:8, 57:10, 57:13, 57:14, 58:9, 58:10, 59:4, 75:2, 75:3, 77:8, 77:17, 81:4, 81:8, 81:10, 82:6, 82:8, 82:12, 82:18, 82:25, 83:9, 83:11, 83:15, 83:24, 84:12, 87:13, 87:15, 87:20, 88:5, 90:4, 90:12, 90:13, 90:18, 90:24, 91:3, 91:15, 91:20, 91:22
**confirming** [1] - 40:11
**conflicts** [1] - 116:12
**connected** [4] - 101:17, 101:18, 105:18
**connection** [2] - 80:21, 86:18
**connections** [1] - 105:19
**consent** [5] - 67:9, 67:10, 108:23, 109:6, 110:24
**considered** [2] - 103:12, 103:14
**consists** [2] - 94:24, 95:15
**construct** [1] - 91:7
**construction** [3] - 25:24, 26:9, 26:18
**consulted** [1] - 70:16
**consulting** [1] - 75:16
**contact** [3] - 70:19, 70:20, 72:8
**contacts** [2] - 93:22, 104:6

**contain** [1] - 113:20
**contained** [6] - 5:11, 5:13, 54:8, 55:21, 62:11, 63:11
**containing** [2] - 5:14, 43:21
**contains** [1] - 108:16
**content** [1] - 113:11
**context** [2] - 28:11, 32:21
**continue** [7] - 2:5, 3:12, 4:8, 5:18, 32:19, 79:5, 85:20
**continuing** [6] - 96:3, 96:6, 96:7, 98:7, 99:5, 99:7
**contraband** [1] - 90:11
**contract** [1] - 58:5
**control** [2] - 73:3, 73:21
**controversy** [1] - 118:6
**conversation** [5] - 12:10, 19:6, 21:24, 89:15
**conversations** [2] - 40:17, 70:12
**coordination** [1] - 76:8
**copy** [1] - 81:24
**corner** [1] - 118:24
**correct** [72] - 8:20, 10:6, 10:7, 13:6, 13:19, 13:21, 13:25, 14:21, 14:25, 15:3, 16:25, 17:4, 17:5, 17:10, 17:19, 17:20, 21:3, 21:7, 21:17, 22:4, 23:24, 23:25, 25:25, 26:9, 26:19, 27:20, 27:22, 28:14, 28:16, 29:21, 30:15, 31:8, 32:9, 34:12, 35:3, 35:6, 35:8, 38:3, 38:4, 38:5, 38:24, 39:16, 40:9, 40:10, 51:1, 57:5, 57:6, 66:20, 67:14, 69:6, 69:13, 69:14, 69:20, 70:2, 70:3, 70:4, 72:2, 72:3, 73:25, 74:6, 74:24, 76:19, 79:11, 79:16, 79:22, 80:11, 81:20, 83:1, 83:4, 88:6, 88:7, 106:20
**correctly** [1] - 10:20, 21:10, 22:20, 29:10, 33:6, 37:9, 95:14

**corresponding** [1] - 53:2
**corruption** [2] - 75:11, 84:17
**Cortes** [4] - 92:6, 107:1, 108:1, 117:9
**cortes** [1] - 92:8
**counsel** [4] - 23:11, 25:12, 47:3, 81:24
**countries** [1] - 115:8
**country** [1] - 115:12
**couple** [1] - 11:4
**Course** [1] - 97:4
**course** [10] - 10:14, 29:21, 41:18, 50:8, 52:2, 72:9, 78:7, 97:14, 99:1, 115:6
**courses** [4] - 96:25, 97:2, 97:12, 99:20
**COURT** [70] - 1:1, 1:10, 2:1, 2:3, 2:4, 2:14, 7:20, 23:7, 25:13, 32:11, 32:14, 32:16, 32:17, 32:18, 41:18, 41:22, 48:23, 48:25, 49:5, 51:12, 51:17, 51:19, 66:11, 66:13, 77:1, 78:17, 78:21, 79:1, 79:3, 79:4, 81:25, 82:16, 82:20, 84:18, 84:20, 84:22, 85:17, 85:18, 85:19, 86:6, 86:10, 86:21, 86:25, 87:7, 87:10, 88:9, 88:12, 91:19, 92:1, 92:3, 97:9, 106:25, 108:9, 109:4, 114:1, 114:3, 114:6, 116:5, 116:8, 117:7, 117:9, 117:14, 117:16, 117:25, 118:7, 118:13, 118:19, 119:2, 119:6, 119:8
**Court** [5] - 1:17, 13:17, 49:24, 67:19, 89:7
**courtroom** [1] - 118:21
**crack** [3] - 112:10, 112:17, 112:21
**cracked** [1] - 114:21
**crash** [1] - 110:14
**crashing** [3] - 110:8, 110:11, 111:9
**create** [4] - 105:20, 105:22, 105:23, 106:2
**created** [1] - 101:7
**creation** [1] - 113:13

**credibility** [14] - 81:10, 82:6, 82:12, 82:18, 83:10, 83:16, 83:21, 83:25, 84:14, 85:6, 85:23, 88:15, 88:19, 88:24
**crew** [1] - 39:12
**Crime** [5] - 70:17, 71:2, 71:8, 71:11, 72:5
**crimes** [1] - 77:21
**criminal** [1] - 116:20
**cross** [4] - 7:21, 41:23, 66:11, 85:8
**Crypto** [3] - 34:17, 46:24, 47:2
**CS** [33] - 10:11, 11:12, 26:2, 35:15, 38:6, 38:22, 69:22, 70:1, 71:24, 72:1, 72:4, 73:22, 74:14, 74:16, 75:7, 75:13, 76:3, 76:5, 76:12, 76:17, 77:4, 77:13, 77:16, 77:24, 83:21, 84:3, 87:17, 88:1, 88:19, 88:23, 89:5, 89:10, 91:13
**curious** [1] - 30:19
**currency** [4] - 34:17, 36:19, 46:24, 47:2
**current** [2] - 92:10, 107:23
**custody** [16] - 5:23, 6:1, 6:4, 6:10, 6:21, 7:15, 59:24, 59:25, 62:5, 62:17, 62:19, 64:13, 64:20, 73:13, 75:1, 75:3
**customer** [1] - 105:7
**Customs** [9] - 18:20, 19:7, 19:8, 19:9, 19:10, 76:8, 92:9, 92:15, 92:19

# D

**daily** [5] - 50:4, 93:7, 94:6, 100:4, 100:5
**danger** [1] - 75:15
**data** [28] - 67:15, 93:16, 93:19, 93:20, 103:11, 103:17, 104:3, 104:7, 104:14, 104:15, 104:21, 104:24, 105:5, 105:11, 105:12, 105:16, 105:24, 106:7, 106:9, 106:12,

106:20, 107:24, 109:8, 109:9, 109:12, 109:14, 111:1, 111:9
**date** [10] - 11:4, 11:5, 71:13, 71:14, 71:17, 86:4, 90:21, 100:10, 114:20, 114:21
**DATE** [1] - 120:8
**dates** [1] - 70:21
**daughter** [7] - 2:9, 2:18, 3:25, 4:3, 11:18, 43:4, 80:10
**days** [4] - 11:5, 60:16, 60:18, 116:14
**DEA** [31] - 8:7, 14:19, 49:8, 49:10, 49:19, 60:24, 61:4, 62:19, 63:16, 64:13, 64:14, 74:7, 74:10, 74:16, 75:9, 76:7, 78:7, 79:9, 79:13, 79:16, 80:10, 81:7, 89:14, 89:20, 89:22, 90:1, 90:2, 90:3, 90:8, 91:17, 109:6
**deactivate** [1] - 60:9
**deal** [13] - 13:9, 13:11, 13:17, 13:23, 14:2, 14:3, 14:9, 14:14, 14:22, 17:15, 18:15
**dealing** [1] - 81:8
**deals** [1] - 13:9
**dealt** [1] - 77:13
**debrief** [1] - 59:19
**debriefed** [2] - 72:5, 91:13
**debriefing** [3] - 71:12, 72:1, 72:6
**decide** [1] - 101:14
**decided** [2] - 12:8, 102:24
**decision** [1] - 101:20
**decisions** [1] - 89:25
**deemed** [2] - 61:18, 62:14
**defendant** [47] - 2:9, 2:18, 2:23, 3:24, 5:7, 5:20, 5:23, 6:4, 6:10, 6:21, 11:13, 38:23, 39:6, 39:10, 39:12, 42:8, 42:11, 42:20, 42:25, 43:1, 43:2, 43:6, 44:4, 44:7, 44:17, 44:18, 44:21, 45:17, 45:24, 46:1, 46:10, 46:15, 46:22, 47:9, 47:11, 47:23, 48:4, 48:10, 48:12, 48:15, 50:19, 57:23,

60:25, 61:2, 62:22, 81:1, 89:10
**DEFENDANT** [1] - 1:14
**defendant's** [4] - 3:25, 4:3, 84:12, 110:24
**Defendant's** [1] - 81:23
**defendants** [3] - 75:8, 80:21, 87:23
**defense** [3] - 23:11, 51:7, 117:24
**deleted** [2] - 104:3, 104:7, 104:14
**Delgado** [1] - 1:15
**deliver** [1] - 10:2
**denied** [1] - 87:19
**deny** [1] - 87:12
**departed** [1] - 5:20
**Department** [2] - 92:20, 109:6
**depiction** [1] - 52:12
**describe** [2] - 58:18, 81:9
**described** [2] - 73:14, 73:21
**describing** [2] - 37:13, 37:15
**designate** [1] - 106:21
**desire** [1] - 40:24
**desk** [1] - 80:13
**details** [8] - 24:22, 24:23, 30:16, 38:11, 40:25, 83:17, 83:19, 84:16
**detained** [4] - 5:22, 25:11, 25:14, 69:10
**detected** [1] - 16:6
**Detective** [3] - 2:7, 3:14, 7:22
**detective** [8] - 5:20, 8:4, 23:7, 41:20, 41:23, 45:22
**determine** [1] - 100:21
**determined** [2] - 61:5, 61:19
**develop** [1] - 72:11
**device** [49] - 57:16, 58:13, 58:14, 58:18, 58:19, 58:21, 58:24, 59:20, 59:23, 60:2, 60:8, 60:10, 60:11, 60:15, 60:16, 62:3, 62:17, 63:3, 63:6, 73:15, 73:21, 75:2, 75:4, 76:19, 89:10, 90:11, 93:17, 95:9, 95:10, 95:12, 95:13, 97:16, 97:23, 101:7, 101:10, 101:17,

103:10, 103:15, 103:17, 103:22, 103:23, 104:22, 107:12, 112:7, 112:19, 114:25, 115:20, 115:21, 116:2
**devices** [27] - 61:5, 62:21, 62:24, 65:22, 68:3, 69:15, 69:19, 78:3, 89:12, 89:13, 93:9, 93:10, 94:25, 97:20, 97:21, 97:25, 98:8, 99:2, 99:25, 100:8, 100:16, 100:17, 101:22, 101:23, 101:24, 102:4, 104:11
**difference** [2] - 93:15, 104:18
**different** [10] - 21:13, 75:19, 77:22, 96:9, 96:25, 99:24, 101:6, 104:20, 105:2, 118:11
**difficult** [5] - 9:21, 9:22, 9:24, 19:24, 20:1
**digital** [36] - 25:21, 73:15, 92:11, 92:14, 92:25, 93:3, 93:5, 93:8, 93:11, 93:13, 93:25, 94:8, 94:11, 94:16, 94:19, 96:10, 96:12, 96:18, 98:19, 99:3, 99:17, 100:11, 102:17, 103:4, 105:3, 105:20, 105:22, 106:10, 106:11, 106:18, 106:19, 106:22, 107:11, 112:16, 115:6
**direct** [7] - 21:7, 21:10, 27:14, 28:2, 57:22, 71:19, 79:8
**directing** [1] - 65:8
**directly** [1] - 13:24
**director** [2] - 66:7, 91:9
**disabling** [1] - 101:11
**disagreed** [1] - 84:6
**discuss** [2] - 19:3, 82:25
**discussed** [9] - 13:11, 13:14, 16:2, 16:3, 16:21, 46:8, 48:18, 80:14, 82:13
**discussing** [3] - 29:18, 36:5, 81:1

**discussion** [14] - 13:9, 17:21, 19:2, 19:22, 23:20, 24:12, 25:20, 28:6, 29:13, 34:13, 34:16, 38:8, 46:8, 75:24
**discussions** [9] - 11:12, 16:17, 25:4, 25:23, 30:4, 41:1, 41:24, 70:23, 71:1
**displaying** [1] - 39:5
**DISTRICT** [3] - 1:1, 1:2, 1:10
**District** [2] - 64:18, 83:4
**Division** [1] - 49:14
**DIVISION** [1] - 1:2
**dock** [2] - 33:24, 34:9
**docket** [1] - 118:14
**docketed** [1] - 118:17
**document** [2] - 82:10, 118:16
**domestic** [1] - 77:23
**Dominguez** [5] - 2:7, 3:14, 7:22, 50:25, 70:15
**done** [16] - 9:11, 18:24, 26:24, 28:8, 29:13, 68:2, 80:15, 80:19, 81:12, 93:17, 100:10, 100:13, 105:10, 106:16, 110:24, 114:14
**Dorrie** [1] - 26:21
**down** [22] - 16:23, 20:24, 31:24, 35:23, 37:7, 37:23, 39:5, 48:23, 49:15, 51:10, 70:21, 73:24, 76:21, 77:2, 77:4, 77:7, 90:4, 90:8, 92:3, 93:19, 103:1, 105:17
**download** [2] - 60:14, 75:5
**downloaded** [2] - 57:19, 59:21
**draft** [2] - 82:14, 118:8
**drag** [1] - 43:7
**drive** [1] - 11:17
**drove** [1] - 7:6
**drug** [4] - 15:6, 33:18, 49:21, 77:19
**drugs** [2] - 42:4, 90:12
**due** [1] - 84:17
**dummy** [1] - 38:3
**duration** [1] - 40:13
**during** [23] - 7:16, 10:13, 15:9, 18:6, 18:14, 19:6, 23:19, 24:1, 25:23, 29:20,

35:15, 36:5, 41:23, 46:8, 50:8, 50:14, 52:2, 58:8, 72:9, 87:2, 87:16, 106:6, 116:15
**duties** [6] - 49:20, 49:21, 93:5, 93:7, 117:5

---

**E**

---

**e-mail** [1] - 118:15
**early** [5] - 11:7, 26:2, 70:24, 90:22, 90:24
**earn** [1] - 18:24
**easier** [2] - 102:3
**easy** [1] - 107:7
**education** [5] - 96:3, 96:7, 98:7, 99:5, 99:7
**effect** [1] - 24:3
**effectively** [1] - 79:13
**eight** [1] - 55:20
**either** [6] - 11:12, 76:13, 96:9, 99:7, 106:3, 115:20
**election** [1] - 22:11
**elections** [4] - 28:8, 29:7, 29:13
**electronic** [5] - 58:19, 61:5, 65:22, 69:19, 101:9
**electronics** [2] - 62:21, 63:20
**Embassy** [1] - 7:2
**employed** [3] - 8:4, 49:7, 49:8
**end** [2] - 70:21, 116:9
**enforcement** [31] - 3:7, 6:3, 6:14, 8:12, 19:11, 38:24, 58:2, 61:3, 61:13, 61:16, 61:24, 62:4, 62:5, 62:13, 62:20, 63:6, 63:17, 64:20, 68:3, 70:15, 71:5, 71:23, 73:20, 75:9, 75:13, 75:14, 75:16, 76:5, 76:10, 76:13, 77:10
**ensure** [1] - 106:7
**enter** [1] - 77:8
**entered** [1] - 4:12
**entire** [1] - 49:13
**entirely** [1] - 118:22
**entitled** [1] - 120:4
**entrance** [1] - 2:20
**entry** [1] - 3:3
**equate** [1] - 17:17
**equation** [1] - 73:11
**equipped** [1] - 76:18

**ESQ** [2] - 1:14, 1:15
**essentially** [4] - 23:22, 59:13, 78:10, 80:17
**estimate** [1] - 9:11
**etcetera** [2] - 93:23, 115:25
**evening** [3] - 23:15, 24:2, 32:20
**event** [1] - 72:1
**events** [1] - 116:17
**eventuality** [1] - 117:20
**eventually** [3] - 64:18, 69:12, 70:8
**evidence** [18] - 50:3, 50:6, 51:4, 57:19, 59:22, 61:3, 62:16, 63:23, 66:1, 67:19, 67:25, 73:13, 75:5, 82:10, 93:8, 105:3, 109:3
**evidentiary** [2] - 61:18, 62:14
**Ex'd** [1] - 64:14
**exact** [8] - 9:15, 11:4, 11:5, 19:9, 20:18, 40:25, 47:13, 88:25
**exactly** [6] - 16:3, 16:18, 27:23, 28:16, 47:11
**examination** [5] - 7:21, 41:23, 66:11, 85:9, 93:7
**Examinations** [1] - 97:7
**examine** [1] - 106:3
**examined** [1] - 62:4
**examiner** [2] - 94:3, 96:1
**example** [2] - 102:4, 105:7
**except** [1] - 11:9
**EXCUSED** [3] - 84:21, 117:8, 117:15
**excused** [2] - 117:6, 117:9
**Executive** [2] - 6:22, 61:1
**exhibit** [1] - 66:2, 107:2, 107:4, 108:5, 115:15, 116:1
**Exhibit** [85] - 4:14, 12:17, 12:25, 36:10, 42:2, 42:10, 45:1, 45:21, 47:6, 51:12, 51:14, 51:23, 51:24, 52:9, 52:12, 52:14, 52:15, 53:5, 53:6, 53:8, 53:9, 53:10, 53:17, 53:19, 53:20,

54:5, 54:7, 54:8, 54:16, 54:18, 54:20, 54:21, 55:4, 55:6, 55:9, 55:18, 55:20, 55:21, 56:3, 56:6, 56:7, 56:15, 56:18, 56:19, 61:8, 62:7, 62:10, 62:13, 63:1, 63:2, 63:4, 63:8, 63:9, 63:10, 63:12, 63:24, 63:25, 64:3, 64:8, 65:2, 65:3, 65:4, 65:10, 65:12, 65:14, 65:18, 65:19, 66:1, 66:16, 87:23, 107:2, 108:2, 108:24, 109:24, 110:19, 111:1, 111:11, 111:13, 111:17, 111:25, 113:15, 113:17, 114:3, 115:14

**Exhibits** [1] - 51:21

**exhibits** [1] - 51:8

**exonerated** [1] - 89:8

**expand** [1] - 85:8

**expended** [1] - 91:13

**experience** [4] - 9:9, 84:3, 88:1, 102:7

**experiences** [1] - 87:16

**expert** [2] - 94:3, 106:22

**explain** [12] - 51:23, 52:14, 53:8, 53:19, 54:7, 54:21, 55:8, 56:7, 56:18, 63:2, 93:5, 102:1

**explaining** [1] - 20:3

**explanation** [1] - 85:12

**express** [1] - 43:10

**extensively** [1] - 13:14

**extra** [1] - 22:18

**extract** [2] - 16:4, 109:12

**extracted** [6] - 62:19, 67:15, 67:16, 93:19, 109:9, 112:2

**extracting** [3] - 93:16, 100:7, 100:18

**extraction** [77] - 16:5, 61:20, 63:17, 67:17, 68:2, 93:11, 93:15, 93:16, 93:25, 94:23, 95:21, 97:15, 97:17, 97:18, 98:10, 98:11, 98:18, 99:12, 99:16, 100:20, 100:22, 101:13, 101:14,

101:15, 101:20, 102:13, 102:14, 102:20, 102:25, 103:1, 103:3, 103:4, 103:6, 103:8, 103:12, 103:18, 103:22, 103:25, 104:1, 104:5, 104:8, 104:10, 104:11, 104:16, 104:22, 104:24, 105:10, 105:12, 105:13, 106:6, 106:8, 106:9, 106:15, 106:18, 106:22, 107:7, 107:9, 107:10, 108:20, 108:22, 109:7, 110:3, 110:10, 110:17, 110:18, 111:16, 111:22, 111:24, 112:20, 113:14, 113:18, 113:22, 114:8, 114:14

**extractions** [8] - 94:17, 94:21, 95:9, 95:14, 99:2, 99:3, 100:10, 105:8

**F**

**facilities** [1] - 80:2

**facility** [1] - 80:5

**fact** [5] - 20:7, 21:12, 22:22, 60:16, 80:14

**facts** [1] - 78:11

**Fahi** [1] - 67:10

**Fahie** [90] - 7:23, 11:13, 11:15, 11:17, 12:5, 12:13, 13:18, 14:3, 14:5, 14:23, 17:23, 19:19, 19:21, 19:24, 21:3, 21:16, 21:25, 23:13, 23:16, 24:1, 24:2, 24:9, 25:3, 26:3, 26:10, 26:17, 27:12, 28:10, 28:16, 28:18, 28:22, 28:24, 29:2, 29:6, 29:9, 29:14, 29:18, 29:20, 30:1, 30:6, 30:9, 30:11, 31:7, 31:10, 31:12, 31:16, 31:20, 32:3, 32:23, 33:2, 33:4, 33:8, 34:5, 34:7, 34:13, 34:20, 35:3, 35:4, 35:6, 35:15, 35:22, 36:5, 36:10, 37:4, 37:20, 38:1, 38:12, 39:17, 40:1, 40:4,

40:6, 40:8, 40:18, 41:4, 50:19, 54:23, 55:11, 56:9, 60:22, 62:3, 62:15, 65:20, 68:8, 68:21, 68:23, 79:10, 79:24, 80:6, 91:23, 119:3

**fahie** [3] - 31:23, 41:8, 73:1

**FAHIE** [1] - 1:6

**Fahie's** [9] - 12:6, 12:9, 17:15, 23:22, 25:24, 41:5, 61:12, 65:18, 80:10

**fail** [1] - 89:13

**fair** [16] - 9:18, 10:8, 13:8, 17:24, 24:14, 24:20, 52:11, 53:5, 53:16, 54:5, 54:17, 55:4, 55:17, 56:4, 56:15, 57:7

**false** [2] - 38:4, 38:19

**familiar** [22] - 16:9, 19:13, 20:7, 25:17, 26:20, 50:18, 50:22, 93:11, 93:13, 94:14, 96:12, 98:15, 99:9, 103:6, 104:8, 104:16, 105:9, 108:13, 112:4, 113:11, 115:7, 115:10

**family** [1] - 25:24

**Faraday** [1] - 101:6

**fast** [6] - 30:11, 30:20, 31:18, 33:16, 33:17, 33:18

**FBI** [1] - 89:24

**fear** [1] - 44:19

**features** [1] - 107:8

**February** [2] - 72:4, 98:23

**Fed** [1] - 64:14

**Federal** [2] - 83:3, 116:20

**fees** [1] - 16:4

**fellow** [2] - 68:3, 76:24

**female** [2] - 11:23, 79:20

**few** [8] - 7:25, 28:11, 28:24, 52:17, 60:16, 60:18, 78:8, 87:1

**fiction** [1] - 14:23

**Field** [4] - 49:9, 49:10, 49:16, 49:19

**fifteen** [4] - 21:16, 34:2, 82:1, 87:23

**fifty** [1] - 95:15

**figure** [1] - 9:24

**file** [10] - 103:6, 103:8,

103:9, 103:18, 104:1, 104:2, 104:5, 108:10, 114:11, 118:14

**FILED** [1] - 120:8

**files** [7] - 93:22, 103:10, 104:7, 104:12, 108:13, 111:12

**final** [2] - 95:15, 118:16

**fine** [2] - 51:3, 118:20

**fingerprint** [4] - 106:10, 106:11, 106:18, 106:19

**finishes** [1] - 106:16

**first** [23] - 10:19, 10:20, 10:24, 11:1, 11:2, 12:15, 12:17, 12:22, 13:2, 13:14, 17:21, 18:14, 18:25, 22:9, 48:20, 49:14, 51:22, 70:19, 71:19, 91:2, 97:3, 100:18, 111:7

**FIRST** [1] - 119:5

**firsthand** [1] - 11:11

**fit** [1] - 38:2

**five** [4] - 32:11, 45:6, 93:3, 114:3

**FL** [1] - 1:18

**flew** [3] - 59:5, 59:6, 59:9

**flight** [3] - 18:17, 40:14, 48:5

**flights** [1] - 40:24

**flip** [6] - 13:13, 51:22, 53:19, 54:20, 64:9, 65:2

**floor** [1] - 117:12

**Florida** [2] - 49:23, 92:13

**FLORIDA** [1] - 1:2

**fly** [1] - 7:10

**focus** [1] - 43:24

**focusing** [10] - 42:10, 42:18, 44:14, 45:5, 45:21, 47:7, 48:10, 50:6, 77:23, 100:18

**folder** [1] - 108:13

**folders** [2] - 113:9, 113:11

**folks** [6] - 70:17, 71:1, 71:11, 72:9, 76:7, 76:10

**follow** [5] - 4:3, 26:23, 79:7, 101:19, 103:3

**followed** [2] - 6:25, 79:23

**following** [4] - 51:8,

59:11, 82:21, 87:25

**footages** [1] - 27:1

**FOR** [9] - 1:12, 1:14, 2:15, 3:2, 3:13, 4:2, 4:10, 4:25, 5:19

**Force** [1] - 70:14

**force** [7] - 8:7, 27:2, 112:6, 112:7, 112:8, 112:19, 112:21

**forcing** [1] - 112:4

**foregoing** [1] - 120:3

**foreign** [5] - 20:10, 20:17, 72:17, 73:4, 118:5

**Foreign** [7] - 83:9, 83:16, 83:20, 84:13, 85:22, 87:1, 118:2

**Forensic** [2] - 92:11, 97:3

**forensic** [21] - 61:19, 92:14, 92:25, 93:4, 93:6, 93:7, 93:8, 93:11, 93:13, 94:11, 96:10, 96:12, 96:18, 98:19, 99:3, 99:17, 99:24, 100:11, 106:22, 112:16, 115:6

**forensically** [1] - 93:17

**Forensics** [1] - 97:8

**forensics** [2] - 102:17, 103:4

**forgot** [1] - 79:7

**form** [1] - 106:11

**format** [1] - 67:18

**formerly** [1] - 73:1

**forth** [3] - 18:1, 103:24, 105:19

**forward** [1] - 30:11

**four** [5] - 4:15, 83:7, 98:25, 113:2, 113:3

**free** [2] - 43:2, 43:19

**fresh** [1] - 117:4

**friend** [6] - 23:13, 23:16, 23:19, 23:22

**front** [12] - 2:20, 12:20, 51:22, 64:23, 65:8, 65:16, 83:3, 108:3, 110:20, 111:17, 114:9, 114:15

**fulfill** [1] - 29:15

**full** [8] - 2:1, 103:6, 103:8, 103:9, 103:18, 103:21, 103:25, 114:11

**fun** [1] - 117:3

**function** [1] - 57:15

**Fundamentals** [1] -

97:3
**funded** [1] - 27:19
**funds** [1] - 90:18
**funny** [1] - 30:6
**future** [1] - 30:14

## G

**gain** [2] - 103:15, 104:5
**Galaxy** [2] - 63:13, 64:6
**galloping** [1] - 84:23
**gaps** [1] - 89:23
**gate** [1] - 11:17
**gender** [1] - 45:11
**general** [5] - 8:13, 83:20, 87:5, 87:7, 99:4
**generally** [4] - 30:18, 30:23, 31:2, 31:8
**generate** [1] - 17:19
**gentleman** [3] - 27:21, 27:24, 29:19
**gentleman's** [2] - 10:16, 10:18
**gentlemen** [4] - 78:21, 84:19, 102:1, 116:10
**gentlemen's** [1] - 91:25
**Gerarde** [3] - 1:12, 68:4, 85:7
**GERARDE** [9] - 49:1, 49:4, 49:6, 51:7, 51:15, 51:18, 66:9, 118:23, 119:4
**gerarde** [1] - 85:12
**gigabytes** [1] - 109:11
**gigs** [2] - 109:13, 110:16
**given** [10] - 17:1, 90:13, 91:3, 91:9, 91:14, 91:21, 91:22, 106:5, 106:11, 112:17
**God** [1] - 11:23
**Godson** [1] - 43:17
**Google** [1] - 86:2
**governed** [1] - 72:12
**Government** [12] - 15:1, 19:10, 19:13, 48:25, 49:1, 51:8, 81:23, 92:4, 92:5, 108:7, 109:19, 118:9
**government** [1] - 19:12
**Government's** [72] - 2:12, 4:14, 4:23, 12:17, 12:24, 32:20, 42:2, 42:10, 42:17,

43:23, 44:14, 45:1, 45:21, 47:6, 51:12, 51:13, 51:14, 54:8, 54:20, 54:21, 55:6, 55:18, 55:20, 55:21, 56:3, 56:6, 56:7, 56:15, 56:18, 56:19, 61:7, 62:7, 62:10, 62:13, 63:1, 63:8, 63:9, 63:12, 63:24, 63:25, 64:3, 64:8, 65:2, 65:3, 65:4, 65:10, 65:12, 65:14, 65:18, 65:19, 66:1, 66:16, 107:1, 107:10, 108:2, 108:24, 109:7, 109:24, 110:19, 111:1, 111:11, 111:12, 111:17, 111:24, 113:15, 113:17, 113:25, 114:3, 115:1, 115:4, 115:14, 115:17
**Governments** [1] - 55:9
**Governor** [2] - 72:21, 73:11
**GPS** [1] - 93:9
**gray** [1] - 63:14
**Graykey** [17] - 99:9, 99:11, 99:12, 99:15, 99:19, 99:20, 100:4, 101:23, 102:4, 105:1, 110:6, 110:7, 110:8, 110:10, 110:17, 110:18, 111:3
**great** [3] - 101:23, 117:3
**green** [1] - 5:4
**group** [2] - 116:19, 116:22
**guy** [1] - 21:20
**guys** [3] - 30:12, 30:17, 32:1

## H

**half** [1] - 83:7
**hand** [2] - 71:16, 78:13
**handle** [1] - 85:13
**handled** [1] - 25:4
**handles** [1] - 24:25
**hands** [1] - 94:25
**hands-on** [1] - 94:25
**harbor** [1] - 17:1
**hardware** [6] - 94:15, 101:16, 101:17,

103:2
**hash** [2] - 106:9, 106:10
**head** [1] - 19:8
**headed** [1] - 2:8
**heading** [1] - 12:3
**hear** [1] - 102:16
**heard** [1] - 12:16
**hearing** [1] - 81:19
**hearings** [2] - 118:19, 118:22
**held** [1] - 58:15
**HELD** [1] - 1:9
**helped** [2] - 61:24, 74:13
**hereby** [1] - 120:3
**hiccups** [1] - 8:23
**hidden** [5] - 38:18, 103:11, 104:7, 104:14, 104:21
**himself** [3] - 26:15, 26:18, 91:16
**hold** [1] - 62:8
**holding** [2] - 3:22, 79:13
**home** [3] - 25:24, 44:23, 116:16
**Homeland** [2] - 76:8, 92:20
**Homestead** [1] - 92:13
**Honor** [16] - 2:6, 23:12, 41:17, 49:4, 51:15, 78:19, 79:6, 85:15, 86:11, 97:11, 108:6, 109:3, 113:24, 117:22, 118:1, 119:5
**HONORABLE** [1] - 1:9
**hot** [1] - 114:18
**hotel** [3] - 7:5, 27:1, 44:8
**hours** [11] - 9:8, 9:11, 9:13, 9:15, 17:2, 23:21, 40:9, 59:9, 95:16, 96:6, 110:2
**house** [1] - 19:11
**HSI** [1] - 89:24
**human** [1] - 93:20
**hundred** [2] - 21:5, 109:11
**hundreds** [3] - 9:13, 28:17

## I

**idea** [1] - 43:4
**identification** [5] - 81:22, 108:2, 108:11, 111:11, 113:8

**identifies** [1] - 114:25
**identify** [3] - 64:24, 65:9, 65:16
**identifying** [4] - 38:13, 38:16, 39:9, 107:8
**Illinois** [1] - 99:17
**IMEI** [2] - 114:24, 114:25
**immediate** [1] - 73:21
**immediately** [1] - 12:1
**Immigration** [1] - 18:21
**important** [4] - 8:21, 90:8, 90:10, 100:24
**importation** [2] - 41:25, 42:24
**imported** [1] - 33:13
**improvisation** [1] - 9:3
**improvise** [3] - 8:24, 9:19, 9:25
**IN** [1] - 119:8
**INAUDIBLE** [1] - 97:5
**Incident** [1] - 97:6
**include** [7] - 49:21, 50:3, 61:5, 93:7, 97:2, 99:3, 103:10
**included** [2] - 51:25, 53:11
**incoming** [1] - 115:25
**incomplete** [1] - 52:6
**INDICATES** [3] - 5:6, 5:10, 110:23
**indicating** [1] - 37:15
**individual** [5] - 27:12, 28:7, 29:12, 29:15, 69:21
**individuals** [4] - 25:11, 65:23, 74:11, 80:2
**industry** [4] - 94:12, 96:10, 96:19, 98:19
**influence** [2] - 101:20, 102:8
**informant** [32] - 2:8, 6:14, 6:16, 10:8, 19:20, 44:1, 47:18, 52:1, 52:17, 53:12, 53:23, 54:12, 54:24, 55:12, 55:24, 56:10, 56:22, 58:21, 58:22, 58:24, 59:3, 59:17, 60:2, 60:7, 60:9, 60:11, 71:12, 74:18, 88:14, 90:9, 90:16, 91:11
**information** [10] - 66:22, 67:18, 67:21, 86:3, 87:5, 87:7, 87:14, 87:20, 88:5,

113:21
**ingest** [1] - 105:13
**ingested** [1] - 106:12
**ingesting** [1] - 105:12
**initial** [2] - 70:23, 71:1
**inquire** [1] - 46:6
**inquired** [2] - 35:11, 35:12
**inquiring** [3] - 30:25, 31:1, 38:14
**inquiry** [1] - 41:5
**inside** [4] - 4:13, 38:18, 39:1, 39:2
**inspection** [4] - 15:18, 15:22, 16:1, 43:22
**instances** [1] - 12:16
**instructed** [1] - 13:17
**instruction** [1] - 117:24
**instructions** [3] - 101:19, 117:18, 118:16
**interact** [1] - 98:7
**interaction** [1] - 89:10
**interesting** [1] - 116:21
**international** [4] - 77:19, 77:23, 77:25, 78:1
**interview** [4] - 25:16, 71:12, 80:4, 80:12
**investigation** [22] - 3:9, 20:8, 46:20, 50:8, 50:18, 50:22, 51:2, 52:2, 60:3, 62:18, 66:6, 70:6, 70:11, 72:9, 72:11, 74:13, 89:20, 90:13, 90:14, 90:22, 90:23
**investigations** [7] - 49:22, 50:4, 75:19, 77:12, 77:15, 77:22
**investigative** [3] - 26:24, 89:22, 89:25
**investigators** [1] - 67:19
**involve** [2] - 77:19, 77:21
**involved** [12] - 10:20, 10:22, 11:1, 11:3, 11:6, 12:15, 13:2, 14:9, 51:3, 70:8, 77:22, 83:11
**involvement** [1] - 13:21
**involving** [2] - 24:13, 27:4
**IOS** [12] - 95:9, 95:12, 97:15, 97:20, 97:23, 97:24, 99:2, 100:9,

100:17, 101:24, 102:4, 102:13
**iPhone** [4] - 64:3, 65:4, 97:24, 114:16
**IRS** [1] - 89:24
**island** [11] - 14:18, 32:4, 32:24, 72:17, 72:18, 72:20, 72:22, 72:24, 73:4, 75:11, 76:6
**Islands** [32] - 13:24, 14:10, 14:16, 15:2, 15:13, 16:16, 16:21, 16:23, 17:2, 17:3, 19:16, 19:22, 20:22, 21:9, 28:4, 41:9, 41:15, 52:20, 68:17, 68:19, 72:12, 73:6, 73:9, 73:18, 73:19, 73:25, 74:3, 74:8, 75:8, 76:14, 115:13
**isolate** [4] - 100:23, 100:25, 101:3, 101:7
**isolated** [2] - 100:20, 101:12
**isolating** [1] - 101:5
**issue** [2] - 73:4, 95:8
**issues** [1] - 84:4
**item** [1] - 108:1
**itself** [1] - 109:10

## J

**jacket** [1] - 5:4
**Jet** [3] - 40:16, 40:18, 40:21
**jet** [2] - 43:7, 44:12
**job** [1] - 94:6
**joined** [1] - 99:16
**joining** [1] - 92:19
**Joyce** [1] - 1:15
**Judge** [14] - 51:15, 81:9, 83:3, 83:9, 83:16, 83:20, 83:25, 84:13, 85:5, 85:22, 87:2, 87:11, 88:8, 117:21
**JUDGE** [1] - 1:10
**Judge's** [1] - 84:6
**June** [3] - 96:23, 98:2, 112:25
**juror** [1] - 116:20
**jurors** [2] - 2:1, 79:1
**JURY** [2] - 84:21, 117:8
**jury** [28] - 2:2, 13:17, 25:10, 32:16, 32:17, 51:18, 51:20, 51:23, 53:8, 53:19, 54:8, 54:21, 55:9, 55:21,

56:7, 56:19, 61:8, 63:2, 63:25, 64:24, 65:9, 65:16, 79:2, 79:3, 85:17, 85:18, 117:11, 117:18
**Justice** [1] - 109:6

## K

**Kadeem** [30] - 14:11, 14:16, 18:7, 18:9, 18:17, 50:19, 52:4, 52:16, 52:24, 53:11, 53:14, 53:22, 54:11, 54:23, 55:2, 55:12, 55:23, 55:25, 56:10, 57:23, 64:4, 64:6, 64:11, 65:6, 66:5, 66:6, 67:3, 68:14, 80:20, 90:19
**KATHLEEN** [1] - 1:9
**keep** [3] - 59:25, 118:20, 118:25
**kept** [7] - 22:18, 60:13, 61:3, 91:11, 91:16, 110:8, 111:9
**Kevin** [1] - 1:12
**kilo** [1] - 16:4
**kilogram** [1] - 14:12
**kilograms** [11] - 13:23, 14:6, 14:17, 14:19, 15:11, 16:14, 21:9, 30:14, 33:12, 41:25, 42:24
**kilos** [2] - 14:10, 14:15
**kind** [9] - 8:21, 9:5, 20:24, 23:13, 32:21, 78:15, 99:5, 100:8, 100:16
**Kingdom** [6] - 19:17, 19:25, 20:3, 20:9, 20:16, 72:14
**knowing** [2] - 87:12, 87:19
**knowledge** [3] - 11:11, 52:11, 91:25
**known** [2] - 15:6, 18:9
**knows** [2] - 15:1, 29:6

## L

**Labs** [1] - 92:9
**lack** [5] - 71:22, 83:9, 84:13, 85:5, 88:23
**lacked** [6] - 83:16, 83:21, 83:25, 85:23, 88:15, 88:19
**ladies** [1] - 78:21, 84:19, 102:1, 116:10
**lady** [2] - 23:15, 26:20

**Lampeck** [1] - 86:14
**land** [2] - 39:19, 48:16
**language** [1] - 118:4
**lap** [2] - 5:11, 5:13
**laptop** [8] - 61:6, 62:11, 65:20, 108:20, 109:8, 109:10, 109:15, 109:23
**laptops** [1] - 93:9
**large** [1] - 113:21
**larger** [1] - 37:1
**last** [7] - 86:6, 86:10, 93:3, 95:24, 98:3, 112:13, 114:18
**lasted** [1] - 9:12
**late** [3] - 59:9, 70:9, 71:4
**latest** [1] - 107:20
**launch** [1] - 108:16
**laundering** [2] - 49:22, 77:21
**law** [32] - 3:7, 6:3, 6:14, 8:12, 19:11, 38:24, 58:2, 61:3, 61:13, 61:16, 61:24, 62:4, 62:5, 62:13, 62:20, 63:6, 63:16, 64:20, 68:3, 70:15, 71:5, 71:23, 73:20, 75:9, 75:12, 75:14, 75:16, 76:5, 76:10, 76:13, 77:9, 118:5
**Law** [1] - 118:2
**lawyer** [1] - 85:7
**lead** [5] - 27:2, 27:7, 27:9, 49:24, 89:22
**leader** [1] - 93:3
**leading** [2] - 16:8, 89:20
**leads** [1] - 6:7
**leaning** [1] - 39:4
**learned** [5] - 8:16, 8:20, 83:14, 88:18, 89:7
**least** [3] - 29:13, 40:7, 74:2
**leather** [1] - 62:12
**leave** [5] - 6:21, 12:1, 12:2, 43:2, 117:12
**leaves** [2] - 40:4, 40:5
**leaving** [1] - 77:9
**led** [1] - 12:10
**left** [5] - 2:7, 34:24, 76:17, 77:4, 88:13
**legal** [1] - 33:21
**legitimate** [1] - 40:20
**less** [1] - 28:19
**letting** [1] - 17:22, 28:3

**level** [3] - 77:12, 77:21, 103:25
**lib** [1] - 8:23
**license** [2] - 105:25, 106:2
**licenses** [1] - 106:1
**life** [2] - 24:3, 24:10
**likely** [1] - 76:24
**line** [17] - 21:16, 24:9, 26:7, 28:12, 31:6, 33:2, 34:2, 42:2, 42:15, 42:19, 45:2, 45:11, 45:13, 46:14, 48:11, 87:24, 87:25
**lines** [10] - 42:11, 42:18, 43:24, 44:15, 45:5, 45:22, 47:7, 47:10, 47:15, 82:2
**listed** [1] - 4:16
**listen** [2] - 82:16, 85:10
**listened** [2] - 22:24, 24:17
**literally** [1] - 35:6
**live** [1] - 116:16
**lives** [1] - 12:6
**living** [1] - 92:20
**load** [1] - 43:21
**loading** [1] - 11:20
**loads** [3] - 15:11, 30:14, 32:2
**lobby** [1] - 4:7
**local** [1] - 75:12
**located** [1] - 95:19
**location** [3] - 34:10, 34:14, 47:13
**lock** [4] - 25:8, 25:10, 25:14, 25:17
**Locka** [9] - 2:10, 2:20, 6:20, 6:22, 7:7, 12:3, 61:1, 68:9, 68:10
**locked** [3] - 59:25, 60:13, 118:21
**lockup** [3] - 79:11, 79:13, 80:5
**log** [4] - 115:18, 115:19, 115:22, 116:1
**logical** [7] - 104:8, 104:10, 104:16, 104:18, 104:19, 104:20, 104:21
**logs** [2] - 104:6, 106:12
**look** [6] - 62:7, 63:8, 63:12, 82:2, 84:15, 87:23
**looking** [5] - 51:21, 64:23, 102:22, 109:5, 114:7

**Lord** [1] - 15:1
**lost** [1] - 106:7
**Louie** [1] - 35:5
**Louis** [5] - 4:17, 20:23, 39:5, 39:11, 49:14
**luggage** [1] - 11:20
**lunch** [4] - 78:18, 78:22, 79:7, 80:14
**LUNCH** [1] - 78:25

## M

**Magistrate** [2] - 83:3, 87:11
**Magnet** [13] - 96:12, 96:15, 96:17, 96:20, 97:1, 97:3, 97:4, 97:6, 97:7, 98:1, 98:13, 99:22, 100:3
**magnet** [2] - 97:15, 107:15
**mail** [1] - 118:15
**main** [2] - 90:3, 94:23
**mainland** [1] - 17:8
**maintain** [3] - 59:25, 96:3, 98:5
**maintained** [2] - 62:17, 62:19
**maintains** [1] - 59:23
**Majesty** [1] - 72:20
**male** [1] - 79:19
**manner** [3] - 58:2, 58:11, 93:17
**March** [7] - 51:25, 52:15, 53:11, 53:21, 54:10, 74:15, 116:2
**mark** [3] - 5:5, 5:9, 38:13
**marked** [4] - 81:22, 108:1, 108:10, 113:8
**marking** [2] - 37:8, 37:24
**markings** [4] - 37:12, 37:14, 39:8, 39:9
**marks** [2] - 37:17, 38:16
**Martin** [3] - 27:13, 27:25, 29:20
**match** [1] - 106:19
**matter** [2] - 81:16, 120:4
**matters** [1] - 77:24
**Maynard** [120] - 6:19, 7:4, 7:13, 11:13, 13:5, 14:11, 14:12, 17:22, 17:23, 18:4, 18:6, 18:9, 18:20, 21:5, 21:15, 22:2, 22:3, 22:6, 22:8,

22:22, 23:14, 23:17, 23:18, 26:2, 26:6, 26:13, 26:17, 30:4, 30:5, 30:8, 34:23, 34:24, 35:16, 35:20, 35:21, 36:2, 36:24, 40:17, 41:4, 42:6, 42:14, 44:9, 45:4, 48:9, 48:13, 50:19, 52:1, 52:3, 52:4, 52:16, 52:23, 52:24, 53:11, 53:12, 53:13, 53:14, 53:22, 54:1, 54:2, 54:11, 54:13, 54:14, 54:24, 55:2, 55:12, 55:14, 55:23, 55:25, 56:9, 56:10, 56:11, 56:12, 56:21, 56:23, 57:23, 60:22, 60:23, 60:25, 63:4, 63:7, 63:20, 64:4, 64:7, 64:11, 65:7, 65:11, 65:13, 65:15, 66:5, 66:6, 66:7, 66:8, 66:19, 67:3, 67:8, 68:9, 68:14, 68:21, 69:1, 69:8, 69:22, 74:5, 79:10, 79:24, 80:6, 90:19, 91:9, 91:14, 91:16

**Maynard's** [11] - 13:24, 17:14, 18:15, 19:4, 19:7, 44:23, 45:10, 63:18, 67:7, 74:15, 80:20

**Maynards** [1] - 14:22

**McLaughlin** [26] - 1:13, 2:5, 2:6, 2:11, 3:12, 4:8, 4:23, 5:15, 7:19, 23:8, 25:12, 41:22, 48:22, 92:2, 92:5, 106:21, 106:25, 108:7, 109:2, 113:24, 114:5, 116:5, 116:7, 118:3, 118:10, 118:18

**mcLaughlin** [3] - 7:20, 116:8, 117:22

**mean** [13] - 20:21, 25:1, 25:18, 43:20, 67:16, 67:17, 94:4, 101:2, 102:2, 102:19, 103:16, 104:4, 110:11

**meaning** [3] - 12:6, 16:22, 24:3

**media** [3] - 86:2, 93:8, 106:5

**meet** [8] - 6:6, 6:10,

27:24, 42:8, 59:5, 59:6, 59:10, 59:11

**meeting** [73] - 6:3, 6:15, 6:19, 12:15, 12:17, 13:12, 13:14, 16:7, 17:21, 18:6, 18:14, 19:3, 21:15, 21:16, 23:19, 24:1, 26:2, 26:20, 28:6, 28:10, 29:21, 30:1, 30:4, 30:11, 34:21, 35:2, 35:15, 42:12, 42:22, 44:2, 44:20, 45:16, 47:12, 47:19, 48:12, 52:16, 52:18, 52:20, 53:24, 55:10, 58:5, 58:6, 58:8, 58:10, 58:20, 59:1, 59:3, 59:4, 59:17, 59:18, 59:19, 60:17, 73:22, 73:23, 74:5, 74:19, 74:21, 74:22, 75:1, 75:24, 76:13, 76:17, 76:18, 77:5, 77:8, 77:9, 90:19, 90:20, 90:25, 91:2, 91:10

**meetings** [18] - 16:24, 24:18, 25:24, 41:1, 57:5, 59:12, 71:5, 71:10, 73:18, 73:24, 74:14, 75:6, 75:7, 75:10, 76:4, 90:5, 90:17

**memory** [3] - 110:13, 110:16

**mention** [1] - 82:17

**mentioned** [4] - 10:13, 67:15, 82:6, 83:12

**merry** [1] - 15:3

**messages** [6] - 67:21, 93:22, 103:10, 104:6, 104:12, 105:18

**met** [8] - 6:9, 7:6, 23:15, 27:13, 42:6, 43:1, 59:17, 90:19

**methods** [1] - 101:6

**Mexican** [1] - 15:6

**Mexico** [10] - 83:12, 83:18, 84:8, 84:9, 84:10, 84:11, 87:6, 89:1, 89:3, 89:4

**mIAMI** [1] - 1:2

**Miami** [24] - 1:17, 1:18, 8:4, 24:14, 31:13, 35:17, 40:14, 48:5, 49:9, 49:10, 49:13, 49:15, 49:16, 49:19, 49:22, 59:5,

64:13, 64:15, 64:16, 69:23, 72:5, 77:18, 77:25, 95:20

**microphone** [1] - 97:9

**Microsoft** [3] - 62:11, 65:19, 107:5

**middle** [4] - 5:16, 24:6, 24:9, 65:3

**might** [3] - 83:23, 85:3, 116:16

**mind** [1] - 83:24

**mine** [2] - 95:20, 106:15

**minimum** [2] - 96:5, 98:8

**minor** [1] - 118:4

**minute** [3] - 4:9, 4:24, 5:16

**minutes** [2] - 32:11, 87:1

**misconduct** [1] - 89:6

**missed** [1] - 115:25

**mobile** [5] - 93:9, 94:3, 96:1, 97:25, 104:11

**Mobile** [1] - 97:8

**mode** [1] - 101:10

**modified** [1] - 53:2

**mom** [1] - 21:19

**moment** [10] - 9:5, 9:25, 37:13, 41:17, 47:19, 66:12, 84:19, 88:2, 88:8, 118:3

**Monday** [8] - 59:11, 59:15, 116:13, 117:4, 117:10, 117:17, 118:7, 119:6

**money** [69] - 3:22, 4:13, 5:14, 7:9, 7:10, 7:11, 7:14, 17:17, 20:20, 20:23, 21:8, 21:20, 21:21, 24:19, 26:15, 26:18, 27:11, 27:18, 28:2, 28:7, 28:23, 30:14, 30:23, 30:25, 31:1, 31:2, 31:4, 32:1, 32:3, 32:8, 32:24, 33:9, 33:10, 33:11, 33:12, 33:15, 35:5, 35:9, 35:16, 36:2, 36:6, 36:7, 36:12, 37:15, 38:11, 38:18, 39:6, 39:11, 39:19, 43:11, 44:13, 45:18, 46:2, 46:6, 47:13, 47:22, 48:1, 49:22, 69:22, 77:21, 90:14, 90:15, 90:17, 90:25, 91:2, 91:12, 91:14, 91:21

**month** [1] - 29:5

**months** [4] - 86:10, 88:21, 113:2, 113:3

**morning** [10] - 7:22, 7:24, 11:23, 43:5, 66:14, 66:15, 78:14, 117:4, 117:10, 119:7

**most** [4] - 76:24, 103:12, 103:14, 107:23

**mother** [1] - 14:11

**motions** [1] - 117:19

**move** [5] - 60:19, 92:1, 95:13, 97:17, 113:25

**moves** [2] - 51:8, 108:7

**MR** [29] - 2:6, 2:11, 3:12, 4:8, 4:23, 5:15, 7:19, 25:12, 48:22, 49:1, 49:4, 49:6, 51:7, 51:15, 51:18, 66:9, 92:2, 92:5, 106:21, 108:7, 109:2, 113:24, 114:5, 116:7, 117:22, 118:10, 118:18, 118:23, 119:4

**MS** [16] - 41:17, 41:19, 66:12, 78:19, 79:6, 88:8, 88:10, 91:18, 91:24, 106:24, 108:5, 114:2, 117:21, 117:23, 118:1, 118:25

**MSABXOY** [8] - 98:15, 98:18, 98:20, 98:23, 99:6, 99:23, 100:3, 111:10

**MSISDN** [1] - 115:2

**MSNB** [1] - 106:3

**multiple** [1] - 89:12

**must** [1] - 85:1

## N

**nailed** [1] - 16:23

**name** [13] - 4:15, 7:22, 10:13, 10:15, 10:17, 10:18, 19:2, 45:6, 45:13, 47:15, 47:18, 70:4, 70:5

**named** [1] - 26:21

**narcotics** [1] - 77:12

**National** [5] - 70:17, 71:2, 71:8, 71:10, 72:5

**national** [1] - 72:17

**natural** [1] - 10:4

**nature** [4] - 11:24,

67:22, 74:23, 77:25

**NCA** [7] - 71:23, 72:9, 75:19, 89:19, 89:21, 89:23, 90:2

**near** [1] - 118:21

**necessary** [1] - 37:20

**need** [8] - 8:23, 23:9, 67:24, 85:8, 94:13, 95:7, 99:23, 117:18

**needed** [3] - 23:7, 80:13, 85:12

**needs** [3] - 29:2, 30:8, 46:6

**Negron** [1] - 92:6

**nervous** [2] - 35:18, 35:19

**network** [7] - 100:21, 100:23, 100:25, 101:2, 101:8, 101:12, 114:25

**never** [6] - 14:15, 17:13, 24:17, 84:3, 86:12

**new** [9] - 21:20, 25:24, 107:20, 107:21, 107:22, 107:24, 107:25, 116:19, 116:22

**newest** [1] - 107:16

**next** [16] - 5:21, 5:25, 22:12, 38:21, 43:4, 46:16, 48:25, 59:13, 59:14, 59:16, 89:2, 92:4, 101:13, 102:24, 103:25, 104:22

**nice** [1] - 117:13

**night** [2] - 30:2, 35:22

**nine** [4] - 33:2, 116:13, 117:10, 119:7

**no..** [1] - 21:21

**nobody's** [2] - 31:24, 31:25

**non** [1] - 92:23

**none** [1] - 14:14

**normal** [3] - 36:22, 103:23

**normally** [2] - 34:9, 77:24

**North** [1] - 1:17

**notably** [1] - 82:24

**Note** [4] - 61:9, 65:18, 109:25, 111:16

**noted** [2] - 22:2, 22:13

**notes** [1] - 66:22

**nothing** [7] - 31:24, 31:25, 34:4, 41:19, 78:15, 83:13, 88:10

**November** [4] - 71:11, 83:7, 83:15, 92:18

**number** [12] - 8:9, 9:15, 12:19, 28:14, 29:20, 36:7, 39:22, 55:8, 77:13, 80:15, 115:3, 115:4
**Number** [1] - 1:3
**numbers** [2] - 67:23, 112:9
**numeric** [1] - 112:8

## O

**o'clock** [2] - 30:2, 78:24
**oath** [2] - 88:3, 116:24
**object** [1] - 91:24
**objection** [9] - 25:12, 51:7, 51:14, 91:18, 106:24, 108:5, 108:9, 114:1, 114:2
**observed** [1] - 74:22
**obtain** [3] - 98:6, 98:22, 99:16
**obtained** [2] - 59:20, 78:2
**obtaining** [1] - 96:25
**obviously** [5] - 17:6, 17:17, 20:9, 74:11, 81:4
**occasions** [1] - 8:9
**occupies** [1] - 72:21
**occurred** [10] - 53:11, 53:21, 54:10, 54:22, 55:10, 55:22, 56:8, 56:20, 59:12, 70:23
**October** [2] - 113:1, 114:21
**odd** [1] - 109:13
**OF** [2] - 1:2, 1:4
**offer** [1] - 106:23
**Office** [8] - 49:9, 49:11, 49:17, 49:19, 64:14, 69:3, 74:9, 74:10
**office** [5] - 61:4, 64:15, 74:8, 79:9, 79:14
**officer** [5] - 8:17, 27:2, 68:3, 92:24, 105:3
**OFFICER** [7] - 2:3, 32:14, 32:17, 79:3, 84:20, 85:18, 117:7
**Officer** [3] - 50:25, 51:19, 70:15
**officers** [1] - 71:5
**official** [1] - 19:12
**often** [1] - 77:19
**OIS** [1] - 114:11
**old** [10] - 11:18, 22:10, 22:23, 80:10, 101:8,

102:7, 102:15, 102:21, 107:22
**older** [1] - 102:16
**Oleanvine** [23] - 14:11, 18:4, 22:3, 22:5, 50:19, 52:1, 52:16, 53:12, 53:13, 53:22, 54:11, 54:23, 55:2, 55:11, 56:9, 56:21, 57:23, 60:25, 66:7, 69:22, 90:19, 91:9, 91:14
**ON** [3] - 5:6, 5:10, 110:23
**once** [19] - 5:23, 57:18, 60:14, 61:4, 64:16, 95:13, 101:12, 102:24, 104:22, 105:10, 105:15, 105:16, 105:22, 105:23, 106:4, 106:8, 106:14, 112:20
**one** [48] - 2:20, 3:15, 3:20, 4:15, 5:14, 8:20, 10:24, 14:22, 27:4, 27:7, 34:24, 36:21, 37:5, 40:17, 44:11, 45:22, 50:1, 66:19, 71:14, 71:15, 74:2, 78:22, 79:24, 79:25, 86:13, 89:13, 94:7, 94:11, 94:23, 94:24, 95:9, 97:3, 97:6, 97:7, 98:7, 98:25, 99:24, 104:11, 110:6, 110:15, 112:1, 112:18, 115:1, 116:2, 117:10
**ones** [1] - 89:17
**Opa** [9] - 2:10, 2:20, 6:20, 6:22, 7:6, 12:3, 61:1, 68:9, 68:10
**open** [2] - 58:15, 97:25
**operate** [1] - 30:20
**operating** [4] - 97:24, 97:25, 102:5, 102:8
**operation** [7] - 3:10, 6:9, 6:17, 6:18, 29:15, 30:16, 42:24
**operations** [1] - 94:6
**operatives** [1] - 15:6
**operator** [2] - 94:8, 94:24
**opinion** [2] - 55:16, 109:17
**opportunity** [6] - 23:8, 52:3, 55:1, 55:13,

85:12, 109:14
**opposed** [3] - 17:15, 68:19, 77:25
**option** [2] - 105:1, 106:14
**options** [1] - 46:7
**order** [4] - 67:24, 95:8, 95:11, 97:17
**Oscar** [1] - 10:2
**outer** [1] - 61:9
**outgoing** [2] - 115:22, 115:25
**outside** [4] - 2:16, 15:12, 37:17, 84:19
**overall** [2] - 17:18, 113:21
**overseas** [2] - 19:16, 72:13
**oversee** [1] - 20:18
**own** [4] - 21:20, 84:3, 87:16, 87:18

## P

**pack** [2] - 12:2, 38:2
**package** [1] - 38:14
**packaged** [4] - 35:13, 36:8, 36:11, 48:2
**packed** [2] - 38:7, 39:6
**packet** [1] - 118:9
**packing** [1] - 38:11
**page** [35] - 2:12, 3:14, 4:14, 4:15, 5:15, 12:22, 21:16, 22:12, 24:6, 24:9, 26:6, 28:12, 30:22, 31:6, 33:2, 39:22, 42:2, 42:10, 42:17, 43:23, 44:14, 45:1, 45:13, 46:14, 46:16, 47:6, 47:10, 48:4, 82:1, 87:23, 87:25, 115:1, 116:2
**pages** [3] - 13:8, 28:11, 115:15
**paid** [3] - 27:21, 27:24, 29:19
**pants** [1] - 2:24
**paragraph** [1] - 71:19
**parse** [8] - 97:18, 104:24, 105:1, 105:10, 105:12, 111:1, 111:3, 111:9
**parsed** [1] - 105:16
**parsing** [25] - 93:13, 93:15, 93:18, 93:25, 95:21, 98:11, 98:18, 100:7, 105:6, 105:14, 105:16, 106:6, 106:13,

106:14, 106:16, 106:17, 106:19, 106:23, 107:12, 111:6, 111:16, 111:22, 113:4, 113:6
**parsings** [3] - 94:19, 94:22, 100:13
**part** [10] - 13:14, 14:4, 17:14, 39:14, 51:5, 83:12, 86:20, 86:22, 87:4, 111:16
**PARTIALLY** [1] - 97:5
**participants** [3] - 51:25, 52:17, 54:10
**participate** [1] - 82:14
**participated** [2] - 24:18, 68:23
**participation** [13] - 3:18, 15:9, 17:14, 17:16, 20:7, 42:12, 42:22, 44:2, 44:20, 46:19, 47:12, 48:11, 84:9
**particular** [4] - 60:2, 74:12, 108:17, 116:2
**particularly** [2] - 81:1, 86:19
**parties** [2] - 116:16, 117:16
**partner** [9] - 57:19, 59:20, 64:17, 68:24, 69:4, 71:21, 75:5, 77:17, 87:4
**partners** [3] - 62:4, 62:20, 76:5
**partnership** [1] - 89:23
**party** [3] - 22:9, 22:23, 115:20
**pass** [7] - 66:23, 95:13, 95:14, 112:10, 112:25, 114:22, 114:23
**pass-codes** [1] - 66:23
**passage** [3] - 21:9, 28:4, 43:19
**passed** [1] - 51:18
**passport** [1] - 19:21
**passports** [1] - 20:10
**password** [5] - 103:23, 112:9, 112:15, 112:17, 113:1
**passwords** [1] - 66:23
**past** [4] - 28:7, 43:22, 87:1, 87:21
**pat** [1] - 90:8
**PATRICIA** [2] - 1:16, 120:8

106:14, 106:16, 106:17, 106:19, 106:23, 107:12, 111:6, 111:16, 111:22, 113:4, 113:6
**patricia_sanders@ flsd.uscourts.gov** [1] - 1:19
**patted** [3] - 76:21, 77:2, 77:4
**patting** [2] - 77:7, 90:4
**pay** [11] - 21:8, 22:9, 22:23, 26:3, 26:13, 26:18, 28:3, 28:7, 29:2, 29:12, 29:15
**paying** [2] - 21:20, 27:12
**payment** [3] - 91:6, 91:8, 91:10
**PD** [1] - 8:5
**penny** [2] - 28:18, 28:19
**people** [10] - 18:18, 25:14, 40:23, 71:23, 72:5, 75:17, 79:17, 116:15, 116:19, 116:22
**percentage** [1] - 17:17
**perfect** [1] - 34:6
**perfecting** [1] - 9:14
**performance** [1] - 10:2
**period** [5] - 17:2, 32:22, 34:25, 36:5, 87:16
**permission** [1] - 114:5
**permitted** [1] - 116:23
**person** [9] - 19:2, 45:6, 62:24, 63:18, 66:2, 72:21, 78:11, 80:24, 118:19
**personal** [2] - 91:25, 109:23
**personally** [1] - 77:2
**personnel** [1] - 70:15
**phase** [3] - 6:9, 6:17, 6:18
**phone** [94] - 18:7, 35:6, 37:12, 51:24, 52:12, 53:10, 53:13, 53:24, 53:25, 54:1, 54:9, 54:13, 54:17, 54:23, 55:23, 55:25, 56:9, 56:11, 56:21, 57:5, 57:12, 57:15, 57:22, 57:25, 58:11, 61:6, 61:9, 61:11, 61:12, 61:13, 61:16, 61:18, 63:4, 63:10, 63:13, 64:6, 64:9, 65:2, 65:3, 65:10, 65:12, 65:13, 65:14, 65:19, 67:11, 67:18, 67:24, 69:16, 69:18, 71:12, 75:6, 80:20,

100:20, 100:21, 100:23, 100:25, 101:3, 101:5, 101:12, 102:7, 102:8, 102:12, 102:15, 102:18, 102:19, 102:22, 104:13, 105:18, 110:3, 110:8, 111:10, 111:19, 111:23, 112:2, 112:3, 112:4, 112:6, 112:8, 112:11, 112:17, 112:23, 112:25, 113:4, 113:18, 113:22, 114:9, 114:14, 114:21, 114:22, 115:3, 115:4

**phones** [21] - 50:10, 50:11, 50:12, 63:15, 63:16, 63:20, 64:10, 64:18, 64:20, 64:24, 65:5, 65:6, 65:9, 66:19, 67:2, 67:7, 67:8, 67:15, 73:14, 93:9, 102:16

**phonetic** [1] - 86:14

**photograph** [2] - 47:22, 66:5

**photographs** [1] - 4:19

**photos** [1] - 67:21

**physical** [4] - 75:6, 95:2, 103:10, 113:7

**physically** [3] - 69:7, 73:17, 104:14

**pick** [7] - 7:4, 11:15, 43:4, 44:7, 44:9, 58:19, 88:13

**picked** [1] - 7:6

**picture** [4] - 20:23, 23:3, 36:7, 37:11

**pictures** [5] - 37:16, 93:22, 102:22, 103:11, 104:6

**pilot** [5] - 3:4, 3:6, 9:5, 38:22, 38:24

**pilot's** [1] - 3:8

**pin** [1] - 70:20

**place** [9] - 12:5, 15:12, 52:19, 52:20, 60:1, 74:15, 75:24, 75:25, 116:5

**placed** [5] - 58:22, 66:16, 80:3, 80:4, 80:12

**places** [2] - 30:24, 101:10

**plan** [6] - 14:4, 15:10,

16:2, 24:20, 32:3

**plane** [16] - 4:12, 4:21, 4:22, 5:20, 7:9, 20:22, 36:3, 36:13, 37:14, 39:1, 39:2, 39:3, 39:18, 40:12, 44:10, 48:15

**planning** [2] - 30:13, 42:25

**platonic** [1] - 23:24

**play** [1] - 8:21

**played** [2] - 89:23, 90:3

**PLAYED** [7] - 2:15, 3:2, 3:13, 4:2, 4:10, 4:25, 5:19

**playing** [6] - 2:8, 3:10, 3:12, 4:8, 4:23, 15:5

**plays** [1] - 70:8

**plus** [3] - 32:11, 98:7, 109:11

**point** [27] - 2:16, 2:19, 2:25, 3:8, 3:21, 3:25, 4:3, 4:11, 4:21, 5:11, 7:16, 11:6, 11:22, 12:1, 12:10, 14:22, 15:9, 18:6, 19:20, 32:2, 32:6, 34:24, 35:5, 43:2, 43:10, 107:1, 117:20

**Police** [1] - 73:6

**police** [3] - 25:15, 25:18, 25:19

**policy** [2] - 72:17, 73:4

**political** [1] - 25:4

**politically** [1] - 28:24

**port** [4] - 16:19, 42:3, 66:7, 91:9

**portion** [5] - 18:24, 19:10, 21:24, 28:15, 118:2

**ports** [3] - 16:21, 16:22, 41:24

**posed** [3] - 82:8, 88:2, 88:3

**position** [2] - 72:21, 92:10

**positive** [4] - 15:13, 15:15, 15:17, 15:20

**possible** [2] - 103:18, 112:19

**post** [1] - 66:22

**post-it** [1] - 66:22

**power** [4] - 101:14, 101:16, 103:1, 110:12

**practicals** [1] - 99:1

**practice** [5] - 10:3, 77:10, 77:11, 81:8, 90:6

**practices** [5] - 8:17, 79:16, 79:19, 79:23, 81:7

**precautions** [1] - 30:9

**precise** [1] - 28:18

**predecessor** [1] - 41:6

**predetermined** [1] - 8:22

**prefer** [1] - 105:4

**preferred** [1] - 32:7

**prejudging** [1] - 117:18

**Premier** [4] - 41:8, 41:14, 72:24, 91:23

**preparation** [1] - 84:15

**prepared** [2] - 117:16, 117:20

**preparing** [1] - 51:3

**prerequisites** [2] - 94:7, 95:7

**presence** [3] - 57:22, 59:21, 75:9

**present** [5] - 17:22, 21:15, 21:17, 73:20, 81:9

**presented** [2] - 15:20, 44:13

**preservation** [1] - 59:21

**preserved** [6] - 50:12, 57:19, 59:20, 62:15, 67:25

**preserving** [1] - 50:3

**pretty** [7] - 24:6, 75:12, 93:19, 103:9, 104:13, 112:7, 115:3

**principles** [1] - 8:13

**print** [1] - 106:12

**prisoner** [2] - 79:19, 79:20

**Pro** [2] - 62:11, 65:20

**problems** [1] - 84:5

**proceed** [3] - 49:4, 82:20, 106:25

**proceedings** [1] - 120:4

**proceeds** [1] - 18:24

**process** [22] - 15:18, 15:23, 16:4, 16:5, 51:5, 61:19, 61:21, 68:2, 77:7, 86:1, 93:16, 95:6, 95:11, 100:18, 100:20, 101:13, 102:25, 103:21, 106:6, 112:13, 112:23

**processing** [1] - 69:17

**profit** [4] - 31:5, 33:10, 33:11, 33:12

**profits** [1] - 17:18

**pronoun** [1] - 45:11

**property** [1] - 61:2

**proposition** [1] - 83:20

**protected** [1] - 62:12

**Protection** [4] - 76:9, 92:9, 92:15, 92:19

**protective** [2] - 61:10, 63:11

**provide** [6] - 94:16, 96:10, 97:15, 97:17, 99:20, 102:3

**provided** [9] - 57:18, 63:16, 74:17, 81:23, 88:5, 90:15, 90:16, 90:18, 90:25

**provides** [1] - 95:17

**prudent** [1] - 117:19

**publish** [5] - 2:11, 109:2, 114:5, 114:6, 115:14

**publishing** [1] - 5:18

**Puerto** [8] - 15:24, 17:4, 17:6, 17:8, 31:13, 31:14, 31:17

**punching** [1] - 67:23

**pure** [1] - 14:23

**purpose** [7] - 3:8, 6:15, 7:3, 7:8, 21:13, 43:14, 91:5

**purposes** [4] - 33:19, 76:3, 111:12, 113:13

**pursuant** [1] - 110:24

**put** [8] - 22:18, 28:11, 32:21, 75:5, 79:11, 79:24, 118:23

**putting** [1] - 37:19

**Q**

**questioned** [1] - 87:21

**questioning** [1] - 24:13

**questions** [34] - 7:19, 7:25, 23:9, 23:10, 29:20, 29:24, 30:12, 33:23, 35:8, 35:12, 36:7, 41:24, 43:13, 43:15, 44:5, 44:23, 45:16, 45:18, 46:1, 47:3, 47:21, 48:1, 48:14, 48:22, 66:9, 76:1, 87:14, 92:2, 95:12, 95:14, 95:15, 97:18, 99:3, 99:4

**Quintero** [2] - 10:13, 70:2

**R**

**RAC** [2] - 74:9, 74:10

**radiological** [1] - 92:23

**raise** [1] - 78:13

**raised** [2] - 87:14, 88:4

**raw** [1] - 93:16

**reach** [1] - 20:1

**reaches** [1] - 31:16

**read** [7] - 22:20, 23:5, 29:10, 33:6, 37:9, 82:4, 93:20

**reader** [1] - 105:8

**readily** [1] - 58:23

**reading** [1] - 82:10

**ready** [2] - 86:8, 117:4

**real** [6] - 10:16, 10:18, 14:14, 14:19, 14:24, 40:20

**realize** [3] - 16:8, 17:13, 22:24

**really** [3] - 24:20, 40:18, 116:21

**realm** [1] - 99:17

**reason** [3] - 24:12, 88:2, 110:8

**receive** [2] - 17:24, 50:6

**received** [4] - 50:8, 50:14, 51:4, 64:17

**receiving** [1] - 96:7

**recently** [1] - 81:20

**RECESS** [3] - 32:15, 78:25, 119:8

**recess** [1] - 78:18

**recitation** [1] - 78:10

**recognize** [12] - 5:1, 66:2, 107:2, 107:6, 108:25, 109:24, 110:1, 110:2, 110:19, 111:12, 111:17, 111:21

**recollection** [11] - 21:14, 28:9, 33:25, 37:21, 39:20, 71:17, 71:20, 81:15, 82:5, 82:11, 89:15

**record** [8] - 2:11, 5:16, 10:16, 57:16, 58:10, 58:15, 81:23, 115:1

**RECORD** [7] - 2:15, 3:2, 3:13, 4:2, 4:10, 4:25, 5:19

**recorded** [3] - 54:18, 57:14, 58:11

**recording** [46] - 2:8, 12:16, 28:15, 51:24, 52:3, 52:6, 52:12,

52:15, 53:10, 53:17, 53:21, 54:5, 54:9, 54:22, 55:1, 55:5, 55:10, 55:17, 55:22, 56:3, 56:4, 56:8, 56:15, 56:16, 56:20, 57:2, 57:4, 57:5, 57:13, 57:17, 57:18, 58:14, 58:24, 59:1, 59:20, 59:23, 60:2, 60:7, 73:21, 75:2, 76:19, 89:9, 89:12, 89:14, 89:16, 90:10
**recordings** [25] - 11:8, 21:2, 21:12, 24:17, 25:23, 50:9, 50:12, 50:14, 50:17, 51:4, 51:6, 53:1, 57:4, 57:7, 57:8, 57:9, 58:3, 58:8, 58:9, 59:15, 73:15, 73:17, 89:17
**records** [2] - 25:21, 26:25
**recovered** [1] - 113:1
**recovery** [1] - 111:22
**red** [4] - 64:3, 65:4, 111:20, 114:9
**redirect** [3] - 41:22, 85:13, 88:12
**refer** [2] - 67:4, 67:17
**reference** [2] - 28:8, 33:9
**referenced** [2] - 45:13, 47:15
**referred** [5] - 10:5, 18:12, 39:9, 45:6, 70:1
**referring** [25] - 3:19, 3:21, 16:12, 18:3, 21:24, 25:15, 26:10, 33:11, 35:19, 35:21, 36:12, 36:19, 36:23, 37:11, 42:13, 42:23, 44:3, 44:21, 44:22, 46:19, 47:11, 48:12, 61:7, 69:4, 108:10
**refile** [1] - 118:11
**reflect** [2] - 115:22, 115:24
**reflected** [3] - 114:13, 114:24, 115:17
**reflection** [9] - 53:6, 53:17, 54:5, 54:17, 55:5, 55:17, 56:4, 56:16, 57:1
**refresh** [6] - 21:14, 28:9, 33:25, 37:21, 39:20, 81:14
**refreshes** [4] - 71:16,

71:20, 82:5, 82:11
**regarding** [3] - 87:13, 94:21, 113:14
**regular** [1] - 72:8
**relating** [1] - 31:4
**relation** [1] - 86:12
**relations** [2] - 20:10, 20:17
**relationship** [1] - 23:24
**relative** [4] - 20:4, 28:3, 32:1, 37:1
**reliability** [4] - 81:10, 82:6, 82:12, 82:25
**remain** [1] - 62:5
**remained** [1] - 75:3
**remember** [3] - 12:19, 39:2, 84:2
**remotely** [1] - 101:1
**removing** [1] - 101:8
**renew** [1] - 106:2
**renews** [1] - 96:2
**repeat** [3] - 9:23, 86:24, 87:22
**repeatable** [1] - 29:4
**report** [9] - 71:16, 71:21, 105:20, 105:22, 105:23, 106:2, 106:3, 106:12, 114:8
**REPORTED** [1] - 1:16
**Reporter** [1] - 1:17
**reporting** [1] - 18:23
**reports** [3] - 113:14, 113:17, 113:20
**represent** [1] - 7:23
**representative** [2] - 71:8, 72:20
**request** [3] - 62:1, 105:7, 111:8
**requestors** [1] - 105:23
**requests** [1] - 105:8
**required** [4] - 50:5, 94:5, 103:2, 106:1
**requirements** [1] - 99:5
**requiring** [1] - 105:24
**research** [3] - 84:17, 100:21, 117:2
**respects** [1] - 72:13
**respond** [2] - 26:12, 38:4
**responds** [10] - 22:8, 26:12, 28:16, 28:22, 29:6, 31:20, 33:4, 34:5, 38:1, 40:8
**Response** [1] - 97:6
**responsibilities** [3] - 49:20, 50:2, 50:3

**rest** [1] - 29:15
**restaurant** [1] - 74:22
**rested** [1] - 117:4
**resume** [1] - 117:5
**retain** [1] - 90:2
**retrieve** [1] - 63:6
**retrieved** [3] - 61:13, 62:21, 63:7
**return** [1] - 17:13
**returned** [1] - 61:4
**review** [15] - 51:5, 52:3, 53:5, 53:16, 54:4, 54:16, 55:1, 55:4, 55:13, 55:16, 56:2, 56:14, 56:25, 109:14, 109:17
**reviewed** [14] - 11:8, 50:14, 52:9, 52:21, 52:23, 53:13, 54:1, 54:13, 55:25, 56:11, 56:23, 57:9, 81:20, 109:16
**reviewing** [1] - 50:17
**Rico** [8] - 15:24, 17:4, 17:6, 17:8, 31:13, 31:14, 31:17
**rise** [7] - 2:3, 32:14, 32:17, 79:3, 84:20, 85:18, 117:7
**Road** [1] - 42:5
**road** [1] - 12:5
**roberto** [1] - 31:11
**Roberto** [45] - 2:9, 2:18, 3:15, 3:19, 10:5, 10:13, 11:15, 11:22, 12:5, 13:5, 18:4, 21:19, 21:24, 24:12, 26:12, 28:12, 28:17, 28:20, 28:23, 29:1, 29:4, 29:8, 31:9, 31:13, 31:18, 31:21, 34:1, 34:3, 34:6, 34:20, 35:3, 35:22, 36:17, 36:18, 36:23, 37:5, 39:25, 40:3, 40:5, 40:7, 40:9, 43:1, 43:7, 43:18, 70:1
**role** [9] - 3:8, 3:10, 10:22, 10:23, 13:3, 73:9, 89:19, 89:23, 90:3
**roles** [1] - 30:13
**room** [5] - 25:16, 34:23, 80:4, 80:13, 118:25
**rooms** [1] - 117:11
**rough** [1] - 9:11
**routinely** [1] - 100:3
**Roxanne** [25] - 6:19,

7:4, 7:13, 23:2, 23:13, 23:15, 23:22, 24:3, 24:7, 24:13, 24:18, 25:4, 34:23, 35:16, 35:20, 36:2, 44:5, 44:9, 44:22, 48:9, 48:13, 50:20, 69:2, 69:8
**RPR** [2] - 1:16, 120:8
**Rule** [1] - 106:23
**ruling** [1] - 89:7
**run** [2] - 19:25, 73:3

## S

**S9** [1] - 64:6
**safe** [3] - 17:1, 21:8, 28:4
**safety** [2] - 74:18, 75:13
**Saint** [14] - 27:13, 27:25, 29:20, 49:14, 64:12, 64:14, 68:14, 68:17, 74:9, 74:15, 74:17, 76:7, 76:24, 91:12
**sale** [1] - 13:23
**Samsung** [6] - 61:9, 63:13, 64:6, 65:3, 65:18, 109:25
**Sanders** [1] - 51:19
**SANDERS** [3] - 1:16, 120:6, 120:8
**santorufo** [1] - 116:11
**Santorufo** [1] - 51:19
**saw** [2] - 11:25, 20:24
**scenario** [11] - 10:14, 10:21, 15:5, 15:16, 15:19, 15:25, 17:11, 27:18, 36:1, 43:17, 69:22
**schedule** [1] - 116:11
**scheduled** [2] - 59:5, 59:11
**scheduling** [1] - 116:12
**scheme** [1] - 41:25
**school** [2] - 99:8, 101:9
**Scientific** [1] - 92:9
**SCREEN** [3] - 5:6, 5:10, 110:23
**screen** [7] - 5:9, 64:23, 65:8, 65:16, 102:22, 108:3, 110:20
**script** [1] - 8:22
**scrolling** [2] - 102:21, 104:13
**Sean** [1] - 1:13

**search** [9] - 64:17, 67:4, 78:2, 80:20, 84:16, 86:2, 108:23, 109:6, 112:10
**searched** [6] - 64:16, 64:19, 64:21, 67:11, 86:5, 112:2
**seated** [5] - 2:4, 32:18, 79:4, 84:22, 85:19
**second** [13] - 3:21, 4:24, 6:9, 6:17, 6:18, 57:16, 63:10, 65:12, 87:25, 90:24, 91:20, 91:22, 97:4
**secondary** [1] - 69:1
**seconds** [3] - 2:22, 4:9, 5:16
**secret** [1] - 36:14
**section** [1] - 38:3
**secured** [2] - 59:25, 60:13
**security** [5] - 20:10, 20:17, 72:17, 73:3, 74:18
**Security** [2] - 76:8, 92:20
**SECURITY** [7] - 2:3, 32:14, 32:17, 79:3, 84:20, 85:18, 117:7
**see** [43] - 2:22, 3:3, 3:14, 4:15, 5:7, 12:8, 12:9, 12:24, 13:10, 21:22, 22:5, 24:10, 24:22, 26:7, 26:15, 33:4, 37:7, 37:14, 37:23, 37:24, 38:6, 38:7, 39:4, 43:11, 44:19, 46:16, 47:15, 66:17, 71:16, 71:19, 78:24, 104:14, 105:17, 105:24, 108:2, 108:10, 113:9, 114:11, 115:2, 117:3, 119:6
**seeing** [1] - 39:2
**seem** [1] - 109:22
**sees** [2] - 11:22, 37:14
**seize** [2] - 69:18, 69:20
**seized** [5] - 50:10, 50:11, 63:10, 63:16, 64:11, 65:6, 65:22, 66:19, 66:23, 67:3, 67:8
**select** [2] - 105:6, 112:20
**selecting** [1] - 101:20
**sell** [1] - 14:16
**send** [2] - 31:13, 118:14

**sending** [2] - 14:19, 15:2
**Senegal** [1] - 27:21
**sentencing** [4] - 86:19, 86:20, 86:23, 87:3
**separate** [7] - 51:16, 79:16, 79:19, 79:25, 80:2, 80:6
**September** [2] - 70:22, 71:4
**sequence** [1] - 112:14
**series** [4] - 45:17, 47:3, 47:21, 48:1
**serve** [1] - 8:17
**served** [3] - 27:2, 49:14, 92:21
**Services** [1] - 92:9
**session** [1] - 116:12
**set** [3] - 19:14, 60:13, 106:15
**seven** [3] - 31:7, 45:6, 55:8
**several** [3] - 9:12, 77:18, 77:19
**shirt** [1] - 2:24
**shock** [1] - 84:23
**shortly** [1] - 10:21
**show** [7] - 3:15, 3:23, 7:9, 7:11, 43:7, 63:25, 81:22
**showed** [5] - 4:19, 7:13, 36:6, 47:22, 68:4
**showing** [10] - 4:12, 4:14, 4:18, 42:2, 63:1, 66:1, 108:1, 108:24, 111:11, 113:8
**shown** [5] - 35:5, 39:10, 39:15, 60:9, 63:23
**shows** [1] - 10:1
**sic** [1] - 75:4
**sic)** [2] - 24:25, 95:2
**side** [14] - 13:9, 13:11, 13:17, 14:2, 14:9, 14:14, 14:22, 17:15, 18:15, 19:11, 73:10, 75:8, 117:11, 118:20
**signed** [1] - 80:25
**signing** [1] - 31:25
**silently** [1] - 82:4
**SIM** [2] - 101:8, 101:9
**similar** [1] - 93:2
**similarly** [1] - 67:10
**Sinaloa** [1] - 15:7
**single** [1] - 102:18
**situation** [3] - 9:6, 10:2, 87:5

**six** [4] - 54:20, 86:10, 88:21, 114:4
**size** [1] - 37:2
**skills** [1] - 9:14
**small** [3] - 12:10, 12:14, 80:1
**smaller** [4] - 36:21, 36:22, 37:1
**Smith** [2] - 19:3, 19:6
**SMS** [2] - 104:6, 104:12
**smuggling** [1] - 33:18
**soft** [1] - 97:10
**software** [12] - 94:14, 101:15, 101:19, 103:3, 105:17, 107:24, 108:17, 108:18, 110:9, 110:17, 111:24, 113:4
**sold** [1] - 14:20
**sole** [1] - 90:10
**someone** [5] - 10:1, 19:10, 40:11, 58:23, 75:17
**sometimes** [5] - 9:21, 10:4, 18:9, 107:20
**somewhere** [1] - 4:7
**son** [6] - 11:13, 18:7, 18:17, 18:20, 45:10, 66:7
**soon** [1] - 34:3
**sorry** [3] - 21:1, 29:23, 114:23
**sort** [3] - 84:8, 96:3, 105:20
**sound** [1] - 58:20
**sounds** [2] - 25:10, 118:18
**source** [36] - 10:9, 50:23, 57:8, 57:10, 57:13, 57:14, 58:9, 58:10, 59:5, 75:2, 75:3, 77:8, 77:17, 81:4, 81:8, 82:9, 82:25, 83:9, 83:11, 83:15, 83:24, 84:13, 87:13, 87:15, 87:20, 88:5, 90:5, 90:12, 90:13, 90:18, 90:25, 91:3, 91:15, 91:20, 91:22, 97:25
**source's** [4] - 81:10, 82:6, 82:12, 82:18
**sourced** [2] - 87:15, 87:20
**sOUTHERN** [1] - 1:2
**speaker** [4] - 42:18, 44:16, 45:3, 45:22, 46:14, 47:8, 57:15

**SPEAKER** [1] - 119:5
**speaking** [5] - 2:25, 19:19, 26:6, 39:23, 58:23
**Special** [20] - 27:8, 49:1, 49:7, 63:23, 64:23, 66:14, 68:6, 69:4, 70:7, 70:14, 70:16, 71:7, 71:23, 81:2, 81:12, 85:21, 86:16, 88:10, 88:13
**special** [5] - 49:8, 49:12, 49:16, 61:7, 82:1
**specialized** [1] - 93:24
**specific** [9] - 41:24, 71:17, 90:16, 90:17, 94:15, 99:20, 103:22, 107:23, 112:7
**specifically** [5] - 8:13, 31:1, 31:2, 39:18, 102:21
**specifics** [1] - 20:19
**speech** [1] - 58:19
**spent** [1] - 110:2
**split** [1] - 22:15
**spoken** [1] - 97:10
**spot** [1] - 114:18
**spur** [1] - 9:5
**St** [1] - 60:24
**staffed** [1] - 74:10
**stage** [1] - 95:15
**stages** [1] - 72:11
**standard** [2] - 77:9, 77:11
**standing** [1] - 5:4
**stands** [1] - 97:24
**start** [10] - 22:19, 26:13, 28:12, 34:1, 39:23, 51:21, 92:17, 114:7, 114:18, 116:13
**started** [3] - 10:23, 12:2, 26:9, 70:11, 112:25
**starting** [3] - 30:6, 45:2, 63:2
**starts** [3] - 26:6, 30:1, 30:12
**state** [1] - 103:22
**statement** [1] - 36:24
**states** [1] - 3:15
**STATES** [4] - 1:1, 1:4, 1:10, 1:12
**States** [10] - 1:17, 15:1, 17:6, 17:9, 33:13, 83:13, 86:13, 89:2, 119:3, 119:4
**station** [3] - 25:15,

25:18, 25:19
**stationed** [1] - 92:12
**stations** [1] - 110:15
**stay** [2] - 4:6, 64:20
**stayed** [1] - 4:7
**step** [8] - 48:23, 84:19, 92:3, 100:19, 101:13, 102:25, 104:23, 117:10
**Stephan** [8] - 18:7, 18:9, 22:19, 45:8, 45:9, 45:15, 67:3
**steps** [2] - 103:3, 106:6
**stick** [2] - 83:23, 84:1
**still** [4] - 3:14, 5:15, 8:1, 110:16
**stings** [1] - 77:20
**stopped** [1] - 2:22
**storage** [1] - 106:5
**stored** [3] - 103:17, 106:5, 110:14
**story** [1] - 16:9
**straight** [1] - 31:17
**strange** [1] - 46:2
**strategic** [1] - 42:24
**street** [2] - 77:12, 77:21
**stuff** [3] - 24:25, 37:16, 119:1
**submit** [2] - 117:24, 118:1
**submitted** [2] - 82:24, 118:9
**submitter** [1] - 106:5
**submitter's** [1] - 111:8
**submitting** [1] - 105:2
**subpoena** [1] - 26:25
**subsequent** [1] - 89:5
**substance** [2] - 15:13, 16:12
**substantially** [1] - 113:21
**suggested** [1] - 118:2
**suggestion** [2] - 32:3, 33:3
**suggestions** [1] - 32:23
**suitcase** [4] - 37:2, 38:2, 38:3, 38:9
**suitcases** [5] - 37:13, 37:14, 37:15, 37:18, 39:8
**Suite** [1] - 1:17
**Suites** [1] - 7:2
**sum** [3] - 17:16, 21:2, 27:11
**support** [7] - 82:24, 102:3, 102:4, 102:17, 102:19,

103:21, 107:23
**supported** [2] - 102:12, 112:18
**supports** [1] - 112:19
**suppose** [2] - 16:22, 116:6
**supposed** [12] - 9:4, 17:1, 17:8, 17:16, 17:23, 18:16, 18:25, 19:7, 20:21, 21:2, 21:5, 27:12
**surface** [1] - 107:5
**Surface** [2] - 62:11, 65:20
**surveil** [1] - 75:22
**surveillance** [4] - 6:25, 27:1, 74:17, 76:13
**surveilled** [1] - 74:19
**surveilling** [3] - 74:21, 75:9, 75:18
**Sustained** [1] - 91:19
**sustained** [1] - 92:1
**swear** [1] - 78:14
**switching** [1] - 28:15
**SWORN** [2] - 49:3, 92:7
**sworn** [2] - 78:11, 78:13
**Sylvester** [9] - 50:20, 69:2, 69:8, 69:10, 69:19, 69:21, 79:11, 80:3, 80:4
**system** [15] - 97:24, 97:25, 101:7, 101:15, 102:6, 102:8, 103:1, 103:6, 103:8, 103:9, 104:1, 104:2, 104:5, 110:14, 114:11

---

## T

**tab** [6] - 12:22, 51:22, 54:7, 54:20, 55:8, 55:20
**table** [1] - 74:22
**tablet** [1] - 107:5
**TAKEN** [2] - 32:15, 78:25
**tampered** [1] - 106:7
**tape** [1] - 31:6
**tapes** [6] - 10:24, 11:2, 11:8, 11:12, 18:10, 22:25, 25:20, 25:21
**targets** [1] - 89:11
**tarmac** [1] - 4:4
**task** [3] - 8:7, 27:2, 111:22
**Task** [1] - 70:14

**Tattoo** [1] - 47:18
**team** [3] - 69:1, 93:3, 93:4
**techniques** [1] - 8:16
**telephone** [2] - 50:9, 57:14
**telephonic** [1] - 71:22
**ten** [2] - 26:7, 98:8
**term** [11] - 3:23, 25:17, 42:11, 42:21, 44:1, 48:11, 71:23, 93:11, 93:13, 104:16, 112:4
**terminal** [1] - 2:21
**terms** [7] - 9:19, 11:1, 14:23, 32:23, 34:16, 73:17, 86:4
**territory** [2] - 19:17, 72:13
**test** [11] - 14:2, 14:14, 15:10, 15:13, 15:15, 15:16, 15:20, 16:18, 17:14, 24:20, 97:12
**testified** [13] - 8:12, 9:2, 21:7, 27:8, 27:11, 41:8, 72:8, 74:7, 78:2, 79:8, 97:20, 99:22
**testify** [1] - 83:3
**testifying** [2] - 25:12, 81:16
**testimony** [15] - 10:19, 11:7, 12:8, 21:1, 21:10, 27:14, 28:2, 37:17, 67:2, 80:17, 83:6, 87:11, 89:5, 106:23
**tethering** [1] - 114:18
**text** [2] - 67:21, 93:22
**THE** [83] - 1:9, 1:12, 1:14, 2:1, 2:4, 2:14, 2:15, 3:2, 3:13, 4:2, 4:10, 4:25, 5:19, 7:20, 23:7, 23:12, 25:13, 32:11, 32:16, 32:18, 41:18, 41:21, 41:22, 48:23, 48:24, 48:25, 49:5, 51:12, 51:17, 51:19, 66:11, 66:13, 77:1, 77:3, 78:17, 78:21, 79:1, 79:4, 81:25, 82:16, 82:19, 82:20, 84:18, 84:22, 85:15, 85:17, 85:19, 86:6, 86:8, 86:10, 86:11, 86:21, 86:24, 86:25, 87:4, 87:7, 87:9, 87:10, 88:9, 88:12, 91:19, 92:1, 92:3, 97:9, 97:11, 106:25,

108:9, 109:4, 114:1, 114:3, 114:6, 116:5, 116:8, 117:9, 117:13, 117:14, 117:16, 117:25, 118:7, 118:13, 118:19, 119:2, 119:6
**themselves** [2] - 94:25, 96:11
**theory** [1] - 117:23
**there..** [1] - 37:24
**thereafter** [1] - 42:8
**Theresa** [2] - 1:14, 7:22
**thinking** [2] - 22:17, 87:16
**thinks** [1] - 85:8
**third** [3] - 65:13, 97:6, 115:20
**Thomas** [11] - 60:24, 64:12, 64:14, 68:14, 68:17, 74:9, 74:15, 74:17, 76:7, 76:24, 91:12
**thorough** [3] - 59:19, 103:12, 103:14
**thoroughly** [1] - 91:13
**thousand** [1] - 41:25
**thousands** [2] - 100:12, 100:15
**three** [18] - 34:17, 34:20, 36:1, 39:3, 40:9, 63:15, 64:18, 64:24, 65:9, 65:22, 67:2, 83:7, 92:16, 94:6, 95:7, 95:16, 98:25, 116:14
**throughout** [3] - 62:17, 70:1, 70:5
**timeframe** [2] - 86:6, 88:18
**title** [1] - 19:9
**today** [4] - 11:7, 49:25, 89:18, 102:13
**together** [3] - 25:7, 26:14, 86:1
**tomorrow** [2] - 116:12, 118:19
**took** [12] - 7:9, 51:5, 52:20, 61:3, 62:3, 74:15, 75:24, 75:25, 80:14, 87:4, 95:25, 110:16
**tool** [30] - 95:1, 96:12, 98:10, 99:9, 99:12, 99:18, 100:21, 101:14, 101:21, 102:9, 102:19, 105:2, 105:6, 105:13, 105:14,

106:13, 106:19, 107:9, 107:14, 110:5, 110:9, 110:18, 111:5, 111:9, 111:24, 112:20, 112:21, 112:22, 113:4, 113:6
**tools** [16] - 94:16, 94:19, 94:21, 98:19, 99:24, 99:25, 100:1, 100:2, 100:11, 100:16, 102:17, 102:24, 103:21, 106:1, 110:9, 112:18
**top** [6] - 3:3, 34:1, 36:17, 45:2, 45:5, 87:24
**Tortola** [13] - 7:10, 35:17, 35:23, 36:3, 39:19, 40:2, 40:12, 40:14, 59:1, 59:4, 69:23, 75:25, 76:3
**total** [1] - 27:17
**towards** [3] - 5:15, 12:3, 70:12
**tower** [2] - 18:18, 101:4
**towers** [1] - 105:18
**Town** [1] - 42:5
**traceable** [1] - 46:17
**tracking** [1] - 118:4
**traffickers** [1] - 33:24
**trafficking** [3] - 15:6, 49:21, 77:20
**train** [2] - 8:24, 100:1
**trained** [2] - 99:13, 99:18
**training** [6] - 8:12, 9:8, 9:9, 93:24, 95:17, 99:15
**transcript** [37] - 2:12, 8:2, 12:17, 13:8, 13:13, 22:2, 22:5, 28:10, 29:17, 30:22, 32:20, 39:21, 51:24, 52:9, 52:15, 52:21, 52:23, 53:10, 53:16, 53:21, 54:4, 54:9, 54:16, 54:22, 55:2, 55:10, 55:13, 55:16, 55:22, 56:2, 56:4, 56:8, 56:14, 56:20, 56:25, 57:1
**transcription** [1] - 120:4
**transcripts** [7] - 51:3, 51:16, 53:2, 57:9, 70:1, 82:2, 89:17
**transfer** [3] - 18:16, 18:25, 24:14

**transferred** [1] - 49:15
**transpired** [1] - 11:11
**transported** [5] - 20:21, 32:24, 33:16, 69:2, 76:5
**travel** [2] - 40:12, 75:20
**traveled** [1] - 71:4
**traveling** [1] - 7:3
**trial** [5] - 67:19, 86:9, 113:13, 116:10, 116:11
**TRIAL** [1] - 1:9
**trip** [1] - 36:6
**true** [1] - 70:4
**trust** [2] - 24:3, 24:10
**trusted** [1] - 75:18
**truth** [3] - 78:14, 78:15
**try** [3] - 20:15, 112:10, 112:20
**trying** [4] - 46:6, 70:20, 91:7, 112:16
**tuning** [1] - 51:3
**turn** [9] - 12:22, 52:14, 53:8, 54:7, 55:8, 55:20, 56:6, 56:18, 82:1
**TV** [1] - 10:1
**tweaking** [1] - 118:8
**tweaks** [1] - 118:2
**twelve** [2] - 42:17, 43:24
**two** [16] - 4:15, 6:15, 16:24, 21:5, 22:15, 26:20, 36:17, 45:13, 45:22, 57:4, 95:9, 95:25, 96:2, 98:4, 109:11, 118:19
**type** [4] - 9:5, 58:13, 104:11, 109:17
**types** [5] - 57:4, 77:22, 103:4

## U

**U.S** [12] - 68:17, 73:19, 73:20, 74:2, 74:8, 75:9, 75:14, 76:10, 76:14, 76:17, 92:21, 92:22
**UK** [12] - 19:25, 41:5, 70:17, 71:2, 71:4, 71:5, 71:23, 72:12, 72:17, 73:10, 75:16, 76:15
**under** [9] - 12:22, 73:11, 80:12, 88:3, 106:23, 108:22, 108:23, 112:2, 112:3
**undercover** [15] -

8:10, 8:14, 8:17, 8:21, 9:9, 9:14, 9:19, 10:14, 10:21, 10:23, 13:3, 20:16, 26:23, 30:13, 46:3
**Undercover** [1] - 50:25
**undergo** [1] - 96:3
**understood** [2] - 23:4, 117:21
**undertaken** [1] - 67:20
**undertook** [1] - 61:21
**unfortunately** [1] - 80:1
**unidentified** [1] - 52:17
**unintelligible** [3] - 22:13, 34:8, 39:24
**UNITED** [3] - 1:1, 1:4, 1:12
**uNITED** [1] - 1:10
**United** [16] - 1:17, 15:1, 17:6, 17:9, 19:17, 19:25, 20:3, 20:9, 20:16, 33:13, 72:13, 83:13, 86:13, 89:2, 119:3, 119:4
**up** [38] - 5:4, 7:4, 7:6, 9:4, 9:5, 11:15, 11:17, 12:2, 16:8, 19:14, 22:10, 24:25, 25:1, 25:8, 25:10, 25:14, 25:17, 26:24, 27:17, 29:25, 34:1, 38:7, 43:4, 44:7, 44:9, 47:18, 48:20, 58:19, 60:13, 60:14, 62:8, 64:20, 73:4, 79:7, 86:13, 88:13, 118:22, 119:2
**upside** [1] - 20:24
**useable** [1] - 67:18
**uses** [5] - 3:23, 42:11, 42:15, 44:1, 44:18, 48:10
**utilizing** [2] - 100:10, 100:13

## V

**value** [2] - 61:18, 62:14
**VAN** [16] - 41:17, 41:19, 66:12, 78:19, 79:6, 88:8, 88:10, 91:18, 91:24, 106:24, 108:5, 114:2, 117:21, 117:23, 118:1, 118:25

**Van** [17] - 1:14, 7:21, 7:22, 32:19, 41:23, 43:13, 44:5, 45:16, 47:21, 48:14, 78:17, 79:5, 85:4, 85:20, 88:13, 89:19, 90:4
**variety** [1] - 33:21
**various** [5] - 8:16, 8:17, 73:14, 80:21, 115:7
**vehicle** [2] - 2:16, 11:20
**vendor** [4] - 94:15, 98:18, 105:9, 107:22
**vendors** [4] - 94:11, 96:9, 96:18, 101:22
**verification** [1] - 38:12
**verified** [1] - 106:9
**verifies** [1] - 106:16
**verify** [3] - 12:12, 106:15, 106:20
**version** [5] - 107:16, 107:20, 107:22, 107:24, 107:25
**versions** [1] - 118:12
**versus** [2] - 86:14, 89:15
**vessel** [1] - 43:21
**vessels** [1] - 30:20
**veto** [1] - 90:2
**via** [2] - 36:3, 67:4
**video** [8] - 2:23, 5:1, 5:7, 20:24, 39:4, 43:10, 50:9, 89:9
**VIDEOTAPE** [7] - 2:15, 3:2, 3:13, 4:2, 4:10, 4:25, 5:19
**viewer** [3] - 106:3, 106:4
**Virgin** [32] - 13:24, 14:10, 14:15, 15:2, 15:12, 16:16, 16:20, 16:23, 17:2, 17:3, 19:16, 19:21, 20:22, 21:9, 28:4, 41:9, 41:14, 52:20, 68:17, 68:19, 72:12, 73:6, 73:9, 73:18, 73:19, 73:25, 74:2, 74:8, 75:8, 76:14, 115:13
**visually** [1] - 74:21
**Vliet** [17] - 1:14, 7:21, 7:23, 32:19, 41:23, 43:13, 44:5, 45:16, 47:21, 48:14, 78:17, 79:5, 85:4, 85:20, 88:13, 89:19, 90:4
**VLIET** [16] - 41:17, 41:19, 66:12, 78:19, 79:6, 88:8, 88:10,

91:18, 91:24, 106:24, 108:5, 114:2, 117:21, 117:23, 118:1, 118:25
**VM** [1] - 108:16
**voices** [2] - 50:18, 50:23
**vs** [1] - 1:5
**Vuitton** [5] - 4:17, 20:23, 35:5, 39:5, 39:11

## W

**Wade** [1] - 19:2
**wait** [1] - 117:11
**waited** [1] - 6:2
**walk** [3] - 3:11, 77:25
**walks** [1] - 10:1
**wants** [3] - 21:20, 22:20, 26:14
**ware** [1] - 108:16
**warrant** [4] - 64:17, 67:5, 82:24, 112:3
**warrants** [2] - 78:2, 80:20
**waters** [1] - 34:4
**ways** [2] - 33:5, 34:16
**weapons** [1] - 90:12
**wearing** [2] - 2:24, 5:4
**webinars** [2] - 96:9, 99:8
**website** [1] - 40:23
**week** [2] - 11:7, 116:10
**weekend** [3] - 59:15, 117:3, 117:13
**weeks** [1] - 9:12
**welcome** [1] - 41:21
**Weston** [4] - 61:4, 69:2, 79:10, 80:1
**whatnot** [1] - 73:14
**wheels** [1] - 37:6
**whole** [2] - 78:14, 102:18
**wife** [3] - 12:6, 12:9
**wifi** [2] - 101:11, 105:19
**William** [1] - 92:6
**WILLIAMS** [1] - 1:9
**wiped** [1] - 101:1
**wisdom** [1] - 24:13
**wish** [1] - 118:20
**Witek** [10] - 27:8, 49:2, 49:7, 61:7, 63:23, 64:23, 66:14, 85:21, 88:11, 88:13
**WITNESS** [19] - 5:6, 5:10, 23:12, 41:21,

48:24, 49:3, 77:3, 82:19, 85:15, 86:8, 86:11, 86:24, 87:4, 87:9, 92:7, 97:11, 110:23, 117:13, 117:15
**witness** [3] - 48:25, 92:4, 106:22
**woman** [1] - 12:13
**word** [1] - 42:15
**words** [2] - 13:11, 44:18
**workers** [1] - 26:13
**works** [1] - 40:25
**workspace** [1] - 60:14
**world** [1] - 102:18
**worthy** [1] - 10:2
**written** [3] - 78:10, 80:17, 87:13
**wrote** [1] - 71:21

## X

**XO** [3] - 40:16, 40:18, 40:21

## Y

**year** [7] - 11:17, 28:25, 86:6, 98:8, 102:15, 106:2
**years** [14] - 9:9, 9:14, 10:3, 77:13, 78:7, 80:15, 83:7, 83:8, 88:25, 92:16, 93:3, 95:25, 98:4, 112:14
**yesterday** [1] - 2:7
**yourself** [6] - 5:1, 13:5, 30:13, 34:20, 55:14, 71:24
**yourselves** [1] - 32:12